IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
BREVARD DIVISION
CASE NO.: _____ -CV-_____

| | |
|---|---|
| DMARCIAN, INC. | |
| Plaintiff, | |
| v. | COMPLAINT |
| DMARCIAN EUROPE BV | |
| Defendant. | |

Plaintiff dmarcian, Inc. ("Plaintiff" or "dmarcian Inc.") alleges as an action against dmarcian Europe BV, a Dutch private company ("Defendant" or "dmarcian BV" or "BV") as follows:

## NATURE OF THE ACTION

1.      This Eleven Count Complaint is an action for preliminary and permanent injunctive relief and monetary damages for (i) breach of written contract, (ii) alternatively, breach of oral contract, (iii) copyright infringement in violation of Title 17 United States Code, (iv) infringement of a Federally Registered Trademark in violation of §32 of the Lanham Trademark Act of 1946 (the "Lanham Act"), as amended, 15 U.S.C. Section 1051 *et seq*.; (v) the use of false designations of origin in violation of §43(a) of the Lanham Act, 15 U.S.C. § 1125; (vi) defamation; (vii) misappropriation of trade secrets; (viii) computer trespass; (ix) tortious interference with contract; (x) tortious interference with prospective economic advantage; and (vi) unfair or deceptive business practices in violation of N.C. Gen. Stat. §75-1.1.

Case 1:21-cv-00067-MR   Document 1   Filed 03/12/21   Page 1 of 41

2.     Plaintiff is the owner of a software product that provide email validation to customers to protect their accounts from phishing attacks (described in greater detail below). Defendant is a business partner who has hijacked Plaintiff's business as part of efforts to separate European operations from Plaintiff's operations.  In doing so, Defendant has engaged in multiple and brazen infringements of Plaintiff's intellectual property rights and has embarked on a scheme to deceive customers to move from Plaintiff's platform to Defendant's platform by: cloning the content and appearance of Plaintiff's website; using Plaintiff's trademarks; falsely advertising Plaintiff's executives and employees as ongoing members of Defendant's team to falsely bolster Defendant's apparent expertise; and misrepresenting to customers that there was a data breach in order to induce them to shift away from Plaintiff's platform to Defendant's platform.  Absent emergent relief to protect Plaintiff's intellectual property and business, continued conduct by Defendant will result in total destruction of Plaintiff's brand, business and reputation.

## THE PARTIES, JURISDICTION, AND VENUE

3.     Plaintiff dmarcian, Inc. is a Delaware corporation formed in 2014 with principal place of business in Brevard, North Carolina.

4.     Plaintiff alleges that at all times relevant herein, Defendant dmarcian Europe BV is a Dutch private company with offices at 3311 JG Dordrecht, Burgemeester de Raadtsingel 93, enrolled at the Netherlands Chamber of Commerce, number 57518793.

5.     This Court has exclusive subject matter jurisdiction over this action pursuant to 17 U.S.C. §101 et seq., and 28 U.S.C. §§ 1331, 1338(a), 1338(b) and 1367(a), pursuant to the Lanham Act, 15 U.S.C. §§ 1114, 1121 and 1125, and under the supplemental jurisdiction of the Lanham Act, among other things.

6.     This Court has supplemental jurisdiction over the State law claims asserted herein because they form part of the same case and controversy as the claims arising under Federal law.

2

7.     This Court has personal jurisdiction over dmarcian Europe BV on several grounds. The Defendant has contracted with Plaintiff within this state, the contract and agreements at issue herein have a substantial connection to this state, and Defendant has created continuing obligations between itself and the residents of this forum.  In addition, the contract's negotiations, contemplated future consequences of the parties' agreement, the terms of the contract and the parties' actual course of dealing (including without limitation a substantial part of the contract's performance necessarily occurs and is based in, and emanates from North Carolina, and Defendant's representatives have visited Plaintiff's offices in North Carolina for training and planning purposes under said agreement) establish that the parties' agreement has a substantial connection with North Carolina so that jurisdiction exercised over Defendant in this Court is consistent with Due Process.

8.     Further, the source code at issue in this dispute, while maintained on a cloud-based platform, is owned, controlled and maintained by Plaintiff from its North Carolina offices, and all customer relationships Defendant enjoyed/profited from using the Plaintiff's source code are maintained and serviced from Plaintiff's North Carolina-based principal place of business.

9.     Further, most if not all financial transactions (customers paying for the use of the Plaintiff-owned software) run through Plaintiff's North Carolina office and internal computer infrastructure and software systems.

10.     Simply put, Defendant could not and cannot possibly realize the ill-gotten gains from its infringing activities and contract breaches without the services and work on all such transactions coming from and flowing through Plaintiff's North Carolina office.

11.     The following diagram illustrates that all transactions at issue with Defendant necessarily and integrally involve, and cannot exist without Plaintiff's North Carolina-based foundational support and maintenance.  The top row lists customer activities after the customer takes action in response to the first marketing hit, through the trial period, and then final sign up and payment.  The second row outlines Plaintiff's indispensable involvement in providing all

3

marketing worldwide and capturing customer leads (all of which, *worldwide,* come through and are developed, established, routed but permanently maintained from Plaintiff's North Carolina office) and Plaintiff's continuing North Carolina-based customer maintenance activities. And the third row outlines, once Plaintiff routes BV customer leads to BV in Europe, BV's first involvement—on the back end--after such routing.



12.     Plaintiff's customer base includes multinational companies which have a presence in both Europe and the United States. Defendant's misuse of Plaintiff's brand and IP to service such customers in Europe necessarily and adversely impacts Plaintiff's relationships with those same customers in the United States.

13.     Venue is proper in this district because, among other reasons, under 28 U.S.C. §1391(c)(3) a defendant not resident in the United States may be sued in any judicial district. See also *In re HTC Corporation*, 888 F.3d 1349 (2018).

## FACTUAL ALLEGATIONS

### I.  DMARC, and Pioneering Development by Tim Draegen

14.     Plaintiff is a leading technology company in DMARC email protection products and services.

15.     DMARC, which stands for "Domain-based Message Authentication, Reporting & Conformance," is an email authentication policy and reporting protocol.  It is essentially an email validation system that vests organizations with greater control over their email channels, and it protects their brands from being used in phishing[1] attacks.

16.     Ubiquitous, untrustworthy email solicitations that appear to come from—but are not from—valid, legitimate organizational sites tarnish that organization's brand and reputation.

17.     Thus, implementation of a DMARC service is invaluable to a company that seeks to prevent use and abuse of its valid domain by others to launch such cyber-attacks.

18.     The native XML format in which DMARC data is transmitted is not intended for human consumption.

19.     Plaintiff's predecessor provided DMARC services since the DMARC specification's 2012 inception.

20.     Plaintiff's DMARC SaaS[2] platform receives, processes and classifies mail observed from its customers' domain namespaces and makes sense of such data for its customers.  Plaintiff's platform visualizes the data in powerful and meaningful ways so its customers can quickly identify authentication gaps (SPF/DKIM) and unauthorized use of their domains.

---

[1] "Phishing" involves the use of deceptive emails that appear to be (but is actually not) from an organization's valid domain/website to gather personal information.

[2] "SaaS," which stands for "Software as a Service," is a cloud-based service that runs a software application (like dmarcian's platform) through an internet browser, as opposed to the user downloading for use the software to a desktop computer or business network.

5

21.     In addition to aggregating DMARC data, Plaintiff's platform provides domain administration teams with the necessary features to adopt DMARC with clarity.  The dmarcian reporting platform sits atop a very accurate source classification engine and affords users with assurances of the true origin of a particular mail stream.

