IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
BREVARD DIVISION
CASE NO.: 1:21-CV-00067

| | |
|---|---|
| DMARCIAN, INC.<br><br>Plaintiff,<br><br>v.<br><br>DMARCIAN EUROPE BV<br><br>Defendant. | DECLARATION OF<br>SHANNON DRAEGEN |

NOW COMES the undersigned Declarant and states that the following is true of her own personal knowledge:

1. I am the Chief Executive Officer of dmarcian, Inc. ("dmarcian"). My husband, Tim Draegen, is the former CEO and the found of dmarcian. I have worked with him at dmarcian since the company's inception in 2012. Prior to becoming the CEO, I acted in the capacity of Chief Operating Officer.

2. I have read the Complaint and confirm that the facts set forth in that Complaint are true of my own personal knowledge, except as to things stated upon information and belief.

3. Plaintiff dmarcian was formed to operate globally to promote dmarcian's Software as a Service ("SaaS"). SaaS software is licensed on a subscription basis and is centrally located. In dmarcian's case, the SaaS software and customer data for all customers, globally, is centrally located on dmarcian's gitlab.com account hosted in the United States. The accounts for all customers, both in the United States and in the EU, are hosted by dmarcian.

1

Case 1:21-cv-00067-MR   Document 8   Filed 03/25/21   Page 1 of 10

Document Ref: UQPYE-MSTXK-VW3KS-JP82S                                    Page 1 of 8

4. Dmarcian has built its brand by working closely with multinational companies, many of which are American companies with a global presence like Tesla (based in California), General Mills (based in Minnesota), Lyft (based in California), Huntington Bancshares (based in Ohio), FIS (based in Florida), Slack Technologies (based in California), Ascensus (based in Pennsylvania), Gartner (based in Connecticut), Mathworks (based in Massachusetts), AmpX Technologies (based on Maryland), DC Advisory Group (based in New York) and Confluence (based in Pennsylvania), and many others.

5. Dmarcian Europe BV ("DME") was established to service customers based in the European Union ("EU"). Dmarcian was to continue servicing all the American companies with EU offices, however over time DME began servicing some of those companies including, for example, Gartner, Mathworks, AmpX, DC Advisory and Confluence.

6. The website for dmarcian is located at www.dmarcian.com. During the course of the parties' discussions on setting up a business which ultimately became DME, , Mr. Groeneweg registered websites at www.dmarcian.nl and www.dmarcian.eu ("the DME Websites") both of which redirected users to dmarcian.com and were not operated as independent websites. Dmarcian's tech operations set up the DME Websites. Accordingly, the websites utilized (with dmarcian's permission) dmarcian's name, trademarks and branding during the time that the parties were engaged in business together.

7. In February of 2021, DME ceased redirecting the DME Websites to dmarcian.com and DME operated the sites independent of dmarcian, without dmarcian's permission.

8. During the time that the parties were in business together, DME also acquired a number of domain names across Europe for the parties' joint benefit, such

2

as www.dmarcian.co.uk, www.dmarcian.es, www.dmarcian.fr, and many others (collectively "the New EU Websites"). A list prepared by me is attached hereto as **Exhibit A.** These websites were not live websites until recently.

9. In March 2021, the New EU Websites went live. Dmarcian did not direct for them to go live. The sites were not redirected to dmarcian.com. Dmarcian granted no permission whatsoever for the use of these sites.

10. The branding and text on the DME Websites and the New EU Websites are virtually identical to the dmarcian.com website. I attach, by way of example only, copies of portions of the dmarcian.com website (**Exhibit B-1 and B-2**) and portions of the dmarcian.co.uk website (**Exhibit C-1 and C-2**).[1] The other New EU Websites are similar to the dmarcian.co.uk website, although may appear in other languages.

11. On its websites and other marketing materials, dmarcian used its well-known common law trademark ⓓmarcian. See **Exhibit B-1, B2, B3** This was the same brand that EU customers would see in working with DME, as the DME website directed back to the dmarcian website.

12. Beginning in or about March of 2021, after DME separated to its independent platform, the distinctive brand of dmarcian used by DME on the DME Websites and the EU Websites is almost identical, except that beginning in March of 2021, DME altered dmarcian's stylized logo to write the word "EUROPE" in tiny letters below the letter "n" in the name "dmarcian", appearing as follows: ⓓmarcian. See **Exhibit C-1, C-2, C-3.** Dmarcian gave no authorization for DME's independent use of this brand.

---

[1] For examples of one-to-one direct comparisons of a dmarcian page compared to the DME page that is a clone of that dmarcian page, the reader should compare Ex. B-1 (dmarcian site) to Ex. C-1 (same page on DME site), B-2 to C-2, B-3 to C-3, and B-4 to C-4.

