IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
BREVARD DIVISION
CASE NO.: 1:21-CV-00067

| | |
|---|---|
| DMARCIAN, INC.<br><br>              Plaintiff,<br><br>v.<br><br>DMARCIAN EUROPE BV<br><br>              Defendant. | DECLARATION OF<br>TIMOTHY DRAEGEN |

NOW COMES the undersigned Declarant and states that the following is true of his own personal knowledge:

1. I am the founder and former Chief Executive Officer of dmarcian, Inc. ("dmarcian").

2. I have read the Complaint and confirm that the facts set forth in that Complaint are true of my own personal knowledge, except as to things stated upon information and belief. Below, I provide an overview of the communications I have had with the other participants in dmarcian's business in Europe which leads up to the current dispute.

3. Dmarcian's business sells "Software as a Service" ("SaaS") relating to "DMARC"--"Domain-based Message Authentication, Reporting & Conformance." DMARC is an email validation system that vests organizations with greater control over their email channels and protects customer's brands from being used in phishing[1] attacks. I was the original author of the copyright-registered source code which has

---

[1] "Phishing" involves the use of deceptive emails that appear to be (but are actually not) from an organization's valid domain/website to gather personal information.

Case 1:21-cv-00067-MR   Document 9   Filed 03/25/21   Page 1 of 9

Document Ref: YCWW8-VZMAQ-MZJXN-AEQLY      Page 1 of 7

and continues to provide DMARC SaaS to customers, and which Code is the subject of this lawsuit.

4. I registered the domain name "dmarcian.com" in early 2012 to provide DMARC tools and services to organizations of all sizes across the globe. Dmarcian is a made-up word and is not itself a technical term. Although I started using the name "dmarcian" in 2012 as a d/b/a of my company Eudaemonic Development, LLC, I ultimately incorporated under the name "dmarcian, Inc." in Delaware on September 16, 2014.

5. As described in greater detail in the Complaint, I worked to grow the company without outside investment, heavily participated in DMARC advocacy groups, and chaired the Internet Engineering Task Force's DMARC Working Group from 2014-2019. My professional work and dmarcian's established brand has resulted in a steady stream of business without the need for traditional outbound or "cold calling" sales strategies.

6. I was first contacted by Martijn Groeneweg in 2013. He identified himself as having an email consulting firm called "Measuremail" in the Netherlands and expressed an interest in marketing dmarcian's product. Neither he nor his company had any prior DMARC experience (i.e., no previous experience with the dmarcian Code, Trademarks, trade secrets and other intellectual property, nor did he have experience with the DMARC concept).

2

7. On July 10, 2014, Mr. Groeneweg wrote to me that he had registered the internet domains of dmarcian.eu and dmarcian.nl and redirected them to dmarcian.com as "governmental regulations in the Netherlands and Europa is is a really strict requirement, that systems that are used are running in the Netherlands of some other EU country" and asked "Is there any possibility to install a dmarcian environment in Europa, preferable in the Netherlands?" We resolved the issue by making dmarcian.eu an alias of dmarcian.com (so that any user with an @dmarcian.com address could also use the same @dmarcian.eu address).

8. I continued discussions with Mr. Groeneweg over an extended period of time and Mr. Groeneweg made a variety of proposals over time. On January 28, 2015, he expressed a desire to run dmarcian's software on top of Measuremail's infrastructure. I responded that I would consider such a proposal under a licensing agreement that would protect dmarcian from software misappropriation.

9. The parties' discussions continued throughout 2015 and related to several different possible structures and ventures. In January of 2016, I traveled to the Netherlands to meet with potential partners, taking the opportunity to meet with Mr. Groeneweg to discuss the structure and cooperation first mentioned September 1, 2015. Mr. Groeneweg and I agreed to a structure where a new European legal entity would be created to develop the European DMARC market using dmarcian technology, I would be given a controlling interest, and Mr. Groeneweg would otherwise be granted as much ownership as possible as an incentive for Mr. Groeneweg to develop the European market. The agreement was not immediately memorialized but was summarized in the form of a series of emails exchanged in late 2016. By that time, we

3

were discussing the creation of an entity called "dmarcian Europe," which ultimately was formally named dmarcian Europe, BV, the Defendant in this action ("DME").

10. On December 7, 2016, I sent an email attaching "Proprietary Information and Inventions Agreements" ("PIIA") and "Non-Disclosure Agreements" ("NDA"), indicating that DME employees would need to execute such documents. A copy of that email with the attachments is attached hereto as **Exhibit A.** The PIIA provided that the intellectual property of any employee belonged to dmarcian.

11. On that same day, Mr. Groeneweg responded positively about finalizing the PIAA and NDA agreements, stating, *"I also would like to formalize our agreement we made on EU for our mutual benefits and clarity together with the PIIA and MNDA. Below is a list of those agreements."* He then laid out other points about how the structure would work, including among other things that I would own 51% of DME to "maintain control over strategic direction" of DME. A copy of his response is attached hereto as **Exhibit B.**

12. DME had no funds to pay licensing fees for dmarcian's Source Code at the time, nor to contribute to its development. Neither Mr. Groeneweg nor his entities ("TDX" or MailMerk BV) paid monetary consideration to dmarcian for being able to use dmarcian's product or its name and brand. Instead, consideration for the use of dmarcian's intellectual property came in other forms as outlined in the Complaint. I originally agreed to Mr. Groeneweg's ownership interest in DME to incent him to develop business in the EU for the joint benefit of dmarcian and DME.

