**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**BREVARD DIVISION**
**Case No. 1:21-CV-00067**

| | |
|---|---|
| DMARCIAN, INC., | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) **MEMORANDUM IN SUPPORT OF** |
| | ) **DEFENDANT'S MOTION TO** |
| DMARCIAN EUROPE BV, | ) **DISMISS** |
| | ) |
| *Defendant.* | ) |
| | ) |

Defendant dmarcian Europe BV ("dBV") files this Memorandum in support of its Motion to Dismiss the First Amended Complaint ("FAC"), ECF No. 19, filed by Plaintiff dmarcian, Inc. ("Plaintiff"). The Court should dismiss this action because Plaintiff has not shown that the Court has personal jurisdiction over dBV. In the alternative, the Court should dismiss this action on the grounds of *forum non conveniens.*

<u>**BACKGROUND**</u>

## I.     **The January 2016 Oral Agreement in the Netherlands**

Plaintiff is a Delaware corporation that was formed in 2014 and is in the business of licensing software and services related to email address security. *See* FAC ¶¶ 3, 14–15. In January 2016, Plaintiff's then CEO, Tim Draegen ("Draegen"), traveled to the Netherlands to discuss a potential agreement between Plaintiff and Mailmerk B.V. ("Mailmerk"), a Dutch company that provided email services. *See* Apr. 19, 2021, Decl. of Martijn Groeneweg ¶¶ 10–11 ("Groeneweg Decl."). Mailmerk's indirect director, Martijn Groeneweg ("Groeneweg"), represented Mailmerk at that meeting in the Netherlands. *See id*. Draegen and Groeneweg knew each other because the two had talked "about a way that they could do business together" back in 2013, years before the Netherlands meeting and months before Plaintiff was formed. FAC ¶ 32; *see also* Groeneweg Decl. ¶ 9.

Plaintiff and Mailmerk orally agreed during that January 2016 meeting that Mailmerk would change its name to dBV and license Plaintiff's email software ("dmarcian software") in Europe, Russia, and Africa. *See* Groeneweg Decl. ¶ 10. In exchange for the right to sell that software abroad, Mailmerk gave Plaintiff or Draegen the option to purchase a majority interest in Mailmerk for one Euro. *Id*. In accordance with that

1

agreement, Mailmerk changed its name to dBV in February 2017 and Draegen exercised the purchase option in July 2018. *See* Decl. of Hub. J. Harmeling ¶¶ 6–7 ("Harmeling Decl.").

The January 2016 agreement between Plaintiff and Mailmerk (later dBV) was never formalized in writing. Nonetheless, "it is undisputed" that dBV was (1) "licensed to use and sell software originating from [Plaintiff]," and (2) "responsible for selling that software (and providing related services) to customers in Europe, Russia and Africa." Enterprise Court Decision ¶ 2.5 (Exhibit A to Harmeling Decl.); *see also* FAC ¶ 33.

## II. Initial Cooperation Between Plaintiff and dBV

In the years since the January 2016 agreement, Plaintiff and dBV have both offered the dmarcian software in their respective markets. dBV licensed the software in Europe, Russia, and Africa from its office in the Netherlands using servers in Belgium and the Netherlands. *See* Groeneweg Decl. ¶ 33. dBV has never had an office, agent, or property in the United States. *Id*. ¶ 32. Representatives of Plaintiff and dBV met periodically to discuss dBV's efforts to commercialize the dmarcian software abroad. Only one of those meeting took place in North Carolina; at least seven other meetings took place in Europe. *See id*. ¶¶ 28–30.

At first, Plaintiff continued to write all of the computer code for the dmarcian software. But in mid-2017, Plaintiff and dBV agreed that dBV would also write code for software, using its own employees in the Netherlands and through a Bulgarian subsidiary of dBV, dmarcian Bulgaria EOOD ("dmarcian Bulgaria"). *See id*. ¶ 18. In total, nine developers worked on the dmarcian software: three of Plaintiff's employees in the United

2

States; two dBV employees in the Netherlands; and four dmarcian Bulgaria employees in Bulgaria. *See id*. ¶ 19. Plaintiff paid for the development work in the United States, and dBV paid for the work in the Netherlands and Bulgaria, *see id.* ¶ 20.

Since 2018, dBV's European developers have written roughly 60% of the code for the current version of the dmarcian software. *See id*. ¶ 27. That new code includes significant improvements. For example, dmarcian Bulgaria developed the dmarcian software from a two-tier application to a three-tier application, allowing for Application Programming Interface accessibility. *See id*. ¶ 18. dBV spent at least $1.5 million writing new code for the dmarcian software. *Id*. ¶ 20. In return, dmarcian Bulgaria transferred to dBV all copyrights it had in code written by the Bulgarian developers. *See id*. ¶¶ 14, 18.

### III. The 2019 Dispute Between Plaintiff and dBV

In late 2019, a dispute arose between Plaintiff and dBV over ownership and licensing of the new code. That dispute arose because the parties had never executed a written contract that allocated development expenses and intellectual property rights. When the parties first started working together, the lack of that allocation did not matter because Plaintiff wrote all of the code for the software and there was thus no question about who owned the copyright. But the lack of any formal agreement became material once dBV invested over $1.5 million improving and rewriting the software.

