# Attachment 1

Ex. 1 - Declaration of Hub J. Harmeling

## Declaration of Hub. J. Harmeling

Hub. J. Harmeling, declares as follows pursuant to 28 U.S.C. § 1746:

### Background

1.      I am a resident of The Netherlands, am over eighteen years of age, and am competent to make this Declaration. I have personal knowledge of the matters stated herein either directly through my involvement in the events or indirectly on the basis of my review of business records of dmarcian Europe BV ("dBV").

2.      On September 10, 2020, the Enterprise Court of the Appellate Court of Amsterdam in The Netherlands (the "Enterprise Court") appointed me as independent director of dBV. In its related ruling of September 7, 2020, the Enterprise Court decided that the policies and state of affairs of dBV should be investigated as requested by TDX, minority shareholder in dBV, and by Timothy George Draegen (Draegen), majority shareholder in dBV, who introduced himself into the Enterprise Court proceedings as interested party.

3.      The Enterprise Court found reasons to order an inquiry into the policy and state of affairs of dBV. For this purpose it appointed (i) an investigator, (ii) an independent director with decisive vote, and (iii) an administrator to execute the governance rights related to the shares held by TDX and Draegen respectively with the sole exception of one share to be held by TDX and one share to be held by Draegen. I am the court-appointed independent director.

4.      Although TDX was maintained as director of dBV, it cannot exercise any external authority without my explicit approval as independent director. In this way I am able to safeguard the assets of dBV and control all actions of dBV as directed by the Enterprise Court, given that the governance rights and external authority of both the board of directors and shareholders have been divested as a result of the court's ruling. Consequently my position is independent of the interests of the shareholders or the other board members and my actions will be determined by the reasonable and valid interests of all stakeholders in dBV including employees, creditors, shareholders, contractual parties, customers, etc.

5.      The mission given to me by the Enterprise Court is to act independently from the

interests of both TDX and Draegen and that is what I do. In the context of these proceedings it is important to note that Draegen is not only the majority shareholder in dBV but also the majority shareholder in control of dmarcian, Inc. ("dInc"), the U.S. company.

**dmarcian Europe BV**

6.     dBV was founded on March 24, 2013 under the name Mailmerk B.V. Its business is to provide products and services in relation to securing the identity of email addresses. dBV changed its name to dmarcian Europe BV as of February 15, 2017. On the basis of the information in the records of dBV, I conclude that this was done as a consequence of oral/email agreements between Martijn Groeneweg (an indirect shareholder in TDX), on the one hand, and Draegen (then the sole shareholder and CEO of dInc), on the other hand.

7.     Part of this arrangement was that, on first request thereto, TDX would transfer the majority of the shares it held in dBV, to dInc. or Draegen. Thus dInc or Draegen would maintain both greater than 50% of the governance rights in dBV, as well as greater than 50% of its benefits. Those shares were ultimately transferred to Draegen in 2018.

8.     In its ruling of September 7, 2020 (at ¶ 2.5), the Enterprise Court confirmed that dBV and dInc cooperated since the beginning of 2016 on the basis of a license granted by dInc to use and distribute dInc's software and making dBV responsible for sales of that software and related services to customers in Europe, Russia and Africa. (A true and correct copy of that ruling, along with an English translation, is attached hereto as Exhibit A.)

9.     In consultation with Draegen, dBV founded a corporation in Bulgaria in 2018, dmarcian Bulgaria EOOD (EOOD). EOOD is a wholly owned subsidiary of dBV and it is financed and operated by dBV and under its control. EOOD is a service company providing development services to dBV and dInc. Its business is not directed toward independent profitability and all of its costs in relation to labour, rents etc., are borne by its owner, dBV.

10.     Based on my review of the company's business records, dBV maintains no offices or agents in North Carolina (or the United States generally). It owns no property – real or personal

2

– in North Carolina or the United States.  It does not do business in North Carolina or the United States generally, nor does it solicit business in the United States.  The company has no U.S. customers.

