# Attachment 6

Exhibit A to Declaration of Alfred Meijboom





Dossiernummer: L2100718/RTM

Vandaag, de negenentwintigste januari
tweeduizend eenentwintig;

Heb ik, Joyca Margaretha Schilders, toegevoegd gerechtsdeurwaarder ten kantore van
Hendrikus Oude Elferink, gerechtsdeurwaarder te Amsterdam en aldaar kantoorhoudende aan
de Hogehilweg 4

de dagvaarding die op 29 januari 2021 om 13:15 uur door H.H. Wessels gerechtsdeurwaarder
(tgv) te Rotterdam op verzoek van de besloten vennootschap DMARCIAN EUROPE B.V. aan:

1. DMARCIAN, INC;
2. Timothy George DRAEGEN

is betekend, met de Engelse vertaling om 17:53 uur gemaild aan:

1. tim@dmarcian.com
2. shannon@dmarcian.com
3. t.jansen@lexence.com

en om 17:56 uur aan:

1. tim@eudaemon.net
2. tim@dmarcian.com
3. p.josephusjitta@burenlegal.com
4. 'f.henke@burenlegal.com

een kopie van beide e-mailberichten is aan dit proces-verbaal gehecht;

Aldus door mij naar eer en geweten en beste kunnen geconstateerd en waarvan is opgemaakt
dit proces-verbaal.

Waarvan akte!



**Post**
Postbus 22259
1100 CG Amsterdam

**Online**
info@groot-evers.nl
www.groot-evers.nl

**Kwaliteitsrekening**
IBAN: NL 15 INGB 0651 2205 99
BIC /SWIFT: INGBNL 2A

**KvK-nr / BTW-nr**
34 11 61 16
NL 8091 02 096 B01

**Amsterdam**
Hogehilweg 4
1101 CC Amsterdam

**Contact**
T 020 40 80 453
F 020 40 80 473

**Rotterdam**
Willemskade 21
3016 DM Rotterdam

**Contact**
T 010 75 36 070
F 010 75 36 080

**Utrecht**
Euclideslaan 259
3584 BV Utrecht

**Contact**
T 030 25 13 814
F 030 25 23 043

## J. Schilders

| | |
|---|---|
| **Van:** | J. Schilders |
| **Verzonden:** | vrijdag 29 januari 2021 17:53 |
| **Aan:** | 'tim@dmarcian.com'; 'shannon@dmarcian.com' |
| **CC:** | 't.jansen@lexence.com' |
| **Onderwerp:** | Dossiernummer: L2100718, DMARCIAN EUROPE B.V., / DMARCIAN, INC.+ DRAEGEN |
| **Bijlagen:** | Exploot - Exploot.pdf; l2100718.pdf |
| **Urgentie:** | Hoog |
| **UniqueID:** | 5a91f295-b2e2-4b99-b4bb-25aed4e0e7a7 |

Sir, Mrs,

Please find enclosed the Dutch version of the writ of summons which has been served on you in accordance with the The Hague Convention of 1965, such together with the English translation thereof.

The court hearing is due to be held on the first of February 2021 at 09:00 hours.

You are advised to consult your/a Dutch lawyer.

Met vriendelijke groet,

Mw J.M. Schilders
Gerechtsdeurwaarder (tgv)

*U kunt al uw OPDRACHTEN VOOR HEEL NEDERLAND aan ons doen toekomen. Stuurt u uw opdrachten naar het adres ambtelijk@groot-evers.nl. Wij dragen of zelf zorg voor betekening en/of beslag en/of verzorgen dit voor u. Wilt u overleggen en/of sparren, belt u ons op 020-4080454.*



**Groot & Evers**

Gerechtsdeurwaarders
en Incassobureau

**Post**
Postbus 22259
1100 CG Amsterdam

**Telefoon**
020 40 80 454
06 20 79 73 21

**Bezoek**
Hogehilweg 4
1101 CC Amsterdam

**Contact**
www.groot-evers.nl
info@groot-evers.nl

**Disclaimer**
Alle opdrachten worden aanvaard en uitgevoerd onder uitsluiting van iedere aansprakelijkheid voor zover deze verder gaat dan de dekking welke de verplichte beroepsaansprakelijkheidsverzekering voor het desbetreffende voorval verleent. Dit e-mailbericht en de mogelijke bijlagen zijn uitsluitend bestemd voor de geadres strikt vertrouwelijk of anderszins wettelijk beschermd. Indien u niet de geadresseerde bent, verzoeken wij u dit bericht en enige bijlage daarbij aan de afzender terug alle kopieën ervan te wissen en te vernietigen. Op al onze werkzaamheden zijn de algemene voorwaarden van toepassing. Deze voorwaarden zijn in te zien op onz en/of hier te downloaden. Tevens verwijzen wij u naar onze beide privacy-statements op onze website: het statement voor opdrachtgevers en het statement voor ni opdrachtgevers.

Gerechtsdeurwaarderskantoor Groot & Evers B.V. is niet aansprakelijk voor virussen in dit e-mailbericht en/of enige bijlage. Gerechtsdeurwaarderskantoor Groot & kan op geen enkele wijze verantwoordelijk of aansprakelijk worden gehouden voor en/of in verband met de gevolgen van en/of schade ontstaan door het onjuist, on niet-tijdig versturen en ontvangen van de inhoud van dit bericht.

# J. Schilders

| | |
|---|---|
| **Van:** | J. Schilders |
| **Verzonden:** | vrijdag 29 januari 2021 17:56 |
| **Aan:** | 'tim@eudaemon.net'; 'tim@dmarcian.com' |
| **CC:** | 'p.josephusjitta@burenlegal.com'; 'f.henke@burenlegal.com' |
| **Onderwerp:** | Dossiernummer: L2100718, DMARCIAN EUROPE B.V., / DMARCIAN, INC.+ DRAEGEN |
| **Bijlagen:** | Exploot - Exploot.pdf; l2100718.pdf |
| **Urgentie:** | Hoog |
| **UniqueID:** | 7cdee0d5-e208-4160-90d7-8af83f18982b |

Sir, Mrs,

Please find enclosed the Dutch version of the writ of summons which has been served on you in accordance with the The Hague Convention of 1965, such together with the English translation thereof.

The court hearing is due to be held on the first of February 2021 at 09:00 hours.

You are advised to consult your/a Dutch lawyer.

Met vriendelijke groet,

Mw J.M. Schilders
Gerechtsdeurwaarder (tgv)

*U kunt al uw OPDRACHTEN VOOR HEEL NEDERLAND aan ons doen toekomen. Stuurt u uw opdrachten naar het adres ambtelijk@groot-evers.nl. Wij dragen of zelf zorg voor betekening en/of beslag en/of verzorgen dit voor u. Wilt u overleggen en/of sparren, belt u ons op 020-4080454.*



Groot
&Evers

Gerechtsdeurwaarders
en Incassobureau

| **Post** | **Telefoon** |
|---|---|
| Postbus 22259 | 020 40 80 454 |
| 1100 CG Amsterdam | 06 20 79 73 21 |

| **Bezoek** | **Contact** |
|---|---|
| Hogehilweg 4 | www.groot-evers.nl |
| 1101 CC Amsterdam | info@groot-evers.nl |

**Disclaimer**
Alle opdrachten worden aanvaard en uitgevoerd onder uitsluiting van iedere aansprakelijkheid voor zover deze verder gaat dan de dekking welke de verplichte beroepsaansprakelijkheidsverzekering voor het desbetreffende voorval verleent. Dit e-mailbericht en de mogelijke bijlagen zijn uitsluitend bestemd voor de geadres... strikt vertrouwelijk of anderszins wettelijk beschermd. Indien u niet de geadresseerde bent, verzoeken wij u dit bericht en enige bijlage daarbij aan de afzender terug... alle kopieën ervan te wissen en te vernietigen. Op al onze werkzaamheden zijn de algemene voorwaarden van toepassing. Deze voorwaarden zijn in te zien op on... en/of hier te downloaden. Tevens verwijzen wij u naar onze beide privacy-statements op onze website: het statement voor opdrachtgevers en het statement voor ni... opdrachtgevers.

Gerechtsdeurwaarderskantoor Groot & Evers B.V. is niet aansprakelijk voor virussen in dit e-mailbericht en/of enige bijlage. Gerechtsdeurwaarderskantoor Groot & ... kan op geen enkele wijze verantwoordelijk of aansprakelijk worden gehouden voor en/of in verband met de gevolgen van en/of schade ontstaan door het onjuist, o... niet-tijdig versturen en ontvangen van de inhoud van dit bericht.

**CONCEPT DAGVAARDING IN KORT GEDING OP VERKORTE TERMIJN KRACHTENS MONDELINGE LAST VAN DE VOORZIENINGENRECHTER VAN DE RECHTBANK ROTTERDAM D.D. 28 FEBRUARI 2021**

Heden, de **negenentwintigste januari** tweeduizend eenentwintig, om **13:15** uur, op verzoek van de besloten vennootschap met beperkte aansprakelijkheid **DMARCIAN EUROPE B.V.**, gevestigd en kantoorhoudend te (3311 JG) Dordrecht aan de Burgemeester de Raadtsingel 93, in deze zaak woonplaats kiezende te (1014 BG) Amsterdam aan de Molenwerf 16, op het kantoor van Kennedy Van der Laan N.V., van welk kantoor mrs. V. van Druenen, A.P. Meijboom en M.R.S. Bacon in deze zaak tot advocaat worden gesteld en als zodanig zullen optreden;

Heb ik, Henricus Hubertus Wessels, toegevoegd gerechtsdeurwaarder ten kantore van Robert Pieter van Veenendaal, gerechtsdeurwaarder te Rotterdam en aldaar kantoorhoudende aan de Willemskade 21,

**IN KORT GEDING GEDAGVAARD OP VERKORTE TERMIJN:**

**1.** De vennootschap naar Amerikaans recht **DMARCIAN, INC.**, gevestigd te 43 S. Broad Street, Suite 203, Brevard, North Carolina 28712, Verenigde Staten van Amerika,

daartoe heb ik uit krachte van artikel 55 lid 1 van het Wetboek van Burgerlijke Rechtsvordering mijn exploot gedaan aan het parket van de ambtenaar van het openbaar ministerie bij de Rechtbank Rotterdam, locatie Rotterdam, alwaar ik te 3072 AK ROTTERDAM aan het adres Wilhelminaplein 100-125 twee afschriften hiervan voorzien van de vertaling van die stukken in de Engels taal, heb gelaten aan:

*J.W. Pollet,*

aldaar werkzaam en aanwezig.

Verzocht wordt dit exploot voorzien van de vertaling van die stukken in de Engels taal, aan de vennootschap naar Amerikaans recht DMARCIAN, INC., gevestigd te 43 S. Broad Street, Suite 203, Brevard, North Carolina 28712, Verenigde Staten van Amerika te doen betekenen/kennisgeven overeenkomstig de artikelen 3 tot en met 6 van het Verdrag inzake de betekening en de kennisgeving in het buitenland van gerechtelijke en buitengerechtelijke stukken in burgerlijke- en handelszaken van 15 november 1965 (het "Verdrag"), en wel door betekening of kennisgeving met inachtneming van de vormen in de wetgeving van de aangezochte lidstaat voorgeschreven voor de betekening of de kennisgeving van stukken, die in dat land zijn opgemaakt en bestemd zijn voor zich aldaar bevindende personen, waarbij aan de in artikel 6 van het Verdrag bedoelde (centrale) autoriteit voorts verzocht wordt een afschrift van dit exploot te retourneren, vergezeld van de verklaring als bedoeld in artikel 6 van het Verdrag.

de kosten ten bedrage van USD 95,00 worden tijdig overgemaakt naar de Wells Fargo Bank, account no. 2007107119, onder vermelding van Swift Code: WFBIUS6S, 1763 4th Ave South, Seattle, Washington 98134 USA onder vermelding van de vennootschap naar het recht harer vestiging DMARCIAN INC. gevestigd en kantoorhoudende te 28712 BREVARD, NORTH CAROLINA,

1

VERENIGDE STATEN VAN AMERIKA aan het adres Broad Street 43 S, Suite 203;

Voorts wordt een afschrift van dit exploot voorzien van de vertaling van die stukken in de Engels taal onverwijld door mij per aangetekende brief gezonden aan het adres van de vennootschap naar Amerikaans recht <u>DMARCIAN, INC.</u>, voornoemd;

**2.** De heer Timothy George **DRAEGEN**, woonachtig aan het adres 272 Delphia Drive, Brevard, North Carolina, 28712, Verenigde Staten van Amerika,

daartoe heb ik uit krachte van artikel 55 lid 1 van het Wetboek van Burgerlijke Rechtsvordering mijn exploot gedaan aan het parket van de ambtenaar van het openbaar ministerie bij de Rechtbank Rotterdam, locatie Rotterdam, alwaar ik te 3072 AK ROTTERDAM aan het adres Wilhelminaplein 100-125 twee afschriften hiervan voorzien van de vertaling van die stukken in de Engels taal, heb gelaten aan:

*J-W. Pollet,*

aldaar werkzaam en aanwezig.

Verzocht wordt dit exploot voorzien van de vertaling van die stukken in de Engels taal, aan <u>Timothy George Draegen</u>, woonachtig aan het adres 272 Delphia Drive, Brevard, North Carolina, 28712, Verenigde Staten van Amerika te doen betekenen/kennisgeven overeenkomstig de artikelen 3 tot en met 6 van het Verdrag inzake de betekening en de kennisgeving in het buitenland van gerechtelijke en buitengerechtelijke stukken in burgerlijke- en handelszaken van 15 november 1965 (het "Verdrag"), en wel door betekening of kennisgeving met inachtneming van de vormen in de wetgeving van de aangezochte lidstaat voorgeschreven voor de betekening of de kennisgeving van stukken, die in dat land zijn opgemaakt en bestemd zijn voor zich aldaar bevindende personen, waarbij aan de in artikel 6 van het Verdrag bedoelde (centrale) autoriteit voorts verzocht wordt een afschrift van dit exploot te retourneren, vergezeld van de verklaring als bedoeld in artikel 6 van het Verdrag.

de kosten ten bedrage van USD 95,00 worden tijdig overgemaakt naar de Wells Fargo Bank, account no. 2007107119, onder vermelding van Swift Code: WFBIUS6S, 1763 4th Ave South, Seattle, Washington 98134 USA onder vermelding van Timothy George Draegen, wonende te 28712 BREVARD, NORTH CAROLINA, VERENIGDE STATEN VAN AMERIKA aan het adres Delphia Drive 272;

Voorts wordt een afschrift van dit exploot voorzien van de vertaling van die stukken in de Engels taal onverwijld door mij per aangetekende brief gezonden aan het adres van <u>Timothy George Draegen</u>, voornoemd;

ONDER VERMELDING IN DEZE DAGVAARDING DAT VERLOF VOOR DE VERKORTING VAN DE DAGVAARDINGSTERMIJN IS VERLEEND ONDER DE VOORWAARDEN DAT:

- de dagvaarding en vertaling uiterlijk op 29 februari 2021, om 14:00, aan gedaagden worden betekend
- onverwijld aan gedaagden mededeling wordt gedaan van het tijdstip en de locatie van de zitting, onder toezending van een kopie van de conceptdagvaarding

2

**OM:**

Op 1 februari 2021, om 09:00 's ochtends, in persoon of vertegenwoordigd door een advocaat, te verschijnen ter terechtzitting van de voorzieningenrechter van de Rechtbank Rotterdam, locatie Rotterdam, welke zitting aldaar zal worden gehouden in het gerechtsgebouw aan het Wilhelminaplein 100-125, 3072 AK Rotterdam

**MET DE UITDRUKKELIJKE AANZEGGING DAT:**

- indien een gedaagde niet in persoon en evenmin vertegenwoordigd door een advocaat op de terechtzitting verschijnt en de voorgeschreven termijnen en formaliteiten in acht zijn genomen, de rechter verstek tegen gedaagde zal verlenen en de hierna omschreven vordering zal toewijzen, tenzij deze hem onrechtmatig of ongegrond voorkomt;
- indien ten minste één van gedaagden in het geding verschijnt en het griffierecht tijdig heeft voldaan, tussen alle partijen één vonnis zal worden gewezen, dat als een vonnis op tegenspraak wordt beschouwd;
- bij verschijning in het geding van ieder van gedaagden een griffierecht zal worden geheven, te voldoen binnen vier weken te rekenen vanaf het tijdstip van verschijning;
- de hoogte van de griffierechten is vermeld in de meest recente bijlage behorend bij de Wet griffierechten burgerlijke zaken, die onder meer is te vinden op de website: www.kbvg.nl/griffierechtentabel;
- van een persoon die onvermogend is, een bij of krachtens de wet vastgesteld griffierecht voor onvermogenden wordt geheven, indien hij op het tijdstip waarop het griffierecht wordt geheven heeft overgelegd:
  1. een afschrift van het besluit tot toevoeging, bedoeld in artikel 29 van de Wet op de rechtsbijstand, of indien dit niet mogelijk is ten gevolge van omstandigheden die redelijkerwijs niet aan hem zijn toe te rekenen, een afschrift van de aanvraag, bedoeld in artikel 24 lid 2, van de Wet op de rechtsbijstand, dan wel
  2. een verklaring van het bestuur van de raad voor rechtsbijstand, bedoeld in artikel 7, derde lid, onderdeel e, van de Wet op de rechtsbijstand waaruit blijkt dat zijn inkomen niet meer bedraagt dan de inkomens bedoeld in de algemene maatregel van bestuur krachtens artikel 35, tweede lid, van die wet;
- van gedaagden die bij dezelfde advocaat verschijnen en gelijkluidende conclusies nemen of gelijkluidend verweer voeren, op basis van artikel 15 van de Wet griffierechten burgerlijke zaken slechts eenmaal een gezamenlijk griffierecht wordt geheven;

3

**TENEINDE:**

alsdan namens eiseres ("**dmarcian Europe**") te horen eisen en concluderen als volgt:

## 1. Inleiding

1.1. dmarcian Europe vraagt uw Voorzieningenrechter in dit kort geding een aantal voorlopige voorzieningen te treffen die ertoe strekken dat de ontzegging door dmarcian Inc. van de toegang tot de medewerkers van dmarcian Europe tot de gezamenlijke (computer)systemen per direct wordt opgeheven, dat de werking aan de door dmarcian Inc bij brief van 22 januari 2021 aangezegde beëindiging van de samenwerking tussen partijen per 1 februari 2021 wordt ontnomen en dat gedaagden wordt bevolen de bestaande samenwerking ongewijzigd voor te zetten totdat duidelijkheid is verkregen omtrent de voorwaarden van de aan dmarcian Europe verstrekte licentie en de eigendom van de auteursrechten op de huidige versie van de door partijen geëxploiteerde software, hetgeen de kern vormt van hun geschil.

1.2. Deze zaak hangt nauw samen met de enquêteprocedure bij de Ondernemingskamer van het Gerechtshof Amsterdam. In die procedure – waarbij ook Draegen partij is – heeft de Ondernemingskamer bij beschikking van 7 september 2020 geoordeeld dat er sprake is van gegronde redenen voor twijfel aan een juist beleid van dmarcian Europe, welke redenen zijn gelegen in (kort omschreven) de door toedoen van partijen ontstane situatie dat zij hun samenwerking, noch in het algemeen noch ter zake de intellectueel eigendomsrechten op ontwikkelde en te ontwikkelen software applicaties en (de reikwijdte van) de in verband daarmee verleende / te verlenen licenties hebben geregeld. De Ondernemingskamer heeft – op verzoek van beide aandeelhouders (Draegen en TDX) – hiernaar een onderzoek bevolen. Voorts heeft de Ondernemingskamer middels het treffen van onmiddellijke voorzieningen ingegrepen, inhoudende dat een bestuurder met doorslaggevende stem is benoemd alsook dat alle aandelen in dmarcian Europe (minus één aandeel per aandeelhouder) ten titel van beheer zijn overgedragen aan een beheerder. Bij beschikking van 10 september 2020 heeft de Ondernemingskamer mr. H.J.M. Harmeling ('**Harmeling**') aangewezen als de bedoelde bestuurder en mr. Y. Borrius als de beheerder. Dit kort geding wordt namens dmarcian Europe gevoerd onder verantwoordelijkheid van Harmeling, teneinde de continuïteit van dmarcian Europe te waarborgen. De beschikkingen van de Ondernemingskamer van 7 en 10 september 2020 worden als Productie 1 overgelegd (**Productie 1**). dmarcian Europe komt op die beslissingen hieronder nader terug.

