# Attachment 9

Ex. 3 - Declaration of Martijn Groeneweg

## Declaration of Martijn Groeneweg

Martijn Groeneweg declares as follows pursuant to 28 U.S.C. § 1746:

1. I am a resident of The Netherlands, over eighteen years of age, and competent to make this Declaration. I have personal knowledge of the matters stated herein.

2. Through The Digital Xpedition (TDX) Holding BV ("TDX"), I am the co-founder of Mailmerk BV, currently known as dmarcian Europe BV ("dBV"). I have been the (indirect) director of dBV since it was founded in March 2013.

3. Before 2010, TDX (via its 100% owned subsidiary Measuremail BV ("Measuremail")) was working on safe email and anti-phishing technology. Measuremail is an email service provider.

4. On January 30, 2012, fifteen leading email service and technology providers launched DMARC (Domain-based Message Authentication, Reporting and Conformance) for reducing the threat of deceptive emails, such as spam and phishing. By that time, Measuremail had been sending all email DMARC compliant for years.

5. Beginning in January 2012, BM&C BV implemented DMARC enforcement at ING Bank to protect against phishing emails on behalf of ING Bank internet domains such as ing.nl.

6. As both TDX and BM&C BV saw the need and business potential of DMARC combined with their prior experience, dBV was founded March 20, 2013 under the name Mailmerk BV by TDX and BM&C BV. Both shareholders held 50% of the shares. dBV is a company registered under the laws of the Netherlands

7. From March 2013 until 2016, Mailmerk did DMARC projects at International Card Services and PostNL (the Netherlands' two most phished brands) and KBC Bank (Belgium) using its own software.

8. At some point in or before 2013, Eudemic Development LLC started the website dmarcian.com, providing SaaS software for free to implement the free open standard DMARC.

9. In 2013, Tim Draegen ("Draegen") and I discussed the DMARC standard by email. We also had preliminary discussions about cooperating on a business venture in the Netherlands to license DMARC software to European customers. Those discussions did not lead to any agreement between Mailmerk BV and Draegen, much less dmarcian, Inc ("dInc"), which did not exist in 2013.

10. On January 22, 2016, TDX – as a 100% shareholder of Mailmerk BV – and Draegen – both privately and as a 100% shareholder of dInc – verbally agreed that dInc granted dBV a perpetual and exclusive royalty-free license for the software dInc had developed at the time and would develop in the future. dInc would take care of all operations (hosting) and would pay for it. Furthermore, Mailmerk BV

2

would exclusively sell to and handle all customers from Russia, Europe and Africa and be entitled to all revenues that would be generated. dBV would do the sales (SaaS platform) and the deployment (consultancy and support). In return, dInc and/or Draegen acquired an option-right to buy 50.01% of (then) Mailmerk's shares at 1 EUR.

11. The agreement between dInc and dBV was made orally in January 2016 on Dutch soil.

12. I am aware that dInc has alleged that dBV "agreed that all original and newly-developed products, software, copyrights, trade secrets, intellectual property, and technical development would continue to be owned by (with IP rights from developed products accruing to) Plaintiff, and would be assigned to and owned by Plaintiff." That is not true. Draegen and I did not discuss ownership of IP rights, and dBV did not agree that any such rights would be assigned to dInc. That discussion would not have made any sense because, in January 2016, dInc wrote all of the code for the dmarcian software and was supposed to write the new code moving forward.

13. On December 7, 2016, Draegen sent a Proprietary Information and Inventions Agreement ("PIIA") and Mutual Nondisclosure Agreement ("MDNA") to me as (indirect) director of dBV. A true and correct copy of Draegen's December 7, 2016, email to me, including the attachments, is attached as Exhibit A.

3

14. The PIIA and MDNA have never been agreed on and have never been signed by me. Moreover, it would not be possible for dBV to sign the PIIA, as the PIIA that Draegen sent over was between dInc and employees. Therefore, I told Draegen on December 7, 2016, by email that I would look into the agreements between dBV and its employees as IP that these employees create is held by dBV both based on their labor contracts and default by Dutch law. A true and correct copy of my email to Draegen is attached as Exhibit B.

15. On December 8, 2016, I sent an email to Draegen outlining the agreement dInc and dBV had reached in January 2016. This email accurately documents the agreement dInc and dBV made during the January 2016 meeting in the Netherlands, which January 2016 agreement did not include the PIIA or MDNA that Draegen later sent to me by email. A true and correct copy of my December 8, 2016 email to Draegen is attached as Exhibit C.

16. Later on December 8, 2016, Draegen responded to my email outlining the terms of the January 2016 agreement. A true and correct copy of Draegen's December 8, 2016 email to me is attached as Exhibit D.

17. On September 28, 2017, I sent an email to Draegen reminding him that we had agreed that dInc "would take care of all development cost and hosting." The next day, Draegen responded to my email, stating, "Yes! Thanks for writing this up."

4

A true and correct copy Draegen's September 29, 2017 email to me, which includes a copy of my September 28, 2017 email to Draegen, is attached as Exhibit E.

