# Attachment 2

Exhibit A to Second Declaration of Martijn Groeneweg (Agreement SaaS)

**dmarcian Europe BV**
Burgemeester de Raadtsingel 93
3311 JG Dordrecht

# Agreement SaaS



Case 1:21-cv-00067-MR   Document 35-2   Filed 05/07/21   Page 2 of 10



## **PARTIES**

| Client | Supplier |
|---|---|
| Name | Name |
| | dmarcian Europe BV |
| Trade reg. no. | Trade reg. no. |
| | 57518793 |
| VAT | VAT |
| | NL852616879B01 |
| IBAN | IBAN |
| | NL42ABNA0476385040 |
| BIC/SWIFT | BIC/SWIFT |
| | ABNANL2A |
| Address | Address |
| | Burgemeester de Raadtsingel 93 |
| Zip Code + City + Country | Zip Code + City + Country |
| | 3311 JG Dordrecht, The Netherlands |
| Phone | Phone |
| | +31 786320242 |
| Contact | Contact |
| | Martijn Groeneweg |
| Email | Email |
| | martijn@dmarcian.com |

**PARTIES**

dmarcian Europe B.V.                                                                                1



## Key details

| | |
|---|---|
| Start Date | [start date] |
| End Date | [end date] |
| Automatic Extension | Yes |
| SaaS Service | dmarcian Enterprise |
| Pricing | € [...] per year |
| DMARC Capable Volume | 5.000.000 per month |
| Active Domains | 15 |
| Inactive Domains | Unlimited |
| Payment terms | Invoiced annually up front. Payment within 14 days after invoice date. |

## SaaS Service description

Our DMARC SaaS Platform is designed for and by email experts to quickly and easily build DMARC compliance while providing deep insight and actionable intelligence. With Dmarcian, you can monitor your email for possible threats and unknown senders, and increase your DMARC policy to prevent spoofing and phishing emails from being sent from your domain.

The Enterprise plan includes access to the following features:

- Processing of DMARC Reports (RUF and RUA)
- SPF, DKIM and DMARC analysis tools
- Enrichment of the DMARC data with sources
- DKIM selector information
- > 1 Year of Data History
- Unlimited custom Domain Groups
- Domain Discovery
- User Access Controls
- Timeline
- Unlimited Users
- Reporting
- Two-Factor Authentication
- API access
- Single Sign On

dmarcian Europe B.V.                                                                                                    2



## Interpretation

| | |
|---|---|
| Active Domains | Domains or subdomains that send DMARC capable emails. |
| Confidential Information | Any information that is not public knowledge and that is obtained from the other party in the course of, or in connection with, the Agreement. Intellectual Property owned by the Supplier (or its licensors) is the Supplier's Confidential Information. The Data is the Client's Confidential Information. |
| Data | all data, content, and information owned, held, used, or created by or on behalf of the Client that is stored using, or inputted into, the Services. |
| DMARC Capable Volume | If the Services discover a source of email that is capable of sending DMARC compliant email, or if a source is identified through the Clients SPF record, that source is shown on the DMARC Capable tab. These messages will account to the DMARC Capable Volume. This is done so that no payment is asked for fraudulent email, only for legitimate traffic. |
| Fees | the fees agreed for delivering the SaaS Service. |
| Force Majeure | an event that is beyond the reasonable control of a party. |
| Inactive Domains | Domains or subdomains that are not used to send (legitimate) email from. |
| Intellectual Property Rights | includes copyright and all worldwide rights conferred under statute, common law or equity relating to inventions (including patents), registered and unregistered trademarks and designs, circuit layouts, data and databases, confidential information, know how, and all other rights resulting from intellectual activity. |
| Payment Term | the payment terms set out in the Key Details (if any). |
| Permitted User | those personnel of the Client who are authorized to access and use the Services on the Client's behalf. |
| Services | The dmarcian SaaS Service and any related service. |
| Underlying Systems | the software, IT solutions, used to provide the Services, including any third-party solutions, systems, and networks. |
| Year | a 12 month period starting on the Start Date or the anniversary of that date. |



## Supplier obligations and services

**General**
1. The Supplier must use best efforts to provide the Services:
    a. in accordance with the Agreement and European law, including data protection legislation;
    b. exercising reasonable care, skill, and diligence.

**Non-exclusive**
2. The Supplier's provision of the Services to the Client is non-exclusive. Nothing in the Agreement prevents the Supplier from providing the Services to any other person.

**Underlying Systems**
3. The Supplier is responsible for procuring all Underlying Systems reasonably required for it to provide the Services in accordance with the Agreement.

## Client obligations

**General use**
4. The Client and its personnel must:
    a. use the Services in accordance with the Agreement solely for:
        i. the Client's own internal business purposes; and
        ii. lawful purposes.
    b. not resell or make available the Services to any third party, or otherwise commercially exploit the Services.

**Access conditions**
5. When accessing the SaaS Service, the Client and its personnel must:
    a. not impersonate another person or misrepresent authorization to act on behalf of others or the Supplier;
    b. not attempt to undermine the security or integrity of the Underlying Systems;
    c. not use, or misuse, the SaaS Service in any way which may impair the functionality of the Underlying Systems or impair the ability of any other user to use the SaaS Service;
    d. not attempt to view, access or copy any material or data other than that to which the Client is authorized to access;
    e. neither use the SaaS Service in a manner nor transmit, input or store any Data, that breaches any third party right (including Intellectual Property Rights and privacy rights) or is objectionable, incorrect, or misleading.

**Authorizations**
6. Without limiting the access conditions, no individual other than a Permitted User may access or use the SaaS Service.
7. A breach of any term of the Agreement by the Client's personnel is deemed to be a breach of the Agreement by the Client.
8. The Client is responsible for procuring all licenses, authorizations and consents required for it and its personnel to use the SaaS Service, including to use, store and input Data into, and process and distribute Data through the SaaS Service.