22.     From small governmental organizations to Fortune 500 companies, Plaintiff dmarcian, Inc. has an international track record for helping organizations across the globe and of all sizes successfully deploy DMARC.

23.     Plaintiff's former Chief Executive Officer, Tim Draegen, was a primary author of DMARC and, among other things, wrote the Outbound Deployment Guide for a non-profit DMARC advocacy group called OTA (Online Trust Alliance) in late 2012.

24.     Until recently, Plaintiff was owned and operated by Tim Draegen and his wife, Shannon Draegen.  Recently, Tim Draegen—who owns a majority interest in the Defendant--stepped down as CEO of Plaintiff.  Shannon Draegen is now the Plaintiff's CEO.

25.     One might say that Tim Draegen is the father of the DMARC interoperability standard and convention.  He pioneered its development and worldwide implementation.  And this work and reputation is exactly why a Dutch gentleman named Martijn Groeneweg, who ultimately partnered with Draegen to form the Defendant (as outlined below), reached out to and connected with Draegen to do DMARC business together.

26.     While at Cisco Systems as a Standards Engineer during 2007-2008, Tim Draegen conceptualized what is now known as the DMARC email authentication model.  From late 2009 until DMARC was made public in early 2012, Tim worked on DMARC's core design team, from concept to specification, from prototyping to proving the technology through production deployment among top US financial institutions.

6

27.     In partnership with the Financial Services Roundtable (now known as the Bank Policy Institute or BPI), in February 2013, Tim co-authored the seminal "Email Authentication Policy and Deployment Strategy for Financial Services Firms".

28.     To facilitate worldwide adoption of DMARC, from late 2011 to early 2013, Tim chaired the Online Trust Alliance's Email Authentication Committee (now a part of The Internet Society), authoring documents such as the "OTA Deployment Guide - Outbound Email Authentication" and earning the "Online Trust Alliance's Member of the Year" in October of 2012.

29.     Recognizing that great technology still requires dedicated advocacy and professional support, Tim founded dmarcian.com in early 2012 to provide DMARC tools and services to organizations of all sizes across the globe.

30.     Tim then worked to grow the company without outside investment, traveled when needed to advocate and educate regarding DMARC, formed partnerships with non-profit technology advocacy groups, and continued to marshal the technology as Chair of the Internet Engineering Task Force's DMARC Working Group from 2014-2019.  Tim's professional work and dmarcian's established brand has resulted in a steady stream of business without the need for traditional outbound or "cold calling" sales strategies.

3031.  Prior to doing business with Plaintiff, Defendant and its sponsors had no commercial DMARC experience whatsoever.

## II. __The Contract__

32.     In or about 2015, Plaintiff and Mr. Groeneweg started talking about a way that they could do business together.  Mr. Groeneweg had a small company consulting regarding email marketing, not involving DMARC.

33.     Mr. Groeneweg initiated contact with Plaintiff when he reached out directly to Mr. Draegen at Plaintiff's North Carolina home office and, through a series of email and text messages, and over several months, Plaintiff and Defendant (with Mr. Groeneweg forming Defendant for the purpose of entering into the agreement discussed herein), in or around January 2016, entered into

7

a contract (the "Contract") that included, among others, the following key points:

(a)     A new entity would be created in the Netherlands in order to promote dmarcian products and services in the EU.

(b)     Messrs. Groeneweg and Draegen would split ownership of the entity with Draegen having controlling ownership.[3]  Draegen agreed to this part-ownership in order to incentivize Groeneweg to help expand DMARC throughout the European Union ("EU").

(c)     Once Plaintiff fielded new customer inquiries from around the world, Plaintiff would route such appropriate customers to the Dutch entity who would best benefit from a point of contact closer to the customer for sales and service, although all aspects of operations, technical support and platform maintenance were fully owned and controlled by Plaintiff.

(d)     Plaintiff granted the Defendant the right to offer and sell Plaintiff's products and services.

(e)     Plaintiff would continue developing, supplying, and operating the DMARC SaaS services, products, and technology for all customers from its North Carolina home office.

(f)     Plaintiff would manage from North Carolina all email domains, manage combined information technology services, and would supply sales leads to Defendant.

(g)     Initially, Plaintiff provided its proprietary DMARC source code to Defendant for continued product and software development efforts by a group of Bulgarian developers, and in exchange, Defendant agreed that all original and newly-developed products, software, copyrights, trade secrets, intellectual property, and technical development would continue to be owned by (with IP rights from developed products accruing to) Plaintiff, and would be assigned to and owned by Plaintiff.  After some time of operation, Defendant was able to fund continued development (after subsidies from Plaintiff in the form of foregone license fees) and as further consideration for the assignment back to Plaintiff of the IP rights, Plaintiff agreed to continue not to charge Defendant licensing fees (which Defendant clearly had the

---

[3] Plaintiff's CEO, Mr. Draegen, owns a majority of the equity in Defendant.

ability to pay).

        (h)    dmarcian Inc. also agreed to provide the BV with all operational costs and functions including business development until the BV could self-sustain (i.e., Defendant would be 100% subsidized by Plaintiff until the Defendant was able to contribute to development costs which did not occur until early 2017).

    34.    In fact, once the parties agreed to these concepts, the following occurred:

        (a)    Defendant was formed using an existing Dutch legal entity partially owned by Groeneweg.

        (b)    Messrs. Groeneweg and Tim Draegen eventually split ownership of the newly formed entity with Draegen having controlling ownership as follows:

        i.    Tim Draegen owns 50.01% of Defendant

        ii.    The Digital Xpedition Holding B.V. ("TDX") is a 49.99% shareholder of Defendant

        iii.    Individuals Martin Groeneweg and Herwert Kalkman each own 50% of TDX.

        (c)    The Plaintiff fielded all leads in North Carolina and routed certain leads to the Dutch entity (the Defendant) which began serving customers in the European Union, Russia and Africa that Plaintiff.

        (d)    Plaintiff continued developing, supplying, and operating the DMARC SaaS services, products, and technology from its North Carolina home location.

        (e)    Plaintiff managed from North Carolina all email domains, managed and combined information technology services, and supplied a steady stream of sales leads to Defendant, on which Defendant capitalized.

        (f)    And, as planned, rather than paying royalties to Plaintiff, Defendant's contribution was to fund further development of Plaintiff's source code, including *inter alia* efforts by a group of Bulgarian developers with the understanding that all such work product of Defendant

9

and/or the Bulgarian developers was to be assigned to and belong to Plaintiff.

III. **The Breach**

35.    However, eventually, Defendant betrayed Plaintiff.

36.    Prior to December 2019, Defendant and the Bulgarian developers made changes to the Code on Plaintiff's servers in the US in a manner that was integrated with changes being made by the US Team and Plaintiff thereby controlled and had possession of all such source code.  Commencing in or around December 2019, and continuing up to the present, Defendant began asserting for the first time in the parties' relationship that new code developed by Defendant's employees and the Bulgarian developers belonged to BV and not Plaintiff. Defendant's assertions triggered a conversation between Plaintiff and Defendant about needing a formal assignment of any such development work consistent with the original agreement. When Plaintiff made that request, Defendant, through Groenewig, refused.

37.    Defendant refused to remedy the breach unless the minority shareholder TDX which is 50% owned by the only managing director and sole member of the Defendant's Board—received a buyout offer from Plaintiff or its principals.