3

13. The graphics and appearance of the New EU Websites are virtually identical to the graphics and appearance of dmarcian's site which DME's customers were accustomed to seeing. Compare **Exhibit B-1** (pages from the dmarcian site) and **Exhibit C-1** (pages from dmarcian.co.uk). These are examples only, and the striking similarity in graphics and appearance continues throughout New EU Websites as well as the DME Websites now being operated independently of dmarcian.

14. The text in the DME Websites and New EU Websites are also confusingly similar (essentially identical) to dmarcian's website. The words on the DME and New EU Websites are essentially verbatim and the appearance of the graphics are basically identical to the dmarcian.com website that EU customers were accustomed to seeing due to the fact that DME's Websites previously redirected DME customers to the dmarcian.com website. Compare **Exhibit B-1 & B-2** (pages from the dmarcian site) and **Exhibit C-1 & C-2** (pages from dmarcian.co.uk).[2] Again these are examples only, and the virtually identical wording between websites is pervasive on each of the pages.

15. As recently as March 25, 2021, the date of this Declaration, the DME Websites and New EU Websites also misleadingly refer to "dmarcian" repeatedly, as if it is dmarcian Inc. and not DME's independent platform which is provided to the customer. See circled references on **Exhibit B-2.**

16. DME's Websites and the New EU Websites also reference the same global customers of dmarcian that are on dmarcian's websites, including several of the American multinational companies referenced in Paragraph 4 above. Compare **Exhibit**

---

[2] These are printed to show the website origin and do not show all of the graphics as they appear on the live site. These exhibits are for the purpose of showing the identical nature of the text.

4

B-3 (home page from the dmarcian.com site) with **Exhibit C-3** (home page from the dmarcian.co.uk, site) [3]

17. DME's Websites and the New EU Websites also include videos, written, filmed and narrated by Tim Draegen for dmarcian Inc., hosted on dmarcian's website, which videos dmarcian created to explain the business value proposition of DMARC and dmarcian's SaaS. Compare **Exhibit B-4** (from the dmarcian.com site) with **Exhibit C-4** (from the dmarcian.co.uk, site) [4]

18. At the time of the filing of the Complaint, the DME Websites and the New EU Websites also had the likenesses of Tim Draegen and other dmarcian employees along with their biographical information, representing them as part of the DME team on what was now DME's separate platform. As noted in the complaint, that was done without the permission of dmarcian or the affected employees. Since the filing of the complaint and since the time the Complaint was emailed to Mr. Groeneweg, those individuals have been removed from DME's Websites and the New EU Websites.

19. The identical nature of the websites gave every appearance of being dmarcian's business when in fact DME had separated onto its own separate platform developed from dmarcian's copyright-protected software. Essentially, DME surreptitiously stole dmarcian's copyright source code to create its independent platform. DME's website even acknowledges that it is using dmarcian's SaaS platform. (See **Exhibit C-2**, describing "dmarcian's DMARC SaaS platform").

20. After posting these new websites, as set forth in the Complaint, DME claimed a false data breach and gave customers instructions to move to DME's newly

---

[3] These are also printed to show the website origin and do not show all of the graphics as they appear on the live site.
[4] These are also printed to show the website origin and do not show all of the graphics as they appear on the live site.

established platform, www.dmarcadvisor.com, which was independent of dmarcian.com and not authorized by dmarcian. See **Exhibit D**.

21. Dmarcian has no control over dmarcadvisor.com. DME gave customers DME's own contact information, routing them to DME's dmarcadvisor.com – an infrastructure controlled solely by DME, and then routed the customers back to dmarcian. This is known in the industry as a "man in the middle" attack.

22. DME's representation that there had been a data breach necessitating them to move their data was false and was designed to scare customers into thinking they had to migrated to dmarcadvisor.com to secure their data.

23. The only data breach dmarcian had was DME's own unauthorized copying of the dmarcian Code and the customer data. This has created its own set of problems and potential liability for dmarcian, requiring dmarcian to notify customers.

24. Customer postings and messages to dmarcian reflect their understandable confusion and concern over DME's communications. Although dmarcian has received many more such messages, examples of such communications are attached hereto as **Exhibit E**.

25. The assertion of a false data breach is extremely damaging to dmarcian's brand and reputation, as customers contract with dmarcian for the very purpose of protecting their data. The irony (and insult) are remarkable. Dmarcian's entire business is email security, protecting customers against email fraud, and yet, dmarcian Inc. is suffering from an ex-partner—DME—using that same platform to commit the very type of email fraud that dmarcian Inc. created the platform to prevent. We have spent numerous hours reassuring customers which has been an extensive distraction from normal day to day operations.