13. The name of Mr. Groeneweg's entity Mailmerk, BV was ultimately changed to dmarcian Europe, BV and shares were ultimately transferred to me on July 13, 2018 granting me a controlling interest in DME per our agreement (as we ultimately concluded it was simpler to transfer the interest to me individually rather than to a corporate entity).

14. Atlhough DME promoted dmarcian's product and services as the 2016 agreement anticipated, I also personally helped in efforts to promote dmarcian's product in the EU and to promote DME by engaging in meetings with prospects in Europe and various promotional events. Additionally, dmarcian subsidized DME's growth through free use of technology, sales enablement, and direct customer transfers.

15. In March of 2017, conversations with a dmarcian contractor who resided in Bulgaria led to the idea that development talent could be hired from Bulgaria and managed by the contractor to further development of dmarcian's Code. Mr. Groeneweg suggested that it might be easier to hire Bulgarian developers through DME due to EU membership, but did not suggest that this would entail any change to the ownership structure of the intellectual property rights in the Code (as had been reaffirmed in the parties' discussions as recently as December 2016).

16. At this time (early 2017), dmarcian was continuing to subsidize time, money and resources to continue to support and promote DME's business to take advantage of market opportunities there, and it was anticipated that the DME's growth would offset the costs of continued development of dmarcian's Code, which development is a work derived from the copyright-protected Code.

17. In May of 2017, Mr. Groeneweg indicated a willingness and ability to pay for development out of DME revenue once a forecasted sales pipeline matured. There was no discussion or even suggestion of altering dmarcian's ownership of its intellectual property in any way, nor would we have entertained such an alteration. We continued to expect that all intellectual property ownership would remain with dmarcian.

18. After hiring enough Bulgarian developers through a contracting agency to justify the creation of a dedicated subsidiary, Bulgarian developers were converted to employees of a subsidiary of DME and began to make changes to dmarcian's Code which were all saved on dmarcian's US source code platform.

19. DME and dmarcian never executed formal PIIA and NDA agreements as contemplated by their email exchange, but we operated based on that email agreement and all parties acted consistently with that agreement until approximately September of 2019.

20. In December of 2019, in connection with litigation with another party, Mr. Groeneweg began to recast our relationship. He asserted, for the first time, that my interest in DME was only a 50% interest and that DME had a "perpetual and exclusive" license for dmarcian's Code and the sole right to service customers in Europe, Russia and Africa.

21. In relation to that lawsuit, Mr. Groeneweg suggested to me that we transfer dmarcian's intellectual property to DME, ostensibly for asset protection

22. While we had been operating with an understanding that DME was authorized to service customers in Europe and was authorized to make changes and improvements to dmarcian's Code with ownership of such changes to remain with

6

dmarcian, no written licensing agreement granting an "perpetual and exclusive license" was executed. Indeed, as our dispute unfolded and DME began to assert rights contrary to our agreement and making demands for an "perpetual and exclusive license", I noted that we should further memorialize with appropriate terms the benefits that DME had been enjoying and what dmarcian was supposed to be getting in return for that benefit.

23. In summary, dmarcian, Inc. gave Defendant access to the dmarcian Code for the parties' joint benefit, and to date has not granted such access to others. The parties' email exchange reflects that the parties' understanding that any derivative works would belong to Plaintiff and could not be used by Defendant independently of Plaintiff. The current form of platform is derived from the dmarcian Code I authored, and neither dmarcian's current platform or the separate one DME illegally created and is using exists or could function without the original dmarcian Code as their primary element.

I declare under penalty of perjury that the foregoing is true and correct.

This the 25 day of March, 2021.

*Tim Draegen*

_____
TIMOTHY DRAEGEN

7

Case 1:21-cv-00067-MR   Document 9   Filed 03/25/21   Page 7 of 9

# Signature Certificate

Document Ref.: YCWW8-VZMAQ-MZJXN-AEQLY

Document signed by:



Tim Draegen
Verified E-mail:
tim@dmarcian.com

*Tim Draegen*

IP: 172.58.156.160   Date: 25 Mar 2021 22:04:38 UTC

Document completed by all parties on:
25 Mar 2021 22:04:38 UTC
Page 1 of 1



Signed with PandaDoc.com

PandaDoc is the document platform that boosts your company's revenue by accelerating the way it transacts.



# CERTIFICATE OF SERVICE

I hereby certify that Defendant has been served by email immediately upon filing with the foregoing DECLARATION as follows:

dmarcian Europe BV
c/o Martijn Groeneweg, Managing Director
Burgemeester de Raadtsingel 93
3311 JG Dordrecht
The Netherlands
martijn@tdx.nl
martin@dmarcadvisor.com

A courtesy copy has also been sent to Plaintiff's Dutch Counsel, Alfred Meijboom at Alfred.Meijboom@kvdl.com, as no US counsel has yet made an appearance. Plaintiff shall also serve a hard copy on Defendant by Federal Express at the above address on March 26, 2021 and will file an additional certificate of service upon completion.

This the 25th day of March, 2021.

/s/ Pamela S. Duffy
Pamela S. Duffy
N.C. State Bar No. 18329
RaShawnda T. Murphy
N.C. State Bar No. 54936
SHARPLESS McCLEARN LESTER DUFFY, PA
200 South Elm Street, Suite 400
Greensboro, North Carolina 27401
Telephone: (336) 333-6389
pduffy@sharplesslaw.com
rmurphy@sharplesslaw.com
*Attorneys for Plaintiffs*