In December 2019, Groeneweg explained to Draegen that dBV owned the intellectual property rights to the new code written in Europe. *See* Groeneweg Decl. ¶¶ 24– 25. Draegen responded by insisting that dBV transfer all of its intellectual property to Plaintiff for no consideration. *See id.* ¶ 26; *see also* Harmeling Decl. ¶ 19. Draegen also

suggested that Plaintiff and dBV would "need a licensing agreement" under which dBV would begin paying licensing fees to sell the dmarcian software, including the new code dBV had written.  Email from Draegen to Groeneweg (Dec. 4, 2019 16:10) (Exhibit I to Groeneweg Decl.).  Plaintiff and dBV tried to negotiate a potential license agreement or other solution to their dispute, but no solution was reached.

While those negotiations were ongoing, Draegen began to use his positions as Plaintiff's CEO and dBV's majority shareholder to put pressure on Plaintiff to give up its intellectual property for no consideration.  For example, on December 6, 2019, Draegen suspended dBV's access to the dmarcian platform, effectively shutting down dBV's business until that access was restored on December 9, 2019.  *See* Harmeling Decl. ¶ 18; *see also* Enterprise Court Decision ¶ 2.9.  When Groeneweg continued to insist that dBV retain its copyrights to the software code it had written, Draegen requested a shareholders meeting to remove Groeneweg as an indirect director of dBV.  *See* Harmeling Decl. ¶ 20. dBV's other shareholder responded by filing a lawsuit in the Enterprise Court of the Amsterdam Court of Appeal to stop Draegen from abusing his position as dBV's majority shareholder.  *See* Groeneweg Decl. ¶ 26.

IV.    **The Dutch Litigation and Investigation**

In September 2020, the Enterprise Court "order[ed] an investigation into the policies and course of affairs of [dBV] from January 1, 2016 to August 20, 2020."  Enterprise Court Decision ¶ 3.4.  The Enterprise Court explained that this investigation is necessary because "[t]here are no unambiguous agreements" related to "the intellectual property rights to software and software applications that has been and will be developed and the licenses

4

granted/to be granted in that connection (and their scope) in particular." *Id.* The Enterprise Court also appointed a third-party director "to try to obtain clarity as to the question of where the intellectual property rights to the software and software applications developed by [dBV] (and dmarcian Bulgaria) lie." *Id.* ¶ 3.5.

While that investigation was ongoing, Plaintiff "terminated the agreement with [dBV] as of 01 February 2021, and gave notice that as of that date [dBV] will no longer have access to the (computer) systems." Court of Rotterdam Judgment ¶ 2.6, ECF No. 8-14. Plaintiff and Draegen then "failed to appear in the proceedings" before the Court of Rotterdam to explain their actions. *Id.* ¶ 2.2. The Court of Rotterdam determined that there was "sufficient ground to grant leave to proceed in default of appearance," *id.* ¶ 2.5, and it ordered Plaintiff and Draegen to "grant [dBV] access to the (computer) systems necessary to service its customers," *id.* ¶ 2.14. The Dutch proceedings are ongoing.

### V. Plaintiff Files This Lawsuit and Seeks Injunctive Relief

In March 12, 2021, Plaintiff filed this lawsuit and later moved for a temporary restraining order and preliminary injunction. On March 31, 2021, this Court denied Plaintiff's motion for a temporary restraining order. As part of its "abbreviated analysis," the Court determined "[b]ased on [the] limited record and briefing" that "it has personal jurisdiction over [dBV]." Mar. 31, 2021, Order at 11, ECF No. 12. In particular, the Court noted Plaintiff's allegations that dBV "reached into the forum state to solicit or initiate business; deliberately engaged in long-term business activities in the forum state; made in-person contact with a resident of the forum in the forum state regarding the business relationship; and engaged in extensive communications about the business being

5

transacted." *Id*. at 8. The Court also noted that its conclusion on personal jurisdiction was "without prejudice to the Defendant submitting a motion pursuant to Federal Rule of Civil Procedure 12(b)(2) that more fully challenges the Court's jurisdiction." *Id*. at 11.

On April 7, 2021, Plaintiff filed the FAC, which is now the operative pleading. Plaintiff alleges that dBV "is a business partner who has hijacked Plaintiff's business as part of efforts to separate European operations from Plaintiff's operations." FAC ¶ 2. Plaintiff seeks, among other relief, an injunction prohibiting dBV "from making, using, distributing, and selling the dmarcian Code," including the code written and owned by dBV. *Id*. at 41 ¶ (B)(1).

## ARGUMENT

This dispute about whether dBV can carry on its business in the Netherlands should be resolved in the Netherlands. Plaintiff has not shown that this Court has personal jurisdiction over dBV and, even it could, the Court should still dismiss this action for *forum non conveniens*.

### I.    Plaintiff Has Not Established Personal Jurisdiction

 "A federal district court may exercise personal jurisdiction over a foreign corporation only if: (1) such jurisdiction is authorized by the long-arm statute of the state in which the district court sits; and (2) application of the relevant long-arm statute is consistent with the Due Process Clause of the Fourteenth Amendment." *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 558 (4th Cir. 2014). To show the contacts necessary under the Due Process Clause for this Court to exercise personal jurisdiction over dBV, Plaintiff must establish "(1) that [dBV] purposefully availed itself of the

privilege of conducting activities in [North Carolina]; (2) that [Plaintiff's] claims arose out of the activities that [dBV] directed at [North Carolina]; and (3) that the district court's exercise of personal jurisdiction over [dBV] would be constitutionally reasonable." *Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd*., 911 F.3d 192, 198 (4th Cir. 2018).