11.    dBV only services customers in the agreed territory, namely Europe, Russia and Africa.  dBV's marketing is also limited to that territory and all prospects or leads coming from outside that territory are passed on to dInc or dInc's Asia Pacific distributor, as the case may be (apart from a few customers in Turkey and Saudi Arabia who prefer to be served from Europe). On an incidental basis and with the approval of or on request of dInc, dBV has also serviced certain international customers which have offices both inside and outside its territory, when requested by those companies.

### The Dispute Between dmarcian Inc. and dmarcian Europe BV

12.    As stated in ¶ 2.5 of Enterprise Court decision, the shareholders of dBV – TDX and Draegen – disagree with regard to the conditions of the cooperation between dInc and dBV in relation to their cooperation/license/distribution arrangements.

13.    TDX takes the position that on January 22, 2016, it came to an oral agreement with Draegen in The Netherlands which was the basis for their cooperation since that date.  According to Draegen the initial terms as described by TDX , are either wrong or inaccurate.  Draegen contends that documents sent by him in December 2016 to TDX have to be considered the basis of the parties' cooperation.

14.    As an independent court-appointed director, my position must be neutral and I cannot align to the positions taken by either TDX or Draegen.  In order to determine my responsibilities in the relation to dInc, I have taken the factual conclusions of the ruling of the Enterprise Court (prior to my appointment) as a starting point (specifically ¶¶ 2.1 through 2.9 of the ruling), as well as my review of the documents available to me, as suggested by ¶ 3.5 of the ruling by the Enterprise Court.

15.    My provisional conclusions (on the basis of the records available to me) which

3

determine my actions as court-appointed director on behalf of dBV are as follows:

- Pursuant to an agreement between Draegen and Groeneweg, dInc and dBV acted from the beginning of 2016 on the basis that dBV enjoyed a perpetual exclusive royalty-free license from dInc to distribute dmarcian software;

- As a part of that agreement, dInc or Draegen obtained an option to purchase the majority of shares in dBV from TDX for a nominal payment of €1.00.

- dInc and dBV shared the same trademark – "dmarcian" – and would operate as separate entities under one brand;

- All business related to dmarcian software in Europe, Russia and Africa would be revenue of dBV;

- dInc and dBV shared one platform at www.dmarcian.com and new customers would click on the website logo for their region and then be automatically directed to the website of the company having exclusivity for that region;

- The web environment of dBV was hosted on servers in Belgium and The Netherlands, controlled by dInc. Thus, dBV was fully dependent on dInc for the hosting of its European platform providing the application and access to its customer data, market activities, mail, calendars, etc., and in relation to determining the level of access for dBV employees;

- As of 2016, dInc was responsible and paid for software development;

- In 2017, Draegen and Groeneweg decided to use Bulgarian developers to rewrite the existing legacy dmarcian software (which I understand to have been two-layered) in order to fully modernise it into a new version which is three-layered with API connection options for customers in relation to all parts of the dmarcian software;

- Initially, a Bulgarian firm, BeLean EOOD, was engaged and paid by dBV, using two software developers in Bulgaria in addition to the two software developers of dInc;

- Later, in 2018 Draegen and Groeneweg arranged for a corporate entity to be set up in Bulgaria. That entity is EOOD which engaged the two developers formerly employed by BeLean and added two more software developers as well as one UX developer to act as a user experience / user interface designer);

- In late 2018, Draegen and Groeneweg arranged that two developers in dBV (Herwert Kalkman and Dennis Seller) would become involved in the development

4



of dmarcian software. By operation of applicable law the employers of these developers owned the intellectual property rights and more specifically copyright to the software created by them, and ,

- From my communications with U.S. counsel to dInc, I learned that dInc claims the right to acquire those copyrights *ex post*, on the basis of specific conditions agreed to between Draegen and Groeneweg in 2016, but I have not been able to identify or confirm the existence of such an agreement.

16.     As established in ¶ 3.4 of the ruling of the Enterprise Court of September 7, 2020, no clear written agreed conditions were made available to that Court in relation to the cooperation, including the ownership of the intellectual property rights (IPR).  According to the Enterprise Court, this justified an investigative inquiry into the governance  and state of affairs of dBV in the period from January 1, 2016 until August 20, 2020.

17.     Based on my review of dBV records, the parties generally understood and acknowledged that the IPR was *in fact* shared between them.  On December 3, 2019, however, when Groeneweg presented to Draegen a possible solution to formalize such shared IPR to keep it available to both businesses, Draegen refused to enter into any discussions or further analysis.