## 2. Introductie partijen

*dmarcian Europe*

2.1. dmarcian Europe is op 21 maart 2013 opgericht onder de naam Mailmerk B.V. (**Productie 2**). Zij houdt zich bezig met het leveren van producten en diensten op het gebied van identiteitsbeveiliging van e-mailadressen.

2.2. Mailmerk B.V. is op 22 januari 2016 een samenwerking aangegaan met dmarcian Inc. Zij heeft haar naam op 15 februari 2017 veranderd in dmarcian Europe. De toenmalig enig bestuurder en aandeelhoudster van Mailmerk B.V./dmarcian Europe, The Digital Xpedition (TDX) Holding B.V. ("**TDX**") heeft dmarcian Inc en/of Draegen in ruil voor de samenwerking een optie aangeboden om een meerderheidsbelang in dmarcian Europe te verwerven voor de prijs van € 1,-. Dit recht is uitgeoefend

4

in juli 2018, waarbij de aandelen evenwel niet aan dmarcian Inc, maar aan haar CEO - Draegen – zijn overgedragen.

2.3. De aandelen in dmarcian Europe werden vanaf juli 2018 tot 7 september 2020 voor 50,01% door Draegen en voor 49,99% door TDX gehouden. Na de beschikking van de Ondernemingskamer zijn de aandelen op één aandeel per aandeelhouder na tijdelijk in beheer gegeven aan een derde partij, mr. Yvette Borius. Daarnaast is Harmeling naast TDX als bestuurder met doorslaggevende stem aangewezen.

2.4. De aandelen in TDX worden gehouden door H.J. Kalkman Beheer B.V. (50%) en M. Groeneweg Holding B.V. (50%), de persoonlijke holdings van respectievelijk de heren Martijn Groeneweg ("**Groeneweg**") en Herwert Jette Kalkman ("**Kalkman**") (**Productie 3**).

2.5. dmarcian Europe houdt op haar beurt 100% van de aandelen in het kapitaal van een Bulgaarse entiteit, genaamd dmarcian Bulgaria EOOD ("**dmarcian Bulgaria**") (**Productie 4**). Tot 12 januari 2021 was de enig bestuurder van dmarcian Bulgaria de heer Nikolay Georgiev Hristov ('**Hristov**'). Op 12 januari 2021 is Harmeling ingeschreven als tweede bestuurder van dmarcian Bulgaria. Beide bestuurders zijn zelfstandig bevoegd dmarcian Bulgaria te vertegenwoordigen.

*dmarcian Inc*

2.6. dmarcian Inc is een Amerikaanse vennootschap die op 19 september 2014 is opgericht en zich net als dmarcian Europe bezighoudt met het leveren van producten en diensten op het gebied van identiteitsbeveiliging van e-mailadressen. Zij heeft software ontwikkeld die partijen sinds 2016 gezamenlijk exploiteren.

2.7. De aandelen in het kapitaal van dmarcian Inc werden aanvankelijk voor 100% gehouden door Draegen. Een voormalig medewerker – Charles E. Swenberg - is op grond van een met dmarcian Inc in 2017 gesloten overeenkomst mede-aandeelhouder geworden. Tussen die partijen is momenteel in de Verenigde Staten een procedure aanhangig over de omvang van dat aandeel. Draegen is hoe dan ook nog altijd CEO en meerderheidsaandeelhouder van dmarcian Inc.

2.8. Anders dan de namen van de entiteiten wellicht doen vermoeden, is dmarcian Europe géén dochtervennootschap van dmarcian Inc. De enige vennootschapsrechtelijke band tussen beide vennootschappen, is het hiervoor genoemde meerderheidsbelang dat Draegen in 2018 heeft verworven in het kapitaal van dmarcian Europe.

2.9. Schematisch weergegeven ziet de vennootschapsstructuur van partijen er als volgt uit:

5



**Het geschil**

2.10. dmarcian Europe en dmarcian Inc werken sinds 2016 samen bij de distributie en licentiering van de dmarcian software en daarbij behorende diensten op het gebied van identiteitsbeveiliging van e-mailadressen ('**de dmarcian software**').[1]

2.11. Partijen bieden de dmarcian software aan als SaaS (Software as a Service) dienst. dmarcian Inc heeft daarvoor een SaaS-platform ontwikkeld dat toegankelijk is via de website www.dmarcian.com. Klanten kunnen de SaaS-dienst via het platform afnemen. dmarcian Europe exploiteert de SaaS-dienst voor klanten in Europe, Rusland, en Afrika; dmarcian Inc doet dat voor Noord- en Zuid Amerika. Nieuwe klanten klikken op de website op hun regio en worden vervolgen doorgeleid naar de web-omgeving van de voor die regio verantwoordelijke partij, die terzake exclusiviteit hebben. De web-omgeving voor dmarcian Europe wordt gehost op servers in België en Nederland, die onder controle van dmarcian Inc staan.

2.12. De website en het SaaS-platform worden beheerd door dmarcian Inc. dmarcian Inc regelt dus de toegang van medewerkers van dmarcian Europe daartoe en heeft het in haar macht die toegang aan dmarcian Europe te ontzeggen. dmarcian Europe is voor de hosting van het SaaS-platform dus volledig van dmarcian Inc afhankelijk. dmarcian Europe is daardoor voor haar bedrijfsvoering, en met name ook voor de toegang tot haar klantgegevens en marktactiviteiten van dmarcian Inc afhankelijk.

2.13. De dmarcian software is auteursrechtelijk beschermd. Bij de aanvang van de samenwerking in januari 2016 lag het auteursrecht op de toenmalige versie van de dmarcian software volledig bij dmarcian Inc, althans bij Draegen, die de software volgens eigen verklaring heeft ontwikkeld, op dat moment haar enig bestuurder en aandeelhouder. Op dat moment is afgesproken dat alleen dmarcian Inc de software zou ontwikkelen. Dat was tot medio 2018 de afspraak. Ter illustratie legt dmarcian Europe een bericht over van Groeneweg aan Draegen van 6 juni 2017 waarin hij schrijft: "W*e agreed that dmarcian inc will take care of software development*". In een ander bericht van 28 september 2017

---

[1] Zeer kort gezegd stelt eigenaren van internetdomeinnamen in staat om DMARC - een publiek gestandaardiseerd verificatieprotocol (https://tools.ietf.org/html/rfc7489) dat is gericht op identiteitsbeveiliging van internetmail - te implementeren. De dmarcian software verwerkt DMARC-gegevens en geeft aan wat er qua identiteitsbeveiliging moet worden opgelost, zodat alle e-mails die tot een domein behoren (blijven) voldoen aan de DMARC data. De domeineigenaar kan daarmee voorkomen dat nep e-mails vanuit de domeinnaam worden verzonden.

schrijft Groeneweg aan Draegen: "*We agreed on 50% each of EU as you know. You also know the terms we agreed on, where you would take care of all development cost and hosting. EU would only focus on selling software and deployment in EU to grow EU.*" **Productie 5**

2.14. Hoewel partijen dus aanvankelijk afspraken dat de ontwikkeling van de dmarcian software door dmarcian Inc zou plaatsvinden, zijn partijen daarvan medio 2018 teruggekomen en zijn zij overeengekomen dat deze ontwikkeling ook door dmarcian Europe en dmarcian Bulgaria zou plaatsvinden (zie hierna onder 2.16). Zij hebben de voorwaarden van de licentie op dat moment dus uitgebreid. Partijen hebben voor het gebruik van de software door dmarcian Europe en de verkoop daarvan door dmarcian Europe in Europa, Rusland en Afrika in januari 2016 een mondelinge overeenkomst afgesloten. Partijen verschillen van mening over de precieze inhoud van hun overeenkomst. Uit de beschikking van de Ondernemingskamer van 7 september 2020 volgt dat tussen partijen vaststaat dat zij in 2016 *ten minste* het volgende zijn overeengekomen (r.o. 2.5):

- Dat dmarcian Europe een licentie heeft voor het gebruik en de verkoop van de software afkomstig van dmarcian Inc.;
- Dat dmarcian Europe verantwoordelijk is voor de verkoop van die software (en het leveren van bijbehorende diensten) aan klanten in Europa, Rusland en Afrika;
- Dat dmarcian Inc. en/of Draegen in ruil daarvoor het meerderheidsaandelenbelang in dmarcian Europe kon kopen tegen betaling van EUR 1,-.

dmarcian Europe komt op de inhoud van de afspraken hieronder nog terug.

2.15. Van de laatstgenoemde optie heeft Draegen in mei 2018 persoonlijk gebruik gemaakt. Als gevolg daarvan heeft hij een meerderheidsbelang van 50.01% in het kapitaal van dmarcian Europe verkregen.

2.16. dmarcian Europe heeft sinds het najaar van 2018 zelf en via haar 100% Bulgaarse dochtervennootschap, aanzienlijke bijdragen geleverd aan de ontwikkeling van (broncode van de) dmarcian software. Dat is gebeurd met volledige wetenschap en instemming van dmarcian Inc en Draegen. dmarcian Europe legt ter illustratie twee berichten over tussen Hristov, Draegen en Groeneweg. Het eerste bericht heeft betrekking op de oprichting van dmarcian Bulgaria. In de akte van oprichting staat onder de bedrijfsactiviteiten van dmarcian Bulgaria onder meer "software development and implementation" In het tweede bericht vraagt Draegen aan Hristov of hij (Draegen) en Groeneweg kunnen langskomen in Bulgarije omdat hij de productiecapaciteit wil vergroten. **Productie 6.** dmarcian Inc, dmarcian Europe en dmarcian Bulgaria gebruiken voorts één centraal broncode ontwikkelingsplatform, dat door dmarcian Inc. wordt beheerd en waartoe zij dmarcian Europe en dmarcian Bulgaria toegang heeft gegeven (zie hierna alinea's 3.12 en verder). De dmarcian software is door dmarcian Bulgaria onder meer ontwikkeld van een twee-laags applicatie naar een drie-laags applicatie, zodat die ook API-toegankelijk zou zijn. Het is natuurlijk uitgesloten dat dmarcian Inc daarvan niet op de hoogte was.

2.17. Alle kosten voor de ontwikkeling binnen dmarcian Europe en dmarcian Bulgaria zijn door dmarcian Europe gedragen. dmarcian Europe en dmarcian Bulgaria hebben op hun bijdragen een eigen auteursrecht verworven en zijn als zodanig mede-rechthebbende geworden van de huidige versie van de dmarcian software die beide bedrijven momenteel aan gebruikers als SaaS-oplossing licentieren. dmracian Bulgaria heeft haar auteursrechten aan dmarcian Europe overgedragen.

7

dmarcian Europe brengt de akte van overdracht in het geding als **Productie 7**. Tevens brengt dmarcian een verklaring in het geding van mevrouw V.P. Kunze, partner bij het Bulgaarse advocatenkantoor Djingov, Gouginski, Kyutchukov & Velichkov te Sofia, Bulgarije. Zij verklaart - kort gezegd - dat de overdacht naar Bulgaars recht geldig is en dat Harmeling bevoegd was deze overdracht als zelfstandig bevoegd bestuurder van dmarcian Bulgaria te effectueren (**Productie 8**).

2.18. Eind 2019 is tussen partijen geschil ontstaan over de eigendom van de rechten op de door dmarcian Europe ontwikkelde aanpassingen van en toevoegingen aan de dmarcian software. Volgens dmarcian Inc zou uit de tussen partijen in 2016 gemaakte afspraken voorvloeien dat zij rechthebbende op die software is, althans dat dmarcian Europe gehouden is deze rechten tegen eenzijdig door dmarcian Inc op te leggen voorwaarden over te dragen. Dit is en wordt door dmarcian Europe betwist. Zij wil eventueel wel meewerken aan overdracht of licentiëering van de auteursrechten op de door haar ontwikkelde software, maar niet tegen de daaraan door dmarcian Inc gestelde voorwaarden, die dmarcian Europe kort gezegd geheel buiten spel zetten. Zij heeft dmarcian Inc. gemeld dat zij de door dmarcian Europe ontwikkelde softwareapplicaties zonder licentie niet aan derden mag licentiëren.

2.19. Het bericht van Groeneweg is Draegen kennelijk in het verkeerde keelgat geschoten. Draegen heeft achtereenvolgens onder meer:
- medewerkers van dmarcian Europe onmiddellijk de toegang tot de door dmarcian Inc beheerde (computer)systemen ontzegd (1$^{ste}$ blackout)
- de webomgeving van dmarcian Europe op de door dmarcian Inc beheerde website (www.dmarcian.com) gemigreerd naar een Amerikaanse host. NB: dmarcian Inc host dus nu alle systemen van dmarcian Europe en heeft het dus in haar macht om de bedrijfsvoering van dmarcian Europe volledig plat te leggen Dit wordt door dmarcian Europe omschreven als de 'nuclear button', die nu gedeeltelijk en bij beëindiging waarschijnlijk volledig zal worden ingedrukt.
- dmarcian Europe de toegang tot haar eigen domeinnamen <dmarcian.eu> en <dmarcian.net> ontzegd
- zonder daartoe bevoegd te zijn een 'Director of Software' aangewezen binnen dmarcian Europe en dmarcian Bulgaria aan wie de software ontwikkelaars van dmarcian Europe en dmarcian Bulgaria zich diende te verantwoorden.

   Zie uitgebreider randnummers 49 – 65 van het verzoekschrift van TDX in de procedure voor de Ondernemingskamer.

2.20. Deze maatregelen zijn door Draegen binnen 48 uur weer teruggedraaid. Partijen hebben na deze machtsgreep geprobeerd in onderling overleg tot een oplossing van hun geschil te komen. dmarcian Europe heeft in mei 2020 een uitgebreid schikkingsvoorstel gedaan, dat echter door Draegen van de hand is gewezen.[2] Na een bespreking op 3 juli 2020 heeft Draegen plotseling een AvA aangevraagd met als agendapunten het ontslag van de (enig) bestuurder en tevens minderheidsaandeelhoudster van dmarcian Europe, TDX, en de benoeming van een door Draegen aangewezen bestuurder. TDX had goede gronden om aan te nemen dat deze bestuurder na zijn aanstelling zou meewerken aan de 'gratis' overdracht van het auteursrecht van dmarcian Europe aan dmarcian Inc, waarmee dmarcian Europe berooid zou achterblijven.

---

[2] Vgl productie 24 bij het verzoekschrift van TDX

8

2.21. TDX heeft daarop een verzoek bij de Ondernemingskamer ingediend teneinde haar ontslag en onmkeerbare schade aan dmarcian Europe te voorkomen. dmarcian Europe brengt het procesdossier van die procedure als Productie 9 in het geding (**Productie 9**). Zij verwijst voor de achtergrond van dit geschil en de aanloop naar die procedure naar het verzoekschrift van TDX en haar verweerschrift, welke stukken hierbij separaat worden overgelegd, (**Productie 10**), en de beschikkingen van de Ondernemingskamer in die procedure (productie 1), waarbij dmarcian Europe met name verwijst naar 2.4. tot en met 2.9. van de beschikking van 7 september 2020. dmarcian Europe zal waar nodig in deze dagvaarding en ter zitting eventueel naar dit procesdossier verwijzen.

2.22. Zoals hiervoor gezegd heeft de Ondernemingskamer heeft bij beschikkingen van 7 en 10 september 2020 bij wijze van onmiddellijke voorziening Harmeling aangesteld als bestuurder en alle aandelen in dmarcia Europe (minus één aandeel per aandeelhouder) ten titel van beheer overgedragen aan de beheerder (mr. Borrius). Daarnaast heeft de Ondernemingskamer een onderzoek gelast naar het bij dmarcian Europe tussen 1 januari 2016 tot 20 augustus 2020 gevoerde beleid. De doeleinden van het enquêterecht zijn o.a. het herstel van de gezonden verhoudingen en het verkrijgen van openheid van zaken[3]. Daarop is ook het ingrijpen van de Ondernemingskamer in de huidige zaak gericht.

2.23. Voor zover van belang heeft de Ondernemingskamer aan het gelaste onderzoek het volgende ten grondslag gelegd (onderstreping advocaat):

*"3.4 De Ondernemingskamer overweegt als volgt. De controverse over de intellectuele eigendomsrechten op de door dmarcian Europe (en dmarcian Bulgaria) ontwikkelde software(applicaties) vormt de kern van het geschil tussen partijen. TDX stelt dat deze software(applicaties) los staat/staan van de door dmarcian, Inc. ontwikkelde software, zodanig dat de intellectuele eigendom daarvan aan dmarcian Europe toekomt. Aan het mogen gebruiken en verkopen van deze software(applicaties) door dmarcian, Inc. dient een door dmarcian Europe te verlenen licentie ten grondslag te liggen, aldus TDX. Daartegenover stelt Draegen dat de door dmarcian Europe (en dmarcian Bulgaria) ontwikkelde software niet meer omvat dan aanvullende features voor verbeterd gebruik van de van dmarcian, Inc. afkomstige software, zodat de intellectuele eigendom daarvan eveneens bij dmarcian, Inc. berust. De Ondernemingskamer stelt voorop dat voor de juridische beoordeling van dat geschil slechts de gewone burgerlijke rechter bevoegd is. Wel kan de Ondernemingskamer constateren dat dit geschil ontwrichtend is voor de onderneming van dmarcian Europe; het ontwikkelen en verkopen van software is haar core business en de samenwerking met dmarcian, Inc. is daarvoor een noodzakelijke voorwaarde. Desondanks is deze samenwerking noch in het algemeen, noch ter zake van de intellectuele eigendomsrechten op ontwikkelde en te ontwikkelen software(applicaties) en (de reikwijdte van) in verband daarmee verleende/te verlenen licenties in het bijzonder, door partijen voldoende geregeld. Hierover zijn geen eenduidig vastgelegde afspraken voorhanden, met als gevolg dat de samenwerking op het spel is komen te staan door de huidige discussie daarover, hetgeen een serieuze belemmering vormt voor de bedrijfsvoering van dmarcian Europe. Naar het oordeel van de Ondernemingskamer levert het bestaan van voornoemde situatie voldoende gegronde redenen op tot twijfelen aan een juist beleid en een juiste gang van zaken van dmarcian Europe. De Ondernemingskamer zal, gelijk door zowel TDX als Draegen is verzocht, een onderzoek gelasten naar het beleid en de gang van zaken van dmarcian Europe, en wel vanaf 1 januari 2016 tot 20 augustus 2020."*

---

[3] HR 10 januari 1990, NJ 1990/466 (Ogem)

9

2.24. Voorts heeft de Ondernemingskamer het volgende overwogen (r.o. 3.9):

*"De Ondernemingskamer zal de aanwijzing van de onderzoeker vooralsnog aanhouden opdat kan worden bezien of reeds door de te treffen onmiddellijke voorzieningen een oplossing van het geschil kan worden bereikt. Ieder der partijen of de door de Ondernemingskamer benoemde bestuurder of beheerder kan op elk moment de Ondernemingskamer verzoeken de onderzoeker aan te wijzen."*

2.25. In reactie op de aanstelling van Harmeling op 10 september 2020 is in het opvolgende weekend vanuit Amerika gewerkt aan het opnieuw volledig afsluiten van dmarcian Europe van alle systemen, hetgeen op 14 september 2020 volledig werd geïmplementeerd (2e blackout). Dit was dus de tweede keer dat dmarcian Europe van de voor haar bedrijfsvoering essentiële systemen werd afgesloten. Harmeling heeft Draegen in zijn rol van aandeelhouder hierop onmiddellijk aangesproken. Draegen heeft het er op aandringen van Harmeling uiteindelijk - na enkele dagen - toe geleid dat de toegang tot de meest essentiële systemen in zodanige mate werd hersteld dat dmarcian Europe haar werk weer kon doen. Na veel en moeizame gesprekken met Draegen is dmarcian Inc er, louter door tussenkomst van Draegen, toe over te gaan om toegang te verschaffen tot andere, maar minder wezenlijke systemen. Onbelemmerde toegang heeft echter sinds 14 september 2020 niet meer bestaan.