18. dInc and dBV later agreed that dBV would begin performing development work on the dmarcian (SaaS) software. Development of the dmarcian (SaaS) software was then performed by dBV and the Bulgarian company Belean EOOD. Draegen and I agreed that it would be productive and cost-effective to engage developers in Bulgaria. A local company was hired and it engaged two developers who worked on changing the legacy version of the SaaS software (version 1) to an API-fied version (version 2). This development company was hired and engaged by dBV, which paid all invoices. Belean has transferred all of its intellectual property rights to dBV.

19. In 2018, the services rendered by Belean were taken over by dmarcian Bulgaria EOOD, a Bulgarian company 100% owned by dBV. dmarcian Bulgaria EOOD engaged the two existing developers in Bulgaria and two additional developers. In 2018 and 2019, dBV also engaged two developers in the Netherlands. All this was done with the consent and approval of Draegen and dInc. All new software over the last 18 months was therefore developed by 3 developers in the United States, 4 developers in Bulgaria and 2 developers in the Netherlands.

5

20. dBV exclusively financed software development in Bulgaria and the Netherlands. From 2017 to the present, dBV has spent at least 1.3 million Euros (roughly 1.5 million U.S. Dollars) writing new code for the dmarcian software.

21. On August 6, 2018, Draegen sent me an email in which he raised the question, "Where is global IP located?" Draegen also wrote that, "since EU has been licensing tech, it is likely impossible to home IP into the EU by default.. even though EU is paying to continue to develop (as US is also paying developers - **so it's sort of a mixed issue**). This means that some sort of asset transfer has to be made (reflected in IRS form 926) along with a proper valuation of said IP." (bold added). A true and correct copy Draegen's August 6, 2018 email to me is attached as Exhibit F.

22. On or about August 21, 2019, I had a Slack conversation with dInc's current CEO, Shannon Draegen ("Shannon"), in which I reminded Shannon that "[t]here's currently no licensing Agreement in place from EU to US for the software created in the EU." She agreed with a "thumb up." A true and correct copy of a printout I made of that Slack conversation is attached as Exhibit G.

23. On September 3, 2019, and after I explained that there is no licensing Agreement in place from dBV to dInc for the software created in the European Union, Shannon created the diagram depicting only the "Perpetual Licensing Agreement" from dInc to dBV.

6



24. On or about December 3, 2019, I sent an email to Draegen with an attached "document [that] describes the current situation that software owned by dmarcian Europe BV can't be sold by dmarcian, Inc. nor Dmarcian Asia Pacific Pty Ltd to customers as there's no license agreement in place to do so." A true and correct copy of the document I sent by email to Draegen on December 3, 2019 is attached as Exhibit H.

25. On December 4, 2019, Draegen responded to email, agreeing that "we'll need a licensing agreement to be put into place . . . to reflect the perpetual and exclusive license that Europe BV has enjoyed." A true and correct copy of that December 4, 2019 email is attached as Exhibit I.

26. The next year, in July 2020, Draegen requested the board of dBV to convene a general meeting of shareholders of dBV with the proposal to dismiss TDX as director of dBV and instead appoint Vision Management Europe Ltd. This

7

concerned TDX, as it is convinced that, were TDX to be dismissed as managing director and Vision Management Europe Ltd would be appointed instead, the unacceptable proposal Draegen and dInc. made – i.e., the free assignment of dBV's intellectual property to dInc – would be pushed through. That would leave dBV – and TDX – with close to nothing. To avoid this, TDX asked the Dutch Enterprise Chamber of the Amsterdam Court of Appeals to swiftly and adequately investigate these concerns and address these concerns as soon as possible. On September 10, 2020, the Dutch Enterprise Chamber appointed Hub. J. Harmeling as an independent director of dBV and it appointed Yvette Borrius as a custodian of the shares.

27. In the autumn of 2020, dBV instructed a local company to analyze the codes of the version 2 software and report on the origin of these codes (US, Bulgarian, or Dutch respectively) and clarify the respective contributions as to give an indication of the respective parts and ownership titles of this shared IP. Roughly sixty percent of the version 2 code was written by the Bulgarian and Dutch developers.

28. I have visited North Carolina only once, in January 2019, for a meeting with dInc's team. No other employee of dBV visited North Carolina for any business purpose.

8

29. Eight employees of dInc (Draegen, Ed Carroll, Tim Chase, Luke Wirkus, Leslie Brazil, Vaughn Talbert, Barry Jones and Moussa Ba) visited the Dutch office of dBV in August 2018.

30. Draegen visited The Netherlands and/or the Dutch office of dBV for business purposes at least in January 2016, April 2017, February 2018, April 2018, August 2018, February 2019 and January 2020.

31. dBV does not sell or promote its products or services to any customer in the United States. Attached as Exhibit J are true and correct copies of printouts made from dBV's accounting software showing the location of dBV's customers in 2020 and 2021 (through April 12, 2021) and the sales to those customers. The sales analysis numbers are all in Euros.

32. dBV has never had an office, agent, or property in the United States.

33. The SaaS platform that dBV licenses to customers in Europe, Russia, and Africa is hosted on servers in Belgium and the Netherlands.

Under the terms of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 19th day of April, 2021.

MARTIJN GROENEWEG