## Data

**Supplier access to Data:**

9. The Client acknowledges that:
    a. the Supplier may require access to the Data to exercise its rights and perform its obligations under the Agreement;
    b. to the extent that this is necessary, the Supplier may authorize a member or members of its personnel to access the Data for this purpose.

## Pricing and payment

**Subscription**

10. The Services are purchased as subscriptions.

**Fees**

11. The Client must pay to the Supplier the Fees according to the Payment Terms.
12. The Supplier may increase the Fees once each Year (but not the first Year) by the percentage change in the European Harmonised index of consumer prices (HICP) over the 12 months preceding the last quarterly publication of that index issued prior to the date of the notice.
13. By giving at least 90 days notice prior to the End Date, the Supplier may increase the Fees after the End Date with more than the percentage change in the European Harmonised index of consumer prices (HICP).

**Invoicing and payment**

14. The Supplier will provide the Client with valid tax invoices.
15. The fees do not include any taxes, levies, duties or similar governmental assessments of any nature, including, for example, value-added, sales, use or withholding taxes, assessable by any jurisdiction whatsoever. Client is responsible for the tax payment on taxable supplies under the Agreement.
16. The Supplier will invoice Client annually upfront.

## Intellectual property

**Ownership**

17. Title to, and all Intellectual Property Rights in, the Services, and all Underlying Systems is and remains the property of the Supplier (and its licensors). The Client must not dispute that ownership.
18. Title to, and all Intellectual Property Rights in, the Data (as between the parties) remains the property of the Client. The Client grants the Supplier a worldwide, non-exclusive, license to use, store, copy, make available and communicate the Data for any purpose in connection with the exercise of its rights and performance of its obligations in accordance with the Agreement.



## Confidentiality

**Obligation of confidentiality**

19. Each party must, unless it has the prior written consent of the other party:
    a. keep confidential at all times the Confidential Information of the other party;
    b. effect and maintain adequate security measures to safeguard the other party's Confidential Information from unauthorized access or use; and
    c. disclose the other party's Confidential Information to its personnel or professional advisors on a need to know basis only and, in that case, ensure that any personnel or professional advisor to whom it discloses the other party's Confidential Information is aware of, and complies with, the provisions of clauses 19a and 19b.

**Permitted disclosure**

20. The obligation of confidentiality in clause 19 does not apply to any disclosure or use of Confidential Information:
    a. for the purpose of performing the Agreement or exercising a party's rights under the Agreement;
    b. required by law;
    c. which is publicly available through no fault of the recipient of the Confidential Information or its personnel;
    d. which was rightfully received by a party to the Agreement from a third party without restriction and without breach of any obligation of confidentiality.

## Liability

**Limitation**

21. Supplier's liability for any direct or indirect, punitive, special, consequential or exemplary damages or loss of any kind arising from the use of the Services or otherwise under or in connection with this Agreement will be limited to the amount paid for the Services in the twelve (12) months prior to the occurrence of the act or omission giving rise to such claim.
22. The Client indemnifies the Supplier against any liability, claim, proceeding, cost, expense (including the actual legal fees charged by the Supplier's solicitors) and loss of any kind arising from any actual or alleged claim by a third party that any Data infringes the rights of that third party (including Intellectual Property Rights and privacy rights) or that the Data is objectionable, incorrect or misleading.

## Termination

**Duration**

23. Unless terminated under clause 24, the Agreement:
    a. starts on the Start Date and ends on the End Date; but
    b. when Automatic Extension is set out "Yes" in the Key Details, the subscription will automatically extend for additional periods equal to the expiring subscription term unless either party gives the other notice of non-extension at least 30 days before the end of the relevant subscription term.



**Termination rights**

24. Either party may, by notice to the other party, immediately terminate the Agreement if the other party:
    a. breaches any material provision of the Agreement and the breach is not:
        i. remedied within 30 days of the receipt of a notice from the first party requiring it to remedy the breach; or
        ii. capable of being remedied;
    b. becomes insolvent, liquidated or bankrupt, has an administrator, receiver, liquidator, statutory manager, mortgagee's or chargee's agent appointed, becomes subject to any form of insolvency action or external administration, or ceases to continue business for any reason;
    c. is unable to perform a material obligation under the Agreement for 30 days or more due to Force Majeure.

**Suspending access**

25. Without limiting any other right or remedy available to the Supplier, the Supplier may restrict or suspend the Client's access to the SaaS Service where the Client (including any of its personnel):
    a. undermines, or attempts to undermine, the security or integrity of the SaaS Service or any Underlying Systems;
    b. uses, or attempts to use, the SaaS Service:
        i. for improper purposes; or
        ii. in a manner, other than for normal operational purposes, that materially reduces the operational performance of the SaaS Service; or
        iii. has otherwise materially breached the Agreement.

## Dispute

**Miscellaneous provisions**

26. This Agreement prevails over all other agreements. Any amendments to this Agreement are only valid if they have been agreed by the parties in writing.
27. This agreement is exclusively governed by Dutch law.
28. The parties will exclusively submit their disputes in connection with this Agreement to the District Court of Rotterdam.
29. Before taking any court action, a party must use best efforts to resolve any dispute under, or in connection with, the Agreement through good faith negotiations.

dmarcian Europe B.V. 7



## Signing

Signed for and on behalf of Client,  Signed for and on behalf of dmarcian,

……………………………………………  …………………………………………
**[NAME CLIENT]**  dmarcian Europe BV

Name: …………………………  Name:

Date: …………………………  Date: **[DATE]**