38.    Defendant used Plaintiff's products, software, copyrights, trade secrets, intellectual property, and technology for years with no payments required to be made Plaintiff based on the Defendant's  agreement to assign  any intellectual property rights to Plaintiff. Defendant's refusal to acknowledge Plaintiff's intellectual property rights in all such work product by Defendant and the Bulgarian Developer in December of 2019 and its refusal to abide by the agreement and assign the work to Plaintiff resulted in absolutely no consideration whatsoever being paid to Plaintiff for Plaintiff's contributions to the agreement.

39.    Worse, Defendant began an intricate plan.  As described below, Defendant forcibly commandeered and used the Plaintiff's source code and other intellectual to break entirely from Plaintiff's platform and operations.  Defendant stole Plaintiff's protected software code, and it created and developed websites and domains that are intentionally confusingly

10

similar to (and actually cloned) Plaintiff's unique brand and Mark (as defined below). In essence, Defendant cloned Plaintiff's business, stole and improperly implemented Plaintiff's intellectual property, capitalized on Plaintiff's global brand, and stole and misappropriated Plaintiff's trade secrets, confidential information and customer lists and database to profit exclusively on Plaintiff's assets, to Plaintiff's compete exclusion and detriment.

## IV. The Copyright

40.    Before reviewing these illegal efforts, understanding the development, establishment, and protection of Plaintiff's intellectual property rights is critical.

41.    The dmarcian products, software, intellectual property, source code, and technology (the "dmarcian Code") was authored by, and is owned by, Plaintiff, and the Plaintiff is the sole owner in all copyrights to the dmarcian Code.

42.    Other than the Contract, Defendant had no agreement with Plaintiff authorizing it to make, use, or sell, the dmarcian Code.

43.    On or about February 18, 2021, Plaintiff filed a registration claim for the dmarcian Code with the United States Copyright Office.

44.    The registration has been accepted and confirmed by the Copyright Office and it bears Registration number TX0008941559.

## V.  The Trademark

45.    Plaintiff is the owner of the federally registered trademark DMARCIAN® with Federal Trademark Registration No. 5,702,379 (sometimes referred to herein as "Plaintiff's Mark").  Plaintiff first used this trademark in 2012, and the mark has been registered with the United States Patent and Trademark Office since 2019.  (A copy of the federal registration is attached hereto as **Exhibit A).**

46.    Plaintiff's Federal Trademark Registration is current, outstanding and valid.

47.     Continuously since in or about 2012, Plaintiff has used the DMARCIAN® mark to identify its products, services and software for ensuring the security of electronic mail services and to distinguish them from those offered by others, by, among other things, prominently displaying Plaintiff's Mark on its websites, advertising, business communications, and business documents, among many other things.

48.     In addition to possessing exclusive rights to the registered DMARCIAN mark, by virtue of its use in commerce, Plaintiff also owns common law rights in the  stylized mark (collectively, with the DMARCIAN mark, the "DMARCIAN Mark"). Indeed, Plaintiff has made longstanding, continuous, and exclusive use of the DMARCIAN Mark on its website (located at <dmarcian.com>) and promotional and marketing materials in connection with the provision of its software services.

49.     Through Plaintiff's extensive use and promotion of the DMARCIAN Mark since 2012, the DMARCIAN Mark has become distinctive and famous as the indication of origin of such services.  The DMARCIAN Mark is instantly recognizable and has undoubtedly acquired valuable goodwill.

**VI. Defendant's Intentional, Deliberate, and Willful Infringement and Website Cloning**

50.     In September of 2019, following commencement of some litigation against Plaintiff and others earlier in the year, Mr. Groeneweg suggested restructuring all dmarcian entities with a Dutch holding company parent for asset protection purposes.

51.     Mr. Groeneweg shared his then-recent experience with Dutch-based intellectual property laws and suggested that it might be possible to move intellectual property from the US to a Dutch holding company.

52.     Plaintiff rejected those suggestions since the original agreement required that all intellectual property rights belonged to Plaintiff.  Mr. Draegen reminded Mr. Groeneweg that, during creation of the Bulgarian subsidiary Mr. Draegen had again made clear that all intellectual property rights were to be assigned to Plaintiff.  The matter was not further discussed until

12

Defendant breached in December 2019.

53.     Following the breach in December 2019,  Plaintiff's founder and former CEO,
Tim Draegen, worked to get Defendant back into compliance with the agreement under which
Defendant had the right to offer and sell Plaintiff's products and services in exchange for an
assignment of intellectual property.

54.     Rather than taking the breach seriously or working to resolve the breach, the
representative of Defendant's managing director, Martijn Groeneweg, made demands that the
managing director's interest in Defendant be bought out for an outrageous amount.

55.     When it became clear that Defendant would never voluntarily cure the breach,
Mr. Draegen, as majority shareholder in Defendant, called a shareholders' meeting of the
Defendant for the purpose of replacing the managing director.

56.     In order to thwart Mr. Draegen's exercise of his majority interest in Defendant to
replace the managing director, in or about September 2020, Defendant's managing director,
TDX, filed an action with a tribunal in the Netherlands known as the "Enterprise Chamber."

57.     The Enterprise Chamber exists to try to help resolve disputes among owners of a
Netherlands entity.

58.     The parties to the Enterprise Chamber proceeding were Defendant, TDX, and Tim
Draegen individually.  The Plaintiff dmarcian, Inc. was not a party to these proceedings.

59.     Just before initiating the Enterprise Chamber proceeding, in or around the summer
of 2020, Defendant compounded the December 2019 breach by arranging for assignment to
Defendant of intellectual property rights from the Bulgarian affiliate.  These were the rights that
Defendant agreed to assign to Plaintiff upon development as a condition of and as part of the
consideration for Plaintiff providing to Defendant its source code for use and development as
part of the original contract.

60.     Once the Enterprise Chamber proceeding was initiated, the Enterprise Chamber acknowledged that, since there was no fully integrated agreement, the Defendant was mismanaged, and (i) prevented TDX from being replaced, (ii) appointed Hub Harmeling as an additional managing director of Defendant, and (iii) appointed Yvette Borrius as proxy to hold all ownership interests in Defendant other than 1 share for each of Mr. Draegen and TDX, effectively divesting Mr. Draegen, as majority shareholder, of any control over the affairs of the Defendant.

61.     Mr. Harmeling conflated Mr. Draegen and Plaintiff even though they are, and always have been, two separate legal entities.  Ignoring the legal significance of Plaintiff as a corporation separate and apart from Mr. Draegen individually, and despite Plaintiff having no representation (particularly as a party disconnected from the internal corporate governance affairs and disputes of the Netherlands Defendant) in, or jurisdictional attachment in the Enterprise chamber proceeding, and despite Plaintiff having many stakeholders other than Mr. Draegen, Mr. Harmeling began making demands on Plaintiff, ostensibly through Mr. Draegen.

62.     Despite this disenfranchisement of Mr. Draegen, and despite that Plaintiff was not involved and not represented in the Enterprise Chamber proceeding, and as a way of informally seeking to resolve all disputes, Mr. Draegen attempted to discuss and resolve the Defendant's breaches during the fall of 2020.

63.     These efforts were unsuccessful.  The shareholder dispute was not resolved and neither Mr. Harmeling nor Defendant attempted to cure Defendant's breach of its agreement with Plaintiff through assignment of the intellectual property derived from Plaintiff's source code, nor were any other steps taken by Defendant to cure the breach.

**Netherlands Action**

64.     On or about January 22, 2021 Plaintiff notified Defendant that, "dmarcian is no longer prepared or able to continue providing technology, services, customers, and use of its trademarks to," Defendant.

14

65. Plaintiff offered a draft Settlement Agreement and a draft Distribution Agreement into which it was prepared to enter with Defendant, and informed Defendant that if a new, separate agreement was not reached, "dmarcian will terminate cooperation between the parties with immediate effect as per February 1, 2021."