26. There are 15,574 dmarcian.com accounts on Plaintiff's EU platforms, including existing customers as well as prospective customers who have signed up for

6

Case 1:21-cv-00067-MR   Document 8   Filed 03/25/21   Page 6 of 10

Document Ref: UQPYE-MSTXK-VW3KS-JP82S                    Page 6 of 8

trials. Dmarcian is involved in servicing and managing data for all of these customers. All of these customers agreed to dmarcian's Terms and Policies. Of these accounts, there are 638 accounts which are paid for by check or wire, or what dmarcian refers to as "Subscribed Manual Accounts", for which payment is directed to DME, whereas credit card payments by EU customers are paid to dmarcian. In other words, DME has a contractual relationship with approximately 4% of Plaintiff's customer base, at most.

27. DME's messages to dmarcian's customers which claimed a false data breach and directed them to move to DME's separate "dmarcadvisor" platform and instructed them on how to do that went out to Plaintiff's *entire* customer base, and not just the 4% which have a servicing relationship with Defendant.

28. Not only have DME's actions resulted in diversion of business from dmarcian to DME, but it has also opened an opportunity for competitors to take advantage of the chaos that DME has caused. An example of a competitor's solicitation that was forwarded to us is attached hereto as **Exhibit F.** This compounds the detrimental impact on dmarcian's reputation resulting from DME's actions.

29. DME is not licensed to sell dmarcian's SaaS services on a platform independent from dmarcian and built on code stolen from dmarcian.

30. Having established cloned websites which looked and felt like dmarcian's websites, and having saved the specter of the false data breach to move to a new platform which they initially made to seem like a dmarcian platform, DME began communicating to customers that it had to establish separate websites to protect their data ***from dmarcian***, claiming that it had the right to do so because of a preliminary relief ruling that a Rotterdam court issued without Plaintiff ever having been served. A copy of a communication forwarded to dmarcian is attached hereto as **Exhibit G-1)** and the translated Judgment attached to that communication is attached as **Exhibit G-2.**

31.     As noted in the Judgment on preliminary relief attached to that email, dmarcian was not properly served with that lawsuit and the ruling was entered in dmarcian's absence based on one-sided information. Even with that heavy advantage, the Court did not find that dmarcian was in breach of its agreement; rather it found the issue of performance to be "insufficiently determinable" and disallowed several of DME's claims given that they were still under investigation by the Enterprise Chamber in a separate proceeding involved Tim Draegen and DME and its other owners (to which dmarcian is not a party). (**Exhibit G-2,** Judgment, ¶¶2.12, 2.14, 3.10). The Judgment makes no findings as to who owns the intellectual property. Yet DME falsely paints the Rotterdam decision as evidence that DME was in the right in moving customers to its new platform.

32.     DME's actions in defaming the dmarcian brand discredits our years of dedication and long-standing reputation with devastating effects not just on our EU markets but also on our US commerce. Dmarcian has invested over $1,400,000.00 just since 2016 in building dmarcian's brand and reputation as well as DME's reputation as part of its joint operations with dmarcian. Referral of our business comes from large networks that refer enterprise-level business, and some of our EU customers are offices of US-based companies.

I declare under penalty of perjury that the foregoing is true and correct.

This the 25th day of March, 2021.

*Shannon Draegen*

_____
SHANNON DRAEGEN

# Signature Certificate

Document Ref.: UQPYE-MSTXK-VW3KS-JP82S

Document signed by:



Verified E-mail:
shannon@dmarcian.com

IP: 68.235.242.215    Date: 25 Mar 2021 21:34:54 UTC



Shannon Draegen

Document completed by all parties on:
25 Mar 2021 21:34:54 UTC
Page 1 of 1



Signed with PandaDoc.com

PandaDoc is the document platform that boosts your company's revenue by accelerating the way it transacts.



## CERTIFICATE OF SERVICE

I hereby certify that Defendant has been served by email immediately upon filing with the foregoing DECLARATION as follows:

dmarcian Europe BV
c/o Martijn Groeneweg, Managing Director
Burgemeester de Raadtsingel 93
3311 JG Dordrecht
The Netherlands
martijn@tdx.nl
martin@dmarcadvisor.com

A courtesy copy has also been sent to Plaintiff's Dutch Counsel, Alfred Meijboom at Alfred.Meijboom@kvdl.com, as no US counsel has yet made an appearance. Plaintiff shall also serve a hard copy on Defendant by Federal Express at the above address on March 26, 2021 and will file an additional certificate of service upon completion.

This the 25th day of March, 2021.

/s/ Pamela S. Duffy
Pamela S. Duffy
N.C. State Bar No. 18329
RaShawnda T. Murphy
N.C. State Bar No. 54936
SHARPLESS McCLEARN LESTER DUFFY, PA
200 South Elm Street, Suite 400
Greensboro, North Carolina 27401
Telephone: (336) 333-6389
pduffy@sharplesslaw.com
rmurphy@sharplesslaw.com
*Attorneys for Plaintiffs*