Plaintiff's evidentiary burden varies depending on whether the "court conducts a hearing at which the parties are afforded a fair opportunity to present both the relevant jurisdictional evidence and their legal argument." *Id*. at 197. Without such a hearing, the Fourth Circuit has "treated the disposition of Rule 12(b)(2) motions to dismiss for a lack of personal jurisdiction in conceptually the same manner as we treat the disposition of motions to dismiss under Rule 12(b)(6)." *Id*. at 196. The Court "can later revisit the jurisdictional issue when a fuller record is presented because the plaintiff 'bears the burden of demonstrating personal jurisdiction at every stage following [the defendant's jurisdictional] challenge.'" *Id*. (alteration in original) (quoting *Grayson v. Anderson*, 816 F.3d 262, 265 (4th Cir. 2016)).

### A. Plaintiff Fails to Show That Jurisdiction Is Authorized by the North Carolina Long-Arm Statute

Plaintiff cites no provision of the North Carolina long-arm statute purportedly authorizing this Court to exercise personal jurisdiction over dBV. That omission matters because North Carolina "employ[s] a *two-step* analysis" when resolving personal-jurisdiction challenges. *Brown v. Ellis*, 363 N.C. 360, 363, 678 S.E.2d 222, 223 (2009) (emphasis added). The "first" step is to determine whether jurisdiction is authorized under N.C. Gen. Stat. § 1-75.4. *Id*. This step requires Plaintiff to identify the long-arm provision

or provisions that it believes apply because Plaintiff has the "burden of demonstrating personal jurisdiction." *Grayson*, 816 F.3d at 267. Plaintiff's failure to carry that burden would force dBV – the party without the burden – to prove a negative: that none of the 12 bases for long-arm jurisdiction apply to the facts here. *See* N.C. Gen. Stat. § 1-75.4. That shifted burden conflicts with the Fourth Circuit precedent assigning the burden to Plaintiff. dBV must know the purported grounds for personal jurisdiction so that it can explain why Plaintiff's evidence fails to satisfy those grounds.

To be sure, the long-arm analysis is straightforward when "personal jurisdiction . . . is asserted under N.C.G.S. § 1-75.4(1)(d)" because the "North Carolina Supreme Court has held that N.C.G.S. § 1-75.4(1)(d) permits the exercise of personal jurisdiction over a defendant to the outer limits allowable under federal due process." *Universal Leather*, 773 F.3d at 558. But this overlap between the long-arm statute and the Due Process Clause "does not eliminate the need to identify a prong of the statute that appears to confer jurisdiction." *Brown Inv. Advisory & Tr. Co. v. Allen*, No. CV JKB-19-2332, 2020 WL 5833034, at *5 (D. Md. Sept. 29, 2020) (quotation marks omitted).

Plaintiff's failure to cite § 1-75.4(1)(d) (or any other provision of the North Carolina long-arm statute) may be explained by the text of that subsection. Section 1-75.41(1)(d) authorizes jurisdiction where "a claim is asserted against a party who *when service of process is made upon such party* . . . [i]s engaged in substantial activity within this State." N.C. Gen. Stat. § 1-75.4(1)(d) (emphasis added). This language limits the inquiry to "when service of process is made." *Id*. On that date, the defendant must be "engaged in substantial activity" in North Carolina. *Id*. Thus, § 1-75.4(1)(d) may extend to the limits of Due

Process for defendants with ongoing activity in North Carolina, but a plaintiff fails to invoke jurisdiction "even under [Section] 1-75.4(1)(d)'s very broad terms" where the allegations involve North Carolina activity that ended before service of process. *Wolfe Fin. Inc. v. Rodgers*, No. 1:17CV896, 2019 WL 203183, at *7 (M.D.N.C. Jan. 15, 2019), *report and recommendation adopted*, 2019 WL 2465218 (M.D.N.C. Feb. 1, 2019).

Here, Plaintiff cannot show that, at the time of service, dBV is engaged in substantial activity within this State. The only alleged link between North Carolina and dBV is Plaintiff, and Plaintiff claims that it "terminate[d] cooperation between the parties with immediate effect as per February 1, 2021." FAC ¶ 65. Plaintiff's CEO also testifies that Plaintiff "terminate[d] access to all dmarcian data on March 4, 2021." Supp. Decl. Shannon Draegen ¶ 7, ECF No. 15. Eleven days later, on March 15, this Court issued the Summons in this case. *See* ECF No. 2. By that time, by Plaintiff's own allegations and evidence, dBV no longer had any connection with North Carolina. Because dBV's alleged North Carolina activity ended before the Summons issued in this case – and thus before Plaintiff could have served that Summons – Plaintiff cannot establish personal jurisdiction under N.C. Gen. Stat. § 1-75.4(1)(d).