18.     Instead, Draegen immediately denied dBV employees access to the computer and other systems managed by dInc and dBV.  This action in December 2019 was the first blockade by dInc.  In addition the  Wordpress  environment of the website created by dBV and shared and managed between the parties (at www.dmarcian.com)  was unilaterally migrated by dInc from a European host onto a Wordpress environment managed by dInc and hosted in the U.S. This meant that dInc was now hosting all of dBV's systems and therefore had the power to take down dBV's business operations completely, at its discretion.  As more fully described below, these actions provided Draegen and dInc with the mechanism to put operational pressure on dBV in order to make it agree to dInc's demands in relation to disputed issues, as I experienced after my appointment.

19.     After the first disconnection of dBV by dInc in December 2019 was restored, TDX and Draegen attempted to resolve the dispute in a face to face meeting at the office of dBV in The

5

Netherlands in January 2020. In May 2020, dBV submitted a comprehensive settlement proposal based on those discussions in the January 2020 meeting in The Netherlands. However, Draegen did not come back with any feedback on this proposal. Instead, Draegen responded by sending a document to transfer IPR for free from dBV to dInc which was refused by dBV and at the same by sharing his intention to replace TDX as the director of dBV.

20.     After a meeting on July 3, 2020, Draegen requested a General Meeting of Shareholders of dBV to obtain such dismissal of TDX – the sole director and minority shareholder of dBV – and the appointment of a Draegen-nominated director. TDX was concerned that this director, following his appointment, would cooperate in the transfer of the copyright from dBV to dInc without compensation which would leave dBV empty-handed and without any consideration for its approximately $1.1 million investment in the software development (which currently exceeds $1.5 million.

### The Enterprise Court Ruling

21.     The Enterprise Court can take far-reaching measures in the context of intramural corporate disputes, including dismissal and appointment of (temporary) directors or supervisory directors, or depriving one or more shareholders of their governance rights connected with their shares.

22.     In order to avoid such alienation of assets of dBV to dInc (to the detriment of TDX, dBV's minority shareholder), TDX submitted an application to the Enterprise Court in order to prevent its dismissal and irreversible damage to dBV. It was that application that ultimately resulted in my appointment described above.

23.     The Enterprise Court in ¶ 3.4 of its ruling, set out its findings:

The Enterprise Court finds as follows. The controversy surrounding the intellectual property rights to the software/software applications developed by dmarcian Europe (and dmarcian Bulgaria) is at the heart of the dispute between the parties [i.e. TDX and Tim Draegen]. TDX argues that the software/software applications is/are apart from the software developed by dmarcian, Inc., to such extent that the

6

intellectual property rights thereto accrue to dmarcian Europe. According to TDX, the use and sale of the software/software applications by dmarcian, Inc. must be based on a license to be issued by dmarcian Europe. Draegen counters this by arguing that the software developed by dmarcian Europe (and dmarcian Bulgaria) comprises no more than additional features for improved use of the software originating from dmarcian, Inc., so that the intellectual property rights thereto are also vested in dmarcian, Inc. The Enterprise Court argues first and foremost that only the ordinary civil court has jurisdiction to conduct the legal assessment of that dispute. The Enterprise Court is able to conclude, however, that this dispute has a disruptive effect on dmarcian Europe's business; its core business is the development and sale of software and the partnership with dmarcian, Inc. is a necessary condition for that. Nevertheless, this partnership has not been sufficiently provided for by the parties, either in a general sense or in respect of intellectual property rights to software/software applications developed and to be developed and in particular licenses granted or to be granted in connection therewith, or the scope of such licenses. No unequivocally recorded agreements in this regard are available, consequent to which the partnership has been jeopardised by the present discussion in that regard, presenting a serious impediment to dmarcian Europe's business operations. In the opinion of the Enterprise Court, the existence of the aforementioned situation causes there to be sufficient well-founded reasons to question the management and affairs conducted by dBV. As requested by both TDX and Draegen, the Enterprise Court will order an investigation into the management and affairs conducted by dmarcian Europe between 1 January 2016 and 20 August 2020.