2.26. Vervolgens is Harmeling begonnen met het zoeken naar wegen om tot een oplossing te komen van het tussen de aandeelhouders van dmarcian Europe gerezen geschil. Hij heeft daarbij onder meer gesproken met zijn medebestuurder TDX (Groeneweg en Kalkman), met TDX en Draegen als aandeelhouders, hij heeft contact gezocht met zijn medebestuurder van dmarcian Bulgaria en alles in het werk gesteld om een oplossing voor het gerezen conflict te vinden. Een en ander ligt vast in een e-mail van Harmeling aan de aandeelhouders van 18 december 2020, die dmarcian Europe als **Productie 11** in het geding brengt. Draegen heeft echter al snel laten weten niet tot een andere oplossing bereid te zijn dan de overdracht, op zijn voorwaarden, van het auteursrecht van dmarcian Europe aan dmarcian Inc. dmarcian Europe heeft de Ondernemingskamer inmiddels verzocht met spoed een onderzoeker te benoemen die het op 7 september 2020 gelaste onderzoek zal gaan verrichten, welk verzoek is ingewilligd. Dmarcian Europe legt de betreffende correspondentie over als **Productie 12.**

2.27. Hoewel het gelaste onderzoek nog niet is begonnen en geenszins overeenstemming is bereikt over de juridische situatie met betrekking tot de eigendom van de intellectuele eigendomsrechten op de huidige versie van de dmarcian software, heeft dmarcian Inc bij brief van 22 januari 2021 plotseling aangekondigd de samenwerking met dmarcian Europe per 1 februari 2021 te beëindigen, tenzij dmarcian Europe een bij die brief gevoegde, voor dmarcian Europe zeer ongunstige distributieovereenkomst en schikkingsovereenkomst zou tekenen. De inhoud van die overeenkomsten komt er kort gezegd op neer dat zij al haar auteursrecht overdraagt in ruil voor een licentie op die rechten, op grond waarvan zij maar liefst 80% (!) van al haar inkomsten uit de verkoop van de dmarcian software en consultancy diensten aan dmarcian Inc dient af te dragen (**Productie 13**). Zoals door dmarcian Inc en Draegen ook bevestigd in het verleden is niet 80% maar 20% gebruikelijk, dat percentage te berekenen uitsluitend over de gedistribueerde software. Ter onderbouwing hiervan verwijst dmarcian Europe naar de in de enqueteprocedure ingebrachte verklaring van de accountant van dmarcian Inc, die onder meer verklaart:

*"**20% BV Fees**

*The company provides technology, brand, business model, and leads to the Europe BV and other*
*dmarcian partners. The value of the services provided to other dmarcian partners is 20% of revenue.*
*To have comparable financials between the US and BV, 20% of revenue from BV should be allocated*
*to the US in the form of revenue to US and expense to BV."* **<u>Productie 14</u>**.

2.28. De onredelijkheid en onrechtvaardigheid van deze wurgcontracten blijkt al uit het feit dat dmarcian Inc er zelf vanuit gaat dat dmarcian Europe deze niet zal willen of kunnen tekenen. Immers, hoewel dmarcian Inc de samenwerking voorwaardelijk beëindigt en aangeeft dat zij de toegang tot de (computer)systemen pas vanaf 1 februari 2021 zal blokkeren, heeft zij in werkelijkheid de medewerkers van dmarcian Europe op het moment van verzending van de brief met onmiddellijke ingang – dat wil zeggen vanaf vrijdag 22 januari 2021 om circa 16 uur – de toegang tot de (computer)systemen ontzegd (3e blackout). Draegen heeft op 25 januari 2021 tijdens een 'all hands' meeting, waarvoor dmarcien Europe niet is uitgenodigd, aan medewerkers van dmarcian Bulgaria en de medewrkers van dmarcian Inc meegedeeld dat de blackout van dmarcian Europe van 22 januari 2021 het gevolg is van een gewijzigde relatie. Zij loopt ook daarmee dus volledig op de feiten vooruit.

2.29. In aanvulling op de brief van dmarcian Inc heeft Draegen bij een brief die enkele minuten na de brief van dmarcian Inc. per e-mail werd verzonden, een beroep gedaan op artikel 4 van de 'exit agreement' die Draegen en TDX in 2018 ter gelegenheid van de verwerving door Draegen van het meerderheidsbelang in dmarcian Europe hebben gesloten (**<u>Productie 15</u>**). Op grond van deze bepaling heeft iedere aandeelhouder het recht om de samenwerking tussen de aandeelhouders ('the co-operation') te beëindigen door een bod uit te brengen op de aandelen van de andere aandeelhouder. Indien de andere aandeelhouder dat bod niet accepteert, zou die aandeelhouder de verplichting hebben de eerste aandeelhouder uit te kopen. Dit aanbod aan de medeaandeelhouder TDX wordt gedaan onder de ontbindende voorwaarde gedaan dat dmarcian Europe akkoord gaat met de eisen van dmarcian Inc, zoals gesteld in de brief van 22 januari 2021. De duidelijke verwevenheid tussen de aandeelhouder Draegen en de principaal dmarcian Inc is daarmee gegeven.

2.30. Dit alles gebeurt zoals gezegd hangende het onderzoek naar het door dmarcian Europe gevoerde beleid, met name betreffende de bestaande onduidelijkheid over de inhoud van de licentieovereenkomst en de eigendom van de intellectuele eigendomsrechten op de dmarcian software. Daarbij is tevens van belang dat Harmeling op 18 december 2020 aan aandeelhouders heeft medegedeeld naar oplossingen buiten de aandeelhouders om te gaan zoeken (vgl productie 11) Met name is door Harmeling aangekondigd de inrichting van de dataroom en een onafhankelijke waardebepaling uit te voeren teneinde hem in staat te stellen te voldoen aan zijn opdracht als genoemd in r.o 3.5. van de beschikking van de Ondernemingskamer van 7 september 2020. De actie van gedaagden van 22 januari 2021 lijkt hiervan het rechtstreekse gevolg.

2.31. Voor zover dmarcian Inc zich als grond voor de beëindiging van de samenwerking beroept op een tekortkoming, betwist dmarcian Europe dat zij de voorwaarden van die licentie heeft geschonden. Van een tekortkoming kan hoe dan ook geen sprake zijn zonder dat de inhoud van de licentieovereenkomst vast staat. Voor zover dmarcian Inc zich zou beroepen op opzegging, heeft te gelden dat partijen zijn overeengekomen dat de overeenkomst niet opzegbaar is. Maar ook daarbuiten is op geen enkele manier duidelijk waarom dmarcian Inc de enquêteprocedure (oftewel het onderzoek en de eventuele vervolgfase) niet kan afwachten. Naar de mening van dmarcian Europe bestaat onder de omstandigheden van dit geval geen enkele juridische grond, althans een

11

voldoende zwaarwegende grond, die de opzegging van de bestaande duurovereenkomst per 1 februari 2021 rechtvaardigt.

2.32. Door de medewerkers van dmarcian Europe de toegang te ontzeggen tot de (computer)systemen en te dreigen met een (onrechtmatige) beëindiging van de duurovereenkomst op zeer korte termijn proberen Draegen en dmarcian Inc dmarcian Europe op oneigenlijke gronden te dwingen tot overdracht van haar auteursrecht op de software. Bovendien blijkt uit de huidige afsluiting van dmarcian Europe van de toegang tot haar klanten en bekende potentiele klanten waarmee al contacten zijn gelegd, de dreiging dat dmarcian Inc zich het klantenbestand van dmarcain Europe zal willen toe-eigenen. Dmarcian Inc handelt daarmee in strijd met de redelijkheid en billijkheid die zij ten opzichte van haar contractspartner dmarcian Europe in acht dient te nemen. Dit klemt temeer nu dmarcian Europe voor haar bedrijfsvoering geheel afhankelijk is van de toegang die dmarcian Inc haar tot het SaaS-platform en computersystemen dient te geven. Draegen handelt op zijn beurt onrechtmatig jegens dmarcian Europe. Door dmarcian Inc te faciliteren in haar pogingen om dmarcian Europe klem te zetten, handelt Draegen niet alleen in strijd met de maatschappelijke zorgvuldigheid, maar tevens met zijn verplichtingen onder artikel 2:8 lid 1 BW.

*Spoedeisend belang*

2.33. dmarcian Europe lijdt door deze acties van dmarcian Inc en Draegen onmiddellijk grote en onmkeerbare schade. De verkoop van de dmarcian software vormt de *core business* van dmarcian Europe. Zij kan door de nieuwe blokkade, inmiddels de derde, niet bij haar klantengegevens, kan bestaande klanten op dit moment niet bedienen en kan bovendien geen nieuwe *leads* voor potentiële nieuwe klanten opvolgen. Dit leidt tot ernstige onrust bij haar medewerkers.

2.34. Indien de samenwerking en de licentieovereenkomst verder per 1 februari 2021 zouden worden beëindigd, zal dit bovendien het einde betekenen van dmarcian Europe, die voor haar bedrijfsvoering van het voortbestaan van de licentieovereenkomst afhankelijk is. Een faillissement is in dat geval onvermijdelijk. Dit zal het gevolg hebben dat 22 werknemers van dmarcian Europe en dmarcian Bulgaria per direct op staat komen te staan en de klanten van de dmarcian software in Europe, Rusland en Afrika mogelijk van de toegang tot de dmarcian software worden beroofd.

2.35. Dmarcian Europe heeft dmarcian Inc in reactie op haar brief van 22 januari 2021 onder meer gesommeerd de blokkade van haar medewerkers op te heffen en de aangekondigde beëindiging in te trekken. Bij gebreke daarvan heeft dmarcian Europe een kort geding aangekondigd. Gezien de verwijten die Draegen persoonlijk treffen, zijn per e-mail van gelijke datum ook verhinderdata van Draegen bij zijn advocaat opgevraagd (**Productie 16**). Zowel dmarcian Inc en Draegen hebben bij e-mailbericht van hun advocaten, dat wederom op elkaar is afgestemd, laten weten niet aan de sommaties gehoor te zullen geven (**Productie 17**). Het spoedeisend belang is daarmee gegeven.

2.36. Gelet op de onmiddellijke en onmkeerbare gevolgen die de handelingen van Draegen en dmarcian Inc teweeg hebben gebracht, heeft dmarcian Europe voldoende spoedeisend belang bij haar vorderingen. Die strekken er immers allen toe de continuïteit van haar onderneming te waarborgen en onmkeerbare gevolgen uit te stellen totdat duidelijkheid zal zijn verkregen, dan wel via het door de Ondernemingskamer gelaste onderzoek, dan wel met een gerechtelijke uitspraak in een bodemprocedure, over de voorwaarden van de licentieovereenkomst en de eigendom van de auteursrechten op de huidige versie van de dmarcian software. dmarcian Inc heeft geen enkel belang bij de wijziging van de status quo in afwachting van de door de Ondernemingskamer beoogde

12

oplossing, welke status quo de facto al sinds december 2019 bestaat zonder duidelijke praktische bezwaren

2.37. dmarcian Europe gaat hieronder nader in op haar stelling dat zij (mede)auteursrechthebbende is op de huidige versie van de dmarcian software. Daarnaast zal zij dieper ingaan op de bevoegdheid van uw Voorzieningenrechter, het toepasselijke recht en de juridische onderbouwing van haar vorderingen. Zij zal een en ander waar nodig ter zitting nader toelichten.

2.38. Hoewel dmarcian Europe naar haar mening mede-auteursrechthebbende is op de dmarcian software, hoeft dat in dit kort geding niet vastgesteld te worden om de vorderingen toe te kunnen wijzen. Daarvoor is voldoende indien dmarcian Europe aantoont dat er *tenminste* onduidelijkheid bestaat over de vraag of aan dmarcian Europe auteursrechten op de dmarcian software toekomen. Dat dit het geval is, wordt bevestigd door de Ondernemingskamer. De acties van gedaagden doorkruisen dit spoor, de opdracht aan Harmeling en het onderzoek als door de Ondernemingskamer gelasten rechtvaardigen dat de gevraagde voorzieningen worden toegewezen.

## 3. De inhoud van de licentieovereenkomst en het auteursrecht op de huidige versie van de dmarcian software

3.1. Op 22 januari 2016 hebben Draegen, dmarcian Inc., TDX en het toenmalige Mailmerk (nu: dmarcian Europe) een mondelinge overeenkomst gesloten met betrekking tot het gebruik en de distributie van de dmarcian software ("**de Overeenkomst**").

3.2. Onder deze Overeenkomst heeft dmarcian Inc aan dmarcian Europe, in ruil voor een aan dmarcian Inc en/of Draegen verstrekt optierecht om een meerderheidsbelang in dmarcian Europe te verwerven een eeuwigdurende, exclusieve licentie verstrekt voor het gebruik van de dmarcian software en de licentiering daarvan aan klanten in Europa, Rusland en Afrika;

3.3. De opbrengsten van de licentiering van de dmarcian software aan klanten uit deze territoria waren op grond van de Overeenkomst uitsluitend bestemd voor dmarcian Europe.

3.4. Partijen hebben vanaf januari 2016 conform de Overeenkomst gehandeld. dmarcian Europe bediende exclusief de Russische, Europese en Afrikaanse markt en de opbrengsten daarvan kwamen - vrijwel - volledig aan haar ten goede.[4] Dmarcian Inc heeft niet alleen conform een eeuwigdurende en exclusieve licentie gehandeld, zij bevestigt het bestaan daarvan ook expliciet in de correspondentie tussen partijen. dmarcian Europe verwijst in dit kader naar een e-mail van Draegen van 4 december 2019, waarin Draegen reageert op een bericht van Groeneweg waarin deze schrijft dat het dmarcian Inc zonder licentieovereenkomst niet is toegestaan de door dmarcian Europe ontwikkelde applicaties te licentieren (het begin van het geschil). Draegen schrijft daarin[5]:

---

[4] Vgl Verzoekschrift TDX in de OK-procedure, randnummer 26. De creditcardinkomsten van de dmarcian Europe applicatie werden en worden vanwege technische redenen volledig aan dmarcian Inc. betaald, maar ook die inkomsten kwamen en komen toe aan dmarcian Europe. Overigens gaat het daarbij om een beperkt percentage van de totale omzet (ongeveer 10%).
[5] Vgl productie 8 bij het verzoekschrift van TDX in de OK-procedure.

13

*"Martijn, thanks for the input. I agree we'll need a licensing agreement to be put into place. Without going into details over email, it makes sense to reflect the perpetual and exclusive license that Europe BV has enjoyed."*.

3.5. Zoals hiervoor gezegd is dmarcian Europe zich vanaf 2018 - in samenspraak met dmarcian Inc - zelf en via haar Bulgaarse dochter gaan toeleggen op de verdere ontwikkeling van de (broncode van de) dmarcian software. Zij financierde de ontwikkeling van de software zelf, zowel binnen haar eigen onderneming als binnen dmarcian Bulgaria. Die investeringen bedroegen tot juli 2020 ca EUR 900.000. De ontwikkelingskosten bedragen momenteel ca EUR 550.000 per jaar, zijnde 35% van de totale kosten van dmarcian Europe. Zij heeft deze kosten uit eigen middelen voldaan en is voor de financiering niet afhankelijk geweest van dmarcian Inc.[6]

3.6. De bijdragen die dmarcian Europe en haar dochtervennootschap tot op heden hebben gedaan bestaan onder meer uit het ontwikkelen van de dmarcian software van een twee-laags applicatie naar een drie-laags applicatie, zodat die ook API-toegankelijk zou zijn. Daarnaast hebben dmarcian Europe en dmarcian Bulgaria verschillende losstaande softwareapplicaties ontwikkeld die in combinatie met de dmarcian software konden worden gebruikt. Dmarcian Europe verwijst voor een gedetailleerdere uiteenzetting naar randnummers 31 tot en met 35 van het verzoekschrift van TDX (productie 10).

3.7. dmarcian Inc betwist dat het dmarcian Europe onder de verstrekte licentie is toegestaan de dmarcian software (verder) te ontwikkelen. Dit is een onhoudbaar standpunt. Hoewel het juist is dat aanvankelijk de ontwikkeling van de dmarcian software uitsluitend door dmarcian Inc zou plaatsvinden hebben partijen later met elkaar afgesproken dat ook dmarcian Europe en dmarcian Bulgaria zich met de ontwikkeling van de software zou gaan bezighouden (vgl hiervoor onder 2.13 – 2.17). De SaaS oplossingen die dmarcian Inc. en dmarcian Europe aan hun respectieve klanten leveren zijn een en dezelfde en bestaan uit de meest recente software, derhalve inclusief de substantiële software die dmarcian Europe en dmarcian Bulgaria hebben bijgedragen. Voor zover de in 2016 verstrekte licentie dus niet toestond dat dmarcian Europe de dmarcian software verder zou ontwikkelen, is de reikwijdte van de licentie door de latere ontwikkelingen aangepast. Van enige tekortkoming in de nakoming van de licentievoorwaarden kan dan ook geen sprake zijn en dit kan dan ook geen grond vormen de bestaande samenwerking te beëindigen.

3.8. Gedaagden realiseerden zich bovendien terdege dat als gevolg van deze ontwikkeling auteursrechten zouden ontstaan aan de zijde van dmarcian Europe en dmarcian Bulgaria. Tussen partijen is gesproken over de manier waarop met de rechten zou moeten worden omgegaan. Daarbij was ook voor dmarcian Inc niet het uitgangspunt dat die rechten om niet overgedragen zouden moeten worden aan dmarcian Inc. Integendeel, dmarcian Inc erkende het bestaan van de auteursrechten aan de zijde van dmarcian Inc en onderkende dat er voor het gebruik van die rechten door dmarcian Inc een licentie nodig was, maar dat dit nog niet was overeengekomen.

3.9. Ter onderbouwing hiervan legt dmarcian Europe als **Productie 18** screenshots over van correspondentie tussen Shannon Draegen, de echtgenote van Draegen en CEO van dmarcian Inc enerzijds en Groeneweg anderzijds. Shannon Draegen maakt op 21 augustus 2019 ten behoeve

---

[6] Vgl randnummer 3.4. - 3.5. en productie 3 bij het verweerschrift van dmarcian Europe en r.o. 3.1 van de beschikking van 7 september 2020 van de Ondernemingskamer

van een lopende ISO certificering ( ISO27001) een overzicht van de vennootschapsstructuur en de – volgens haar – bestaande juridische situatie met betrekking tot het auteursrecht op de dmarcian software.



Dit schema gaat ervan uit dat er een licentieovereenkomst over en weer bestaat en impliceert dus - terecht - dat dmarcian Europe auteursrecht op de dmarcian software heeft verworven.