66. Defendant did not make any attempt to cure the breach or negotiate new agreements.

67. Rather, on or about February 1, 2021, Defendant commenced an action against Plaintiff in a Rotterdam court without notice to Plaintiff, without issuance of appropriate legal process and without compliance with due process requirements. Despite lacking personal jurisdiction over Plaintiff, Defendant sought and the Rotterdam Court issued a mandatory injunction against Plaintiff that for the duration of the Enterprise Chamber proceeding (estimated to be at least another year) requiring Plaintiff to restore all access to Plaintiff's platform to Defendant's employees until the agreement between the parties is validly terminated. Neither the Defendant nor the Rotterdam Court gave any recognition to Plaintiff's intellectual property rights. Consistent with their pattern of deceptive, illegal and fraudulent conduct outlined herein, Defendant provided untrue and deceptively misleading/incorrect information to the Rotterdam Court.

68. The Rotterdam Court (i) made no explanation of what the agreement between the parties included or said, or how it would or could be terminated, (ii) did not inquire about or consider in any way Plaintiff's several claims of intellectual property infringement alleged herein, and (iii) did not take notice that Plaintiff had been claiming breach for over a year.

69. In contrast to the Defendants' contacts with North Carolina as described herein, the Rotterdam Court has no jurisdiction whatsoever over Plaintiff, nor does that Court have any standing to enforce Plaintiff's US-registered intellectual property rights. Therefore, the only place that full justice can be done to protect and enforce Plaintiff's rights is in this Court.

**Defendant's Illegal Use of Plaintiff's Marks and Copyrighted Code to Deceive and Divert Plaintiff's Customers, and Ultimately to Create its Own Separate Cloned Platform Independent of Plaintiff**

70.     To protect its business pending its efforts to resolve its differences with Defendant, Plaintiff reduced Defendant's access to Plaintiff's cloud platform to allow Defendant to only service existing customers.  In response, Defendant began a calculated effort to put in place various steps to ultimately generate and steal both new and established dmarcian Inc customers through both illegal infringement of Plaintiff's protected rights in its copyright and Marks, AND by falsely and deceptively lying to customers by contending that Plaintiff had compromised their customer data and they therefore had to move to a new platform.  Those communications falsely implied that the new platform was still maintained by the Plaintiff when in fact it was the Defendant's illegally sponsored platform set up for the purposes of diverting business from Plaintiff to Defendant.

71.     As described in more detail below, Defendant engaged in a three-step process to deceive the public and move new and established dmarcian customers into leaving dmarcian Inc. and moving those customers to Defendant's illegal platform:

> (a)  Defendant intentionally copied Plaintiff's website and used Plaintiff's trademarks to trick consumers, customers and potential customers into believing its website is Plaintiff's website;
>
> (b)  Defendant included its own contact information to divert consumers from Plaintiff to Defendant, routing Plaintiff's customers to an infrastructure controlled by Defendant and then routing the customers back to Plaintiff in what is known as a "man in the middle attack";
>
> (c)  Defendant used the cloned website to solicit third parties to purchase Plaintiff's copyrighted software and source code, which also constitutes a confidential and protected trade secret, misleading them into believing that

16

Plaintiff was the party selling and servicing the software despite the fact that Defendant had diverted the business to its own platform.

72.     In September 2019, while discussing with Mr. Draegen a lawsuit involving Plaintiff, Mr. Groeneweg suggested that all dmarcian intellectual property ownership could be transferred to a newly formed BV entity in order to shield it from a possible judgment in the United States.

73.     If Defendant actually had any interest or rights in any of Plaintiff's intellectual property, Mr. Groeneweg's suggestion would have made no sense, since intellectual property resident in the Netherlands and owned by Defendant would have not needed shielding.

74.     Plaintiff is informed, and believes, and thereon alleges that it was in or about September of 2019 when Defendant made the decision to breach its Agreement with Plaintiff and refuse to assign the intellectual property it had agreed to assign.

75.     Disputes between the parties grew more pronounced by September 2020.  Despite the parties' differences, and in order to do what it could within its control to support customer relationships and protect its own reputation, Plaintiff continued to provide technology, services, customers, and use of its trademarks to Defendant, while Defendant selfishly continued to refuse to recognize and respect the proceeds of Plaintiff's business efforts, i.e. Defendant was exploring transferring operational control of dmarcian.eu and generally denying the arrangements set out in the parties' agreement.  Defendant continued to refuse or recognize and respect the proceeds of Plaintiff's  business efforts, i.e. by challenging Plaintiff's IP rights, then stealing and using them, then transferring to itself operational control of dmarcian.eu, and generally refusing to abide by the arrangements set out in the December 2016 e-mails that form the basis of the parties' agreement and which were the foundation of the parties' intended relationship.

76.     Due to Defendant's breaches and its refusal to return to the terms of the original Contract,  Plaintiff was no longer prepared or able to continue providing technology, services, customers, and use of its trademarks to Defendant and ceased doing so on January 22, 2021.

17

77.     When the parties' discussions for an amicable resolution were not fruitful and Plaintiff took the aforementioned steps to protect its business in January of 2021, in February and March of 2021 and continuing to present, Defendant sought to take by force what it could not obtain by agreement.  Defendant began a stepped process to establish itself as a separate "dmarcian" company that is confusingly and strikingly similar in website portrayal to Plaintiff, including but not limited to willful Copyright and trademark infringement.

78.     **First,** Defendant created websites which were strikingly similar to plaintiff's website using domain names that had been previously secured for the parties' joint benefit.  The domain names use the protected name "dmarcian" and then the country code for the host site. Examples include "dmarcian.co.uk," "dmarcian.nl," etc.  Defendant began posting those websites for public access in late February and continuing into March 2021.

79.     The Defendants copied, in many instances word-for-word, the website pages from dmarcian, Inc., even, without authorization, populating these pages with the likenesses and backgrounds of more than a dozen of Plaintiff's employees without notice or permission.

80.     Screen shot examples of pages from Plaintiff's dmarcian Inc. site ("dmarcian.com") compared to copied, unauthorized pages of one of Defendant's sites (dmarcian.co.uk) which also advertise, use and employ **without** any authorization the likenesses, experience and reputation of individuals from Plaintiff's organization:

Plaintiff's site:                    Defendant's UK site (with offending
                                     individuals associated with
                                     Defendant circled):

     

81.     None of these Plaintiff executives or employees gave any permission to

Defendant to use their likeness (nor did Defendant ask about it or advise it intended to do so) for

Defendant to deceptively induce new and existing customers to engage Defendant through its

cloned websites, rather than through Plaintiff's site and control.  The websites contain many

other strikingly similar pages which are designed to cause confuse customers into thinking that

they continue to deal with the Plaintiff.

82.     **Second**, Defendant used that cloned website to divert both new and existing

customers, re-routing them to Defendant's independent platform using Plaintiff's protected code,

websites/pages, likenesses, and Marks.

83.     Defendant has now created a platform called "dmarc advisor."  And with that

platform, comprising Plaintiff's copyrighted code (without which Defendant could not possibly

conduct this illegal business), Defendant can fully operate independent of Plaintiff's legitimate

control and influence over its business and its customers that Defendant is stealing through its

deceptively cloned websits and through, misrepresentations to customers regarding Plaintiff's

alleged responsibility for data breaches of customer data. There in fact has been no data breach except for the data that *that the Defendant* itself misappropriated.