Nor do the other potential bases for jurisdiction under § 1-75.4 apply here. In its Memorandum in Opposition to Motion for Temporary Restraining Order, dBV speculated – because Plaintiff fails to carry its burden of identifying the relevant provisions – that Plaintiff may seek to invoke N.C. Gen. Stat. § 1-75.4(4) or (5). *See* Mem. Opp'n TRO at 8, ECF No. 11. Those subsections have different temporal requirements than § 1-75.4(1)(d).

Under § 1-75.4(4), a North Carolina court has jurisdiction over an "action claiming injury to person or property" when, "at or about the time of the injury,"

a. Solicitation or services activities were carried on within this State by or on behalf of the defendant;
b. Products, materials or thing processed, serviced or manufactured by the defendant were used or consumed, within this State in the ordinary course of trade; or
c. Unsolicited bulk commercial electronic mail was sent into or within this State . . . .

*Id*. None of these provisions apply because, at the time of the alleged injuries, dBV did not conduct any activities in North Carolina, and the other grounds for jurisdiction are inapplicable to dBV's business model. Similarly, § 1-75.4(5) authorizes jurisdiction in circumstances related to services performed or goods located in North Carolina. *See* N.C. Gen. Stat. § 1-75.4(5). These grounds for jurisdiction do not apply because there is no allegation or evidence that dBV performed or agreed to pay for services in North Carolina, and the allegations here do not concern goods.

In the end, Plaintiff has failed to carry its burden of identifying and establishing a statutory basis for this Court's jurisdiction over dBV. If Plaintiff later comes forward with argument or evidence under § 1-75.4(1)(d), § 1-75.4(4), § 1-75.4(5), or any other provision of the North Carolina long-arm statute, dBV must have a chance to respond those new arguments or evidence.

### B. Plaintiff Has Not Established Minimum Contacts with North Carolina

As this Court noted in its March 31 Order, the Fourth Circuit has "identified numerous nonexclusive factors to be considered" in "determining whether a defendant has

purposely availed itself of the privilege of conducting business in a State." *Sneha Media & Ent.*, 911 F.3d at 198–99. Those factors include

> (1) whether the defendant maintained offices or agents in the State; (2) whether the defendant maintained property in the State; (3) whether the defendant reached into the State to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the State; (5) whether a choice of law clause selects the law of the State; (6) whether the defendant made in-person contact with a resident of the State regarding the business relationship; (7) whether the relevant contracts required performance of duties in the State; and (8) the nature, quality, and extent of the parties' communications about the business being transacted.

*Id*. at 198–99.

Applying these factors, the Fourth Circuit has "found purposeful availment where a defendant substantially collaborated with a forum resident and that joint enterprise constituted an integral element of the dispute." *Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 302 (4th Cir. 2012) (per curiam). Specifically, the Fourth Circuit upheld jurisdiction over an Arizona resident who "deliberately entered a collaborative enterprise with [a co-defendant North Carolina resident], well aware that any potentially tortious content [the North Carolina resident] created would be physically uploaded by a North Carolina resident working on a computer in North Carolina." *Christian Sci. Bd. of Directors of First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 217 (4th Cir. 2001).

In contrast, "purposeful availment was lacking in cases in which the locus of the parties' interaction was overwhelmingly abroad." *Tire Eng'g & Distribution*, 682 F.3d at 302. For example, the Fourth Circuit found personal jurisdiction lacking over a Colorado and Indian corporation because "neither had purposefully availed itself of the privilege of

11

conducting activities in Virginia, the forum state." *Id*. (citing *Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273, 279 (4th Cir. 2009)). Of particular relevance here, the Indian corporation "maintained no offices in Virginia," "none of its employees had ever traveled there," the "activity complained of took place in India, and the alleged conspiracy was hatched outside of the forum state." *Id*. Similarly, the Fourth Circuit rejected personal jurisdiction over a different Indian company that "carries on its business solely in India" where the "only relevant contact that [defendant] had with Virginia was a single meeting" in Virginia with the CEO of the plaintiff Virginia LLC. *Sneha Media & Ent.*, 911 F.3d at 199. The meeting in Virginia could not establish personal jurisdiction over the Indian defendant because "that discussion was informal and limited, leading to no arrangement." *Id*.

Here, dBV has not purposefully availed itself of the privilege of conducting activities in North Carolina because "the locus of the parties' interaction was overwhelmingly abroad." *Tire Eng'g & Distribution*, 682 F.3d at 302. dBV is a Dutch company that orally agreed in the Netherlands to license the dmarcian software in Europe, Africa, and Russia. dBV has never sold any product or service in North Carolina, it has never owned property in North Carolina, and it has never had an office or agent here. Like the Indian defendant in *Sneha Media & Ent.*, the only relevant contact that dBV had with North Carolina was a single meeting that did not form the basis for the parties' relationship. Instead, the parties began their relationship in the Netherlands and held all but one of their later meetings in the Netherlands or elsewhere in Europe.

12

Contrary to Plaintiff's allegations, the evidence does not show that dBV "reached into the forum state to solicit or initiate business." Mar. 31, 2021, Order at 8. Plaintiff alleges that "Groeneweg initiated contact with Plaintiff in 2013," FAC ¶ 33, because Groeneweg emailed Draegen in 2013 to show interest in email-security technology. Groeneweg's 2013 email did not involve Plaintiff, which was not formed until 2014. *See* FAC ¶ 3. And the ensuing conversations between Groeneweg and Draegen were "informal and limited." *Sneha Media & Ent.*, 911 F.3d at 199. It was not until years later, in 2016, that Plaintiff and dBV agreed – in the Netherlands – that dBV would license the dmarcian software abroad.