24.     The Enterprise Court further held in ¶ 3.9 of its ruling that:

For the time being, the Enterprise Court will stay the appointment of the investigator so as to find out whether the dispute can already be resolved through the immediate relief to be granted. Each of the parties or the director or manager appointed by the Enterprise Court may request the Enterprise Court at any time to appoint the investigator.

25.     After my appointment on September 10, 2020, activities were carried out from the United States in the next weekend to completely shut out dBV from all systems for a second time. That blockade was fully implemented on September 14, 2020. In view of my responsibility to keep the business of dBV safe, I immediately sought to hold Draegen, in his role as shareholder, to account for this. At my insistence, Draegen eventually – after some days – caused partial access to most essential systems to be restored to the extent that dBV was able to conduct some of its business. After many discussions with Draegen, dInc, through Draegen's intervention, proceeded

7

to grant some additional access to other systems, although there has never been fully unimpeded access for dBV after September 14, 2020.

26.     By the end of October 2020, I started looking for ways to arrive at a resolution of the dispute that had arisen between the shareholders of dBV. To this end, I spoke to, among others, the directors of TDX (Groeneweg and Kalkman) and Draegen. I also sought contact with my fellow director of dmarcian Bulgaria (EOOD), and I made every effort to resolve the conflict that had arisen. Throughout November and December 2020, and January 2021, I invited Draegen and dInc to respond to my proposals, but no responses were received except for a summary rejection by dInc's U.S. counsel.

27.     Despite these efforts, it became clear to me that Draegen was not prepared to agree to any other solution than the transfer, on his conditions (*i.e.*, without consideration), of the copyright from dBV to dInc.

28.     In response to a new attempt at resolution by me on January 8, 2021 sent to Draegen (and Shannon Draegen), dInc's lawyers suddenly announced, in a letter dated January 22, 2021, that dInc would terminate its relationship with dBV effective February 1, 2021, unless dBV agreed to sign a distribution agreement and settlement agreement on terms very unfavourable to dBV. Put succinctly, under those agreements dBV would transfer all of its copyright in the shared IPR with no other compensation than termination of the existing license and distribution arrangements and a new license to those rights, based on which dBV would have to pay dInc no less than 80% of all its income from the sales of the dmarcian software and consultancy services. That percentage is much higher than the customary 20% (as confirmed by dInc's accountant).

29.     My ultimate informed assessment of this proposal was that it would result in short order in the bankruptcy of dBV, the company placed under my control by the Enterprise Court.

30.     In addition and (and even though dInc indicated that it would not block the access to the computer systems until February 1, 2021), dInc, in reality, denied the employees of dBV access to its computer systems immediately, as of January 22, 2021. That decision was not

8

communicated to me by Draegen. Meanwhile I requested the Enterprise Court to urgently appoint an investigator to carry out the investigation ordered on September 7, 2020, which request was granted soon after.

### The Rotterdam Court Proceeding

31. By denying dBV's employees access to the computer and other systems on January 22, 2021, Draegen and dInc were trying to force dBV and me, as independent director, to transfer its copyright to the software to dInc for no consideration. Moreover, the immediate blockade of access of dBV to its customers and known potential customers with whom contact has already been established made me aware that dInc was seeking to take over dBV's customer base and other business assets, which I am required by the Enterprise Court to protect and safeguard.

32. Because of these actions by dInc and Draegen, dBV was suffering serious and irreversible damage. The distribution of the dmarcian software forms the core business of dBV. Because of the January 22, 2021 blockade – now the third one – dBV was unable to access its customer data, unable to serve existing customers, and also unable to follow up on leads for potential new customers. These action by dInc were also causing severe unrest among dBV's employees who are an important asset of dBV. I received serious warnings that dBV might lose some of its key employees in addition to two other key employees who had already left because they found the aggressive communications and blockades initiated by dInc too stressful.

33. Moreover, if the collaboration between the two companies were to be terminated effective February 1, 2021, that would essentially mean the end of dBV whose business operations are dependent on the continued access to its customers to the dmarcian application. In that case, dBV's bankruptcy would be unavoidable.