3.10. Groeneweg reageert hierop via Slack (een chatfunctie op het SaaS-platform):

*"There's currently no licensing Agreement in place from EU to US for the software created in EU. So there should be an arrow only from USA to EU like to APAC with "Eternal License Agreement". We had a plan to merge, but as Chuck didn't agree on it, @tim and myself decided to move on as agreed on January 22 in 2016 in 2 separate entities. Arrow from US to APAC should be "Temporary License Agreement", at least from what I know."*

Shannon Draegen reageert hierop bevestigend met een duimpje omhoog en maakt vervolgens op 3 september 2019 de definitieve versie van het schema. Zij stuurt dit door middels een link:

15



Hieruit blijkt dus dat er geen licentie vanuit dmarcian Europe aan dmarcian Inc aanwezig is en dat dit reeds voor december 2019 niet alleen bij de directie van dmarcian Inc bekend is, maar dat deze situatie ook wordt bevestigd door de directie van dmarcian Inc.

3.11. Daarnaast verwijst dmarcan Europe naar de e-mail van Draegen aan Groeneweg van 6 augustus 2018 waarin Draegen ook zelf onderkent dat er intellectuele eigendomsrechten bij dmarcian Europe zijn ontstaan en dat daarover afspraken moeten worden gemaakt (vgl r.o. 2.6. van de beschikking van de Ondernemingskamer van 7 september 2020):

"*There are 2 main parts to consider: 1. (...) 2. Where is global 1F located? (...) About location of IP: since EU has been licensing tech, it is likely impossible to home 1F into the EU by default.. even though EU is paying to continue to develop (as US is also paying developers — so it's sort of a mixed issue). This means that some sort of asset transfer has to be made (...) along with a proper valuation of said 1F*".

3.12. Partijen hebben het ontstaan van auteursrecht aan de zijde van dmarcian Europe en dmarcian Bulgaria onderkend. Zij hebben echter nooit afgesproken wat er met die auteursrechten moet gebeuren. Daarmee kan niet worden volgehouden, zoals gedaagden lijken te doen, dat dmarcian Europe gehouden is haar auteursrecht tegen eenzijdig door dmarcian Inc op te leggen voorwaarden over te dragen.

*Auteursrecht op de door dmarcian Europe en dmarcian Bulgaria aangebrachte wijzigingen in de software.*

3.13. Voor zover dmarcian Europe aan de dmarcian software heeft gewerkt, is dat gebeurd door medewerkers van dmarcian Europe, althans door Kalkman. Op grond van artikel 7 van de Auteurswet vallen auteursrechten die in dienst van dmarcian Europe zijn gecreëerd, toe aan dmarcian Europe. De arbeidsovereenkomsten met de medewerkers van dmarcian Europe bevatten een expliciete bepaling die eventueel auteursrecht aan dmarcian Europe overdraagt. Hiervoor is al

16

uiteengezet dat de auteursrechten die bij dmarcian Bulgaria zijn ontstaan rechtsgeldig aan dmarcian Europe zijn overgedragen (vgl 2.17).

3.14. De broncode van de dmarcian software staat op een door dmarcian Inc beheerde *repository* op gitlab.com. In de computerwetenschappen wordt de term Git wel gebruikt voor een versiecontrolesysteem, waarmee programmeurs wijzigingen in de code op een overzichtelijke wijze kunnen bijhouden en kunnen samenwerken aan het schrijven van software. Een verzameling (broncode-) bestanden die allemaal deel uitmaken van hetzelfde project, wordt een *repository* genoemd. Gitlab is een online platform dat een Git dienst voor het bijhouden van *repositories* aanbiedt. Op de *repository* zijn dus alle aanpassingen of bijdragen (*commits*) zichtbaar die sinds het eerste moment op en aan de (bron)code van de dmarcian software zijn gemaakt.

3.15. dmarcian Europe heeft aan mr. ir. A. Engelfriet van ICT Recht ('**de deskundige**') opdracht gegeven om te beoordelen of de *commits* die dmarcian Euopre en dmarcian Bulgaria aan de broncode van de dmarcian software hebben toegevoegd auteursrechtelijk zijn beschermd. Dmarcian Europe brengt het rapport van de deskundige in het geding als productie 19 (**Productie 19**).

3.16. In het rapport is omwille van de grote hoeveelheid *commits* aan de broncode van de dmarcian software gekozen voor een getalsmatige benadering. De deskundige heeft gefocust op de zogenaamde Python broncode bestanden, omdat de kans dat als gevolg van aanpassingen aan die bestanden auteursrecht ontstaat het grootst is. Gelet op de grote hoeveelheid wijzigingen die zowel dmarcian Europe als dmarcian Bulgaria vervolgens aan de zogenaamde Python broncode bestanden hebben doorgevoerd, heeft de deskundige geconcludeerd dat op de daaraan toegevoegde *commits* auteursrecht is verworven.

3.17. dmarcian Inc neemt blijkens het verweerschrift van Draegen in de OK-procedure het standpunt in dat partijen in december 2016 hebben afgesproken dat dmarcian Europe alle auteursrechten die zij als gevolg van ontwikkeling van de dmarcian software zou verkrijgen aan dmarcian Inc zou overdragen. Zij beroept zich daarbij op overeenkomsten die nooit zijn ondertekenend en een enkele e-mail van Groeneweg van 7 december 2016.[7] dmarcian Europe betwist dat zij op basis van die stukken met dmarcian Inc is overeengekomen dat alle auteursrechten die zij gedurende de samenwerking zou verwerven onder eenzijdig door dmarcian Inc te bepalen voorwaarden aan haar overgedragen of gelicentieerd zouden worden.

3.18. Al deze argumenten zijn ook aan de Ondernemingskamer voorgelegd. De Ondernemingskamer heeft in rechtsoverweging 3.4. van haar beschikking van 7 september 2020 overwogen dat de beoordeling van de inhoud van de licentieovereenkomst en de vraag aan wie het auteursrecht op de dmarcian software toevalt door de gewone burgerlijke rechter moet worden beantwoord, maar dat de bestaande onduidelijkheid aanleiding is om een onderzoek naar het binnen dmarcian Europe gevoerde beleid te gelasten. De Ondernemingskamer onderschrijft daarmee *tenminste* dat er omtrent de inhoud van de licentieovereenkomst en de eigendom van de intellectuele eigendomsrechten onduidelijkheid bestaat.

3.19. Concluderend is dmarcian Europe van mening dat gelet op de aard en omvang van de bijdrage die zij en dmarcian Bulgaria aan de broncode van de dmarcian software hebben doorgevoerd, de

---

[7] Vgl. verweerschrift Draegen in OK-procedure randnummer 2.38 en productie 36

17

conclusies uit het rapport van de deskundige en de overdracht van auteursrecht van dmarcian Bulgaria aan dmarcian Europe voorshands voldoende aannemelijk is dat zij auteursrecht heeft op onderdelen van de dmarcian software en dat zij als mede-auteursrechthebbende op de (huidige versie van de) dmarcian software moet worden beschouwd. Maar *tenminste* staat op grond van de beschikking van de Ondernemingskamer vast dat er over de inhoud van de licentieovereenkomst en de eigendom van de intellectuele rechten onduidelijkheid bestaat. Reeds dat laatste zou moeten betekenen dat de status quo moet worden gehandhaafd totdat die onduidelijkheid is opgelost.

## 4. Onrechtmatigheid van de opzegging en aansprakelijkheid Draegen

4.1. De tussen partijen bestaande overeenkomst c.q. samenwerking kwalificeert als een duurovereenkomst voor onbepaalde tijd. Partijen zijn geen opzeggingsregeling overeengekomen.

4.2. Uit vaste rechtspraak van de Hoge Raad volgt dat een dergelijke overeenkomst *in beginsel* kan worden opgezegd. De eisen van redelijkheid en billijkheid in verband met de aard en de inhoud van de overeenkomst en de omstandigheden van het geval kunnen echter met zich meebrengen dat (i) opzegging slechts mogelijk is indien daarvoor een voldoende zwaarwegende grond aanwezig is en/of (ii) een bepaalde opzegtermijn in acht moet worden genomen of de opzegging gepaard moet gaan met het aanbod tot betaling van een (schade)vergoeding.[8]

4.3. Bij de beoordeling wat in dit kader naar maatstaven van redelijkheid en billijkheid van partijen gevergd kan worden, moeten alle omstandigheden van het geval worden meegewogen. Van bijzonder belang zijn daarbij:

- De belangen van partijen: het redelijk belang van de opzeggende partij bij de opzegging, afgewogen tegen het redelijk belang van de opgezegde partij bij voortzetting van de overeenkomst.

- De aard en duur van de overeenkomst c.q. relatie: de vraag of partijen lange tijd zaken met elkaar doen en/of sprake is van een hechte en/of exclusieve relatie.

- Afhankelijkheid: de mate waarin een partij afhankelijk is van de (omzet van de) andere partij en of het voortbestaan van de onderneming van de partij die wordt opgezegd in gevaar is.

- Wat aan de opzegging vooraf is gegaan: de wijze waarop partijen hebben samengewerkt en het vertrouwen dat de opgezegde partij mocht hebben op voortzetting van de overeenkomst (bijvoorbeeld door de wijze waarop partijen zich in dat kader over en weer naar elkaar hebben uitgelaten) en de reden voor de opzegging.

- Investeringen: de investeringen die een partij heeft gedaan. Deze kunnen worden gecompenseerd door het in acht nemen van een bepaalde opzegtermijn of – indien dat niet mogelijk is – voor schadevergoeding in aanmerking komen.

4.4. Het voorgaande laat onverlet dat een duurovereenkomst naar de bedoeling van partijen niet-opzegbaar kan zijn.

---

[8] Vgl. Hoge Raad, 2 februari 2018, ECLI:NL:HR:2018:141 (Goglio v SMQ Group) r.o. 3.6.1 e.v.

18

*Primair: partijen zijn overeengekomen dat de Overeenkomst niet opzegbaar is*

4.5. In dit geval geldt (primair) dat uit de bedoeling van partijen volgt dat de Overeenkomst c.q. hun samenwerking niet (althans alleen onder zeer bijzondere omstandigheden die hier niet spelen) opzegbaar is. Partijen zijn immers een *perpetual* (dus: eeuwigdurende) licentie overeengekomen in ruil voor een meerderheidsbelang in dmarcian Europe (vgl de e-mail van Draegen onder 3.4. en het schema van Shannon Draegen onder 3.10.). Daaruit blijkt al dat partijen de bedoeling hadden dat de licentie en daarmee ook de distributierechten van dmarcian Europe in beginsel niet beëindigd kunnen worden.

4.6. Daar komt bij dat dmarcian Europe naar haar mening intussen mede-auteursrechthebbende op de huidige versie van de dmarcian software is geworden. Dit staat hoe dan ook aan de beëindiging van de gemaakte exploitatieafspraken in de weg.

*Subsidiair: de Overeenkomst kan (onder de huidige omstandigheden) niet of slechts met een dringende reden worden opgezegd*

4.7. Voor zover de Overeenkomst naar bedoeling van partijen wél opzegbaar zou zijn, geldt (subsidiair) dat de Overeenkomst in het licht van de eisen van redelijkheid en billijkheid en de relevante omstandigheden van dit geval (bij de huidige stand van zaken) niet, althans niet zonder dringende reden (die ontbreekt) kan worden opgezegd.

4.8. In dat kader zijn, naast hetgeen hiervoor in het kader van de partijbedoelingen is opgemerkt, de volgende omstandigheden van belang:

- Er is sprake van een exclusieve Overeenkomst, die al tenminste vijf jaar voortduurt. Het gaat bovendien om een zeer hechte samenwerking. De bedrijfsvoering van partijen is sterk verwerven, zoals onder meer blijkt uit de door partijen gebruikte (domein)namen en de aanwezigheid van een broncode ontwikkelplatform.

- De exploitatie van de dmarcian software vormt de *core business* van dmarcian Europe. Haar onderneming is volledig ingericht op de distributie van die software en al haar klantgegevens (en gegevens van potentiele klanten) zijn opgenomen in de (back-end van de) door dmarcian Inc. beheerde SaaS-applicatie. Het voortbestaan van dmarcian Europe is daarom afhankelijk van het in stand blijven licentie en distributierechten die zij in het kader van de Overeenkomst heeft verkregen en het in stand blijven van de toegang tot die applicatie. Beëindiging van de Overeenkomst zal zonder twijfel tot haar faillissement leiden, met als gevolg dat al haar werknemers op straat komen te staan en haar klanten gedupeerd worden. Het belang van dmarcian Europe bij de voorzetting van de relatie is derhalve zeer groot.

- dmarcian Europe heeft aanzienlijke investeringen gedaan in de ontwikkeling van de dmarcian software. Die investeringen zijn niet doorbelast aan dmarcian Inc. dmarcian Inc. was daarvan wel op de hoogte en profiteert daar ook van door (zonder daartoe gerechtigd te zijn) de door en in opdracht van dmarcian Europe ontwikkelde software aan te bieden aan derden.

- dmarcian Inc heeft geen enkel rechtens te respecteren belang bij een (onmiddellijke) beëindiging van de Overeenkomst. De enige reden waarom zij de Overeenkomst thans beëindigt, is omdat zij

19

op dmarcian Europe op die manier in een dwangpositie wil brengen, om haar zo (alsnog) zover te krijgen dat zij instemt met een overdracht van de intellectuele eigendomsrechten en een distributieovereenkomst onder voor dmarcian Europe zeer ongunstige voorwaarden.

- Dit laatste klemt temeer nu over de eigendom van de intellectuele rechten in de software ten minste onduidelijkheid bestaat. De Ondernemingskamer heeft in haar beschikking in verband daarmee een onderzoek gelast naar de gang van zaken binnen dmarcian Europe. De Ondernemingskamer heeft bovendien een tijdelijke bestuurder aangesteld, die als expliciete opdracht heeft om duidelijkheid te krijgen over de intellectuele eigendomsrechten en om een minnelijke oplossing te beproeven tussen de betrokken partijen (Beschikking Ondernemingskamer d.d. 7 september 2020, r.o. 3.5 en 3.6). De acties van gedaagden maaien het gras voor de voeten van deze aangestelde bestuurder weg en stellen de onderzoeker – nadat die zal zijn benoemd – voor een voldongen feit, als de onduidelijkheid over de intellectuele eigendomsrechten inmiddels is opgelost doordat dmarcian Europe die rechten onder dwang aan dmarcian Inc heeft overgedragen. Het is onduidelijk waarom van dmarcian Inc niet zou kunnen worden gevergd dat zij *op zijn minst* de door de tijdelijk aangestelde bestuurder ondernomen acties c.q. het door de Ondernemingskamer gelaste onderzoek afwacht, althans totdat in een bodemprocedure duidelijkheid is verkregen over de eigendom van de intellectuele eigendomsrechten op de huidige versie van de dmarcian software.

- Bovendien pleegt dmarcian Inc met de opzegging van de overeenkomst een onrechtmatige daad jegens dmarcian Europe omdat zij daarmee profiteert van de normschending van Draegen jegens dmarcian Europe. Deze normschending is kort gezegd dáárin gelegen dat Draegen als aandeelhouder van dmarcian Europe de verplichting jegens dmarcian Europe en overige stakeholders had om de status quo te behouden gedurende het – nota bene mede door hemzelf aangevraagde – onderzoek. Hij is in die verplichting tekortgeschoten doordat hij zijn positie als bestuurder en grootaandeelhouder van dmarcian Inc heeft gebruikt om de samenwerking op te zeggen, althans druk uit te oefenen op dmarican Europe (zie over de normschending hierna ook paragraaf 4.12 en 4.13). dmarcian Inc zou de samenwerking niet kunnen beëindigen als haar bestuurder en grootaandeelhouder zich, in zijn hoedanigheid van (groot)aandeelhouder van dmarcian Europe, had gehouden aan zijn verplichting om ervoor te zorgen dat de status quo gedurende het gelaste onderzoek zou worden gehandhaafd. Onder het Nederlandse recht levert het profiteren van een normschending van een ander (in casu: Draegen) een zelfstandig onrechtmatige daad op indien er sprake is van wetenschap van de normschending en bijkomende omstandigheden.[9] In dit geval is aan deze vereisten voldaan. Dat dmarcian Inc. wetenschap heeft blijkt al uit de afstemming van dmarcian Inc. en Draegen omtrent de brieven en e-mails die op 22 januari jl. respectievelijk 26 januari door (de advocaten van) dmarcian Inc. respectievelijk Draegen zijn verstuurd (zie par. 2.26 hiervoor). Van de bedoelde bijkomende omstandigheden (naast de enkele wetenschap van de normschending) is eveneens sprake nu a) Draegen bestuurder en (groot)aandeelhouder van dmarcian Inc is en de facto het beleid van dmarcian Inc (mede) bepaalt en b) de Ondernemingskamer een onderzoek heeft gelast naar het binnen dmarcian Europe gevoerde beleid.

4.9. In het licht van deze omstandigheden moet worden geoordeeld dat de eisen van redelijkheid en billijkheid met zich meebrengen dat de Overeenkomst – in ieder geval bij de huidige stand van zaken, oftewel zolang de OK-procedure nog niet is afgerond – niet, althans niet zonder zwaarwegende reden,

---

[9] Hof Den Haag van 28 januari 2020 ECLI:NL:RBDHA:2018:2158 (Silifi – Roka) r.o. 5.20

kan worden opgezegd. Voor de goede orde: van een zwaarwegende grond voor opzegging is in dit geval geen sprake. Het enkele feit dat tussen partijen op dit moment nog discussie bestaat over de vraag aan wie de intellectuele eigendomsrechten op de software toebehoren, kwalificeert in ieder geval niet als zodanig. Dat is nu juist de reden geweest voor de Ondernemingskamer om voorlopige maatregelen te treffen.

4.10. De conclusie luidt dat de opzegging onrechtmatig en daarmee nietig is. Dmarcian Inc. is en blijft daarom gehouden haar verplichtingen onder de Overeenkomst na te komen. Die verplichtingen omvatten in ieder geval dat zij dmarcian Europe in staat moet stellen om haar distributierechten uit te (blijven) oefenen. Daartoe heeft zij in ieder geval (ononderbroken) toegang nodig tot de (computer)systemen en het SaaS-platform.

*Meer subsidiair: verzoek tot treffen ordemaatregel*

4.11. Voor het geval uw voorzieningenrechter voorshands onvoldoende aannemelijk vindt dat de opzegging onrechtmatig is, verzoekt dmarcian Europe uw voorzieningenrechter – meest subsidiair - gelet op het door de Ondernemingskamer gelaste onderzoek bij wijze van ordemaatregel te bepalen dat de status quo voor de duur van dat onderzoek wordt gehandhaafd en dat dmarcian Europe dus weer onbeperkt toegang tot alle systemen dient te krijgen en dat de samenwerking gedurende die periode niet kan worden beëindigd.

*Aansprakelijkheid Draegen*

4.12. Dmarcian Europe is tevens van mening dat Draegen in strijd handelt met de normen van artikel 2:8 BW. Draegen is aandeelhouder van dmarcian Europe en heeft zich bovendien ook zelf gewend tot de Ondernemingskamer met het verzoek in te grijpen vanwege een mede ook door zijn toedoen ontstane situatie. Die positie brengt naar het oordeel van dmarcian Europe mee dat Draegen hangende de enquêteprocedure de huidige status quo dient te respecteren en dat hij niet –als bestuurder en grootaandeelhouder van dmarcian Inc – feitelijk bewerkstelligt dat de Overeenkomst door dmarcian Inc. wordt opgezegd. Dat deze actie als pressiemiddel dient, mag reeds volgen uit de brief van Draegen zelf.