84.     Specifically, Defendant's representatives have falsely informedestablished Plaintiff customers (who had been previously routed to Defendant under the parties' agreement) that Plaintiff has allowed a breach of their data, and the Defendanttricked the customers into providing to Defendant their access to their accounts on Plaintiff's own platform (which Plaintiff had, since January 22, limited Defendant's access). Defendant then accesses the data (under the deceitful guise that it is the customer accessing its own data) and then downloads and copyies that data it draws from Plaintiff's systems to establish those accounts and data *on Defendant's illegal platform.*

85.     Technically speaking, this occurs when Defendant tells a current Plaintiff customer to update their Domain Name Server ("DNS" – essentially the prime source of domain rules) to point its data directly to the DMARC administrator on Defendant's "dmarc advisor" platform. In that way all current and future developed data transfers directly to Defendant's platform and away from Plaintiff's platform and control. Defendant is using the Plaintiff's protected name, Marks, and intellectual property rights to induce current and future customers to send their data to a specific system and platform *that is not Plaintiff's.*

86.     In these ways, Defendant as set up a system that, using Plaintiff's copyrighted code, protected Marks, and Plaintiff's executives' and employees' likenesses (and using their established reputations and DMARC business experience to make current customers think the continuity of control through Plaintiff continues when it clearly is not, and induce new customers to go with Defendant and its internal "experts"—Plaintiff's executives and even the DMARC pioneer himself, Tim Draegen), completely mirrors and transfers the entire business to its own, Plaintiff-excluded control.

87.     More recently, dmarcian has expanded the provision of its software services under its widely recognized DMARCIAN Mark, a mark it has used in commerce since at least as early as January 31, 2012.

88.     Recently, Defendant and its principal, Martin Groeneweg, began using Plaintiff's intellectual property (i.e., the DMARCIAN Mark and the source code) to unlawfully solicit business to brazenly operate separate and independent of Plaintiff and Plaintiff's North Carolina-based and maintained operations, while continuing to capitalize on the name and reputation Plaintiff built in the DMARCIAN Mark.

89.     Without Plaintiff's consent or authorization, Defendant used the Dmarcian trademark, trade name, and logo to pass itself off as an affiliate called "dmarcian Europe," which Defendant is not.

90.     Evidence of Defendant's unlawful use can be found on http://dmarcian.nl/. Through that site, Defendant has illegally solicited third parties to purchase Plaintiff's copyrighted software, which is not only protected intellectual property, but also constitutes a confidential and protected trade secret.  Defendant removed operational control of the dmarcian.eu domain from dmarcian, Inc. and continues to aggravate by creating and using the dmarcian-europe domain to redirect business away from dmarcian, Inc.

91.     In addition, Defendant's employees proceeded to clone dmarcian.com's marketing website, where most business leads originate, and alter it with false information, such as redirecting all sales, support, partners, and invoices to *dmarcian-europe.com* email addresses and by placing themselves back on the "our team" (initially referencing Plaintiff's "team") page. The cloned platform (dmarc advisor) runs on stolen-from-Plaintiff dmarcian Inc. copyrighted code, and operates on www.dmarcadvisor.com.[4]

---

[4] Compare this illegal, rogue website and platform Defendant created with the Plaintiff's own website: www.dmarcian.com.  They are virtually identical in appearance and content, except the Defendant's site includes prime offender Groeneweg and other BV-connected people as part of "his" team (in addition to the unauthorized use

21

92.     The Defendant's actions have caused significant damage to Plaintiff, including expending hours of employee time to monitor, develop, and make changes to attempt to remedy the Defendant's illegal actions, and time triaging confused and misled customers.

93.     The Plaintiff has suffered and will continue to suffer irreparable harm through the unlawful redirecting of Plaintiff's business to a fraudulent website, which dramatically harms Plaintiff's brand.   The loss of business to the cloned sites is also difficult to quantify and determined because customers will incorrectly associate bad customer experiences with Plaintiff when the Defendant's sites don't work and do not provide easy points of entry for potential customers, Or in the event that the security of their data is compromised.   Any defective service by Defendants will be confusingly and mistakenly attributed to Plaintiff due to Defendant's deceptive use of the Plaintiff's Marks.

~~94~~.     Plaintiff sent on February 16, 2021 to Defendant a "cease and desist" letter but to date, Defendant has completely ignored Plaintiff's demands.

95.     The avaricious pattern of conduct did not stop there.   Defendant further deceived the public through its intentional copying of Plaintiff's website to trick consumers, customers and potential customers into believing *its website is Plaintiff's website*.

96.     In fact, ***Defendant included its own contact information*** to divert consumers from Plaintiff to Defendant.

97.     Worse, and most egregiously, ***Defendant has solicited third parties to purchase Plaintiff's copyrighted software***, which is not only protected intellectual property, but also constitutes a confidential and protected trade secret.

98.     Defendant's continued recalcitrance led to Plaintiff filing a Complaint in accordance with the Uniform Domain Name Dispute Resolution Policy ("UDRP") on February 25, 2021.

---

of Plaintiff's executives and employees' likenesses, *and* their connection to dmarcian Inc.   There can be no greater, clear, undeniable illustration of these rogue violations than that comparison, and the others contained herein.

99. Defendant does not have any right or license to use Plaintiff's Mark.

100. Defendant's use of Plaintiff's Mark in this and other unauthorized and illegal ways is infringing, among other things.

101. Defendant's infringing use of Plaintiff's Mark includes its name, domain names, advertising materials, and websites, among many other things.

102. Such infringing use of Plaintiff's Mark by Defendant is without permission or authorization of Plaintiff and all such use by Defendant is likely to cause, and actually has caused, confusion, or mistake, or to deceive, and falsely imply Plaintiff's affiliation with and/or sponsorship of such use.

103. Defendant has known for several years that Plaintiff's Mark is registered in the U.S. Patent and Trademark Office. Plaintiff has requested that Defendant cease and desist from its acts of trademark infringement. Defendant refused, and continues to refuse, to cease such acts.

104. By reason of Defendant's acts alleged herein, Plaintiff has and will suffer damage to its business, reputation and good will and the loss of profits Plaintiff would have made but for Defendant's acts.

105. Defendant threatens to continue to do the acts complained of herein, and unless restrained and enjoined, will continue to do so, all to Plaintiff's irreparable damage. It will be difficult to ascertain the amount of damages which would afford Plaintiff adequate relief for such continuing acts. Plaintiff's remedy at law, therefore, is not adequate to compensate it for injuries actual and threatened.

**Defendant Engineers Data Breach to Steal Customer Data**

106. Since February 1, 2021, Defendant has run roughshod through Plaintiff's systems, copying code and data where it could, engaging in rogue communications with Plaintiff's employees, and establishing dozens of domains using the DMARCIAN mark.

23

107.    GDPR (the General Data Protection Regulation of Europe) requires that all, "[C]ontroller[s] and processor[s] [of confidential data] shall implement appropriate technical and organizational measures to ensure a level of security appropriate to the risk, including inter alia as appropriate…(b) the ability to ensure the ongoing confidentiality, integrity, availability and resilience of processing systems and services," among many other things.

108.    All users of dmarcian's platforms--including those on the previously Plaintiff-controlled EU platform--agree to dmarcian's Terms, Privacy, GDPR, and other privacy policies when signing up for an account.  This includes all users that Plaintiff eventually routed to Defendant for handling per their original arrangement.  EU credit card payers become Plaintiff's customers, and some after routing from Plaintiff become Defendant's customers (when they pay for services by check or wire with Defendant getting them to sign their contract).