The evidence likewise undermines Plaintiff's claim that dBV "deliberately engaged in long-term business activities in the forum state." Mar. 31, 2021, Order at 8. Plaintiff and dBV entered a contract regarding dBV's use of the dmarcian software in Europe, but that agreement included *no ongoing obligation* from dBV to Plaintiff. Rather, Plaintiff authorized dBV to exploit the dmarcian software abroad in exchange for Draegen – Plaintiff's CEO and majority shareholders – receiving a controlling interest in dBV. dBV satisfied that obligation in July 2018, when Draegen purchased a controlling interest in dBV for one Euro.

The lack of any ongoing obligation from dBV to Plaintiff is critical because "an individual's contract with an out-of-state party *alone*" cannot "establish sufficient minimum contacts in the other party's home forum." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985). A contract is "but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the

business transaction." *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 190 (4th Cir. 2016) (quoting *Burger King*, 471 U.S. at 478). "It is these factors – prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing – that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." *Burger King*, 471 U.S. at 479.

All of those factors show that dBV did not establish minimum contacts with North Carolina. The only connection to North Carolina is Plaintiff, and the only alleged obligation that dBV had to Plaintiff was dBV's supposed "agree[ment] that all original and newly-developed products, software, copyrights, trade secrets, intellectual property, and technical development would continue to be owned by (with IP rights from developed products accruing to) Plaintiff, and *would be assigned to and owned by Plaintiff*." FAC ¶ 33(g) (emphasis added). That allegation is false: Plaintiff and dBV did not discuss assignment of intellectual property rights because, at that time, Plaintiff was developing all of the software code for the dmarcian software. *See* Groeneweg Decl. ¶ 12; *see also* Email from Groeneweg to Draegen (Dec. 8, 2016 00:31) (Exhibit C to Groeneweg Decl.) (listing terms of January 2016 oral agreement).

Once dBV began writing code for the software and paying dmarcian Bulgaria to do the same, Plaintiff appears to have assumed that it would own all newly created intellectual property. But the parties never discussed or agreed on an assignment from dBV to Plaintiff. Indeed, the lack of agreement on that critical term is one of the reasons why the Enterprise Court is now conducting an investigation of dBV's affairs to determine "where the

intellectual property rights to the software and software applications developed by [dBV] (and dmarcian Bulgaria) lie." Enterprise Court Decision ¶ 3.5.

### C. Exercising Jurisdiction over dBV Would Be Constitutionally Unreasonable

To determine whether jurisdiction is constitutionally reasonable, the Court should evaluate "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate [here, international] judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States [and nations] in furthering fundamental substantive social policies." *Christian Sci. Bd. of Directors*, 259 F.3d at 217 (quoting *Burger King*, 471 U.S. at 477).

The most efficient and just outcome here is for the Dutch courts to continue resolving this dispute over dBV's operations in the Netherlands. This dispute arises from an oral agreement reached in the Netherlands, most of the developers who wrote the software code at issue are located in the Netherlands (or elsewhere in Europe), and dBV is managed by a court-appointed director charged with "obtain[ing] clarity as to the question of where the intellectual property rights to the software and software applications developed by [dBV] (and dmarcian Bulgaria) lie, or at least to make sufficiently clear agreements with [Plaintiff] about this and to record these." Enterprise Court Decision ¶ 3.5. Plaintiff is attempting to undermine the Enterprise Court's ongoing "investigation into the policies and course of affairs of [dBV]," *id*. ¶ 3.4, by forcing dBV's court-appointed director to spend dBV's time and resources defending dBV's business in U.S. federal court

even though dBV does not sell any product or service in the United States.  The Court should hold that exercising personal jurisdiction over dBV under these circumstances would be constitutionally unreasonable.

### D. Federal Rule of Civil Procedure 4(k)(2) Does Not Create Personal Jurisdiction over dBV

In its March 31 Order, this Court raised the possibility that Plaintiff's allegations "create personal jurisdiction over the Defendant under Federal Rule of Civil Procedure 4(k)(2)."  Mar. 31, 2021 Order at 7 n.3.  A "plaintiff can invoke Rule 4(k)(2) if it demonstrates that *no State* can exercise personal jurisdiction over the defendant but that the defendant's contacts with the United States as a whole support the exercise of jurisdiction consistent with the Constitution and laws of the United States."  *Grayson*, 816 F.3d at 271; *accord Cato Corp. v. Cato (HK) Ltd.*, No. 3:20cv117FDWDCK, 2021 WL 879078, at *5 (W.D.N.C. Mar. 9, 2021) ("the plaintiff must show" the requirements for Rule 4(k)(2) jurisdiction).