34. That would result in the immediate termination of 22 employees of dBV and dmarcian Bulgaria and would result in depriving dBV's customers in Europe, Russia and Africa of access to the dmarcian software thus forcing them to terminate their customer contracts with dBV in order to avoid the vulnerability of their mail platforms due to the disconnection from the

9

protections afforded by the dmarcian software.

35. I therefore instructed specialist lawyers to summon dInc and Draegen to lift the blockade on dBV's employees' access and withdraw the announced termination. If dInc failed to do so, dBV would institute preliminary relief proceedings in the Dutch court. My object in doing so was to ensure the continued existence of dBV's business and to postpone irreversible consequences until clarity can be obtained, either through the investigation ordered by the Enterprise Court or through a court decision in proceedings on the merits, as to the terms and conditions of the licensing agreement and the ownership of the copyrights to the current version of the dmarcian software.

36. I decided to take these actions upon consultation of my corporate counsel and the administrator of the shares and, with their approval, I decided that taking action against dInc and Draegen was unavoidable if dBV were to be saved. Such approval and support were *ex post* substantiated and expressed at a General Meeting of Shareholders in dBV specifically convened for this purpose on February 9, 2021, at which Draegen and his Dutch counsel were present and presented their point of view.

37. In view of the explicit invitation to me by Draegen's counsel at that occasion to try to find an alternative route to resolution of the outstanding issues rather than continue litigation, I thereafter had informal personal telephone conversations and follow up email correspondence with both Timo Jansen (the lawyer of dInc in The Netherlands) and with Paul Josephus Jitta lawyer of Tim Draegen in The Netherlands) in order to test the potential of this invitation. In the absence of any constructive replies it was made clear to me that the only "alternative route of resolution of outstanding issues" appeared to be an immediate and unconditional compliance by dBV to the letters and proposals made by dInc on January 22, *i.e.*, dBV giving up all IPR and accepting a new distribution agreement with financial terms which would render dBV bankrupt.

39. That action was instituted in Rotterdam Court on January 29, 2021. While the Dutch lawyers for both dInc and Draegen were duly given notice of the proceeding and an urgent

10

hearing scheduled for February 1, 2021, they did not appear at the hearing.

40.     On February 1, 2021, after the judge determined that the defendants had been properly served and jurisdiction had been properly established, the court issued its Judgment requiring dInc and Draegen to lift the blockade within 24 hours (Judgment ¶ 3.3). Under the terms of the Judgment, their failure to do so would result in a daily fine of €20,000 up to a maximum of €500,000. (A true and correct copy of that ruling, along with an English translation, is attached hereto as Exhibit B.)

41.     To date, dInc and Draegen have refused to comply with the Rotterdam Court's Judgment (and have incurred the maximum fines). They have also, as of April 6, 2021, appeared in the Rotterdam Court proceeding in an effort to undo the Judgment. A hearing on that issue will be held in the Rotterdam Court on May 10, 2021

42.     In order to mitigate the consequences of the negative communications by dInc, I instructed all dBV employees to inform customers only of facts, to avoid any further statements with regard to dInc, and to inform customers that dBV and its court-appointed director were working hard to put an end to the misunderstandings between dBV and dInc. As a part of those efforts, I also issued a public notice which was posted on dBV's website and which was sent to a number of customers (none in the U.S.). (A true and correct copy of that notice is attached hereto as Exhibit C.)

43.     As I understand the allegations in the complaint in the U.S. proceeding, dInc claims that dBV's breach of the parties agreement dates back to December 2019. Yet dInc waited until March 25, 2020, well over a year later, to seek injunctive relief against dBV. (As more fully described above, dInc waited until after the initiation of two Dutch court proceedings, as well as the rulings by the Dutch courts.) During that time period after December 2019, dBV undertook numerous activities at its expense intended not only for its own benefit but also the benefit of dInc, including further development of the software and acquisition of additional customers within its territory.

11

44.     If the preliminary injunction requested by dInc is granted, it will hasten the bankruptcy of dBV and the end of its business in the absence of continued access to marketing tools such as websites and to client data and reports (generated by the application) directly related to the status of dBV's customers' email platforms, etc., which are vital for continued customer relationships.

Under the terms of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this ___ day of April, 2021.

HUB J. HARMELING

12