4.13. Sterker nog, Draegen heeft de verhoudingen verder op scherp gezet door <u>als aandeelhouder in dmarcian Europe</u> een beroep te doen op artikel 4 van de exit agreement, onder de ontbindende voorwaarde dat dmarcian Europe de door <u>dmarcian Inc</u> bij de opzegbrief gevoegde *distribution agreement* en *settlement agreement* accepteert. Hoewel die bepaling geen grond voor beëindiging van de samenwerking tussen dmarcian Inc en dmarcian Europe vormt – zij zijn immers geen partij bij de exit agreement – maar wel grote relevantie heeft voor de samenwerking tussen de aandeelhouders, probeert Draegen daarmee evident de druk op (de aandeelhouders van) dmarcian Europe op te hogen om akkoord te gaan met de voornoemde *distribution agreement* en *settlement agreement*. Het gaat daarbij om een duidelijk vooraf gecoördineerde actie tussen dmarcian Inc. en Draegen in persoon. Dat blijkt alleen al uit het feit dat de brieven van respectievelijk dmarcian Inc. en Draegen luttele minuten na elkaar per e-mail verzonden zijn. Draegen heeft daarmee in strijd gehandeld met de zorgvuldigheid die hij jegens dmarcian Europe in acht behoort te nemen en de normen van artikel 2:8 BW.

4.14. Gezien de gedragingen van gedaagden tot op heden, kan dmarcian Europe niet anders dan concluderen dat dmarcian Inc. en Draegen alles in het werk zullen stellen om zich aan een oordeel

21

van uw voorzieningenrechter te onttrekken. Dat blijkt ook uit de e-mail van de advocaat van dmarcian Inc. in reactie op de aankondiging van dit kort geding. Daarin schrijft hij namens dmarcian Inc.: *"[dmarcian Europe may resolve to initiate injunctive relief proceedings, but Dutch courts have no competence over [dmarcian Inc] and, consequently, a Dutch judgement cannot be enforced against it in its jurisdiction. Consequently, this will be to no avail."*. Het is daarbij opmerkelijk, en in de ogen van dmarcian Europe opportunistisch, dat ter voorkoming van dit kort geding uitsluitend een beroep wordt gedaan op het ontbreken van rechtsmacht van de Nederlandse rechter.

4.15. Gezien de duidelijke samenhang in het handelen tussen Draegen en dmarcian Europe heeft dmarcian Europe er recht op en belang bij dat ook Draegen verboden wordt verdere (onrechtmatige) handelingen te verrichten die er op gericht zijn haar te benadelen, ten behoeve van dmarcian Inc. – en daarmee Draegen persoonlijk. Ook zijn in dit licht substantiële dwangsommen in het geval van niet nakoming van het door uw voorzieningenrechter te wijzen vonnis op zijn plaats.

## 5. Toepasselijk recht

*De relatie tussen dmarcian Europe en dmarcian Inc.*

5.1. De Overeenkomst kwalificeert aanvankelijk en primair als een distributieovereenkomst.[10] Partijen zijn geen rechtskeuze overeengekomen. Om die reden is op de Overeenkomst het recht van toepassing van het land waar dmarcian Europe als distributeur haar gewone verblijfplaats heeft (art. 4 lid 1 Rome I Verordening[11] jo art. 10:154 BW). dmarcian Europe is gevestigd in Nederland. Dat wil zeggen dat op de Overeenkomst tussen dmarcian Europe en dmarcian Inc. Nederlands recht van toepassing is. Voorts staan de servers waar het Saas-platform van dmarcian Europe op servers in België en Nederland. Ook om die reden moet worden geoordeeld dat Nederlands recht van toepassing is.

*De relatie tussen dmarcian Europe en Draegen*

5.2. De handelingen van Draegen kwalificeren als een onrechtmatige daad. Op een onrechtmatige daad is het recht van toepassing van het land waar de schade zich voordoet (artikel 4 lid 1 Rome II Verordening jo. 10:159 BW).[12] De schade die het gevolg is van het handelen van Draegen doet zich voor in Nederland. Ook op de vorderingen van dmarcian Europe jegens Draegen is derhalve Nederlands recht van toepassing.

## 6. Bevoegdheid van de Nederlandse rechter

6.1. De Nederlandse rechter is op verschillende gronden bevoegd om van dit geschil kennis te nemen.

6.2. Ten eerste geldt dat de Nederlandse rechter op grond van artikel 6 Rv rechtsmacht heeft.

6.2.1. Ten aanzien van de vorderingen van dmarcian Europe jegens dmarcian Inc. geldt dat er sprake is van een verbintenis die voortvloeit uit een overeenkomst. Artikel 6 onder a Rv bepaalt dat de Nederlandse rechter in een dergelijk geval rechtsmacht heeft, indien de verbintenis die aan de eis of het verzoek ten grondslag ligt in Nederland is uitgevoerd of moet worden uitgevoerd. In het geval van een overeenkomst voor de verstrekking van diensten, geldt dat de plaats van de uitvoering in Nederland is gelegen, indien de diensten volgens de overeenkomst in

---

[10] In 2018 is de relatie uitgebreid met toegang tot de broncode ten behoeve van de ontwikkeling als gevolg waarvan gezamenlijk eigendom is gestaan.

[11] VERORDENING (EG) Nr. 593/2008 VAN HET EUROPEES PARLEMENT EN DE RAAD van 17 juni 2008 inzake het recht dat van toepassing is op verbintenissen uit overeenkomst (Rome I).

[12] Verordening (EG) nr. 864/2007 van het Europees Parlement en de Raad van 11 juli 2007 betreffende het recht dat van toepassing is op niet-contractuele verbintenissen (Rome II).

22

Nederland verstrekt werden of verstrekt hadden moeten worden (art. 6a Rv). Daarvan is in dit geval sprake. dmarcian Europe was onder de Overeenkomst verantwoordelijk voor de verkoop van de software (en het leveren van de bijbehorende diensten) aan klanten in Europa, Rusland en Afrika (vgl. r.o. 2.5 van de beschikking van de Ondernemingskamer d.d. 7 september 2020). Deze diensten verrichtte dmarcian Europe vanuit haar vestigingsplaats Nederland. De Nederlandse rechter heeft om die reden op grond van artikel 6 lid 1 Rv de bevoegdheid om over dit geschil te oordelen.

6.2.2. Ten aanzien van Draegen geldt dat er sprake is van vorderingen die gebaseerd zijn op verbintenissen uit onrechtmatige daad. In het geval van verbintenissen uit onrechtmatige daad is de Nederlandse rechter bevoegd indien het *'schadebrengende feit'* zich in Nederland heeft voorgedaan of zich kan voordoen (art. 6 onder e Rv). Omdat artikel 6 onder e Rv gebaseerd is op (de voorlopers van) artikel 7 onder 2 Herschikte EEX-Vo[13], is voor de uitleg daarvan de rechtspraak van het Hof van Justitie over de laatstgenoemde bepaling(en) leidend. Uit die rechtspraak volgt dat onder het *schadebrengende feit* zowel de plaats waar het schadebrengende feit zich heeft voorgedaan wordt verstaan (het *Handlungsort*), als de plaats waar de schade zich heeft voorgedaan (het *Erfolgsort*).[14] In dit geval is in ieder geval het *Erfolgsort* gelegen in Nederland. Om die reden heeft de Nederlandse rechter ook ten aanzien van de vorderingen jegens Draegen op grond van artikel 6 Rv rechtsmacht.

6.3. Overigens geldt dat ook als dat anders zou zijn, de Nederlandse rechter bevoegd is om over dit geschil te oordelen. Er is sprake van een verzoek tot het treffen van bewarende maatregelen, welke voldoende relevante aanknopingspunten heeft met de Nederlandse rechtsorde. Het geschil draait immers om de opzegging van een overeenkomst die in Nederland moet worden uitgevoerd door een Nederlandse partij (en die dus beheerst wordt door Nederlands recht), en daarmee verband houdende onrechtmatige handelingen. Met die handelingen wordt bovendien getracht een beschikking van de Nederlandse rechter, te weten de Ondernemingskamer, te doorkruisen. In dergelijke omstandigheden kan de bevoegdheid van de Nederlandse rechter op grond van artikel 13 Rv niet worden betwist op de (enkele) grond dat de Nederlandse rechter ten aanzien van een geschil ten principale (beweerdelijk) geen rechtsmacht zou hebben.

6.4. Tot slot merkt dmarcian Europe op dat haar vorderingen jegens dmarcian Inc. en Draegen een zodanige samenhang bestaat, dat redenen van doelmatigheid een gezamenlijke behandeling rechtvaardigen. Dit houdt in dat indien de Nederlandse rechter rechtsmacht heeft ten aanzien van de vorderingen ten aanzien van één van de gedaagden, hij dat automatisch ook heeft ten aanzien van de andere gedaagden (art. 7 lid 1 Rv).

*Relatieve bevoegdheid Rechtbank Rotterdam*

6.5. Uw Voorzieningenrechter bent ook relatief bevoegd.

6.6. Op grond van artikel 102 Rv is in zaken betreffende verbintenissen uit onrechtmatige daad de rechter van de plaats waar het schadebrengende feit zich heeft voorgedaan (mede) bevoegd om over het geschil te oordelen. Het schadebrengende feit doet zich in dit geval voor in de vestigingsplaats van dmarcian Europe, te weten Dordrecht, vanuit waar zij de Overeenkomst uitvoert. Uw Voorzieningenrechter is daarom in ieder geval relatief bevoegd waar het de vorderingen jegens

---

[13] Verordening (EU) nr. 1215/2012 van het Europees Parlement en de Raad van 12 december 2012 betreffende de rechterlijke bevoegdheid, de erkenning en de tenuitvoerlegging van beslissingen in burgerlijke en handelszaken (Herschikte EEX Verordening).
[14] Hof van Justitie 30 november 1976, C-21/76, ECLI:EU:C:1976:166 (*Kalimijnen*).

23

Draegen betreft. Nu tussen de vorderingen jegens Draegen en dmarcian Inc. een zodanige samenhang bestaat dat redenen van doelmatigheid een gezamenlijke behandeling rechtvaardigen, maakt dit dat uw Voorzieningenrechter ook ten aanzien van de vorderingen jegens dmarcian Inc. relatief bevoegd bent (art. 107 Rv).

6.7. Voor zover de voorgaande bepalingen niet van toepassing zouden zijn, geldt verder dat uw Voorzieningenrechter op grond van artikel 109 Rv bevoegd bent, nu dmarcian Europe als eiseres in Dordrecht gevestigd is.

## 7. Bekende verweren van dmarcian Inc.

7.1. Dmarcian Inc betwist dat zij aan dmarcian Europe een eeuwigdurende, exclusieve licentie op haar software heeft gegeven. Zij betwist verder dat dmarcian Europe auteursrechten op de dmarcian software heeft verworven, althans zij stelt zich op het standpunt dat dmarcian Europe gehouden is die rechten onder door dmarcian Inc te bepalen voorwaarden aan dmarcian Inc over te dragen. Dmarcian Europe is op al deze verweren in het hiervoorgaande ingegaan.

## 8. Bewijs

8.1. Ter onderbouwing van haar stellingen verwijst dmarcian Europe naar de bij deze dagvaarding gevoegde producties. Zonder overigens onverplicht enige bewijslast op zich te nemen, biedt dmarcian Europe daarnaast aan haar stellingen verder te bewijzen door alle middelen rechtens.


**OM DEZE REDENEN:**

Het uw Voorzieningenrechter behage om bij vonnis, voor zover mogelijk uitvoerbaar bij voorraad:

Ten aanzien van dmarcian Inc

1. (a) Primair: dmarcian Inc te gebieden de tussen partijen bestaande overeenkomst onverkort na te komen, totdat deze rechtsgeldig is beëindigd,

   (b) Subsidiair: bij wijze van ordemaatregel (i) dmarcian Inc. te gebieden de status quo voor de duur van het door de Ondernemingskamer gelaste onderzoek te handhaven en de tussen partijen bestaande overeenkomst gedurende die periode onverkort na te komen en (ii) dmarcian Inc. te verbieden gedurende die periode de tussen partijen bestaande overeenkomst te beëindigen.

2. dmarcian Inc te gebieden de blokkade van (de medewerkers van) dmarcian Europe tot het SaaS-platform en de voor de uitoefening van haar bedrijfsactiviteiten vereiste (computer)systemen met onmiddellijke ingang op te heffen en opgeheven te houden totdat de tussen partijen bestaande overeenkomst rechtsgeldig is beëindigd;

3. dmarcian Inc te veroordelen tot betaling van een dwangsom van EUR 50.000,- per dag dat zij niet, of niet volledig voldoet aan het onder 1 en 2 gevorderde.

   Ten aanzien van Draegen

4. Draegen te veroordelen zich te onthouden van iedere handeling, zelf of via een door hem bestuurde onderneming waaronder expliciet begrepen dmarcian Inc, die de bedrijfsvoering van dmarcian Europe belemmert, totdat dan wel als gevolg van het door de Ondernemingskamer gelaste

onderzoek, dan wel als gevolg van een gerechtelijk bodemvonnis, duidelijkheid ontstaat over de inhoud en reikwijdte van de aan dmarcian Europe verstrekte licentieovereenkomst en de eigendom van het auteursrecht op de dmarcian software.

5. Draegen te veroordelen tot betaling van een dwangsom van EUR 50.000,- per dag dat hij niet, of niet volledig voldoet aan het onder 4 gevorderde.

Ten aanzien van dmarcian Inc en Draegen

6. dmarcian Inc en Draegen hoofdelijk te veroordelen in de proceskosten en de nakosten, alle kosten te vermeerderen met wettelijke rente vanaf de datum van het vonnis tot aan de dag der algehele voldoening.

De kosten dezes zijn voor mij, deurwaarder, EUR 85,81



---

Deze zaak wordt behandeld door mr. V. van Druenen, mr. A. Meijboom en mr. M. Bacon van Kennedy Van der Laan, Postbus 58188 te (1040 HD) Amsterdam, telefoon (020) 5506 688, fax (020) 5506 788, e-mail veerle.van.druenen@kvdl.com.

25

**PRODUCTIES**

| | |
|---|---|
| Productie 1 | Beschikkingen Ondernemingskamer d.d. 7 en 10 september 2020 |
| Productie 2 | Uittreksel KvK en handelsregisterhistorie dmarcian Europe |
| Productie 3 | Uittreksels KvK TDX, Groeneweg Beheer en Kalkman Holding |
| Productie 4 | Uittreksel Bulgaars handelsregister dmarcian Bulgaria |
| Productie 5 | Correspondentie tussen partijen die bevestigt dat de ontwikkeling van de software aanvankelijk door dmarcian Inc zou plaatsvinden |
| Productie 6 | Correspondentie met betrekking tot de wetenschap van Draegen van de oprichting en het doel van dmarcian Bulgaria |
| Productie 7 | Akte van overdracht IE rechten dmarcian Bulgaria aan dmarcian Inc. |
| Productie 8 | Verklaring V.P. Kunze over Bulgaars recht |
| Productie 9 | Procesdossier OK procedure |
| Productie 10 | Verzoekschrift TDX en verweerschrift dmarcian Europe |
| Productie 11 | Bericht Harmeling aan aandeelhouders dmarcian Europe d.d. 18 december 2020 |
| Productie 12 | Correspondentie met Ondernemingskamer met betrekking tot benoeming onderzoeker d.d. 27 januari 2021 |
| Productie 13 | Opzeggingsbrief dmarcian Inc d.d. 22 januari 2021, met bijlages |
| Productie 14 | Rapport van accountant dmarcian Inc d.d. 10 augustus 2020 |
| Productie 15 | Exit Agreement |
| Productie 16 | E-mails aan advocaten gedaagden d.d. 25 januari 2021 |
| Productie 17 | E-mails van advocaten gedaagden d.d. 26 januari 2021 |
| Productie 18 | Slack correspondentie tussen Groeneweg en Shannon Draegen (CEO dmarcian Inc) d.d. 29 september 2019 |
| Productie 19 | Deskundigenrapport ICT Recht |

Today, the                                                      two thousand and twenty-one,
at                  hours, at the request of the private limited company **DMARCIAN EUROPE B.V.**, with its
registered office and principal place of business in (3311 JG) Dordrecht at Burgemeester de Raadtsingel
93, choosing its address for service in this matter in (1014 BG) Amsterdam at Molenwerf 16, at the
offices of Kennedy Van der Laan N.V., of which firm attorneys V. van Druenen, A.P. Meijboom and
M.R.S. Bacon have been appointed as counsel and will act as such;

## SUMMONED IN ACCELERATED PRELIMINARY RELIEF PROCEEDINGS:

**1.** The company incorporated under US law **DMARCIAN, INC.**, with its registered office at 43 S. Broad
Street, Suite 203, Brevard, North Carolina 28712, United States of America,

serving my writ by virtue of Article 55(1) Dutch Code of Civil Procedure (DCCP) with the public official
of the public prosecution service of Rotterdam District Court, location Rotterdam, where I have left two
copies hereof in 3072 AK ROTTERDAM at Wilhelminaplein 100-125, accompanied by translations of
those documents in the English language, with:

employed and present there.

It is requested that this document, together with the translation of such documents into English, be
served on DMARCIAN, INC., having its registered office at 43 S. Broad Street, Suite 203, Brevard, North
Carolina 28712, United States of America, in accordance with Articles 3 to 6 of the Convention on the
Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters of 15 November
1965 (the "Convention"), by service in accordance with the formalities laid down in the law of the
requested Member State for the service of documents, drawn up in that country and intended for persons
therein, in the forms prescribed by that State's law; the (central) authority referred to in Article 6 of the
Convention shall also be requested to return a copy of this writ, together with the declaration referred to
in Article 6 of the Convention.

the costs in the amount of USD 95.00 shall be transferred in a timely manner to Wells Fargo Bank,
account no. 2007107119, stating the Swift Code: WFBIUS6S, 1763 4th Ave South, Seattle, Washington
98134 USA stating the company incorporated under the law of its place of establishment DMARCIAN
INC. with its registered office and its principal place of business in 28712 BREVARD, NORTH
CAROLINA, UNITED STATES OF AMERICA at Broad Street 43 S, Suite 203;

Furthermore, a copy of this writ accompanied by the translation of those documents in the English
language, will be sent by me forthwith by registered letter to the address of the aforementioned company
incorporated              under              US              law              DMARCIAN,              INC.;

**2.** Mr Timothy George **DRAEGEN**, residing at 272 Delphia Drive, Brevard, North Carolina, 28712, United
States of America,

1

serving my writ by virtue of Article 55(1) Dutch Code of Civil Procedure (DCCP) with the public official of the public prosecution service of Rotterdam District Court, location Rotterdam, where I have left two copies hereof in 3072 AK ROTTERDAM at Wilhelminaplein 100-125, accompanied by translations of those documents in the English language, with:

employed and present there.