109.    Defendant's actions since February 1, 2021 have caused, and continue to cause, a violation of GDPR, which subjects Plaintiff to potential liability under GDPR Article 82.  And as described below, Defendant has falsely stated to Plaintiff's customers that Plaintiff has failed to protect their personal data and that data has been compromised, when it is the Defendant's actions that have caused that to occur.

110.    An example of this just occurred on March 5, 2021.  On that date, Defendant updated the DNS (defined below) entry for "ag.dmarcian.eu" to point to infrastructure outside of dmarcian Inc.'s control, specifically for email that is destined to "CUSTOMER-TOKEN@ag.dmarcian.eu".  Through this method, Defendant gave itself access to Plaintiff's customer data to which it had no legal right.  In other words, Defendant is intercepting customer data that it never (and does not now) have a right to.

111.    In the days preceding the filing of this Complaint, Defendant also falsely representing to customers that more than 50% of the Code was developed by Defendant and the Bulgarian developers when in fact such work is all derivative of Plaintiff's intellectual property,

and falsely representing to such customers that the Code belongs to Defendant rather than Plaintiff and that Defendant is in charge of development. A copy of Defendant's false messages to customers is attached hereto as **Exhibit B.**

112. In addition, there are countless dmarcian Inc. (Plaintiff) users on the Defendant's fraudulent european platform that are having their data routed to infrastructure controlled by Defendant, and then Defendant at times routes the data back to dmarcian's real platform. This is a "man in the middle attack" that effectively results in Defendant stealing confidential, privileged customer data in violation of confidentiality obligations to acquire and use for its own platform moving forward, and to steal and then sustain those dmarcian Inc. customer relationships.

113. These unauthorized Defendant actions also may violate Plaintiff's US-based SOC2 security controls, obliging Plaintiff to inform all "affected" customers, which means every single new customer coming to Plaintiff's site via dmarcian.eu (which still points to our platform) and existing customers of the past few years. The cost to remedy and potential exposure for these fraudulent actions committed intentionally and knowingly by Defendant are enormous.

<u>COUNT ONE</u>
**(Breach of Written Contract)**

114. Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

115. Plaintiff and Defendant entered into the Contract for the terms set forth above and the Contract was supported by consideration.

116. In or around December 2019 Defendant breached the Contract, has failed and refused to cure such breach, is still in breach, and that breach is continuing (collectively, the "<u>Breach</u>"), insofar as Defendant has and continues to use Plaintiff's intellectual property without assigning back to Plaintiff any further developed software and without paying any other consideration for the previously permitted use of Plaintiff's intellectual property.

117. Through the time of the Breach and thereafter, Plaintiff fully performed its

obligations under the Contract.

118. Defendant's Breach has caused Plaintiff damages as alleged herein and according to proof, and Plaintiff should be awarded damages and costs of suit.

## COUNT TWO
### (Breach of Oral Contract)

119. Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

120. Pleading in the alternative to a writing, Plaintiff asserts that the Contract was agreed and confirmed several times by Plaintiff and Defendant orally in conversations.

121. Plaintiff and Defendant orally entered into the Contract and the Contract was supported by consideration as outlined previously.

122. In or around December 2019 Defendant committed the Breach.

123. Through the time of the Breach and thereafter, Plaintiff fully performed its obligations under the Contract.

124. Defendant's Breach has caused Plaintiff damages as alleged herein and according to proof, and Plaintiff should be awarded damages and costs of suit.

## COUNT THREE
### (Copyright Infringement; 17 U.S.C. §501)

125. Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

126. Plaintiff owns the copyright in the dmarcian Code.

127. Defendant has infringed Plaintiff's copyright in the dmarcian Code through its continued use, copying, sales, and distribution of the dmarcian Code, and Defendant's infringement continues through the present.

128. Defendant's use of the dmarcian Code is without permission or authorization of Plaintiff.

129. Defendant's acts are willful, intentional, and in disregard of Plaintiff's exclusive rights in the dmarcian Code.

26

27

130.    Following the Breach Plaintiff has demanded that Defendant cease and desist all such infringing use of the dmarcian Code, but Defendant has failed and refused and continues to fail and refuse to cease such infringing use.

131.    Furthermore, Defendant's acts complained of herein are being conducted with full knowledge of Plaintiff's rights, and such acts therefore constitute willful infringement.

132.    Unless enjoined by this Court, Defendant's acts of infringement will continue.

133.    As a further direct and proximate result of Defendant's infringement of Plaintiff's exclusive rights under copyright, Plaintiff is entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c).

134.    Plaintiff is also entitled to its costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

135.    Defendant's deliberate and wrongful acts of infringement have caused and continue to cause great injury and damage to Plaintiff's exclusive rights, which injury and damage cannot be adequately quantified.  As a result of Defendant's conduct, Plaintiff has suffered and continues to suffer irreparable damage for which there is no adequate remedy at law

136.    As a result of such infringement, Plaintiff is entitled to damages, costs of suit, reasonable attorney's fees, and injunctive relief against Defendant.

## COUNT FOUR
### (Trademark Infringement Under The Lanham Act, 15 U.S.C. §1114)

137.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

138.    Defendant has infringed Plaintiff's Mark in interstate and international commerce by various acts, including continued use of Plaintiff's Mark in its name, continued use of Plaintiff's Mark in several domain names including dmarcian.eu, dmarcian.co.uk, finance.dmarcian.eu, among many others.

139.     Defendant's use of Plaintiff's Mark in this manner was done so to advertise, promote, offer and market Defendant's alleged independent services and DMARC platform on the internet.

140.     Such use was without authorization or permission of Plaintiff.

141.     Defendant's willful use of Plaintiff's registered Mark is likely to cause confusion or mistake among consumers, customers, and their employees as to the origin, sponsorship or approval of Defendant's goods or services.

142.     The foregoing deceptive, intentional and willful acts constitute infringement of Plaintiff's exclusive rights in its Mark in violation of 15 U.S.C. § 1114.

143.     Defendant's unauthorized use of Plaintiff's Mark has caused, is causing, will continue to cause, and is likely to cause, confusion or mistake or to deceive as to the source or origin of Defendant's products and services and as to the relationship between Plaintiff and Defendant.

144.     Plaintiff has demanded that Defendant cease and desist all such infringing, confusing and improper use of any and all confusingly similar marks, and Defendant has failed and refused and continues to fail and refuse to cease such improper use.

145.     Defendant's heretofore alleged acts of trademark infringement have been committed with the intent to cause confusion, mistake and to deceive.

146.     Furthermore, Defendant's acts complained of herein are being conducted with full knowledge of Plaintiff's rights, and such acts therefore constitute willful infringement.

147.     Unless enjoined by this Court, Defendant's acts of infringement will continue.

148.     As a result of such infringement, Plaintiff is entitled to damages, costs of suit and injunctive relief against Defendant.

## COUNT FIVE
### (False Designation under Section 43(a) of The Lanham Act, 15 U.S.C. §1125(a))

149.     Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

150.     Defendant is intentionally using Plaintiff's Mark as part of its company name and in doing business in interstate and international commerce, with the false designation and representation that it is affiliated with Plaintiff.

151.     This use of Plaintiff's Mark is a false designation of origin which is likely to cause, and actually has caused, confusion, or mistake, or to deceive as to the affiliation, connection, or association of Defendant with Plaintiff and as to the origin, sponsorship, or approval of Defendant's products and services.

152.     This use by Defendant of Plaintiff's Mark and Defendant's false designation of origin have actually caused confusion among those with whom Plaintiff does business.