Here, Plaintiff has not shown, as it must, that dBV "is not subject to personal jurisdiction in any state."  *Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory"*, 283 F.3d 208, 215 (4th Cir. 2002) (affirming dismissal for lack of personal jurisdiction when the plaintiff "has never attempted to argue that [the foreign defendant] is not subject to personal jurisdiction in any state").  Plaintiff alleges only that dBV has sufficient contacts with North Carolina for this Court to exercise personal jurisdiction over dBV.  There is no alternative allegation that, if "contacts are so scattered among states that

none of them would have jurisdiction," dBV still has "ample contacts with the nation as a whole." *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 551 (7th Cir. 2001).

Plaintiff also cannot show that dBV "contacts with the United States as a whole support the exercise of jurisdiction consistent with the Constitution and laws of the United States." *Grayson*, 816 F.3d at 271. The only allegations concern dBV's alleged contacts with North Carolina and, as discussed above, those contacts fall short of the bar needed to exercise personal jurisdiction consistent with the Due Process Clause.

## II. This Action Should Be Dismissed on the Grounds of *Forum Non Conveniens*[1]

This action, if not dismissed, will require the Court to adjudicate an intramural dispute between the owners of a Dutch company which is already well underway in the Dutch courts. dBV has therefore filed this Motion to Dismiss on the grounds of *forum non conveniens*. The doctrine of *forum non conveniens* permits a court "to resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute," *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507 (1947), if dismissal "would best serve the convenience of the parties and the ends of justice," *Koster v. (Am.) Lumbermens Mut. Casualty Co.*, 330 U.S. 518, 527 (1947).

---

[1] The Supreme Court has held that a district court "may dismiss a case on forum non conveniens grounds, without first addressing personal and subject-matter jurisdiction." *Trustgard Ins. Co. v. Collins*, 942 F.3d 195, 201 (4th Cir. 2019) (citing *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007)). That is "because the Court could first address questions that 'involve[ ] a deliberate abstention from the exercise of jurisdiction.'" *Id.* (quoting *Sinochem Int'l*, 549 U.S. at 430).

In *American Dredging Co. v. Miller*, 510 U.S. 443, 447-48 (1994), the United States

Supreme Court described the outline of the doctrine:

> Under the federal doctrine of *forum non conveniens*, when an alternative
> forum has jurisdiction to hear a case, and when trial in the chosen forum
> would establish oppressiveness and vexation to a defendant out of all
> proportion to plaintiff's convenience, or when the chosen forum is
> inappropriate because of considerations affecting the court's own
> administrative and legal problems, the court may, in the exercise of its sound
> discretion, dismiss the case, even if jurisdiction and proper venue are
> established.

*Id.* (quotation marks omitted). And, as the Supreme Court has held, "[d]ismissal for forum

non conveniens reflects a court's assessment of a 'range of considerations, most notably

the convenience to the parties and the practical difficulties that can attend the adjudication

of a dispute in a certain locality.'" *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping

Corp.*, 549 U.S. 422, 429 (2007) (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706,

723 (1996)). A "trial court's forum non conveniens determination 'may be reversed only

when there has been a clear abuse of discretion.'" *SAS Inst. Inc. v. World Programming

Ltd.*, 468 F. App'x 264, 265 (4th Cir. 2012) (per curiam) (quoting *Piper Aircraft Co. v.

Reyno*, 454 U.S. 235, 241 (1981)).

Thus, a "*forum non conveniens* dismissal must be based on the finding that, when

weighed against plaintiff's choice of forum, the relevant public and private interests

strongly favor a specific, adequate, and available alternative forum." *Tang v. Syntura Int'l,

Inc.*, 656 F.3d 242, 246 (4th Cir.2011).[2] In considering such a motion, the "district court

---

[2] While a plaintiff's choice of forum, particularly its home forum, is entitled to a degree of
deference, "there is no automatic right to the presumption" that it is a proper forum.
*Interface Partners Intern. Ltd. v. Hananel*, 575 F.3d 97, 102 (1st Cir. 2009). The Supreme

must determine whether the alternative forum is: (1) available; (2) adequate; and (3) more convenient in light of the public and private interests involved." *NLA Diagnostics LLC v. Theta Technologies Ltd.*, No. 3:12-cv-00087, 2012 WL 3202274 at *3 (W.D.N.C. Aug. 3, 2012) (citing *Piper Aircraft*, 454 U.S. 235 at 241 (dismissing U.S. action on forum non conveniens grounds in favor of proceeding in English courts)).

### A. The Dutch Courts Provide an Available Forum

"Availability will ordinarily 'be satisfied when the defendant is 'amenable to process' in the other jurisdiction.'" *NLA Diagnostics*, 2012 WL 3202274 at *3 (quoting *Piper Aircraft*, 454 U.S. at 255 n.22). In this case, dBV, as a Dutch corporation, is clearly amenable to process in the Dutch courts; indeed, it is currently controlled by a director appointed by the Dutch Enterprise Court. *Cf.* Apr. 19, 2021, Decl. of Alfred Meijboom ¶¶ 8–10 ("Meijboom Decl.").

### B. The Dutch Courts Provide an Adequate Forum

A "foreign forum is adequate when (1) all parties can come within that forum's jurisdiction, and (2) the parties will not be deprived of all remedies or treated unfairly, even though they may not enjoy the same benefits as they might receive in an American court."