Requesting that this writ and the documents specified below, accompanied by a English translation of those documents, be served on/notified to Timothy George Draegen, residing at 272 Delphia Drive, Brevard, North Carolina, 28712, United States of America in accordance with Articles 3 through 6 of the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters of 15 November 1965, specifically by service or notification with due observance of the formalities laid down in the law of the state addressed for the service of documents drawn up in that country and intended for persons within its territory, also requesting the central authority referred to in Article 6 of the Convention to return a copy of this writ, accompanied by the certificate referred to in Article 6 of the Convention.

the costs in the amount of USD 95.00 shall be transferred in a timely manner to Wells Fargo Bank, account no. 2007107119, stating the Swift Code: WFBIUS6S, 1763 4th Ave South, Seattle, Washington 98134 USA stating Timothy George Draegen, residing in 28712 BREVARD, NORTH CAROLINA, UNITED STATES OF AMERICA at Delphia Drive 272;

Furthermore, a copy of this writ, accompanied by the translation of those documents in the English language, will be sent by me forthwith by registered letter to the address of the aforementioned Timothy George Draegen;

STIPULATING IN THIS SUMMONS THE CONDITIONS THAT:

- Leave to shorten the summons period has been granted under the condition that the summons and translation be served on the defendants by no later than on 29 February 2021 at 14:00 hours
- The defendants are notified of the time and location of the hearing without undue delay, with a copy of the draft summons being sent to the defendants

**TO APPEAR:**

On 1 February 2021, at 09:00 hours, in person or represented by counsel, at the hearing of the Preliminary Relief Court of the Rotterdam District Court, location Rotterdam, which hearing will be held there at the courthouse at Wilhelminaplein 100-125, 3072 AK Rotterdam

**WITH EXPRESS NOTICE THAT:**

- If a defendant fails to appear at the hearing, either in person or represented by counsel, and the prescribed time periods and formalities have been observed, the court will declare that defendant to be in default of appearance and will allow the claim set forth below, unless the

2

court deems this claim unlawful or unfounded;

- if at least one of the defendants appears at the hearing and has paid the court fee in good time, one judgment will be rendered between all parties, which will be regarded as a judgment rendered in a defended action;
- upon appearing before the court, each of the defendants will be charged a court fee to be paid within four weeks after the date of appearance;
- the amount of the court fee is stated in the most recent appendix to the Dutch Court Fees in Civil Cases Act, which can be found on the following website: www.kbvg.nl/griffierechtentabel;
- a person who is of limited means will be charged a court fee for persons of limited means, as determined by or pursuant to the law, if at the time at which the court fee is charged they have submitted:
  1. a copy of the decision to grant legal aid as referred to in Article 29 of the Dutch Legal Aid Act or, if this is not possible as a result of circumstances that cannot reasonably be attributed to that person, a copy of the application referred to in Article 24(2) of the Dutch Legal Aid Act, or
  2. a statement from the Legal Aid Board, within the meaning of Article 7(3)(e) of the Dutch Legal Aid Act, showing that their income does not exceed the amounts stated in the order in council by virtue of Article 35(2) of that Act;
- a joint registry fee will be levied once only for defendants appearing through the same counsel and submitting identical statements or conducting an identical defence based on Article 15 of the Court Fees (Civil Cases) Act;

**IN ORDER TO:**

hear it claimed and moved as follows on behalf of the claimant ("**dmarcian Europe**"):

## 1. Introduction

1.1. dmarcian Europe requests the Preliminary Relief Court in these preliminary relief proceedings to award a number of preliminary relief measures serving to lift, with immediate effect, the denial by dmarcian Inc. of the access of employees of dmarcian Europe to the joint computer and other systems, to eliminate the effect of the termination of the partnership between the parties effective 1 February 2021 as given notice of in a letter of 22 January 2021, and to order the defendants to continue the existing partnership unchanged until clarity has been obtained about the terms and conditions of the license granted to dmarcian Europe and the ownership of the copyrights to the current version of the software exploited by the parties, which constitutes the essence of their dispute.

1.2. This case is closely connected to the inquiry proceedings before the Enterprise Court of the Amsterdam Court of Appeal. In those proceedings – to which Draegen is also a party – the Enterprise Court held in a decision of 7 September 2020 that there are well-founded reasons to question whether dmarcian Europe has conducted proper management, which reasons can be found in, put succinctly, the situation, caused by the parties, that the parties have not arranged their partnership, either in general or in terms of the intellectual property rights to software applications developed and to be developed and the licenses granted or to be granted in relation thereto, as

3

well as the scope of such licenses. At the request of both shareholders – Draegen and TDX – the Enterprise Court ordered an investigation into this. Furthermore, the Enterprise Court has intervened by awarding immediate relief, comprising the appointment of a director with deciding vote as well as the transfer of all shares in dmarcian Europe (minus one share per shareholder) for management purposes to a manager. By decision of 10 September 2020, the Enterprise Court appointed H.J.M. Harmeling ('**Harmeling**') as the said director and Y. Borrius as manager. These preliminary relief proceedings are conducted on dmarcian Europe's behalf under the responsibility of Harmeling, in order to ensure the continuity of dmarcian Europe. The Enterprise Court's decisions of 7 and 10 September 2020 are submitted as Exhibit 1 (**Exhibit 1**). dmarcian Europe will discuss those decisions in more detail below.

## 2. Introduction of the parties

*dmarcian Europe*

2.1. dmarcian Europe was incorporated on 21 March 2013 under the name Mailmerk B.V. (**Exhibit 2**). It is engaged in the provision of products and services in the field of e-mail address identity security.

2.2. On 22 January 2016, Mailmerk B.V. entered into a partnership with dmarcian Inc. It change its name to dmarcian Europe on 15 February 2017. Then sole director and shareholder of Mailmerk B.V./dmarcian Europe, The Digital Xpedition (TDX) Holding B.V. ("**TDX**"), offered dmarcian Inc and/or Draegen, in exchange for the partnership, an option to acquire a majority interest in dmarcian Europe for the price of EUR 1. This right was exercised in July 2018, but the shares were not transferred to dmarcian Inc, but to its CEO – Draegen.

2.3. From July 2018 until 7 September 2020, 50.01% of the shares in dmarcian Europe were held by Draegen and 49.55% of the shares were held by TDX. Following the Enterprise Court's decision, the shares, excepting one share per shareholder, were temporarily transferred for management purposes to a third party, Yvette Borrius. In addition, Harmeling was appointed as director with decisive vote alongside TDX.

2.4. The shares in TDX are held by H.J. Kalkman Beheer B.V. (50%) and M. Groeneweg Holding B.V. (50%), the personal holding companies of Mr Martijn Groeneweg ("**Groeneweg**") and Mr Herwert Jette Kalkman ("**Kalkman**"), respectively (**Exhibit 3**).

2.5. dmarcian Europe in turn holds 100% of the shares in the capital of a Bulgarian entity, named dmarcian Bulgaria EOOD ("**dmarcian Bulgaria**") (**Exhibit 4**). Until 12 January 2021, the sole director of dmarcian Bulgaria was Mr Nikolay Georgiev Hristov ("**Hristov**"). Harmeling was registered as second director of dmarcian Bulgaria on 12 January 2021. Both directors have independent authority to represent dmarcian Bulgaria.

*dmarcian Inc*

2.6. dmarcian Inc is a US company incorporated on 19 September 2014 and, like dmarcian Europe, is engaged in the provision of products and services in the field of e-mail address identity security. It has developed software that the parties have exploiting together since 2016.

4

2.7. Initially, 100% of the shares in the capital of dmarcian Inc were held by Draegen. A former employee – Charles E. Swenberg – became co-shareholder in 2017 pursuant to an agreement concluded with dmarcian Inc. Proceedings between those parties are currently pending in the United States about the extent of that shareholding. Be that as it may, Draegen to this continues to be the CEO and majority shareholder of dmarcian Inc.

2.8. Contrary to what the names of the entities might suggest, dmarcian Europe is not a subsidiary of dmarcian Inc. The only corporate connection between both companies is the aforementioned majority interest that Draegen acquired in the capital of dmarcian Europe in 2018.

2.9. Represented schematically, the corporate structure of the parties looks as follows:



**The dispute**

2.10. dmarcian Europe and dmarcian Inc have been working together since 2016 in the distribution and licensing of the dmarcian software and the associated services in the field of e-mail address identity security ("**the dmarcian software**").[1]

2.11. The parties offer the dmarcian software as SaaS (Software as a Service). To this end, dmarcian Inc has developed a SaaS platform that can be accessed via the www.dmarcian.com website. Customers can purchase the SaaS via the platform. dmarcian Europe exploits SaaS for customers in Europe, Russia, and Africa; dmarcian Inc does that for North America and South America. New customers click on the website for their region and are then directed to the web environment of the party responsible for that region, which has exclusivity in that respect. The web environment for dmarcian Europe is hosted on servers in Belgium and the Netherlands, controlled by dmarcian Inc.

---

[1] Put very succinctly, owners of internet domain names are able to implement DMARC – a public standardised verification protocol (https://tools.ietf.org/html/rfc7489) aimed at securing the identity of internet mail. The dmarcian software processes DMARC data and indicates what needs to be resolved in terms identity security so that all e-mails belonging to a domain comply and continue to comply with the DMARC data. The domain owner can thereby prevent fake e-mails from being sent from the domain name.

5

2.12. The website and the SaaS platform are managed by dmarcian Inc, which means that dmarcian Inc regulates the access of dmarcian Europe employees to that platform and has the power to deny dmarcian Europe that access. Therefore, dmarcian Europe is fully dependent on dmarcian Inc for the hosting of the SaaS platform. Consequently, dmarcian Europe if also dependent on dmarcian Inc for its business operations and, in particular, for the access to its customer data and market activities.

2.13. The dmarcian software is protected by copyright. At the start of the partnership in January 2016, the copyright to the version of the dmarcian software current at that time was vested in dmarcian Inc, or Draegen, its sole director and shareholder at that time, who, according to his own statement, developed the software. At that time, it was agreed that only dmarcian Inc would be developing the software. That was the agreement until mid-2018. By way of illustration, dmarcian Europe submits a message that Groeneweg sent Draegen on 6 June 2017, in which he wrote: "*We agreed that dmarcian inc will take care of software development*". In another message, of 28 September 2017, Groeneweg wrote the following to Draegen: "*We agreed on 50% each of EU as you know. You also know the terms we agreed on, where you would take care of all development cost and hosting. EU would only focus on selling software and deployment in EU to grow EU.*" **Exhibit 5**

2.14. So although the parties initially agreed that dmarcian Inc would be responsible for the development of the dmarcian software, the parties reneged on that agreement in mid-2018 and agreed that this development would also be carried out by dmarcian Europe and dmarcian Bulgaria (see 2.16). This means that they extended the terms and conditions of the license at that time. For the purposes of the use of the software by dmarcian Europe and the sale thereof by dmarcian Europe in Europe, Russia and Africa, the parties entered into an oral agreement in January 2016. The parties disagree on the exact substance of their agreement. It emerges from the decision of the Enterprise Court of 7 September 2020 that it has been established between the parties that they agreed on *at least* the following in 2016 (para. 2.5):

- The fact that dmarcian Europe holds a license for the use and the sale of the software originating from dmarcian Inc.;
- The fact that dmarcian Europe is responsible for the sale of that software (and the provision of associated services) to customers in Europe, Russia and Africa;
- The fact that, in exchange, dmarcian Inc. and/or Draegen could purchase the majority interest in dmarcian Europe for payment of EUR 1.

dmarcian Europe will discuss the substance of the agreements made below.

2.15. Draegen personally exercised the latter option in May 2018. Consequently, he acquired a majority interest of 50.01% in the capital of dmarcian Europe.

2.16. Since the autumn of 2018, dmarcian Europe, itself and through its wholly-owned Bulgarian subsidiary, has made significant contributions to the development of the dmarcian software and its source code. dmarcian Inc and Draegen were fully aware of and consented to this. To illustrate this, dmarcian Europe submits two messages between Hristov, Draegen and Groeneweg. The first message relates to the incorporation of dmarcian Bulgaria. The business activities listed in dmarcian Bulgaria's deed of incorporation include "software development and implementation". In the second message, Draegen asked Hristov whether he (Draegen) and

6

Groeneweg could pay a visit in Bulgaria because he wanted to expand production capacity. **Exhibit 6**. dmarcian Inc, dmarcian Europe and dmarcian Bulgaria furthermore use a single central source code development platform, which is managed by dmarcian Inc. and to which it has granted dmarcian Europe and dmarcian Bulgaria access (see sections 3.12 et seq. below). Among other things, dmarcian Bulgaria developed the dmarcian software from a two-tier application to a three-tier application, allowing for API accessibility. It can of course be ruled out that dmarcian Inc has not noticed this.

2.17. All costs for the development within dmarcian Europe and dmarcian Bulgaria have been borne by dmarcian Europe. dmarcian Europe and dmarcian Bulgaria have obtained their own copyright to their contributions and, as such, have become co-owners of the current version of the dmarcian software that both companies are currently licensing to users as SaaS solution. dmarcian Bulgaria has transferred its copyrights to dmarcian Europe. dmarcian Europe submits the deed of transfer as **Exhibit 7**. dmarcian also submits a statement by Ms V.P. Kunze, partner at Bulgarian law firm Djingov, Gouginski, Kyutchukov & Velichkov in Sofia, Bulgaria. She states – put succinctly – that the transfer is valid under Bulgarian law and that Harmeling, as director of dmarcian Bulgaria with independent authority, was authorised to effect this transfer (**Exhibit 8**).

2.18. In late 2019, a dispute arose between the parties on the ownership of the rights to the modifications of and additions to the dmarcian software that were developed by dmarcian Europe. According to dmarcian Inc, it emerges from the agreements made between the parties in 2016 that dmarcian Inc is the rightholder to that software, or at least that dmarcian Europe is required to transfer these rights under conditions to be unilaterally imposed by dmarcian Inc. This has been and is being disputed by dmarcian Europe. dmarcian Europe may be willing to cooperate in the transfer or licensing of its copyrights to the software developed by it, but not under the conditions imposed thereon by dmarcian Inc, which, put briefly, sideline dmarcian Europe altogether. It has notified dmarcian Inc. that, without a license, dmarcian Inc. is not allowed to license software applications developed by dmarcian Europe to third parties.

2.19. Apparently, Groeneweg's message did not go down very well with Draegen. Among other things, Draegen, in succession:
- immediately denied dmarcian Europe employees access to the computer and other systems managed by dmarcian Inc (1st blackout)
- migrated the web environment of dmarcian Europe on the website managed by dmarcian Inc (www.dmarcian.com) to a US host. Please note: this means that dmarcian Inc is now hosting all of dmarcian Europe's system and therefore has the power to take down dmarcian Europe's business operations completely. dmarcian Europe describes this as the "nuclear button", which is pressed in part now and is likely to be pressed in full in the event of termination.
- denied dmarcian Europe access to its own domain names <dmarcian.eu> and <dmarcian.net>
- appointed, without authority to do so, a "Director of Software" at dmarcian Europe and dmarcian Bulgaria to whom the software developers of dmarcian Europe and dmarcian Bulgaria had to report.

See, in more detail, paras. 49-65 of TDX's application in the proceedings before the Enterprise Court.

7

2.20. Draegen reversed these measures within 48 hours. Following this coup, the parties tried to resolve their dispute in mutual consultation. In May 2020, dmarcian Europe submitted a comprehensive settlement proposal, which was rejected by Draegen.[2] After a meeting on 3 July 2020, Draegen suddenly requested an AGM with the dismissal of TDX – the sole director and minority shareholder of dmarcian Europe, TDX – and the appointment of a Draegen-nominated director as items on the agenda. TDX had good reasons to assume that this director, following his appointment, would cooperate in the "free" transfer of the copyright from dmarcian Europe to dmarcian Inc, leaving dmarcian Europe with nothing.

2.21. In response, TDX submitted an application to the Enterprise Court in order to prevent its dismissal and irreversible damage to dmarcian Europe. dmarcian Europe submits the case file of these proceedings as Exhibit 7 (**Exhibit 9**). For the background to this dispute and the run-up to those proceedings, it refers to its own procedural documents and those of TDX, which are hereby submitted seperately **Exhibit 10** and the decisions rendered by the Enterprise Court in those proceedings (Exhibit 1 to this summons), with dmarcian Europe referring in particular to paras. 2.4. through 2.9. of the Enterprise Court's decision. Where necessary, dmarcian Europe will refer to this case file in this summons and at the hearing.

2.22. As stated above, the Enterprise Court, through decisions rendered on 7 and 10 September 2020 and by way of immediate relief, appointed Harmeling as director and transferred all shares in dmarcian Europe (minus one share per shareholder) for management purposes to the manager (Borrius). In addition, the Enterprise Court ordered an investigation into the management conducted at dmarcian Europe between 1 January 2016 until 20 August 2020. The purposes of the right of inquiry include restoring healthy relationships and obtaining transparency.[3] That is also what the Enterprise Court's intervention in the present case is aimed at.

2.23. Insofar as relevant, the Enterprise Court has based the investigation ordered on the following (emphasis added by counsel):

*"3.4 The Enterprise Court finds as follows. The controversy surrounding the intellectual property rights to the software/software applications developed by dmarcian Europe (and dmarcian Bulgaria) is at the heart of the dispute between the parties. TDX argues that the software/software applications is/are apart from the software developed by dmarcian, Inc., to such extent that the intellectual property rights thereto accrue to dmarcian Europe. According to TDX, the use and sale of the software/software applications by dmarcian, Inc. must be based on a license to be issued by dmarcian Europe. Draegen counters this by arguing that the software developed by dmarcian Europe (and dmarcian Bulgaria) comprises no more than additional features for improved use of the software originating from dmarcian, Inc., so that the intellectual property rights thereto are also vested in dmarcian, Inc. The Enterprise Court argues first and foremost that only the ordinary civil court has jurisdiction to conduct the legal assessment of that dispute. The Enterprise Court is able to conclude, however, that this dispute has a disruptive effect on dmarcian Europe's business; its core business is the development and sale of software and the partnership with dmarcian, Inc. is a necessary condition for that. Nevertheless, this partnership has not been sufficiently provided*

---

[2] Cf. Exhibit 24 to TDX's application
[3] Supreme Court 10 January 1990, NJ 1990/466 (Ogem).

Case 1:21-cv-00067-MR   Document 26-6   Filed 04/19/21   Page 38 of 55

*for by the parties, either in a general sense or in respect of intellectual property rights to software/software applications developed and to be developed and in particular licenses granted or to be granted in connection therewith, or the scope of such licenses. <u>No unequivocally recorded agreements in this regard are available, consequent to which the partnership has been jeopardised by the present discussion in that regard, presenting a serious impediment to dmarcian Europe's business operations.</u> In the opinion of the Enterprise Court, the existence of the aforementioned situation causes there to be sufficient well-founded reasons to question the management and affairs conducted by dmarcian Europe. As requested by both TDX and Draegen, the Enterprise Court will order an investigation into the management and affairs conducted by dmarcian Europe between 1 January 2016 and 20 August 2020."*

2.24.  The Enterprise Court furthermore held the following (para. 3.9):
    *"For the time being, the Enterprise Court will stay the appointment of the investigator so as to find out whether the dispute can already be resolved through the immediate relief to be granted. Each of the parties or the director or manager appointed by the Enterprise Court may request the Enterprise Court at any time to appoint the investigator."*

2.25.  In response to Harmeling's appointment on 10 September 2020, activities were carried out from the United States in the next weekend to completely shut out dmarcian Europe from all systems again, which shutout was fully implemented on 14 September 2020 (2nd blackout). This was therefore the second time that dmarcian Europe was shut off from the systems essential for its business operations. Harmeling immediately held Draegen, in his role as shareholder, to account for this. At the insistence of Harmeling, Draegen eventually – after some days – caused access to most essential systems to be restored to such extent that dmarcian Europe was able to conduct its business again. After many and cumbersome discussions with Draegen, dmarcian Inc, purely through Draegen's intervention, proceeded to grant access to other, but less material, systems. There was never any unimpeded access after 14 September 2020.