153.     These acts by Defendant are in violation of Plaintiff's rights under 43(a) of the Lanham Act, 15 U.S.C. Section 1125(a), in that Defendant has used and is using a false designation of origin, a false or misleading description and representation of fact which is likely to cause confusion, or mistake, or to deceive as to the affiliation, connection, or association of Defendant with Plaintiff and as to the origin, sponsorship, and approval of Defendant's services and commercial activities by Plaintiff.

154.     Defendant committed these acts willfully, intentionally and maliciously.

155.     Unless enjoined by this Court, Defendant will continue its acts of false designation of origin.

156.     Moreover, as a direct and proximate result of Defendant's counterfeiting of the Plaintiff's Mark, Plaintiff is entitled to reasonable attorney's fees pursuant to 15 U.S.C. § 1117(b). In addition, at Plaintiff's election, Plaintiff is entitled to the maximum statutory damages pursuant to 15 U.S.C. § 1117(c).

30

157.    As a result of Defendant's acts, Plaintiff has suffered and continues to suffer substantial harm, and is entitled to damages, costs and other remedies against Defendant.

## COUNT SIX
### (Defamation)

158.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

159.    Defendant has made false statements of fact to Plaintiff's customers and potential customers concerning Plaintiff which are damaging to its reputation:

   a.  a Setting up cloned websites which use Plaintiff's marks and the likenesses and information of Plaintiff's employees to falsely represent that Plaintiff's employees and executive continue to be involved in Defendant's business, and to falsely suggest that the customers continue to do business with Plaintiff when in fact it is Defendant's pirated business site;

   b.  Asserting that Plaintiff has had a data breach requiring Plaintiff's customers to move to a new platform, namely Defendant's pirated and unlawful new platform.

   c.  Falsely representing to customers that more than 50% of the Code was developed by Defendant and the Bulgarian developers when in fact such work is all derivative of Plaintiff's intellectual property,

   d.  Falsely representing to such customers that the Code belongs to Defendant rather than Plaintiff and falsely representing the extent of its responsibility for development of the Code.

160.    Defendant's defamatory statements have and proximately caused actual damages to Plaintiff in an amount to be proven at trial, and were also willful, wanton and malicious so as to warrant punitive damage.

31

## COUNT SEVEN
### (Misappropriation of Trade Secrets)

161.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

162.    Plaintiff is the owner of certain Trade Secrets, including:

(a)  The source code for dmarcian;

(b)  The customer database which includes all historical customer data, customer service requirements such as data that exposes threats and reports Plaintiffs to the customers of the various threats which is then used to provide better protection to the customers' infrastructure and protection of their domain presence, and separates the threats from legitimate mail;

(c)   Account registrations for new customers or potential customers who sign up for a trial in the platform;

(e)  Business and market intelligence which comes from all account registrations for new customers or potential customers in trial on the platform;

(f)  The application database which includes all customer internet domains, reporting preferences, and all customers DMARC XML data as well as DMARC forensic data; and,

(c)  Sales leads information from prospective customers who contacted Plaintiff.

163.    Defendant knew or should have known of the Trade Secrets.

164.    The Trade Secrets are not known or made available to the public, nor are they readily ascertainable through independent development.

165.    Plaintiff takes reasonable measures to protect the Trade Secrets from disclosure, including but not limited to:

(a)  Taking security measures including protecting customer data from disclosure through logins and passwords, and two factor authentication to verify those passwords, and redundant identity checks before support is given to any

32

account;

    (b)  Yearly penetration tests to make sure no one can get into the site or access the Plaintiff's code;

    (c)  Protecting source code by restricting access to a need to know basis;

    (d)  Plaintiff has adopted Terms of Service and a Privacy Policy;

    (e)  Paintiff's employees are required to signed confidentiality agreements and NDAs and appropriate use policies.

166.   Defendant had the specific opportunity acquire the Trade Secrets through access to Plaintiff's cloud database acquired during its business and contractual relationship with Plaintiff in which Plaintiff entrusted Defendant with login and password access for the purposes of sales and servicing of Plaintiff's European customers.

167.   Defendant did in fact acquire and use the Trade Secrets for its own and separate benefit without the Plaintiff's express or implied consent or authority, and thereby misappropriated the Plaintiff's trade secrets within the meaning of N.C.G.S. §66-152.

168.   Plaintiff is entitled to a preliminary injunction against the continued misappropriation and misuse of its Trade Secrets pursuant to N.C.G.S. §66-154(a).

169.   Plaintiff has suffered actual damages proximately caused by Defendant's misappropriation of Plaintiff's trade secrets in an amount to be proven at trial pursuant to N.C.G.S. §66-154(b).

170.   Defendant's misappropriation of trade secrets was willful and wanton and Plaintiff is entitled to recover punitive damages from Defendant pursuant to N.C.G.S. §66-154(c).

171.   Defendant's misappropriation was in bad faith and was willful and wanton, and Plaintiff is therefore entitled to recover its attorneys' fees from Defendant pursuant to N.C.G.S. §66-154(d).

# COUNT EIGHT
## (Computer Trespass)

172.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

173.    Plaintiff has a subscription to a service that controls a server which stores the data. Employees of both Plaintiff and Defendant, as well as employees of the Bulgarian developer, each had a dmarcian.com email address [i.e. Plaintiff's email account] which everyone logged into as a centrally located email address.  These individuals used their dmarcian.com credentials to get what the needed from the Code to make further developments to the Code.  Upon information and belief, Defendant used this access to misappropriate Code for its own purposes and to store it on a platform separate from Plaintiff's system contrary to the parties' agreement and past practice.  In or about 2021, upon information and belief Defendant began to utilize such Code for its own separate purposes.

174.    Defendant has unlawfully accessed Plaintiff's computer networks without authority and with the intent to make or cause an unauthorized copy of Plaintiff's customer data produced by the computer networks that receive DMARC data and is attempting to send it to Defendant's platform. In January of 2021, Defendant's employees were attempting to exploit a bug in Plaintiff's system to try work around Plaintiff's access controls and gain access to new customer data.

175.    Defendant's conduct constitutes computer trespass within the meaning of N.C.G.S. §14-458.

176.    Plaintiff suffered actual damages as a result of Defendant's computer trespass and is entitled to recover such damages pursuant to N.C.G.S. §1-539.2A.

## COUNT NINE
### (Tortious Interference with Contract)

177.     Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

178.     All customers of Plaintiff as well as Defendant come through Plaintiff's site and accept Plaintiff's terms of service.  When they sign up for either a trial or an account, there is a digital registration with Plaintiff for each such customer. This occurs before any customers is sent over to Defendant for continued service, and those original terms of service continue to apply. Plaintiff has valid contracts with its customers to provide services to such customers on a monthly or a yearly basis or multiyear period.

179.     Defendant knew of Plaintiff's terms of service with said customers by virtue of Defendant's prior work with Plaintiff, referrals made by Plaintiff to Defendant, and Defendant's access to Plaintiff's database.

180.     Defendant intentionally induced Plaintiff's existing customers to switch from Plaintiff's platform to Defendant's platform, thereby effectively terminating the Plaintiff's services to such customers and diverting their business from Plaintiff to Defendant.

181.     Defendant induced Plaintiff's customers to switch platforms by:

   (a) Misleading them into believing that they were continuing to deal with Plaintiff by use of a false and deceptive website which cloned the information, look, and appearance of Plaintiff's website and falsely identified Plaintiff's personnel as working for Defendant.

   (b) Defendant put up a banner or notification on their platform instructing customers to "update" their DMARC records to dmarcadvisor.com as opposed to dmarcian.com, falsely suggesting that it was necessary due to a purported data breach.  A copy of such banner is attached hereto as **Exhibit C.**

35

(c)   Making false statements as set forth in **Exhibit B** about Defendant's involvement and responsibility for development of Plaintiff's Code.