---

Court has instructed that a "citizen's forum choice should not be given dispositive weight" and "dismissal should not be automatically barred when a plaintiff has filed suit in his home forum." *Piper Aircraft*, 454 U.S. at 254 n.23; *see also Pollux Holding Ltd. v. The Chase Manhattan Bank*, 329 F.3d 64, 73 (2d Cir. 2003) (courts "do[] not assign talismanic significance to the citizenship or residence of the parties, and there is no inflexible rule that protects U.S. citizen or resident plaintiffs from having their cases dismissed for *forum non conveniens*"). The deference is even more discounted when, as here, "an American corporation doing extensive foreign business brings an action for injury occurring in a foreign county." *DTEX, LLC v. BBVA Bancomer, S.A.*, 508 F.3d 785, 795 (5th Cir. 2007).

*Fid. Bank PLC v. N. Fox Shipping N.V.*, 242 F. App'x 84, 90 (4th Cir. 2007) (per curiam) (quotation marks omitted). As a general proposition, the Dutch courts have long "been found to be an adequate alternative forum in prior forum non conveniens cases." *Potomac Cap. Inv. Corp. v. Koninklijke Luchtvaapt Maatschapplj N.V.*, No. 97-cv-8141, 1998 WL 92416, at \*5 (S.D.N.Y. Mar. 4, 1998) (citing multiple cases regarding the adequacy of the Dutch courts). Indeed, there is a "presumption that the substantive law of the foreign forum is adequate, unless plaintiff can show 'conditions in the foreign forum . . . plainly demonstrate that the plaintiff is highly unlikely to obtain justice there." *Flowserve U.S. Inc. v. ITT Corp.*, 68 F. Supp. 3d 646, 654 (N.D. Tex. 2014) (quoting *DTEX, LLC v. BBVA Bancomer, S.A.*, 508 F.3d 785, 796 (5th Cir. 2007)).

As stated in the Declaration of dBV's Dutch counsel, the claims brought in this case are generally cognizable under Dutch law and in Dutch courts. *See* Meijboom Decl. ¶ 19. dBV easily meets the standard of demonstrating that "the alternative forum addresses the types of claims that the plaintiff has brought." *Interface Partners Intern. Ltd. v. Hananel*, 575 F.3d 97, 101 (1st Cir. 2009) (affirming forum non conveniens dismissal in favor of proceeding in Israeli courts).

### C. The *Forum Non Conveniens* Factors Favor Dismissal

"If the alternative forum is both available and adequate, then the district court must weigh the public and private interest factors." *NLA Diagnostics*, 2012 WL 3202274 at \*4 (citing *Tang v. Syntura Int'l, Inc.*, 656 F.3d 242, 246 (4th Cir. 2011)). The private interest factors include the "[1] relative ease of access to sources of proof; [2] availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of

willing, witnesses; [3] possibility of view of premises, if view would be appropriate to the action; and [4] all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gulf Oil v. Gilbert*, 330 U.S. 501, 508 (1947).

The "public factors bearing on the question include [1] the administrative difficulties flowing from court congestion; [2] the 'local interest in having localized controversies decided at home'; [3] the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; [4] the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and [5] the unfairness of burdening citizens in an unrelated forum with jury duty." *NLA Diagnostics*, 2012 WL 3202274 at *4 (quoting *Piper Aircraft*, 454 U.S. at 241 n.6).

### i.    Private Interest Factors

Both of the pertinent private interest factors – relative ease of access to sources of proof and witness considerations – favor dismissal. The fact that dBV is a Dutch company whose conduct generally – and especially the conduct complained of – occurred almost entirely within the Netherlands is pertinent to this factor. *See Interface Partners*, 575 F.3d at 104 (noting the fact that defendant "was almost always in Israel . . . when he was working for [plaintiff]" was pertinent to access to sources of proof inquiry). In other words, as in *Interface Partners* where the "locus of the alleged misconduct is in Israel," *id*., here the "locus" of any misconduct is the Netherlands. The "facts that the events relating to [defendant's] alleged misconduct" occurred in the Netherlands, "weighs heavily in favor of the foreign forum." *Id*.; *see also Howe v. Goldcrest Invest., Ltd.*, 946 F.2d 944, 951 (1st Cir. 1991) (dismissing in favor of Canadian forum because the "relevant events

surrounding both plaintiff's misrepresentation and breach of fiduciary duty claims took place *in Canada*, not in the United States") (quotation marks omitted).

As in the Supreme Court's seminal *Piper* case, because a "large proportion of the relevant evidence is located in Great Britain" it was not unreasonable for the trial court to conclude "that fewer evidentiary problems would be posed if the trial were held in Scotland." *Piper*, 454 U.S. at 257–58. Here, it appears based on the declarations filed by dBV that the "majority of witnesses with the most relevant information reside aboard," *Flowserve U.S. Inc.*, 68 F. Supp. 3d at 659, meaning that "securing their attendance in the United States would be more expensive," *id.*, than if the case were litigated in the Netherlands. That includes the fact that six of the nine developers of the contested software are located in Europe. *See* Groeneweg Decl. ¶ 19; Harmeling Decl. ¶ 15. The processes available to secure testimony from those witnesses are available in the Dutch court, Meijboom Decl. ¶ 20, and there is no showing that the U.S. courts have a like procedure. In any event, the cost of securing attendance of European witnesses to a European proceeding is necessarily less.