2.26.  Harmeling then started looking for ways to arrive at a resolution of the dispute that had arisen between the shareholders of dmarcian Europe. To this end, he spoke to, among others, his fellow director TDX (Groeneweg and Kalkman), with TDX and Draegen as shareholders, he sought contact with his fellow director of dmarcian Bulgaria, and he made every effort to resolve the conflict that had arisen. All of this has been laid down in an e-mail that Harmeling sent the shareholders on 18 December 2020, which dmarcian Europe submits as **Exhibit 11**. However, Draegen soon indicated that he was not prepared to agree on any other solution but the transfer, on his conditions, of the copyright from dmarcian Europe to dmarcian Inc. dmarcian Europe has meanwhile requested the Enterprise Division to urgently appoint an investigator to carry out the investigation ordered on 7 September 2020, which request has now been granted. dmarcian Europe submits the relevant correspondence as **Exhibit 12.**

2.27.  Although the investigation ordered has not started yet and agreements has by no means been reached on the legal situation surrounding the ownership of the intellectual property rights to the current version of the dmarcian software, dmarcian Inc suddenly announced, in a letter of 22 January 2021, that it would terminate the partnership with dmarcian Europe effective 1 February 2021, unless dmarcian Europe were to sign a distribution agreement and settlement agreement,

9

attached to the letter, that are very unfavourable to dmarcian Europe. Put succinctly, under those agreements dmarcian Europe would transfer its copyright in exchange for a licence to those rights, based on which it would have to pay dmarcian Inc no less than 80% (!) of all its income from the sales of the dmarcian software and consultancy services (**Exhibit 13**). As dmarcian Inc and Draegen have also confirmed in the past, 20% is customary, not 80%, and that percentage is to be calculated exclusively on the software distributed. To substantiate this, dmarcian Europe refers to the statement by dmarcian Inc's accountant that was submitted in the inquiry proceedings. The account stated, among other things, the following:

"***20% BV Fees***
*The company provides technology, brand, business model, and leads to the Europe BV and other dmarcian partners. The value of the services provided to other dmarcian partners is 20% of revenue.*
*To have comparable financials between the US and BV, 20% of revenue from BV should be allocated*
*to the US in the form of revenue to US and expense to BV.*" **Exhibit 14**.

2.28. The unreasonableness and unfairness of these contracts is already evident from the fact that dmarcian Inc itself assumes that dmarcian Europe will not be willing or able to sign them. After all, even though dmarcian Inc conditionally terminated the partnership and indicated that it would not block the access to the computer and other systems until 1 February 2021, it has, in reality, denied the employees of dmarcian Europe access to the computer and other systems with immediate effect from the time it sent the letter – i.e. as of Friday, 22 January 2021 at about 4 pm (3rd blackout). During on all hands meeting on 25 January 2021, for which dmarcian Europe did not receive an invitation, Draegen announced to employees of dmarcian Bulgaria and the employees of dmarcian Inc that the 22 January 2021 blackout of dmarcian Europe was the result of a changed relationship. That means it is getting ahead of the facts as well.

2.29. In addition to the letter from dmarcian Inc, Draegen, in a letter that was sent by e-mail some minutes after dmarcian Inc.'s letter, invoked Clause 4 of the exit agreement entered into by Draegen and TDX in 2018 upon Draegen's acquisition of the majority interest in dmarcian Europe (**Exhibit 15**). Pursuant to this provision, every shareholder has the right to terminate the co-operation between the shareholders by making an offer for the shares of the other shareholder. If the other shareholder does not accept the offer, that shareholder would be required to buy out the first shareholder. This offer to co-shareholder TDX was made under the condition subsequent that dmarcian Europe agree to dmarcian Inc's demands as stated in the letter of 22 January 2021. This establishes as fact the clear interconnectedness between the shareholder Draegen and the principal dmarcian.

2.30. All of this happened, as stated, pending the investigation into the management conducted by dmarcian Europe, in particular into the lack of clarity existing in respect of the substance of the licensing agreement and the ownership of the intellectual property rights to the dmarcian software. Also relevant in this respect is that Harmeling informed shareholders on 18 December 2020 to start looking for solutions outside of the shareholders (cf. Exhibit 11). Harmeling in particular announced the establishment of the data room and an independent valuation in order to enable him to comply with his instruction as referred to in para. 3.5 of the Enterprise Court's decision. The defendants' action of 22 January 2021 seems to be the direct consequence of this.

10

2.31. Insofar as dmarcian Inc relies on a breach as the basis for the termination of the partnership, dmarcian Europe contests that it breached the terms and conditions of that license. At any rate, there can be no question of any breach without the substance of the licensing agreement being established. Insofar as dmarcian Inc were to rely on notice of termination, the parties agreed that the agreement cannot be terminated by notice. Outside of this as well, however, it is not clear in any way why dmarcian Inc cannot await the outcome of the inquiry proceedings (i.e. the investigation and any follow-up phase). Under the circumstances of this case, in dmarcian Europe's opinion, there is not a single legal ground, at least no sufficiently compelling ground, that justifies the termination of the existing continuing performance contract effective 1 February 2021.

2.32. By denying dmarcian Europe's employees access to the computer and other systems and threatening to unlawfully terminate the continuing performance contract in the very short term, Draegen and dmarcian Inc are trying to force dmarcian Europe on improper grounds to transfer its copyright to the software. Moreover, the present preclusion of dmarcian Europe's access to its customers and known potential customers with whom contact has already been established goes to show that dmarcian Inc aims to take over dmarcian Europe's customer base. dmarcian Inc is thereby acting in violation of the principles of reasonableness and fairness that it ought to observe towards its contractual partner dmarcian Europe. This is all the more cogent as dmarcian Europe's business operations are fully dependent on the access to the SaaS platform and computer systems that dmarcian Inc must provide dmarcian Europe. Draegen in turn is acting unlawfully towards dmarcian Europe. By facilitating dmarcian Inc's attempts to corner dmarcian Europe, Draegen is not only breaching the standard of due care, but also his obligations under Article 2:8(1) of the Dutch Civil Code.

*Urgent interest*

2.33. Because of these actions by dmarcian Inc and Draegen, dmarcian Europe is suffering serious and irreversible damage. The sale of the dmarcian software forms the core business of dmarcian Europe. Because of the new blockade, the third one by now, it is unable to access its customer data, unable to serve existing customers at this time, and also unable to follow up on leads for potential new customers. This is causing severe unrest among its employees.

2.34. Moreover, if the partnership and the licensing agreement were to be terminated effective 1 February 2021, this would mean the end of dmarcian Europe, whose business operations are dependent on the continued existence of the licensing agreement. In that case, bankruptcy would be unavoidable. This would immediately leave 22 employees of dmarcian Europe and dmarcian Bulgaria without a job and might rob the customers of the dmarcian software in Europe, Russia and Africa of access to the dmarcian software.

2.35. In response to dmarcian Inc's letter of 22 January 2021, dmarcian Europe demanded that dmarcian Inc lift the blockade on its employees and withdraw the termination announced, failing which dmarcian Europe would institute preliminary relief proceedings. Given the serious accusations relating to Draegen personally, Draegen's lawyer was also asked, by e-mail of that same date, to provide the dates on which Draegen would be unable to appear in court (**Exhibit 16**). Both dmarcian Inc and Draegen indicated in an e-mail sent by their lawyers, again following

coordination between the parties, that they would not comply with the demands (**Exhibit 17**). This establishes the urgent interest.

2.36. In view of the immediate and irreversible consequences that the actions of Draegen and dmarcian Inc have caused, dmarcian Europe has a sufficiently urgent interest in its claims. After all, all those claims serve to ensure the continued existence of its company and to postpone irreversible consequences until clarity has been obtained, either through the investigation ordered by the Enterprise Court or through a court decision in proceedings on the merits, on the terms and conditions of the licensing agreement and the ownership of the copyrights to the current version of the dmarcian software. dmarcian Inc has no interest whatsoever in changing the *status quo* in anticipation of the solution envisaged by the Enterprise Court, which *status quo* has *de facto* existed ever since December 2019 without any clear practical objections.

2.37. dmarcian Europe will discuss in more detail below why it owns/co-owns the copyrights to the current version of the dmarcian software. In addition, it will discuss in more detail the jurisdiction of this Preliminary Relief Court, the applicable law, and the legal substantiation of its claims. Where necessary, it will explain the above in more detail at the hearing.

2.38. Even though dmarcian Europe believes it is the owner/co-owner of the copyrights to the dmarcian software, this need not be established in these preliminary relief proceedings in order to award the claims. For this to happen, it would be sufficient for dmarcian Europe to prove that there is *at least* a lack of clarity on the question of whether dmarcian Europe is entitled to copyrights to the dmarcian software. The Enterprise Court has confirmed this to be the case. The actions of the defendants, the instruction to Harmeling, and the investigation ordered by the Enterprise Court justify the award of the relief sought.

## 3. The content of the licensing agreement and the copyright to the current version of the dmarcian software

3.1. On 22 January 2016, Draegen, dmarcian Inc., TDX and the former Mailmerk (now: dmarcian Europe) entered into an oral agreement with regard to the use and the distribution of the dmarcian software (the "Agreement").

3.2. Under this Agreement, dmarcian Inc granted dmarcian Europe, in exchange for an option provided to dmarcian Inc and/or Draegen to acquire a majority interest in dmarcian Europe, a perpetual, exclusive license for the use of the dmarcian software and the licensing thereof to customers in Europe, Russia and Africa;

3.3. On the basis of the Agreement, the proceeds from sales of the dmarcian software to customers from these territories accrued exclusively to dmarcian Europe.

3.4. The parties acted in accordance with the Agreement from January 2016 onwards. dmarcian Europe exclusively served the Russian, European and African market and all – at least virtually

all – proceeds accrued to it.[4] dmarcian Inc not only acted in accordance with a perpetual and exclusive license, but it also explicitly confirmed the existence thereof in the correspondence between the parties. dmarcian Europe refers in this context to an e-mail Draegen sent on 4 December 2019, in which Draegen replied to a message from Groeneweg in which the latter wrote that, without a licensing agreement, dmarcian Inc is not allowed to license the applications developed by dmarcian Europe (the beginning of the dispute). In that e-mail, Draegen wrote:[5]

"*Martijn, thanks for the input. I agree we'll need a licensing agreement to be put into place. Without going into details over email, it makes sense to reflect the perpetual and exclusive license that Europe BV has enjoyed.*".

3.5. As mentioned above, from 2018 onwards, dmarcian Europe – in consultation with dmarcian Inc – started to focus itself and through its Bulgarian subsidiary on the further development of the (source code of the) dmarcian software. It financed the development of the software itself, both within its own company and within dmarcian Bulgaria. The investments amounted to approximately EUR 900,000 until July 2020. Development costs currently amount to approximately EUR 550,000 per year, being 35% of the total costs incurred by dmarcian Europe. It paid for these costs from its own resources and has not relied on dmarcian Inc. for financing. [6]

3.6. The contributions made by dmarcian Europe and its subsidiary to date include developing the dmarcian software from a two-layer application to a three-layer application so that it would also be API accessible. In addition, dmarcian Europe and dmarcian Bulgaria developed various stand-alone software applications that could be used in combination with the dmarcian software. For a detailed explanation, dmarcian Europe refers to paragraphs 31 through 35 of TDX's application (Exhibit 10).

3.7. dmarcian Inc disputes the assertion that dmarcian Europe is permitted under the license granted to (further) develop the dmarcian software. This is an untenable position. Even though it is true that the dmarcian software would initially only be developed by dmarcian Inc, the parties agreed at a later time that dmarcian Europe and dmarcian Bulgaria would also engage in the development of the software (cf. section 2.13 - 2.17 above). The SaaS solutions provided by dmarcian Inc. and dmarcian Europe to their respective customers are one and the same and consist of the latest software, therefore including the substantial software contributed by dmarcian Europe and dmarcian Bulgaria. Thus, to the extent that the license issued in 2016 did not allow dmarcian Europe to further develop the dmarcian software, the scope of the license has been modified by subsequent developments. There can therefore be no question of any failure to comply with the licensing conditions and this cannot constitute a reason for terminating the existing partnership.

3.8. The defendants also realized that, as a result of this development, copyrights would arise on the part of dmarcian Europe and dmarcian Bulgaria. Discussions were held between the parties as to how to deal with these rights. In that respect, dmarcian Inc did not start from the assumption

---

[4] Cf. TDX's application in the proceedings before the Enterprise Court, paragraph 26. The credit card revenues from the dmarcian Europe application were and are paid in full to dmarcian Inc. due to technical reasons, but those revenues also accrued and accrue to dmarcian Europe. Incidentally, this is a small percentage of the total revenue (about 10%).
[5] Cf. Exhibit 8 to TDX's application in the proceedings before the Enterprise Court.
[6] Cf. paragraph 3.4. - 3.5. and Exhibit 3 to dmarcian Europe's statement of defence and para. 3.1 of the Enterprise Court's decision of 7 September 2020

13

that those rights should be assigned to dmarcian Inc for no consideration. On the contrary, dmarcian Inc acknowledged the existence of the copyrights on the part of dmarcian Inc and acknowledged that the use of those rights by dmarcian Inc required a license, but that this had not yet been agreed upon.

3.9. To substantiate this, dmarcian Europe submits as **Exhibit18** screenshots of correspondence between Shannon Draegen, the spouse and CEO of dmarcian Inc, and Groeneweg. On 21 August 2019, Shannon Draegen made an overview of the company structure and the – according to her – existing legal situation regarding the copyright to the dmarcian software, for the purpose of an ongoing ISO certification ( ISO27001).



This overview presumes that there is a licensing agreement in place from and to both parties and therefore implies that dmarcian Inc believes – correctly – that copyright to the dmarcian software has accrued to dmarcian Europe.

3.10. Groeneweg responded to this via Slack (a chat function on the SaaS platform):

*"There's currently no licensing Agreement in place from EU to US for the software created in EU. So there should be an arrow only from USA to EU like to APAC with "Eternal License Agreement". We had a plan to merge, but as Chuck didn't agree on it, @tim and myself decided to move on as agreed on January 22 in 2016 in 2 separate entities. Arrow from US to APAC should be "Temporary License Agreement", at least from what I know."*

Shannon Draegen responded affirmatively with a thumbs up emoji and then prepared the final version of the diagram on 3 September 2019.

14



This therefore shows that there is no license from dmarcian Europe to dmarcian Inc and that this was not only already known to dmarcian Inc's management before December 2019, but that this situation is also confirmed by dmarcian Inc.'s management.

3.11. In addition, dmarcian Europe refers to the e-mail from Draegen to Groeneweg dated 6 August 2018 in which Draegen himself also recognises that intellectual property rights were created at dmarcian Europe and that agreement should be made about them (cf. para. 2.6 of the Enterprise Court's decision of 7 September 2020):

"*There are 2 main parts to consider: 1. (...) 2. Where is global 1F located? (...) About location of IP: since EU has been licensing tech, it is likely impossible to home 1F into the EU by default.. even though EU is paying to continue to develop (as US is also paying developers — so it's sort of a mixed issue). This means that some sort of asset transfer has to be made (...) along with a proper valuation of said 1F*".

3.12. The parties have acknowledged the existence of copyright on the part of dmarcian Europe and dmarcian Bulgaria. However, they have never agreed on what should be done with those copyrights. With this, it cannot be maintained, as the defendants seem to do, that dmarcian Europe is obliged to transfer its copyright on conditions to be imposed unilaterally by dmarcian Inc.

*Copyright on modifications made to the software by dmarcian Europe and dmarcian Bulgaria.*

3.13. To the extent that dmarcian Europe worked on the dmarcian software, this was done by dmarcian Europe employees, or at least by Kalkman. Pursuant to Article 7 of the Copyright Act, copyrights created in the service of dmarcian Europe accrue to dmarcian Europe. The employment contracts with the employees of dmarcian Europe contain an explicit provision that assigns any copyright to dmarcian Europe. It has already been explained above that the copyrights that were created at dmarcian Bulgaria were validly assigned to dmarcian Europe (cf. 2.17).

3.14. The source code for the dmarcian software is on a repository managed by dmarcian Inc at gitlab.com. In computer science, the term Git is sometimes used to describe a version control system that allows programmers to keep track of changes in the code in an organized manner and to collaborate on writing software. A collection of (source code) files that are all part of the same project is called a repository. Gitlab is an online platform that provides a Git service for maintaining repositories. Thus, the repository shows all modifications or contributions (commits) made on and to the (source) code of the dmarcian software since the first moment.

3.15. dmarcian Europe instructed the attorney A. Engelfriet of ICT Recht ("**the expert**") to assess whether the commits added by dmarcian Europe and dmarcian Bulgaria to the source code of the dmarcian software are copyrighted. dmarcian Europe submits the expert's report as Exhibit 19 (**Exhibit19**).

3.16. In the report, because of the large number of commits to the source code of the dmarcian software, a numerical approach was chosen. The expert has focused on what is referred to as the Python source code files, because the likelihood of copyright arising as a result of modifications to those files is highest in that case. Given the large number of modifications that both dmarcian Europe and dmarcian Bulgaria subsequently made to the Python source code files, the expert concluded that copyright had been acquired on the commits added thereto.

3.17. According to Draegen's statement of defence in the proceedings before the Enterprise Court, dmarcian Inc. adopts the position that the parties agreed in December 2016 that dmarcian Europe would assign all copyrights it would acquire as a result of developing the dmarcian software to dmarcian Inc. In this respect, it relies on agreements that were never signed and a single e-mail from Groeneweg of 7 December 2016.[7] dmarcian Europe disputes the assertion that it agreed with dmarcian Inc. on the basis of those documents that all copyrights it would acquire during the partnership would be assigned or licensed to dmarcian Inc. on conditions to be unilaterally determined by the latter.

3.18. All of these arguments were also presented to the Enterprise Court. In para. 3.4 of this decision of 7 September 2020, the Enterprise Court considered that the assessment of the contents of the licensing agreement and the question who owns the copyright to the dmarcian software must be answered by the regular civil court, but that the existing lack of clarity constitute a reason for ordering an investigation into the policies conducted within dmarcian Europe. The Enterprise Chamber thereby at least endorses that there is a lack of clarity regarding the contents of the licensing agreement and the ownership of the intellectual property rights.

3.19. In conclusion, dmarcian Europe is of the opinion that, in view of the nature and extent of the commits it and dmarcian Bulgaria have added to the source code of the dmarcian software, the conclusions from the expert report and the transfer of copyright from dmarcian Bulgaria to dmarcian Europe, it is sufficiently plausible for the time being that it has copyright to parts of the dmarcian software and that it should be considered to be the co-owner of the current version of the dmarcian software. However, it is at least certain on the basis of the Enterprise Court's decision that there is a lack of clarity regarding the contents of the licensing agreement and the ownership

---

[7] Cf. Draegen's Statement of Defence in proceedings before the Enterprise Court, paragraph 2.38 and Exhibit 36

16

Case 1:21-cv-00067-MR   Document 26-6   Filed 04/19/21   Page 46 of 55

of the intellectual property rights. The latter alone should mean that the status quo should be maintained until that lack of clarity has been resolved.

**4. Unlawfulness of termination and liability on the part of Draegen.**

4.1. The agreement and/or partnership between the parties qualifies as a continuing performance contract for an indefinite period of time. The parties did not agree on a termination arrangement.

4.2. According to established case law of the Supreme Court, such an agreement can, _in principle,_ be terminated. However, the requirements of reasonableness and fairness may, depending on the nature and contents of the agreement and the circumstances of the case may (i) only permit termination if there is a sufficiently compelling ground for such termination and/or (ii) dictate that a certain notice period must be observed or that termination must be accompanied by the offer to pay compensation or damages.[8]

4.3. In assessing what can be required of the parties in this context according to the standards of reasonableness and fairness, all the circumstances of the case must be taken into account. In this respect, the following is of particular importance:

- The parties' interests: the reasonable interest of the party giving notice of termination in the termination, weighed against the reasonable interest of the party receiving notice of termination in continuation of the contract.

- The nature and term of the agreement and/or relationship: the question of whether the parties have been doing business with each other for a long time and/or whether there is a close and/or exclusive relationship.

- Dependency: the extent to which a party depends on the other party, or its revenue, and whether the continued existence of the business of the party receiving notice of termination is being jeopardized.