182.    Defendant's actions in inducing the Plaintiff's customers to leave Plaintiff's platform were without justification.

183.    Defendant's actions resulted in actual damage to Plaintiff in an amount to be proven at trial.

184.    Defendant's actions were willful, wanton and malicious and Plaintiff is entitled to recover punitive damages from Defendant.

185.    Plaintiff will be irreparably harmed if Defendant is allowed to continue to interfere with its contracts with customers, and Plaintiff is entitled to a preliminary and permanent injunction.

## COUNT TEN
### (Tortious Interference with Prospective Economic Advantage)

186.    Plaintiff realleges and incorporates herein by this reference the preceding paragraphs of this complaint as though fully set forth herein.

187.    Prospective customers interested in Plaintiff's DMARC product and services contact Plaintiff through its website and sign up for trials.

188.    Information about prospective customers who have signed up for trials gets funneled into sales leads as shown in the diagram in Paragraph 10 herein.

189.    Plaintiff typically has approximately average of 800 customers a month who sign up for trials, and of those customers approximately 40% become ongoing customers of Plaintiff.

190.    Plaintiff reasonably expects that customers who sign up for trials will grow into a continued customer relationship.

191.    Defendant obtained information about sales leads and prospective customers who signed up for trial periods which have a presence in Europe. Defendant diverted such customers to its own independent platform.

192.    Defendant diverted those prospective customers by misleading them into thinking

36

they were continuing to deal with Plaintiff based on their misleading cloned website and other communications.

193.    Defendant thereby intentionally induced the prospective customers not to do business with Plaintiff and instead misappropriated such prospective customers for themselves through wrongfully obtaining information from Plaintiff's system and through misleading information provided to such customers as described above.

194.    Defendant intentionally induced Plaintiff's prospective customer away from Plaintiff's platform and diverted them to Defendant's platform.

195.    Defendant's new and unauthorized website makes it appear to the customers that they are doing business with Plaintiff when in fact the Defendant acquired the new accounts to the exclusion of Plaintiff.

196.    Defendant's actions in inducing the Plaintiff's prospective customers to do business with Defendant and not do to business with Plaintiff was without justification.

197.    Defendant's actions resulted in actual damage to Plaintiff in an amount to be proven at trial.

198.    Defendant's actions were willful, wanton and malicious and Plaintiff is entitled to recover punitive damages from Defendant.

199.    Plaintiff will be irreparably harmed if Defendant is allowed to continue to misappropriate Plaintiff's prospective customers, and Plaintiff is entitled to a preliminary and permanent injunction.

## COUNT ELEVEN
### (Unfair or Deceptive Business Practices)

200.    Plaintiff realleges and incorporates herein by references paragraphs 1-114 and paragraphs 138-200 of this complaint as though fully set forth herein.

201.    Defendant's conduct as set forth in Counts Four through Ten of the Complaint is unfair and deceptive within the meaning of N.C. Gen. Stat. §75-1.1.

202. Defendant's unfair and deceptive conduct is in and affecting commerce.

203. Defendant's unfair and deceptive conduct proximately caused actual damages to Plaintiff.

204. Plaintiff is entitled to recover treble damages from Defendant pursuant to N.C.G.S. §75-16.

205. Plaintiff is entitled to recover its reasonable attorneys' fees from Defendant pursuant to N.C.G.S. §75-16.1.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff dmarcian, Inc. prays for judgment against Defendant dmarcian Europe BV. as follows:

A. Entry of a preliminary injunction, to be effective throughout the pendency of this action, enjoining Defendant, its employees, agents, officers, successors, and assigns, or others in privy therewith or under its control, and any and all persons acting by or under the authority of Defendant or in privity with it:

(1) from making, using, distributing, and selling the dmarcian Code.

(2) from directly or indirectly using the Plaintiffs DMARCIAN Mark or any other mark, word, or name similar to Plaintiff's Mark which is likely to cause confusion, mistake or to deceive;

(3) from infringing Plaintiff's copyright in the afore-described computer program/software; and

(4) from otherwise unfairly competing with Plaintiff.

B. Entry of a permanent injunction perpetually enjoining Defendant, its employees, agents, officers, successors, and assigns, or others in privy therewith or under its control, and any and all persons acting by or under the authority of Defendant or in privity with it:

(1) from making, using, distributing, and selling the dmarcian Code.

38

(2) from engaging in any other activity constituting an infringement of the dmarcian Code;

(3) from directly or indirectly using Plaintiff's DMARCIAN Mark or any other mark, word, or name similar to Plaintiff's Mark which is likely to cause confusion, mistake or to deceive; and

(4) from otherwise unfairly competing with Plaintiff.

(5) from engaging in any other activity constituting an infringement of Plaintiff's Mark or constituting unfair competition with Plaintiff; and

(6) from assisting, aiding and abetting any other person or business entity in engaging in any activities referred to in subparagraphs (1) through (5) above.

C. Entry of judgment ordering that all labels, signs, prints, promotions, advertisements, letterhead, business cards, collateral literature and media, domain names, and web pages in the possession or control of Defendant bearing Plaintiff's Mark and all plates, molds, matrices and other means of making the same, shall be delivered to Plaintiff for destruction.

D. Entry of judgment requiring transfer to Plaintiff of all dmarcian domains Defendant and that are not otherwise destined for destruction.

E. Entry of judgment requiring Defendant, within thirty days after the service of judgment upon it, to file with the Court, and serve upon counsel for Plaintiff, a written report under oath setting forth in detail the manner in which Defendant has complied with paragraphs A through C above.

F. Damages according to proof for Defendant's Breach of the written Contract.

G. In the alternative, Damages according to proof for Defendant's Breach of the oral Contract.

H.    Entry of judgment finding that Defendant, through its copying, use, reproduction, distribution, and sales of the dmarcian Code has infringed Plaintiff's copyright in the dmarcian Code under 17 U.S.C. §501;

I.    Entry of judgment finding that Defendant, through its use of the Plaintiff's Mark has infringed Plaintiff's registered mark under 15 U.S.C. §1114;

J.    Entry of judgment finding that Defendant, through its use of the Plaintiff's Mark has created false designations of origin and false or misleading descriptions of fact in violation of 15 U.S.C. §1125(a);

K.    Entry of judgment that the unfair or deceptive acts or practices of Defendant were committed willfully or knowingly, and that Plaintiff be awarded up to three times its actual damages together with its costs and attorney's fees as a result of the same;

L.    Entry of judgment requiring Defendant to account to Plaintiff for any and all profits derived by Defendant from the sale of its services and for all damages sustained by Plaintiff by reason of Defendant's infringement and unfair competition complained of herein.

M.    Entry of judgment awarding Plaintiff punitive and exemplary damages due to Defendant's wilful acts and infringement complained of herein.

N.    Entry of judgment awarding Plaintiff its attorney's fees and costs incurred in the prosecution of this action pursuant to the Lanham Act, 15 USC §1117, and pursuant to 17 U.S.C. §505, together with such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims or issues so triable.

This the 12th day of March, 2021.

/s/ Pamela S. Duffy _____
Pamela S. Duffy, N.C. Bar. No. 18329
*pduffy@sharplesslaw.com*
Sharpless McClearn Lester Duffy, PA
200 S. Elm Street, Suite 400
Greensboro, NC 27401
Telephone: (336) 333-6389
Attorney for Plaintiff

OF COUNSEL:

/s/ David Dorey _____
David Dorey, DE #5283
Blank Rome, LLP
Dorey@BlankRome.com
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6418
Attorney for Plaintiff