To take another factually similar example, in *Wallert v. Atlan*, 141 F. Supp. 3d 258, 281 (S.D.N.Y. 2015), primarily a copyright case, the court found "the private factors strongly favor France because resolving [plaintiff's] foreign law claims will require testimony from French witnesses, analysis of French (and other EU law), and evidence that will overwhelmingly be found in France." The same is true here with respect to the Netherlands. And, "because most witnesses will undisputedly be based in Europe, securing

those witnesses for trial will be far less expensive in [the European home of defendant] than in [the U.S.]." *Id*.

      **ii.**        **Public Interest Factors**

Four of the five public interest factors (apart from court congestion) concern the desirability of hearing cases in the most appropriate "local" court, *i.e.*, the one with the greatest interest, most at home with the applicable law, and most appropriate to bear the burden of the dispute's resolution. Again, those factors all point to the Netherlands.

As noted in dBV's Memorandum in Opposition to the Motion for Preliminary Injunction, the agreement between the parties was made in the Netherlands and Dutch law will apply to its interpretation. *See* Groeneweg Decl. ¶ 11; *NLA Diagnostics*, 2012 WL 3202274 at *5 ("North Carolina has little interest in this controversy, which primarily concerns allegations of breach of a contract governed by [foreign] law"). Moreover, to the extent that this dispute largely concerns intellectual property rights – copyright, trademark, and trade secrets – the law applicable to dBV, a Dutch entity doing the bulk of its business in Europe – is Dutch, not U.S., law. *See generally* Mem. Opp'n Mot. for Prelim. Inj. The North Carolina law claims would require improper extraterritorial application of the foreign actions of foreign defendants. *See NLA Diagnostics*, 2012 WL 3202274 at *5 (dismissing case in favor of English forum when adjudication in North Carolina "would be substantially burdened with attempting to untangle problems in conflict of has laws, and in foreign law itself") (quotation marks omitted).

Naturally, there is a public interest in having the trial "in a forum that is at home with the law that must govern the action." *Mars, Inc. v. Kabushiki-Kaisha Nippon Conlux*,

24 F.3d. 1368, 1376 (Fed. Cir. 1994). In that case, the court refused to exercise jurisdiction over a Japanese patent infringement claim which "would require the court to resolve complex issues of Japanese procedural and substantive law a task further complicated by having to agree on the proper translation of laws, documents and other communications." *Id*. (quotation marks omitted). In addition, the "court also found that general concerns respecting international comity counsel against exercising jurisdiction over a matter involving a Japanese patent, Japanese law, and acts of a Japanese defendant in Japan." *Id*. The choice-of-law factor also weighs in favor of the Netherlands when, as here "the tort occur[ed] on the ground in the Netherlands." *Potomac Capital Inv. Corp.*, 1998 WL 92416 at *13.

The fact that "there is a history of litigation between the parties in the alternative forum, and foreign law will likely be applied," *Flowserve US Inc.*, 68 F. Supp. 3d at 661, means that the "administrative burdens weigh in favor of dismissal." *Id*. Finally, the "Netherlands certainly has an interest in adjudicating . . . a claim against one of its . . . corporations." *Potomac Capital Inv. Corp.*, 1998 WL 92416 at *10. At the same time, "the Western District of North Carolina has comparatively less interest in this case, which primarily involves injuries inflicted abroad, and jury duty 'ought not to be imposed upon the people of a community which has no relation to the litigation.'" *NLA Diagnostics*, 2012 WL 3202274 at *5 (quoting *Gilbert*, 330 U.S. 508–09).[3]

---

[3] That Plaintiff may suffer revenue loss in North Carolina "is not material to the analysis" since "[i]t will always be the case that U.S. companies doing business abroad will suffer a loss of revenue in the U.S." *Flowserve US Inc.*, 68 F. Supp. 3d at 662.

With regard to the final factor, whether the case involves matters of local concern, it again counsels in favor of the Dutch forum. The "court's interest in controlling a crowded docket also provides a basis for the court's inherent power to dismiss on ground of *forum non conveniens*." *Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824, 828 (5th Cir. 1993). Thus, "Courts may validly protect their dockets from cases which arise within their jurisdiction, but which lack significant connection to it." *Postel v. El-Al Israel Airlines, Ltd.*, 690 F. Supp. 1361, 1364 (S.D.N.Y. 1988). The doctrine of *forum non conveniens* "is designed not only to relieve the parties of the burden of litigating in an inconvenient forum, but to clear the courts of protracted litigation in which the original forum has little sovereign interest." *Ali v. Offshore Co.*, 753 F.2d 1327, 1333 (5th Cir. 1985).

## CONCLUSION

The Court should dismiss the FAC for lack of personal jurisdiction over dBV and on the grounds of *forum non conveniens*.

This the 19th day of April, 2021.

**WOMBLE BOND DICKINSON (US) LLP**

/s/ Pressly M. Millen
Pressly M. Millen, NC State Bar No. 16178
Samuel B. Hartzell, NC State Bar No. 49256
Post Office Box 831
Raleigh, North Carolina 27602
Phone: (919) 755-2135
Fax: (919) 755-6067
Email: Press.Millen@wbd-us.com
　　　　Sam.Hartzell@wbd-us.com

*Counsel for Defendant dmarcian Europe BV*