- The events leading up to the termination: the way in which the parties cooperated and the confidence that the party receiving notice of termination was allowed to have in the continuation of the agreement – for example, the manner in which the parties expressed themselves to each other in that context – and the reason for the termination.

- Investments: the investments made by a party. These can be compensated by observing a certain notice period or – if that is not possible – be eligible for compensation.

4.4. The foregoing is without prejudice to the fact that a continuing performance contract is non-terminable according to the parties' intentions.

_Primarily: the parties agreed that the Agreement is non-terminable_

4.5. In this case, it does not follows from the parties' intentions that the Agreement and/or their partnership cannot be terminated (or at least only under very special circumstances, which are not

---

[8] Cf. Supreme Court, 2 February 2018, ECLI:NL:HR:2018:141 (Goglio v SMQ Group) para. 3.6.1 et seq.

at issue here). After all, the parties agreed on a *perpetual* license (cf Draegen's e-mail under 3.4 and Shannon Draegen's 2nd overview under 3.10) in exchange for a majority interest in dmarcian Europe. This already shows that the parties had the intention that the license and therefore the distribution rights of dmarcian Europe in principle cannot be terminated.

4.6. In addition, dmarcian Europe is of the opinion that it has since become the co-copyright holder of the current version of the dmarcian software. This in any case prevents the termination of the operating agreements made.

*Alternatively: the Agreement cannot – under the current circumstances – be terminated, or can only be terminated with an urgent reason.*

4.7. To the extent that the Agreement would be terminable according to the parties' intentions, (alternatively) in light of the requirements of reasonableness and fairness and the relevant circumstances of this case, the Agreement cannot – in the current course of events – be terminated, or cannot be terminated without an urgent reason, which is lacking.

4.8. In this context, in addition to what has been noted above in the context of the parties' intentions, the following circumstances are of importance:

- There is an exclusive Agreement, which has existed for at least five years. Moreover, it involves a very close partnership. The parties' business operations are highly intertwined, as evidenced by, among other things, the (domain) names used by the parties and the presence of a source code development platform.

- The operation of the dmarcian software forms the core business of dmarcian Europe. Its business is fully designed to distribute that software and all of its customer data – and data from potential customers – is contained in the back-end of the SaaS application managed by dmarcian Inc. The continued existence of dmarcian Europe is therefore dependent on the maintenance of license and distribution rights it has acquired under the Agreement and the maintenance of access to that application. Termination of the Agreement will undoubtedly lead to its bankruptcy, resulting in all of its employees being laid off and its customers suffering considerable losses. dmarcian Europe therefore has a very significant interest in the continuation of the relationship.

- dmarcian Europe has made significant investments in the development of the dmarcian software. These investments have not been passed on to dmarcian Inc. dmarcian Inc. was aware of this and benefits from it by – without being entitled to do so – offering the software developed by and on the instructions of dmarcian Europe to third parties.

- dmarcian Inc has no legally relevant interest whatsoever in (immediate) termination of the Agreement. The only reason why it is now terminating the Agreement is because it wants to see dmarcian Europe with its hands tied in order to get it to agree to a transfer of the intellectual property rights and a distribution agreement under conditions that are very unfavourable for dmarcian Europe.

18

-   The latter is all the more cogent now that there is at least a lack of clarity about the ownership of the intellectual rights to the software. In its decision, the Enterprise Court ordered an investigation into the course of events at dmarcian Europe in that regard. The Enterprise Court has also appointed a temporary director, who has been explicitly instructed to obtain clarity on the intellectual property rights and to try to reach an amicable solution between the parties involved (Enterprise Court Decision dated 7 September 2020, para. 3.5 and 3.6). The defendants' actions make it very difficult for this appointed director to carry out their tasks and present the investigator – after he will have been appointed – with a foregone conclusion, if the lack of clarity about the intellectual property rights has been resolved in the meantime by dmarcian Europe forcibly transferring those rights to dmarcian Inc. It is not clear why dmarcian Inc could not be required to at least await the actions taken by the temporarily appointed director or the investigation ordered by the Enterprise Court, at least until clarity has been obtained in proceedings on the merits about the ownership of the intellectual property rights to the current version of the dmarcian software.

-   Moreover, by terminating the agreement, dmarcian Inc is acting unlawfully towards dmarcian Europe because it therefore benefits from the violation of standards by Draegen in respect of dmarcian Europe. Briefly put, this violation of standards lies in the fact that Draegen, as shareholder of dmarcian Europe, was obliged towards dmarcian Europe and other stakeholders to maintain the status quo during the investigation, which he had applied for himself. He failed to perform that obligation as he used his position as director and major shareholder of dmarcian Inc to terminate the partnership, or to exercise pressure on dmarcian Europe (as regards the violation of standards, see also sections 4.12 and 4.13 below). dmarcian Inc would not be able to terminate the partnership if its director and major shareholder, in his capacity of major shareholder of dmarcian Europe, had complied with his obligation to ensure that the status quo would be maintained during the investigation ordered. Under Dutch law, benefiting from a violation of standards by another party (in this case: Draegen) constitutes an independent unlawful act if there is knowledge of the violation of standards and additional circumstances.[9] These requirements are met in this case. That dmarcian Inc. has knowledge of the violation of standards is already evident from the coordination of dmarcian Inc. and Draegen with regard to the letters and e-mail sent by the lawyers of dmarcian Inc. and Draegen on 22 January 2021 and 26 January 2021, respectively (see section 2.26 above). The said additional circumstances – besides the mere knowledge of the violation of standards – are also at issue now that a) Draegen is director and major shareholder of dmarcian Inc and in fact co-determines the policy of dmarcian Inc and b) the Enterprise Court ordered an investigation into the policy conducted within dmarcian Europe.

4.9. In the light of these circumstances, it must be held that the requirements of reasonableness and fairness imply that the Agreement – in any case in the current course of events, or as long as the proceedings before the Enterprise Court have not been completed – cannot be terminated, or at least not without a compelling reason. For the record: there is no compelling reason for termination in this case. The mere fact that the parties are currently still in dispute about who is the owner of the intellectual property rights to the software in any case does not qualify as such. This has exactly been the reason for the Enterprise Court to grant preliminary relief.

---

[9] The Hague Court of Appeal, 28 January 2020, ECLI:NL:RBDHA:2018:2158 (Silifi – Roka) par 5.20

4.10. The conclusion is that the termination is unlawful and thus invalid. dmarcian Inc. therefore is and remains obliged to perform its obligations under the Agreement. Those obligations in any case include that it must allow dmarcian Europe to continue to exercise its distribution rights. For this purpose, it in any case requires uninterrupted access to the computer systems and the SaaS platform.

*As a second alternative: request to take disciplinary action*

4.11. Should this preliminary relief court find it insufficiently plausible at this time that the termination is unlawful, dmarcian Europe requests this Preliminary Relief Court – as a final alternative – to determine by way of disciplinary action, in view of the investigation ordered by the Enterprise Court, that the status quo be maintained for the duration of that investigation and that dmarcian will therefore be granted unlimited access to all systems and that the partnership cannot be terminated during that period.

*Liability on the part of Draegen*

4.12. dmarcian Europe is also of the opinion that Draegen is acting in violation of the standards of Article 2:8 DCC. Draegen is shareholder of dmarcian Europe and, moreover, applied to the Enterprise Court himself, requesting it to intervene because of a situation that has arisen partly due to his actions. In the opinion of dmarcian Europe, that position entails that Draegen has to respect the current status quo pending the investigation proceedings and that he does not – as a director and major shareholder of dmarcian Inc – actually bring about the termination of the Agreement by dmarcian Inc. That this act serves as a means of pressure follows from the letter of Draegen himself.

4.13. In fact, Draegen also put the relations on edge by, <u>as shareholder in dmarcian Europe</u>, relying on Clause 4 of the exit agreement, on the condition subsequent that dmarcian Europe accepts the distribution agreement and settlement agreement attached to the letter of termination by <u>dmarcian Inc.</u> Although that provision does not constitute a ground for termination of the partnership between dmarcian Inc and dmarcian Europe – as they are not parties to the exit agreement – but does have great relevance for the cooperation between the shareholders, Draegen is clearly trying to increase the pressure on dmarcian Europe and its shareholders to induce them to agree to the above-mentioned distribution agreement and settlement agreement. This is a clearly pre-coordinated action between dmarcian Inc. and Draegen in person. This is apparent from the mere fact that the letters from dmarcian Inc. and Draegen, respectively, were sent by e-mail within minutes of each other. Draegen has therefore acted in violation of the care he should exercise towards dmarcian Europe and the standards of Article 2:8 DCC.

4.14. In view of the defendants' conduct thus far, dmarcian Europe can only conclude that dmarcian Inc. and Draegen will make every effort to evade a judgment from this Preliminary Relief Court. This is also evident from the e-mail from dmarcian Inc.'s lawyer in response to the notice of these preliminary relief proceedings. In that e-mail, he wrote the following on behalf of dmarcian Inc: "*[dmarcian Europe may resolve to initiate injunctive relief proceedings, but Dutch courts have no competence over [dmarcian Inc] and, consequently, a Dutch judgement cannot be enforced against it in its jurisdiction. Consequently, this will be to no avail.*".

4.15. In this context, it is remarkable, and in dmarcian Europe's view opportunistic, that in order to avoid these preliminary relief proceedings, the lack of jurisdiction of the Dutch court is exclusively relied on. Given the clear connection in the acts between Draegen and dmarcian Europe, dmarcian Europe is entitled to and has an interest in ensuring that Draegen is also prohibited from performing any further (unlawful) acts aimed at prejudicing it, for the benefit of dmarcian Inc. - and thereby Draegen personally. Substantial penalties for failing to comply with the judgment to be rendered by the Preliminary Relief Court are also appropriate in this light.

## 5. APPLICABLE LAW

*The relationship between dmarcian Europe and dmarcian Inc.*

5.1. The Agreement initially and primarily qualifies as a distribution agreement.[10] The parties have not agreed on a choice of law. For this reason, the Agreement is governed by the laws of the country in which dmarcian as a distributor has its habitual residence (Article 4(1) Rome I Regulation[11] in conjunction with Article 10:154 DCC). dmarcian Europe has its registered office in the Netherlands. This means that the Agreement between dmarcian Europe and dmarcian Inc. is governed by Dutch law. Furthermore, the servers hosting dmarcian Europe's SaaS platform are located on servers in Belgium and the Netherlands. Also for this reason Dutch law is applicable.

*The relationship between dmarcian Europe and Draegen*

5.2. Draegen's acts qualify as an unlawful act. This unlawful act is subject to the laws of the country in which the damage occurs (Article 4(1) Rome II Regulation in conjunction with Article 10:159 DCC).[12] The damage resulting from Draegen's actions occurs in the Netherlands. The claims of dmarcian Europe against Draegen are therefore also be governed by Dutch law.

## 6. Jurisdiction of the Dutch court

6.1. The Dutch court has jurisdiction to hear this dispute on various grounds.

6.2. First, the Dutch court has jurisdiction on the basis of Article 6 DCCP.

6.2.1. With respect to dmarcian Europe's claims against dmarcian Inc., there is an obligation arising from an agreement. Article 6(a) DCCP stipulates that the Dutch court has jurisdiction in such a case, if the obligation underlying the claim or request has been performed or is to be performed in the Netherlands. In the event of a contract for services, the Netherlands is considered to be the place of performance if the contract stipulates that the services were provided or should have been provided in the Netherlands (Article 6a DCCP). This applies int his case. Under the Agreement, dmarcian Europe was responsible for the sale of the software and the provision of the accompanying services to customers in Europe, Russia and Africa (cf. para. 2.5 of the Enterprise Court's decision dated 7 September 2020). dmarcian Europe performed these services from its place of business, the Netherlands. For this reason, the Dutch court has jurisdiction to hear this dispute pursuant to Article 6(1) DCCP.

---

[10] In 2018, the relationship expanded to include access to source code for development purposes, as a result of which joint ownership was created.
[11] REGULATION (EC) No 593/2008 OF THE EUROPEAN PARLIAMENT AND OF THE COUNCIL of 17 June 2008
on the law applicable to contractual obligations) ("Rome I").
[12] Regulation (EC) no. 864/2007 of the European Parliament and of the Council of 11 July 2007 on the law applicable to non-contractual obligations (Rome II).

21

6.2.2. As regards Draegen, the claims are based on obligations arising from an unlawful act. In the event of obligations arising from an unlawful act, the Dutch court has jurisdiction if the "harmful event" occurred or may occur in the Netherlands (Article 6(e) DCCP). Because Article 6(e) DCCP is based on (the predecessors of) Article 7(2) Recast Brussels I Regulation[13], the case law of the ECJ on the latter provision(s) is guiding for the interpretation thereof. It follows from that case law that the harmful event means both the place where the harmful event occurred (the *Handlungsort*) and the place where the damage occurred (the *Erfolgsort*).[14] In this case, the *Erfolgsort* is in any event located in the Netherlands. The Dutch court therefore also has jurisdiction over the claims again Draegen pursuant to Article 6 DCCP.

6.3. Incidentally, even if this were different, the Dutch court would still have jurisdiction to hear this dispute. There is a request to take protective measures, which has sufficient relevant points of reference with the Dutch legal system. After all, the dispute revolves around the termination of an agreement to be performed in the Netherlands by a Dutch party – which is thus governed by Dutch law – and related unlawful acts. These actions, moreover, seek to thwart a decision by the Dutch court, namely the Enterprise Court. In such circumstances, the jurisdiction of the Dutch court cannot be contested on the basis of Article 13 DCCP on the sole ground that the Dutch court allegedly lacks jurisdiction over a dispute in the principal action.

6.4. Finally, dmarcian Europe notes that its claims against dmarcian Inc. and Draegen are so closely related that reasons of efficiency justify a joint hearing. This means that if the Dutch court has jurisdiction over the claims against one of the defendants, it also has jurisdiction with regard to the other defendants (Article 7(1) DCCP).

**Territorial jurisdiction Rotterdam District Court**

6.5. This Preliminary Relief Court also has territorial jurisdiction.

6.6. Pursuant to Article 102 DCCP, in cases concerning obligations arising from an unlawful act, the court in the place where the harmful event occurred (also) has jurisdiction to rule on the dispute. In the present case, the harmful event occurs in the place of business of dmarcian Europe, namely in Dordrecht, from where it performs the Agreement. This Preliminary Relief Court therefore in any case has territorial jurisdiction in so far as it concerns the claims against Draegen. Now that the claims against Draegen and dmarcian Inc. are so closely related that reasons of efficiency justify a joint hearing, this Preliminary Relief Court also has territorial jurisdiction with regard to the claims against dmarcian Inc. (Article 107 DCCP).

6.7. In so far as the previous provisions would not be applicable, it also applies that this Preliminary Relief Court has jurisdiction pursuant to Article 109 DCCP, as dmarcian Europe is based in Dordrecht as claimant.

7. **KNOWN DEFENCES OF DMARCIAN INC.**

7.1. dmarcian Inc disputes the assertion that it has granted dmarcian Europe a perpetual, exclusive license to its software. It also disputes the assertion that dmarcian Europe acquired copyrights to the dmarcian software, or at least it adopts the position that dmarcian Europe is obliged to assign

---

[13] Regulation (EU) No 1215/2012 of the European Parliament and of the Council of 12 December 2012 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (Recast Brussels I Regulation).
[14] Court of Justice 30 November 1976, C-21/76, ECLI:EU:C:1976:166 (*Mines de Potasse d'Alsace*).

22

those rights to dmarcian Inc under conditions to be determined by dmarcian Inc. dmarcian Europe has already responded to these defences above.

## 8. PROOF

8.1. To substantiate its assertions, dmarcian Europe refers to the exhibits attached to this summons. Without voluntarily assuming any burden of proof, dmarcian Europe also offers to furnish additional proof of its assertions by all lawful means.

**FOR WHICH REASONS:**

may it please this Preliminary Relief Court, in a judgment immediately enforceable regardless of any appeal, in so far as possible, to:

In respect of dmarcian Inc.

1. (a) primary claim: order dmarcian Inc to fully comply with the agreement existing between the parties, until it has been terminated in a legally valid manner;

   (b) in the alternative: by way of disciplinary action (i) order dmarcian Inc to maintain the status quo for the duration of the investigation ordered by the Enterprises Court and to fully comply with the agreement existing between the parties during that period and (ii) prohibit dmarcian Inc. to terminate the agreement between the parties during that period.

2. order dmarcian Inc to lift the blockade of the employees of dmarcian Europe to the SaaS platform and the computer and other systems required for the execution of its business activities with immediate effect and to keep it lifted until the agreement existing between parties has been terminated in a legally valid manner;

3. order dmarcian Inc. to pay a penalty of EUR 50,000 for each day that it does not, or does not fully, comply with what is claimed at 1 and 2

In respect of Draegen

4. order Draegen to refrain from any acts, performed by himself or through a company managed by him, explicitly including dmarcian Inc, that obstruct the business operations of dmarcian Europe, until, or as a result of the investigation ordered by the Enterprise Chamber, or as a result of a judgment on the merits, clarity has been provided about the contents and scope of the licensing agreement granted to dmarcian Europe and the ownership of the copyright to the dmarcian software.

5. order Draegen to pay a penalty of EUR 50,000 for each day that he does not, or does not fully, comply with what is claimed at 4.

in respect of dmarcian Inc. and Draegen

6. order dmarcian Inc and Draegen to jointly and severally pay the costs of the proceedings and the subsequent costs, to be increased by statutory interest from the day of the judgment until the day of payment in full.

The costs incurred by me, bailiff, are EUR 85,81

Case 1:21-cv-00067-MR   Document 26-6   Filed 04/19/21   Page 53 of 55

This case is being handled by V. van Druenen, A. Meijboom and M. Bacon van Kennedy Van der Laan, P.O. Box 58188 at (1040 HD) Amsterdam, telephone (020) 5506 688, fax (020) 5506 788, e-mail veerle.van.druenen@kvdl.com.

24

# EXHIBITS

Exhibit 1:      Decisions Enterprises Court dated 7 and 10 September 2020

Exhibit 2:      Extract Chamber of Commerce and history dmarcian Europe

Exhibit 3:      Extracts Chamber of Commerce TDX, Groeneweg Beheer and Kalkman Holding

Exhibit 4:      Extract Bulgarian Chamber of Commerce dmarcian Bulgaria

Exhibit 5:      Correspondence between the parties confirming that the software would initially be developed by dmarcian Inc.

Exhibit 6:      Correspondence with regard to Draegen's knowledge of the incorporation and objective of dmarcian Bulgaria

Exhibit 7:      Deed of transfer IP rights dmarcian Bulgaria to dmarcian Europe

Exhibit 8:      Statement of V.P. Kunze re Bulgarian law

Exhibit 9:      Procedural file proceedings Enterprises Court

Exhibit 10:     Application and memorandum of oral arguments TDX + statement of defence and memorandum of oral arguments dmarcian Europe

Exhibit 11:     Message Harmeling to shareholders dmarcian Europe dated 18 December 2020

Exhibit 12:     Correspondence with Enterprises Court re the appointment of the investigator dated 27 January 2021

Exhibit 13:     Termination letter dmarcian Inc. dated 22 January 2021 with exhibits

Exhibit 14:     Report accountant dmarcian Inc. dated 10 August 2020

Exhibit 15:     Exit Agreement

Exhibit 16:     E-mails to lawyers defendants dated 25 January 2021

Exhibit 17:     E-mails to lawyers defendants dated 26 January 2021

Exhibit 18:     Slack correspondence between Groeneweg and Shannon Draegen (CEO dmarcian Inc.) dated 29 September 2019

Exhibit 19:     Expert Report ICTRecht