# Attachment 4

Exhibit C to Second Declaration of Martijn Groeneweg
(District Court of North Holland Judgment 5.7.21)

# Judgment

## DISTRICT COURT OF NORTH HOLLAND

Trade, Subdistrict and Insolvency
Seat at Haarlem

case number / docket number: C / 15/314124 / KG ZA 21 -124

**Supplement to the interim relief judgment of April 23, 2021**
(date supplement: May 7, 2021)

in the matter of

the limited liability company
**DMARCIAN EUROPE B.V.**,
Established at Dordrecht,
claimant,
attorney *Mr*. A.P. Meijboom of Amsterdam,

against

1.      **ANTON ALFRED FERNANDES**,
residing in Oud-Beijerland,

2.      **BERNARD PIETER VAN DER LAAN**,
residing in Zwanenburg,
defendants,
attorney *Mr*. T.S. Jansen of Amsterdam.

The parties will hereinafter be referred to as DME and Fernandes et al.

**1.      The procedure**

1.1.      The course of the procedure is evidenced by:
-      the summons;
-      the deed containing exhibits of DME with exhibits E1-33;
-      the deed submitting exhibits of Fernandes et al. with exhibits G1-10;
-      the letter from *Mr*. Meijboom dated April 15, 2021, with exhibits E34-41 as attachments;
-      the e-mail from *Mr*. Meijboom dated April 15, 2021 with exhibit E42 as attachments;
-      the oral hearing
-      DME's pleading notes
-      the Fernandes et al. pleading notes

1.2.      Finally, a date for judgment was scheduled.
In connection with the urgency of the case, a so-called accelerated ("*head-tail*") judgment was rendered on April 23, 2021. The following forms the further written elaboration thereof (drawn up on May 7, 2021). Both documents can be read together as a complete judgment in interim relief proceedings.

## 2.      The facts

2.1.      DME is a company established in 2013, originally with the name Mailmerk B.V.  The Digital Xpedition Holding BV (hereinafter: TDX) is the sole shareholder and director of DME.

2.2.      Dmarcian Inc is an American company of which Tim Draegen (hereinafter: Draegen) was the sole shareholder until recently.  Shannon Draegen, Tim Draegen's spouse, is currently CEO and director of Dmarcian Inc.

2.3.      Both companies run a business that provides products and services in the field of identity protection of e-mail addresses.  DME uses software from Dmarcian Inc. DME is also involved in product and software development, including through Dmarcian Bulgaria EOOD (hereinafter: Dmarcian Bulgaria), a Bulgarian company in which DME holds all shares.

2.4.      DME and Dmarcian Inc. have entered into an oral agreement in January 2016 regarding the use and distribution of the Dmarcian software. Under this agreement, DME received a license to distribute and license the Dmarcian software in Europe, Russia and Africa.  In return, Dmarcian Inc, or its then sole shareholder, Draegen, received an option right to a majority stake in DME.

2.5.      In practice, Dmarcian Inc. and DME jointly use the dmarcian.com website.  Potential customers are redirected to DME through this site if the customer is from Europe, Africa or Russia, and other customers are redirected to Dmarcian Inc.

2.6.      In July 2018, Draegen exercised his option right and accordingly acquired 50.01% of the DME shares.

2.7.      DME has amended and expanded the Dmarcian software in 2019, partly due to the efforts of Dmarcian Bulgaria.  Since November 2019, only this version of the software is available.

2.8.      In connection with a DME shareholders meeting in 2019, TDX sent Draegen the topics to be discussed on the occasion, including the proposal to discuss a copyright license for Dmarcian Inc for the latest version of the software.  In this regard, Draegen proposed that DME transfer its share of the joint copyright in the software to Dmarcian Inc.  Since TDX refused, Dmarcian Inc. blocked access for DME to the joint systems on December 6, 2019.  This blockade was lifted after 48 hours.

2.9.      Fernandes has been employed by DME as Senior Business Development Manager Europe until December 31, 2019.  In that capacity he was responsible for acquiring new customers for DME in Europe.  A confidentiality clause has been included in his employment contract.

2.10.    Fernandes and Van der Laan jointly established Vision Management Europe BV (hereinafter: Vision) on June 16, 2020, and they are (indirect) directors and shareholders of this company.

2.11.    In an email dated July 3, 2020, Draegen requested that a DME shareholders' meeting be convened, with a proposal to dismiss TDX as director and appoint Vision as such.

2.12.    DME's shareholders' meeting was scheduled for August 13, 2020.  As a result of the foregoing, TDX has started an investigation procedure against DME before the Enterprise Chamber of the Amsterdam Court of Appeal.  In connection with this, the shareholders' meeting has been moved to September 7, 2020.  Draegen has joined in these proceedings as an interested party.

2.13.    In the subsequent decision of the Enterprise Chamber of September 7, 2020, inter alia, the following was considered:

*'2.5. TDX and Draegen are disputing the agreements underlying the 2016 collaboration between dmarcian Europe and dmarcian, Inc./Draegen.  According to TDX, on January 22, 2016, dmarcian Europe, dmarcian, Inc., TDX and Draegen entered into an oral agreement which is the basis of their cooperation.  According to Draegen, the parties have always based their collaboration on the email correspondence of December 2016 between him and Groeneweg about formalizing their collaboration, in which Draegen sent documents for signature (which were not signed).  In any event, it is undisputed between the parties that in 2016 they have at least agreed:*

*-    that dmarcian Europe is licensed to use and sell software originating from dmarcian, Inc;*

*-    that dmarcian Europe is responsible for selling that software (and providing accompanying services) to customers in Europe, Russia and Africa;*

*-    that in return, dmarcian, Inc. and/or Draegen was able to purchase the majority equity interest in dmarcian Europe against payment of € 1.*

*(...)*

*3.4. The Enterprise Chamber holds as follows. The controversy over the intellectual property rights to the software and software applications developed by dmarcian Europe (and dmarcian Bulgaria) is at the heart of the dispute between the parties.  TDX alleges that this software and software applications is/are separate from the software developed by dmarcian, Inc. such that the intellectual property thereof belongs to dmarcian Europe.  According to TDX the right to use and sell this software and software applications by dmarcian, Inc. must be based on a license to be granted by dmarcian Europe.  On the other hand, Draegen argues that the software developed by dmarcian Europe (and dmarcian Bulgaria) does not include more than additional features for improved use of the software sourced from dmarcian, Inc. so that the intellectual property thereof also belongs to dmarcian, Inc.*

_The Enterprise Chamber first notes that only the ordinary civil court is competent for the legal assessment of such dispute.  However, the Enterprise Chamber notes that this dispute is disruptive to dmarcian Europe's business; developing and selling software is its core business and the cooperation with dmarcian, Inc. is a necessary condition for this.  Nevertheless, this cooperation is not sufficiently regulated by the parties, neither in general, nor with regard to the intellectual property rights to software (applications) that has been and will be developed and the licenses granted/to be granted in that connection (and their scope) in particular.  There are no unambiguous agreements on this available, with the consequence that the collaboration has been put at risk by the current discussion on this, which is a serious obstacle to dmarcian Europe's business operations.  In the opinion of the Enterprise Chamber, the existence of the aforementioned situation provides sufficient legitimate reasons to doubt the proper policy and course of affairs of dmarcian Europe.  The Enterprise Chamber, as requested by both TDX and Draegen, will order an investigation into the policies and course of affairs of dmarcian Europe from January 1, 2016 to August 20, 2020.'_

2.14.    By decision of September 10, 2020, the Enterprise Chamber appointed _Mr_. H.J.M. Harmeling (hereinafter: Harmeling) as director of DME.

2.15.    On September 14, 2020, Dmarcian Inc. blocked DME's access to its systems again. Ultimately, access to the most essential systems was restored after a few days.

2.16.    In an email dated November 3, 2020, Draegen writes the following to Harmeling:

_'(...) I'd like to introduce you to Ton (judge: Fernandes) and Ben (judge: Van der Laan), the principles of Vision Management._

_(...)_
_I'm hoping that you three (or at least Ton and Hub (judge: Harmeling)) can connect to talk about how the BV (judge: DME) could benefit from real growth planning, business process development (...), and a go-market-strategy that takes into consideration how different EU countries are looking to make DMARC mandatory. (...) '_

2.17.    By letter dated January 22, 2021, Dmarcian Inc notified DME that it wishes to terminate the cooperation with DME as of February 1, 2021 and that it will no longer grant DME access to its systems from that date unless DME transfers its copyright in the new software to Dmarcian Inc in exchange for a license under which it cedes 80% of its income to Dmarcian Inc.

2.18.    On January 22, 2021, Dmarcian Inc again blocked DME's access to its systems.  As a result, DME no longer has access to the data of the vast majority of its customers and cannot answer customer requests for renewal or renewal of the license.

2.19.     DME has sued Dmarcian Inc and Draegen in interim relief proceedings in connection with said blockade.  DME's claims were granted by default judgment of February 1, 2021.  The decision includes the following:

*'3. The decision*

*The Court, giving judgment in interim proceedings:*

*3.1. grants leave to proceed in default  against the defendants who failed to appear;*

*3.2. orders dmarcian Inc., as a disciplinary measure, during the investigation ordered by the Enterprise Section, to perform the agreement existing between the parties and prohibits it from terminating that agreement during that period;*

*3.3. orders dmarcian Inc. within 24 hours after service of this judgment to lift the blockade of (the employees of) dmarcian Europe to the SaaS platform and the (computer) systems required for the execution of its business activities and to keep it lifted until the existing agreement between the parties has been legally terminated;*

*3.4. orders dmarcian Inc. to pay a penalty of €20,000 to dmarcian Europe for each day or part of a day that it fails to comply with the main order issued in operative parts 3.2 and 3.3., until a maximum of €500,000 is reached;*

*3.5 orders Draegen to refrain from any action undertaken by himself or through a company managed by him, expressly including dmarcian Inc., which impedes the business operations of dmarcian Europe, until or as a result of the investigation ordered by the Enterprise Section, or as a result of a judgment on the merits, clarity has been created about the contents and scope of the license agreement granted to dmarcian Europe and the ownership of the IP rights to the dmarcian software;*

*3.6. orders Draegen to pay a penalty to dmarcian Europe of €20,000 for each day or part of a day that it fails to comply with the main order pronounced in operative part 3.4., until a maximum of €500,000 is reached;*

*3.7. orders dmarcian Inc. and Draegen, jointly and severally, to pay the costs of the proceedings, estimated to date at €1,408.81 on the part of dmarcian Europe, plus the statutory interest as referred to in Article 6:119 Dutch Civil Code (DCC) on this amount starting fourteen days after service of this judgment until the day of full payment;*

*3.8. orders dmarcian Inc. and Draegen, jointly and severally, to pay the costs incurred after this judgment, estimated at €163.00 for the attorney's fees, to be increased, on condition that dmarcian Inc. and Draegen have not complied with the judgment within 14 days after notice was given and service was subsequently effected, by an amount of €85.00 for attorney's fees and the costs of serving notice of the judgment, and to be increased by the statutory interest as referred to in Article 6:119 DCC on the subsequent costs starting fourteen days after service of this judgment until the date of payment;*

*3.9. declares this judgment provisionally enforceable up to here;*

*3.10. dismisses all other claims.*

2.20.   The judgment in default has been served on Dmarcian Inc and Draegen. They filed an
        opposition.

2.21.   Dmarcian Inc appointed Fernandes and Van der Laan as sales managers for Europe in January
        2021.  On February 2, 2021, Van der Laan and Fernandes were listed on the Dmarcian.com
        website as 'Sales-Europe'.

2.22.   In a letter dated February 3, 2021, DME's lawyer wrote the following to Fernandes and Van
        der Laan:

*'(…)*
*You are also undoubtably aware of the fact that a dispute between Mr. Tim Draegen, CEO of*
*dmarcian Inc and shareholder of dmarcian Europe (...), resulted in dmarcian Inc. blocking dmarcian*
*Europe's access to its commercial data on 6 December 2019, 14 September 2020 and 22 January*
*2021. (...) Directly following the last blockade, dmarcian Inc. misappropriated dmarcian Europe's*
*customers and leads listings and financial information, contacted customers and prospects of*
*dmarcian Europe, and appointing you as Sales representatives for Europe. (...)*

*I trust that you are also aware that the Enterprise Court at the Amsterdam Court of Appeal (...), on*
*request of both shareholders of dmarcian Europe (...) ordered an investigation into dmarcian Europe's*
*past governance, and decided that a director, investigator and custodian of dmarcian Europe's shares*
*would be appointed (...).*

*The intervention of the Enterprise Court was the direct consequence of Mr. Draegen's attempt to*
*replace TDX as director of Dmarcian BV by Vision Management Europe B. V. (i.e. replace Messrs*
*Groeneweg and Kalkman by the two of you) and take dmarcian Europe's intellectual property rights.*
*The Enterprise Court put a stop to Mr. Draegen's plan.*

*(...)*

*In its decision of the 1 February the interim relief judge (...) of the court of Rotterdam ordered*
*dmarcian Inc. under pain of ci penalty (...) to comply with the agreement between dmarcian Inc. and*
*dmarcian Europe and prohibited dmarcian Inc. form terminating that agreement during the*
*investigation ordered by the Enterprise Court. Draegen was ordered (...) to refrain from any action*
*undertaken by himself or through a company managed by him, such as dmarcian Inc., which impedes*
*the business operations of dmarcian Europe, until or as a result of the investigation ordered by the*
*Enterprise Court, or as a result of a judgment on the merits, clarity has been created about the*
*contents and scope of the license agreement granted to dmarcian Europe and the ownership of the IP*
*rights of the dmarcian software. The decision has been served on dmarcian Inc. and Draegen and has*
*direct effect, even if dmarcian Inc and or Draegen would appeal. I attach a copy of the decision.*

_____     _____

*Consequently, the Rotterdam court ordered dmarcian Inc. and Draegen to immediately respect and comply with dmarcian Europe's exclusive distributorship of Europe, Africa and Russia, and to restore dmarcian Europe's access to the computer systems which were blocked by dmarcian Inc. In this respect, employees, contractors and others working for or on behalf of dmarcian Inc. and/or on instruction of Draegen, and or other companies he . manages, are also bound by the decision. This include the both of you as well as Vision (...)*

*Therefore, I hereby request you in person as well as your companies to immediately*

*(a)      refrain from acting as sales representative for Europe, Africa and/or Russia for dmarcian Inc. and or another entity managed by Draegen and or Draegen himself; and*

*(b)      refrain from contracting any individual and or company in Europe, Africa and or Russia in connection with dmarcian software and/or services; and*

*(c)      forward any request from an individual and or company in Europe, Africa and or Russia in connection with dmarcian software and/or services which you directly or indirectly receive from dmarcian Inc. and/or another entity managed by Draegen and or Draegen himself to dmarcian Europe at sciles@dmarcian-europe.com without comment and without replying the requester; and*

*(d)      request dmarcian Inc. to immediately remove your title 'Sales - Europe 'from dmarcian's website and other dmarcian Inc. digital and tangible materials, and not replace them with any other indication which suggests that either of you have responsibilities in connection to dmarcian software and/or services in Europe, Africa and or Russia.*

*All such acts at least as long as the interim relief order of 1 February 2021 is in force (...)'*

2.23.    As of February 5, 2021, Fernandes' and Van der Laan's title on the website of Dmarcian Inc. changed to 'Sales'.

2.24.    On March 1, 2021, so-called 'All Hands meeting' took place at Dmarcian, Inc in which Fernandes and Van der Laan spoke.  As far as relevant, the following was said on this occasion:

*'Shannon Draegen; 'We've had Ton and Ben join us and working under the US but representing the EU that really, really know the market and they will take that on and they will influence what needs to be kind of delivered to that market' (...)*

*Fernandes; 'Hi, so we are here for a month now and I'm seeing a lot of old customers of me, because I see ci lot of customers that have to be renewed, that kind of things. We just started, I think a week now, selling again and contacted customers because there are troubles with the European ex-partner. It's going well, we see not so many leads as I thought, because normally we got 20 to 26 leads and nowadays it's 11 because I think that 50% of the leads are going to Europe but yeah, I had my first sales today. So ci Plus via a new partner that I made (...) We have some troubles with Europe of course that we have to address. But we like it and I'm sure that we get a lot of customers in this way (...)*

*Van der Laan: From a European point of view as a few days ago you suggested to Ton and me to pick up a number of the advisor cases for Europe which we 're now doing, but am I correct that the US advisors now don't pick up any EU leads anymore or because the last few days I see a lot of them unassigned. And I just want to know if they 're waiting for Ton and me, all of them, or that we can share a little?*
*(…).*

2.25.    In an email dated March 10, 2021, a DME customer wrote to DME:

*'Later I called Ton to request a breeding hour, and then it emerged that he indicated that renewals only run through the US, and no longer through the Europe division. '*

2.26.    Dmarcian Inc. has sent quotations to European customers that are very similar to those used by DME and that differ from the usual Dmarcian Inc. Quotations. The quotation sent by Dmarcian Inc to a European customer contains the email address 'ton@damarcian.com' with the contact details of Dmarcian.


## 3.    The dispute

3.1.    DME claims' by judgment, as far as possible provisionally enforceable:

*1.        defendants under 1 and 2, each separately, as long as the director of dmarcian Europe appointed by the Enterprise Chamber by decision of September 7, 2020 is in office and the investigation of the investigator appointed by the Enterprise Chamber on January 29, 2021 has not been completed, or during proceedings on the  merits between dmarcian Inc. and dmarcian Europe:*

*(a)        to prohibit [them] from directly or indirectly representing dmarcian Inc., another company controlled by Timothy Draegen, another company in which Timothy Draegen has control and / or a majority interest and / or Timothy Draegen himself, in Europe, Africa, and Russia in connection with software and / or services of dmarcian Inc., regardless of legal title or by order of any legal entity they do so;*

*(b)        to prohibit[them] from contacting natural or legal persons in Europe, Africa and Russia, directly or indirectly, by e-mail, video conference, correspondence, physical visit, or otherwise, in connection with software and / or services of dmarcian Inc., regardless of under which legal title or on behalf of which legal person they do this;*

*(c)        to order [them] forwarded to Plaintiff at the email address sales@dmarcian-europe.com or another email address to be provided by dmarcian Europe any request in connection with software and / or services of dmarcian Inc., from natural or legal persons of Europe, Africa and Russia that the relevant defendant receives directly or indirectly from or through dmarcian Inc., another company controlled , another company in which Timothy Draegen has decisive control and / or Timothy Draegen himself, without commenting and / or replies / or reply to the sender of the relevant request;*

_____          _____

*(d)   to order [them], within five days of service of the judgment to be rendered, provide in writing to dmarcian Europe through its attorney* Mr. *A.P. Meijboom of Kennedy van der Laan, Molenwerf 16, 1014 BG Amsterdam with e-mail address* [alfred.meijboom@kvdl.com](mailto:alfred.meijboom@kvdl.com)*, while simultaneously submitting relevant copies of correspondence, quotations, invoices and license agreements, the names, addresses and contact details of all natural or legal persons from Europe, Africa and Russia with whom they have or have been in contact as of January 22, 2021 regarding the use of dmarcian software, including the purchase, renewal and renewal of such software;*

*(e)   to prohibit [them] to infringe dmarcian Europe's copyright, including by using quotes and other business documentation the design of which is derived from the draft of similar dmarcian Europe documents;*

*(f)   to order [them] to send a signed letter or e-mail to the direct e-mail address of the CEO of dmarcian Inc., currently being Mrs Shannon Draegen, within 24 hours of service of the judgment to be rendered in this regard, with the following text in a standard format in Times Roman font, pitch 12 (or a font that is comparable in readability and size), without adding or omitting:*

> *'Dear Mrs. Draegen,*
> *In its preliminary decision of [datum] 2021, the interim relief judge of the court of North-Holland, location Haarlem ('voorzieningenrechter in de Rechtbank Noord-Holland, locatie Haarlem') ordered me to directly and indirectly refrain from any activities with respect to dmarcian software and services in Europe, Africa and the Russian Federation under pain of a penalty.*
> *Consequently, I hereby request dmarcian Inc. to immediately relieve me from any duties that may violate such court decision and to amend my title 'sales' https JIdmarcian.com/meet-our-team and or any other location(s) on dmarcian Inc. 's website, as well as on other promotional materials, including business cards, by adding to the current term 'sales' 'by order of the interim relief judge of the court of North-Holland, location Haarlem of [date], the Netherlands, [name of the relevant defendant] may not be active in Europe, Africa and the Russian Federation'.*
> *I also request you to instruct your staff to no longer to provide contact in Europe, Africa and the Russian Federation my name as contact person.*
> *Sincerely yours,*

_____    _____

*[followed by the full name and address of the relevant defendant],*

*or a text to be determined by the interim relief judge in proper justice; and simultaneously send a copy of this message by means of a blind carbon copy (bcc) to the lawyer of dmarcian Europe at the e-mail address alfred.meijboom@kvdl.com;*

*2.      to order the defendants under 1 and 2, each separately, to pay a penalty of EUR 50,000 per day that they do not or not fully comply with one or more of the prohibitions and commandments of the claim under 1.*

*3.      to order the defendants sub 1 and sub 2 jointly and severally to pay the costs of the proceedings and the subsequent costs, all costs plus statutory interest from the date of the judgment until the day of full payment. '*

3.2.     DME bases its claims primarily on the grounds that Fernandes et al. act unlawfully towards it or that they profit from the Dmarcian Inc. breach of contract committed against DME and the wrongful conduct of Draegen and Dmarcian Inc.  DME argues, among other things, that Fernandes et al. are aware of the agreements between DME and Dmarcian Inc. with respect to the exclusive right granted to DME to sell and service Dmarcian software in Europe, Africa and Russia.  In addition, they are familiar with the content of the judgment of the interim relief judge in Rotterdam and of the fact that Draegen and Dmarcian Inc. ignore the contents of this judgment.  Despite this, they remain for Dmarcian Inc. active as sales managers in Europe and in that capacity they approach customers of DME. In doing so, Fernandes et al. themselves act unlawfully or profit from the unlawful acts of Dmarcian Inc., according to DME.  DME also takes the position that if Fernandes et al. working through their company Vision, they can be personally blamed as directors.
In the alternative, DME requests that the claims be granted by way of disciplinary measure, at least for the duration of the investigation ordered by the Enterprise Chamber and until the director appointed by the Enterprise Chamber has been able to form an opinion about the ownership situation with regard to the copyright on the newly developed software.

3.3.     Fernandes et al. put forward a defense.

3.4.     The arguments of the parties are discussed in more detail below, insofar as they are relevant.

**4.      The assessment**

4.1.     Fernandes et al. put forward as a preliminary defense that DME's claims are inadmissible because there is no legal basis for DME to submit claims against Fernandes et al. in private.  They argue that, in its claims against them, DME ignores the fact that they perform their duties for Dmarcian Inc pursuant to a 'consulting agreement' between Vision, of which Fernandes and Van der Laan are indirect directors, and Dmarcian Inc.  Fernandes et al. argue that there is therefore no legal relationship between them privately and Dmarcian Inc.  DME should have sued Vision because the conduct that DME considers to be unlawful or in breach of contract are legal acts of Vision.

4.2.      The interim relief judge considers the following.
The claims brought by DME against Fernandes et al. are aimed at obtaining a preliminary injunction. It is implied in the assertions that in their capacity as indirect directors of Vision, they have behaved in such a way, and that Vision's legal personality is actually so insignificant, that private liability for the accused actions is appropriate and warranted.
Whether DME has rightly submitted its claims against Fernandes and Van der Laan thus requires a substantive assessment of the case. It will follow hereafter.

4.3.      Fernandes et al. argue that their activities for Dmarcian Inc. started in February 2021.  This means that they are completely outside the dispute between DME and Dmarcian Inc.  The fact that they are aware of the content of the default judgment of  February 1, 2021 does not change that.  In addition, opposition has now been filed against that default judgment, so that the interim relief proceedings have been reopened.
Accordingly, Fernandes et al. allege that it is not a given that Dmarcian Inc. is obliged to comply with that judgment.
In addition, they argue that Dmarcian Inc. terminated the cooperation with DME by letter dated January 22, 2021.  This means that a legal relationship between Dmarcian Inc. and DME no longer exists for which reason Dmarcian Inc. cannot commit any breach of contract towards DME, let alone that Fernandes et al. can profit from it.  Finally, a weighing of the interests prevents the granting of the claims, according to Fernandes et al.

4.4.      In assessing all this, it should be assumed that the Enterprise Chamber has determined by decision of September 7, 2020 that part of the agreement between Dmarcian Inc and DME is at least that DME has a license for the use and sale of software originating from Dmarcian Inc and that it is responsible for the sales of that software in Europe, Africa and Russia.  In the default judgment of February 1, 2021, the interim relief judge in the District Court of Rotterdam has ordered Dmarcian Inc to comply with that agreement by way of a disciplinary measure.  The fact that Dmarcian Inc and Draegen filed an opposition does not alter the fact that they are obliged to comply with the judgment.  After all, the judgment has been declared provisionally enforceable and the opposition has no suspensive force.

4.5.      DME has undisputedly stated that Dmarcian Inc and Draegen are no longer fulfill the agreement with DME.   In practice, this means that DME employees no longer have (full) access to the customer systems and are therefore severely hindered in the way in which they can serve European, African and Russian customers.  Fernandes et al. acknowledged at the hearing that they serve European customers for Dmarcian Inc. in the sense that when customers come to them, they respond.  This implies that European customers are currently not forwarded to DME.  In the opinion of the interim relief judge, the foregoing is sufficient ground to believe that Dmarcian Inc and Draegen are acting unlawfully towards DME.
This does not mean that Fernandes et a. are also acting unlawfully towards DME.  The interim relief judge considers the following in this regard.

4.6.      The interim relief judge considers it plausible that the actions of Dmarcian Inc and Draegen
were prompted by the desire to put DME out of the game completely and in this way acquire the
copyright on the latest version of the Dmarcian software. The fact that the agreement was
apparently terminated in response to the finding that the temporary director of DME did not
automatically comply with wishes serving  the interests  of Draegen et al and, although terminated by
February 1, 2021, was immediately implemented on January 22, 2021 by DME of the shutting down
systems is a sufficient illustration of this.

4.7.      The propositions of DME boil down to Fernandes et al., having full knowledge of the
unlawfulness of the above-described actions, have lent themselves to play an active role in this.
The interim relief judge also considers this plausible.
It has been established that Fernandes et al. came into the picture as successive (indirect) directors
in the context of Draegen's attempt as a majority shareholder in DME to put TDX aside as director of
DME. This attempt was unsuccessful because TDX turned to the Enterprise Chamber and the latter
ruled in its decision that TDX can remain as director of DME for the time being. In his email to
Harmeling dated 3 November 2020, Draegen again put forward Fernandes et al. (Vision) as
replacement (s) of TDX as director of DME. He then proceeded to terminate the agreement after it
became clear to him that his views on the legal relationship between Dmarcian and DME were not
supported amicably.
The interim relief judge deduces from all this that Fernandes et al. will be involved via Vision in the
plans of Dmarcian Inc and Draegen to put DME out of action from the summer of 2020. Furthermore,
it is clear that Fernandes et al. will be aware of the default judgment of February 1, 2021 from 3
February 2021. They also indicate that they are aware of the background to the dispute between
DME on the one hand and Dmarcian Inc and Draegen on the other.

4.8.      In addition, the following is important.
Fernandes has been employed by DME from March 2018 to January 2020. In his position there he
was responsible, among other things, for attracting new customers for DME in Europe, Africa and
Russia. His employment contract contained a confidentiality clause.  From his position at DME,
Fernandes has knowledge of DME customers, which knowledge must be considered to fall under his
duty of confidentiality.  In view of his collaboration with Van der Laan within Vision and in view of the
fact that they are currently working together for Dmarcian Inc. To serve European customers, it must
be assumed plausibly for the time being that Fernandes shared that knowledge with Van der Laan
and that Van der Laan is responsible for the origin of that knowledge.  It is also plausible that
Fernandes and Van der Laan are currently using this knowledge for their work.  The most important
indication of this can be found in the "all hands meeting" of March 1, 2021 of Dmarcian Inc. On that
occasion, Fernandes reports:  *'Hi, so we are here for a month now and I'm seeing a lot of old
customers of me. , because I see a lot of customers that have to be renewed, that kind of things. We
just started, I think a week now, selling again and contacted customers because there are troubles
with the European ex-partner. It's going well, we see not so many leads as I thought, because
normally we got 20 to 26 leads and nowadays it's 11 because I think that 50% of the leads are going
to Europe (...)* '
The interim relief judge deduces from this that Fernandes and Van der Laan have recently contacted
known European customers in connection with the renewal of the contract, as well as with new

customers to sell them a contract. It can also be deduced from this quote that Fernandes, contrary to what he stated at the hearing, actively approaches well-known customers ('*selling again and contacted customers'*).  The fact that Fernandes et al. are trying to serve (potential) European customers in this way is also evident in an e-mail dated 10 March 2021 from a customer of DME. This customer writes: '*Later I called Ton (judge: Fernandes) to request an invoice, and then it emerged that he indicated that renewals only go through the US, and no longer through the Europe division*.'
In addition, DME has made plausible that Fernandes and Van der Laan use offers with an appearance derived from DME's offers, in such a way that existing DME customers - as long as they do not study the details of the appearance of the offer - the impression is given that they are dealing with DME, whereas upon acceptance of that offer they do not renew their contract with DME but with Dmarcian Inc. to contract.
The foregoing is sufficient to consider it plausible that Fernandes and Van der Laan have since been appointed by Dmarcian Inc. as sales managers Europe make an active effort to get DME customers towards Dmarcian, using cunning tricks and misrepresentations.


4.9.      In any case, Fernandes and Van der Laan must have been aware of the fact that Dmarcian Inc. and Draegen, as the majority shareholder of DME, were bound to respect the status quo pending the investigation of the Enterprise Chamber.  That is to say, Fernandes et al must have known that Draegen, as a minority shareholder of DME and majority shareholder of Dmarcian Inc, was required to ensure that the Dmarcian Inc. was fulfilled with DME and DME could therefore continue to serve its (potential) customers in Europe. It must also have been clear to them that the non-performance of the agreement by Dmarcian Inc. from January 22, 2021, cannot be interpreted as anything other than a response to the decision of the Enterprise Chamber, directed by Draegen.  It remains open whether that decision afforded Dmarcian Inc room to terminate that agreement.  The termination as it took place was so motivated by Draegen's desire to be proved right outside of orderly channels determined by the rule of law, that it must be considered unlawful in the absence of indications to the contrary.  Furthermore, the aforementioned quotations to customers will not have been chosen without consultation with the management of Dmarcian Inc.


4.10.     Fernandes et al. have argued that Draegen no longer holds the shares in Dmarcian Inc and is no longer a director.  In view of the fact that the directorship is now exercised by Draegen's spouse, the interim relief judge considers this insufficient to warrant Draegen's involvement in Dmarcian Inc. in the absence of any explanation of the change in the shareholding. thereby refuting the wrongful rationale behind the attempts to erode DME.
The interim relief judge sees in the circumstance that (1) Fernandes and Van der Laan make use of the lawyer who acted for the Draegens during and after the termination of the agreement, (2) both Draegens are also copied in the correspondence in February and (3) that the pleading memorandum of this lawyer (especially par. 4.11-4.26) reads as if it is the   as the discourse by Draegen himself and many indications that the Draegens are still jointly at the wheel and that Fernandes and Van der Laan are not only aware of this, but also participating in the actions based on that awareness .  The positioning at the hearing illustrated the intention to continue such participation.

4.11.    The outlined state of affairs does not permit any other conclusion than that Fernandes et al. must have had sufficient insight into what actually happened: Dmarcian Inc and / or Draegen make it impossible for  DME  to serve its customers, and in this way try to destroy DME.
Continuing to use their knowledge of DME's customers in the given circumstances and attempting to remove customers from DME in the manner outlined above, qualifies as acting unlawfully against DME.

4.12.    This raises the question of whether Fernandes et al. can also be addressed in private for this. Fernandes et al. argue that they perform their work for Dmarcian Inc on the basis of an agreement between Dmarcian Inc and their personal company Vision, of which they are the (indirect) directors. It follows from settled case law of the Supreme Court  that if a company fails to fulfil an obligation or commits an unlawful act, the starting point is that the company alone is liable for damage resulting therefrom.  However, under special circumstances, in addition to the liability of that company, there is also room for liability of a director of the company.  In order to assume such liability, it is required that that director can be personally blamed for the disadvantage.

4.13.    The question is therefore whether the accusation that can be made against Fernandes et al. is sufficiently serious for the assumption of personal liability.
In answering this, the reproach itself is primarily meaningful.  This cannot be taken lightly.  The joint conscious and deliberate making of efforts and the continuation thereof, aimed at assisting the ultimate beneficial owner of a principal to erode the business of a company affiliated to him, while there are court rulings from which it follows that the latter has to refrain from this and making use of the knowledge gained by one of the two as a former employee of the associated company, qualifies as contributing to a serious form of unlawful competition.
The seriousness of this is increased if that action is carried out behind a corporate veil of which - in the absence of indications to the contrary - the primary aim in relation to this action must be considered for the time being: to prevent the persons acting from being effectively accountable for the harmful consequences thereof.
The interim relief judge also attaches weight to the fact that Vision's independent identity in relation to the conduct alleged against Fernandes et al. has remained completely unclear.  The agreement on the basis of which the work is performed has not been brought into question.
Nor have any facts been presented from which it can follow that Vision is developing activities that are independent of the execution of the agreement with Dmarcian.  What are the further business activities?  Do they have an office?  Is there a history?  Are staff employed?  There is nothing to indicate that there are others working within Vision than Fernandes and Van der Laan.

In addition, Fernandes and Van der Laan as natural persons and with mentioning of name and telephone number and photo, are listed on the website of Dmarcian Inc. without mentioning anything about Vision.  Fernandes and Van der Laan also present themselves as natural persons working for Dmarcian Inc. in their contacts with customers.
Under these circumstances, the interim relief judge considers the actions accused of Fernandes et al. to be sufficient for the judgment that they can also be personally blamed seriously.

4.14.    Fernandes et al. argue that a balance of mutual interests means that the claims of DME cannot be allowed. Fernandes et al argue that they are dependent on Dmarcian's order to provide for their income.  If DME wants to fight for its legal position against Dmarcian Inc. and believes that Fernandes et al. stand in the way of this, they must wage that fight against the right counterparty and in the right arena, not before the Dutch interim relief judge, against Fernandes and Van der Laan.

4.15.    The interim relief judge does not follow Fernandes et al.  The actions of Dmarcian Inc. and Draegen implies that DME's business has actually been paralyzed.  DME cannot be accepted due to the refusal of Dmarcian Inc. In order to give it access to the Dmarcian systems, it no longer serves its customers while it must patiently watch as these customers are recruited by Dmarcian Inc.  This while there is a judgment against Dmarcian Inc. and Draegen to at least provisionally respect the agreement.  The provisional director of DME explained that the actions of Dmarcian Inc. and Draegen makes the situation precarious.  According to their position at the hearing, Fernandes and Van der Laan choose to continue their involvement in the full awareness of the unlawfulness of the actions of their client (s).  They will therefore have to accept the consequences of that choice.

4.16.    Because no independent defenses have been put forward against the various parts of the claims as filed by DME, they will be awarded in the manner stated below.

4.17.    Because it is assumed that the position of Fernandes et al. is guided and stimulated by Dmarcian, the interim relief judge ignores the protest against the amount of the claimed penalties to the extent that they will be kept at a considerable height. They will, however, be limited to a maximum.

4.18.    Fernandes et al will be ordered to pay the costs of the proceedings as the unsuccessful party. The costs on the part of DME are estimated at:

| | | | |
|---|---|---|---|
| - | service of notice | € | 87.61 |
| - | court fee | € | 667.00 |
| - | lawyer's salary | € | 1,016.00 |
| | | | |
| Total | | € | 1,770.61 |

**5. The decision**

is included in the accelerated judgment of April 23, 2021.

This supplement had been rendered *Mr*. A.H. Schotman and issued on May 7, 2021

[signature]                              [signature]


[stamp]

ISSUED AS A TRUE BAILIFF'S COPY
the Registrar

# vonnis

---

**RECHTBANK NOORD-HOLLAND**

Handel, Kanton en Insolventie
Zittingsplaats Haarlem

zaaknummer / rolnummer: C/15/314124 / KG ZA 21-124

**Aanvulling van het vonnis in kort geding van 23 april 2021**
(datum aanvulling: 7 mei 2021)

in de zaak van

de besloten vennootschap met beperkte aansprakelijkheid
**DMARCIAN EUROPE B.V.**,
gevestigd te Dordrecht,
eiseres,
advocaat mr. A.P. Meijboom te Amsterdam,

tegen

1.      **ANTON ALFRED FERNANDES**,
wonende te Oud-Beijerland,
2.      **BERNARD PIETER VAN DER LAAN**,
wonende te Zwanenburg,
gedaagden,
advocaat mr. T.S. Jansen te Amsterdam.

Partijen zullen hierna DME en Fernandes c.s. genoemd worden.

**1.      De procedure**

1.1.      Het verloop van de procedure blijkt uit:
- de dagvaarding;
- de akte houdende producties van DME met de producties E1-33;
- de akte overlegging producties van Fernandes c.s. met de producties G1-10;
- de brief van mr. Meijboom van 15 april 2021 met als bijlagen de producties E34-41;
- de e-mail van mr. Meijboom van 15 april 2021 met als bijlage met productie E42;
- de mondelinge behandeling
- de pleitnota van DME
- de pleitnota van Fernandes c.s..

1.2.      Ten slotte is vonnis bepaald.
In verband met de spoedeisendheid van de zaak is op 23 april 2021 een zogenaamd kop-staartvonnis gewezen. Het onderstaande vormt hiervan de nadere schriftelijke uitwerking (opgemaakt: 7 mei 2021). Beide stukken laten zich samen lezen als een volledig vonnis in kort geding.

**2.      De feiten**

2.1.      DME is een in 2013 opgerichte vennootschap, oorspronkelijk met de naam
Mailmerk B.V. The Digital Xpedition Holding B.V. (hierna: TDX) is enig aandeelhouder en
bestuurder van DME

2.2.      Dmarcian Inc is een Amerikaanse vennootschap waarvan Tim Draegen (hierna:
Draegen) tot voor kort enig aandeelhouder was. Op dit moment is Shannon Draegen,
echtgenote van Tim Draegen, CEO en bestuurder van Dmarcian Inc.

2.3.      Beide vennootschappen drijven een onderneming die zich bezighoudt met het
leveren van producten en diensten op het gebied van identiteitsbeveiliging van e-
mailadressen. DME maakt daarbij gebruik van software die afkomstig is van Dmarcian Inc.
Tevens doet DME aan product- en softwareontwikkeling, onder meer via Dmarcian
Bulgaria EOOD (hierna: Dmarcian Bulgaria), een Bulgaarse vennootschap waarin DME alle
aandelen houdt.

2.4.      DME en Dmarcian Inc. hebben in januari 2016 een mondelinge overeenkomst
gesloten met betrekking tot het gebruik en de distributie van de Dmarcian software. Op
grond van deze overeenkomst ontving DME een licentie voor het distribueren en licentieren
van de Dmarcian software in Europa, Rusland en Afrika. In ruil daarvoor ontving Dmarcian
Inc dan wel haar toenmalig enige aandeelhouder Draegen, een optierecht op een
meerderheidsbelang in DME.

2.5.      In de praktijk maken Dmarcian Inc. en DME gezamenlijk gebruik van de website
dmarcian.com. Potentiële klanten worden via deze site doorgeleid naar DME indien de klant
uit Europa, Afrika of Rusland komt en andere klanten worden naar Dmarcian Inc
doorgeleid.

2.6.      In juli 2018 heeft Draegen zijn optierecht uitgeoefend en daardoor 50,01% van de
aandelen DME verkregen.

2.7.      DME heeft in 2019, mede door inspanningen van Dmarcian Bulgaria, de Dmarcian
software aangepast en uitgebreid. Sinds november 2019 is alleen nog deze versie van de
software te verkrijgen.

2.8.      In verband met een aandeelhoudersvergadering van DME in 2019 heeft TDX aan
Draegen de bij die gelegenheid te bespreken onderwerpen gezonden, waaronder het voorstel
om te spreken over een auteursrechtlicentie voor Dmarcian Inc voor de nieuwste versie van
de software. Draegen heeft in dit verband voorgesteld dat DME haar deel van het
gemeenschappelijk auteursrecht op de software aan Dmarcian Inc zou overdragen.
Aangezien TDX dit weigerde heeft Dmarcian Inc. op 6 december 2019 de toegang voor
DME tot de gemeenschappelijke systemen geblokkeerd. Deze blokkade is na 48 uur
opgeheven.

2.9.      Fernandes is tot en met 31 december 2019 in dienst van DME geweest als Senior
Business Development Manager Europe. In die hoedanigheid was hij belast met het
aantrekken van nieuwe klanten voor DME in Europa. In zijn arbeidsovereenkomst is een
geheimhoudingsbeding opgenomen.

Case 1:21-cv-00067-MR   Document 35-4   Filed 05/07/21   Page 19 of 33

2.10.    Fernandes en Van der Laan hebben samen op 16 juni 2020 Vision Management
Europe B.V. (hierna: Vision) opgericht, van welke vennootschap zij (indirect) bestuurder en
aandeelhouder zijn.

2.11.    Draegen heeft bij e-mail van 3 juli 2020 verzocht een aandeelhoudersvergadering
van DME bijeen te roepen, met op de agenda het voorstel TDX als bestuurder te ontslaan en
Vision als zodanig te benoemen.

2.12.    De aandeelhoudersvergadering van DME stond gepland op 13 augustus 2020.
Naar aanleiding van het voorgaande is TDX tegen DME een enquête-procedure gestart bij
de Ondernemingskamer van het Gerechtshof Amsterdam. In verband hiermee is de
aandeelhoudersvergadering verplaatst naar 7 september 2020. Draegen heeft zich als
belanghebbende in deze procedure gevoegd.

2.13.    In de daarop volgende beschikking van de Ondernemingskamer van 7 september
2020 is onder meer het volgende overwogen:

*'2.5 TDX en Draegen twisten over de afspraken die in 2016 aan de samenwerking tussen
dmarcian Europe en dmarcian, Inc./ Draegen ten grondslag zijn gelegd. Volgens TDX
hebben dmarcian Europe, dmarcian, Inc., TDX en Draegen op 22 januari 2016 een
mondelinge overeenkomst gesloten waarop hun samenwerking is gebaseerd. Volgens
Draegen hebben partijen de in december 2016 gevoerde e-mailcorrespondentie tussen hem
en Groeneweg over het formaliseren van hun samenwerking, waarbij Draegen documenten
ter ondertekening heeft toegestuurd (die niet zijn ondertekend), altijd beschouwd als de
basis van hun samenwerking. In ieder geval staat tussen partijen vast dat zij in 2016 ten
minste zijn overeengekomen:*

*- dat dmarcian Europe een licentie heeft voor het gebruik en de verkoop van software
afkomstig van dmarcian, Inc.;*

*- dat dmarcian Europe verantwoordelijk is voor de verkoop van die software (en het leveren
van bijbehorende diensten) aan klanten in Europa, Rusland en Afrika;*

*- dat dmarcian, Inc. en/of Draegen in ruil daarvoor het meerderheidsaandelenbelang in
dmarcian Europe heeft kunnen kopen tegen betaling van € 1.*

*(...)*

*3.4 De Ondernemingskamer overweegt als volgt. De controverse over de intellectuele
eigendomsrechten op de door dmarcian Europe (en dmarcian Bulgaria) ontwikkelde
software(applicaties) vormt de kern van het geschil tussen partijen. TDX stelt dat deze
software(applicaties) los staat/staan van de door dmarcian, Inc. ontwikkelde software,
zodanig dat de intellectuele eigendom daarvan aan dmarcian Europe toekomt. Aan het
mogen gebruiken en verkopen van deze software(applicaties) door dmarcian, Inc. dient een
door dmarcian Europe te verlenen licentie ten grondslag te liggen, aldus TDX.
Daartegenover stelt Draegen dat de door dmarcian Europe (en dmarcian Bulgaria)
ontwikkelde software niet meer omvat dan aanvullende features voor verbeterd gebruik van
de van dmarcian, Inc. afkomstige software, zodat de intellectuele eigendom daarvan*

_eveneens bij dmarcian, Inc. berust. De Ondernemingskamer stelt voorop dat voor de
juridische beoordeling van dat geschil slechts de gewone burgerlijke rechter bevoegd is.
Wel kan de Ondernemingskamer constateren dat dit geschil ontwrichtend is voor de
onderneming van dmarcian Europe; het ontwikkelen en verkopen van software is haar core
business en de samenwerking met dmarcian, Inc. is daarvoor een noodzakelijke
voorwaarde. Desondanks is deze samenwerking noch in het algemeen, noch ter zake van de
intellectuele eigendomsrechten op ontwikkelde en te ontwikkelen software(applicaties) en
(de reikwijdte van) de in verband daarmee verleende/te verlenen licenties in het bijzonder,
door partijen voldoende geregeld. Hierover zijn geen eenduidig vastgelegde afspraken
voorhanden, met als gevolg dat de samenwerking op het spel is komen te staan door de
huidige discussie daarover, hetgeen een serieuze belemmering vormt voor de
bedrijfsvoering van dmarcian Europe. Naar het oordeel van de Ondernemingskamer levert
het bestaan van voornoemde situatie voldoende gegronde redenen op om te twijfelen aan
een juist beleid en een juiste gang van zaken van dmarcian Europe. De Ondernemingskamer
zal, gelijk door zowel TDX als Draegen is verzocht, een onderzoek gelasten naar het beleid
en de gang van zaken van dmarcian Europe, en wel vanaf 1 januari 2016 tot 20 augustus
2020.'_

2.14.    Bij beschikking van 10 september 2020 heeft de Ondernemingskamer mr. H.J.M.
Harmeling (hierna: Harmeling) aangewezen als bestuurder van DME.

2.15.    Op 14 september 2020 heeft Dmarcian Inc. de toegang van DME tot haar systemen
opnieuw geblokkeerd. Uiteindelijk is na enkele dagen de toegang tot de meest essentiële
systemen hersteld.

2.16.    In een e-mail van 3 november 2020 schrijft Draegen onder meer het volgende aan
Harmeling:

_'(...) I'd like to introduce you to Ton (vzr: Fernandes) and Ben (vzr: Van der Laan), the
principles of Vision Management._

_(...)_
_I'm hoping that you three (or at least Ton and Hub (vzr: Harmeling)) can connect to talk
about how the BV (vzr: DME) could benefit from real growth planning, business process
development (...), and a go-market-strategy that takes into consideration how different EU
countries are looking to make DMARC mandatory._
_(...)'_

2.17.    Bij brief van 22 januari 2021 heeft Dmarcian Inc aan DME bericht dat zij de
samenwerking met DME per 1 februari 2021 wenst te beëindigen en zij DME vanaf die
datum geen toegang meer verschaft tot haar systemen tenzij DME haar auteursrecht op de
nieuwe software aan Dmarcian Inc overdraagt in ruil voor een licentie op grond waarvan zij
80% van haar inkomsten aan Dmarcian Inc afstaat.

2.18.    Op 22 januari 2021 heeft Dmarcian Inc de toegang van DME tot haar systemen
opnieuw geblokkeerd. Als gevolg hiervan heeft DME geen toegang meer tot de gegevens
van het overgrote deel van haar klanten en kan zij vragen van klanten om verlenging of
vernieuwing van de licentie niet beantwoorden

2.19.    In verband met genoemde blokkade heeft DME Dmarcian Inc en Draegen in kort geding gedagvaard. Bij verstekvonnis van 1 februari 2021 zijn de vorderingen van DME toegewezen. In het vonnis staat onder meer het volgende:

*'3.De beslissing*

*De voorzieningenrechter:*

*3.1. verleent verstek tegen de niet verschenen gedaagden;*

*3.2. gebiedt dmarcian Inc., bij wijze van ordemaatregel, gedurende het door de Ondernemingskamer gelaste onderzoek de tussen partijen bestaande overeenkomst na te komen en verbiedt haar gedurende die periode die overeenkomst te beëindigen;*

*3.3. gebiedt dmarcian Inc. binnen 24 uur na betekening van dit vonnis de blokkade van (de medewerkers van) dmarcian Europe tot het SaaS-platform en de voor de uitoefening van haar bedrijfsactiviteiten vereiste (computer)systemen op te heffen en opgeheven te houden totdat de tussen partijen bestaande overeenkomst rechtsgeldig is beëindigd;*

*3.4. veroordeelt dmarcian Inc. om aan dmarcian Europe een dwangsom te betalen van € 20.000,00 voor iedere dag of gedeelte daarvan dat zij niet aan de in dictumonderdeel 3.2 en 3.3. gegeven hoofdveroordeling voldoet, tot een maximum van € 500.000,00 is bereikt;*

*3.5. veroordeelt Draegen zich te onthouden van iedere handeling zelf of via een door hem bestuurde vennootschap waaronder expliciet begrepen dmarcian Inc., die de bedrijfsvoering van dmarcian Europe belemmert, totdat dan wel als gevolg van het door de Ondernemingskamer gelaste onderzoek, dan wel als gevolg van een gerechtelijk bodemvonnis, duidelijkheid ontstaat over de inhoud en reikwijdte van de aan dmarcian Europe verstrekte licentieovereenkomst en de eigendom van de IE- rechten op de dmarcian software;*

*3.6. veroordeelt Draegen om aan dmarcian Europe een dwangsom te betalen van € 20.000,00 voor iedere dag of gedeelte daarvan dat hij niet aan de in dictumonderdeel 3.4 gegeven hoofdveroordeling voldoet, tot een maximum van € 500.000,00 is bereikt;*

*3.7. veroordeelt dmarcian Inc. en Draegen , hoofdelijk, in de proceskosten, aan de zijde van dmarcian Europe tot op heden begroot op € 1.408,81, te vermeerderen met de wettelijke rente als bedoeld in art. 6:119 BW over dit bedrag met ingang van veertien dagen na betekening van dit vonnis tot de dag van volledige betaling;*

*3.8. veroordeelt dmarcian Inc. en Draegen , hoofdelijk, in de na dit vonnis ontstane kosten, begroot op € 163,00 aan salaris advocaat, te vermeerderen, onder de voorwaarde dat dmarcian Inc. en Draegen niet binnen 14 dagen na aanschrijving aan het vonnis hebben voldaan en er vervolgens betekening van de uitspraak heeft plaatsgevonden, met een bedrag van € 85,00 aan salaris advocaat en de exploitkosten van betekening van de uitspraak, en te vermeerderen met de wettelijke rente als bedoeld in art. 6:119 BW over de nakosten met ingang van veertien dagen na de betekening van dit vonnis tot aan de voldoening;*

*3.9. verklaart dit vonnis tot zover uitvoerbaar bij voorraad;*

Case 1:21-cv-00067-MR   Document 35-4   Filed 05/07/21   Page 22 of 33

*3.10. wijst het meer of anders gevorderde af.*

2.20.     Het verstekvonnis is aan Dmarcian Inc en Draegen betekend. Zij zijn daar tegen in
verzet gekomen.


2.21.     Dmarcian Inc heeft Fernandes en Van der Laan in januari 2021 aangesteld als sales
managers voor Europa. Op 2 februari 2021 worden Van der Laan en Fernandes op de
website van Dmarcian.com vermeld als 'Sales-Europe'.

2.22.     Bij brief van 3 februari 2021 heeft de advocaat van DME het volgende aan
Fernandes en Van der Laan geschreven:

*'(...)*
*You are also undoubtably aware of the fact that a dispute between Mr. Tim Draegen, CEO*
*of dmarcian Inc and shareholder of dmarcian Europe (...), resulted in dmarcian Inc.*
*blocking dmarcian Europe's access to its commercial data on 6 December 2019, 14*
*September 2020 and 22 January 2021. (...) Directly following the last blockade, dmarcian*
*Inc. misappropriated dmarcian Europe's customers and leads listings and financial*
*information, contacted customers and prospects of dmarcian Europe, and appointing you as*
*Sales representatives for Europe. (...)*

*I trust that you are also aware that the Enterprise Court at the Amsterdam Court of Appeal*
*(...), on request of both shareholders of dmarcian Europe (...) ordered an investigation into*
*dmarcian Europe's past governance, and decided that a director, investigator and*
*custodian of dmarcian Europe's shares would be appointed (...).*

*The intervention of the Enterprise Court was the direct consequence of Mr. Draegen's*
*attempt to replace TDX as director of Dmarcian BV by Vision Management Europe B.V.*
*(i.e. replace Messrs Groeneweg and Kalkman by the two of you) and take dmarcian*
*Europe's intellectual property rights. The Enterprise Court put a stop to Mr. Draegen's*
*plan.*

*(...)*

*In its decision of the 1 February the preliminary relief judge (...) of the court of Rotterdam*
*ordered dmarcian Inc. under pain of a penalty (...) to comply with the agreement between*
*dmarcian Inc. and dmarcian Europe and prohibited dmarcian Inc. form terminating that*
*agreement during the investigation ordered by the Enterprise Court. Draegen was ordered*
*(...) to refrain from any action undertaken by himself or through a company managed by*
*him, such as dmarcian Inc., which impedes the business operations of dmarcian Europe,*
*until or as a result of the investigation ordered by the Enterprise Court, or as a result of a*
*judgment on the merits, clarity has been created about the contents and scope of the license*
*agreement granted to dmarcian Europe and the ownership of the IP rights of the dmarcian*
*software. The decision has been served on dmarcian Inc. and Draegen and has direct effect,*
*even if dmarcian Inc and/or Draegen would appeal. I attach a copy of the decision.*

*Consequently, the Rotterdam court ordered dmarcian Inc. and Draegen to immediately respect and comply with dmarcian Europe's exclusive distributorship of Europe, Africa and Russia, and to restore dmarcian Europe's access to the computer systems which were blocked by dmarcian Inc. In this respect, employees, contractors and others working for or on behalf of dmarcian Inc. and/or on instruction of Draegen, and/or other companies he manages, are also bound by the decision. This include the both of you as well as Vision (...)*

*Therefore, I hereby request you in person as well as your companies to immediately*

*(a) refrain from acting as sales representative for Europe, Africa and/or Russia for dmarcian Inc. and/or another entity managed by Draegen and/or Draegen himself; and*

*(b) refrain from contracting any individual and/or company in Europe, Africa and/or Russia in connection with dmarcian software and/or services; and*

*(c) forward any request from an individual and/or company in Europe, Africa and/or Russia in connection with dmarcian software and/or services which you directly or indirectly receive from dmarcian Inc. and/or another entity managed by Draegen and/or Draegen himself to dmarcian Europe at sales@dmarcian-europe.com without comment and without replying the requester; and*

*(d) request dmarcian Inc. to immediately remove your title 'Sales – Europe' from dmarcian's website and other dmarcian Inc. digital and tangible materials, and not replace them with any other indication which suggests that either of you have responsibilities in connection to dmarcian software and/or services in Europe, Africa and/or Russia.*

*All such acts at least as long as the preliminary relief order of 1 February 2021 is in force. (...)'*

2.23.    Per 5 februari 2021 is de aanduiding bij Fernandes en Van der Laan op de website van Dmarcian Inc. gewijzigd in 'Sales'.

2.24.    Op 1 maart 2021 heeft binnen Dmarcian Inc. een zogenaamde 'All Hands meeting' plaatsgevonden waarin Fernandes en Van der Laan aan het woord komen. Voor zover relevant wordt bij deze gelegenheid het volgende gezegd:

*'Shannon Draegen: 'We've had Ton and Ben join us and working under the US but representing the EU that really, really know the market and they will take that on and they will influence what needs to be kind of delivered to that market'*
*(...)*
*Fernandes: 'Hi, so we are here for a month now and I'm seeing a lot of old customers of me, because I see a lot of customers that have to be renewed, that kind of things. We just started, I think a week now, selling again and contacted customers because there are troubles with the European ex-partner. It's going well, we see not so many leads as I thought, because normally we got 20 to 26 leads and nowadays it's 11 because I think that 50% of the leads are going to Europe but yeah, I had my first sales today. So a Plus via a new partner that I made (...) We have some troubles with Europe of course that we have to address. But we like it and I'm sure that we get a lot of customers in this way.*
*(...)*

_Van der Laan: From a European point of view as a few days ago you suggested to Ton and me to pick up a number of the advisor cases for Europe which we're now doing, but am I correct that the US advisors now don't pick up any EU leads anymore or because the last few days I see a lot of them unassigned. And I just want to know if they're waiting for Ton and me, all of them, or that we can share a little?_
_(…)'_

2.25.    In een e-mail van 10 maart 2021 schrijft een klant van DME aan DME het volgende:

'_Later heb ik Ton gebeld om een faktuur op te vragen, en toen kwam er naar voren dat hij aangaf dat renewals alleen via de US lopen, en niet meer via de divisie Europa._'

2.26.    Dmarcian Inc. heeft offertes aan Europese relaties gestuurd die sterke gelijkenis vertonen met de door DME gebruikte offertes en die afwijken van de gebruikelijke Dmarcian Inc. Ogffertes. Op de door Dmarcian Inc aan een Europese relatie gestuurde offerte staat het e-mailadres 'ton@damarcian.com' vermeld bij de contactgegevens van Dmarcian.

## 3.      Het geschil

3.1.    DME vordert '_bij vonnis, voor zover mogelijk uitvoerbaar bij voorraad:_

1.   _gedaagden sub 1 en sub 2, ieder afzonderlijk, zolang de door de Ondernemingskamer bij beschikking van 7 september 2020 benoemde bestuurder van dmarcian Europe in functie is en het onderzoek van de door de Ondernemingskamer op 29 januari 2021 benoemde onderzoeker niet is afgerond, dan wel zolang er een bodemprocedure tussen dmarcian Inc. en dmarcian Europe loopt:_

(a)   _te verbieden om dmarcian Inc., een ander bedrijf dat wordt bestuurd door Timothy Draegen, een ander bedrijf waarin Timothy Draegen beslissende zeggenschap en/of een meerderheidsbelang heeft en/of Timothy Draegen zelf, in Europa, Afrika, en Rusland direct of indirect te vertegenwoordigen in verband met software en/of diensten van dmarcian Inc., ongeacht op welke juridische titel dan wel in opdracht van welke rechtspersoon zij dit doen;_

(b)   _te verbieden om met natuurlijke personen of rechtspersonen in Europa, Afrika en Rusland direct of indirect in contact te treden via e-mail, videoconference, briefwisseling, fysiek bezoek, of anderszins, in verband met software en/of diensten van dmarcian Inc., ongeacht op welke juridische titel dan wel in opdracht van welke rechtspersoon zij dit doen;_

(c)   _te gebieden om ieder verzoek in verband met software en/of diensten van dmarcian Inc., van natuurlijke personen of rechtspersonen uit Europa, Afrika en Rusland dat de desbetreffende gedaagde direct of indirect ontvangt van of via dmarcian Inc.,een ander bedrijf dat wordt bestuurd, een ander bedrijf waarin Timothy Draegen beslissende zeggenschap heeft en/of Timothy Draegen zelf, zonder commentaar en/of antwoorden/of antwoord aan de verzender van het desbetreffende verzoek_

---

*door te sturen aan eiseres op het e-mailadres sales@dmarcian-europe.com of een
door dmarcian Europe op te geven ander e-mailadres;*

(d) *te gebieden binnen vijf dagen na betekening van het te dezen te wijzen vonnis
schriftelijk aan dmarcian Europe via haar advocaat- mr. A.P. Meijboom van
Kennedy van der Laan, Molenwerf 16, 1014 BG Amsterdam met e-mailadres
alfred.meijboom@kvdl.com – onder gelijktijdige overlegging van relevante kopieen
van correspondentie, offertes, facturen en licentieovereenkomsten, opgave te doen
van de namen, adressen en contactgegevens van alle natuurlijke personen of
rechtspersonen uit Europa, Afrika en Rusland met wie zij vanaf 22 januari 2021
contact hebben of hebben gehad ter zake van gebruik van dmarcian software,
waaronder de aanschaf, verlenging en vernieuwing van bedoelde software;*

(e) *te verbieden om inbreuk te maken op het auteursrecht van dmarcian Europe, onder
meer door gebruik te maken van offertes en ander zakelijke documentatie waarvan
het ontwerp is ontleend aan het ontwerp van soortgelijke documenten van dmarcian
Europe;*

(f) *te gebieden om aan de CEO van dmarcian Inc., thans zijnde mevrouw Shannon
Draegen, binnen 24 uur na betekening van het te dezen te wijzen vonnis een door
hen ondertekende brief, dan wel e-mail aan het directe e-mailadres van de CEO van
dmarcian Inc., te sturen met de volgende tekst in een standaard opmaak in
lettertype Times Roman, pitch 12 (dan wel een in leesbaarheid en grootte
vergelijkbaar lettertype), zonder toevoegen of weglatingen:*

> *'Dear Mrs. Draegen,*
>
> *In its preliminary decision of [datum] 2021, the preliminary relief judge
> of the court of North-Holland, location Haarlem ('voorzieningenrechter
> in de Rechtbank Noord-Holland, locatie Haarlem') ordered me to directly
> and indirectly refrain from any activities with respect to dmarcian
> software and services in Europe, Africa and the Russian Federation under
> pain of a penalty.*
>
> *Consequently, I hereby request dmarcian Inc. to immediately relieve me
> from any duties that may violate such court decision and to amend my title
> 'sales' https://dmarcian.com/meet-our-team and/or any other location(s)
> on dmarcian Inc.'s website, as well as on other promotional materials,
> including business cards, by adding to the current term 'sales' 'by order
> of the preliminary relief judge of the court of North-Holland, location
> Haarlem of [datum], the Netherlands, [naam van betreffende gedaagde]
> may not be active in Europe, Africa and the Russian Federation'.*
>
> *I also request you to instruct your staff to no longer to provide contact in
> Europe, Africa and the Russian Federation my name as contact person.*
>
> *Sincerely yours,*

*[gevolgd door de volledige naam en het adres van de desbetreffende gedaagde].*

*dan wel een tekst door de voorzieningenrechter in goede justitie te bepalen; en een afschrift van dit bericht gelijktijdig middels een blind carbon copy (bcc) te versturen aan de advocaat van dmarcian Europe op het e-mailadres alfred.meijboom@kvdl.com;*

*2.    gedaagden sub 1 en sub 2, ieder afzonderlijk, te veroordelen tot betaling van een dwangsom van EUR 50.000 per dag dat zij niet, of niet volledig voldoen aan een of meer van de verboden en geboden van het onder 1 gevorderde.*

*3.    gedaagden sub 1 en sub 2 hoofdelijk te veroordelen in de proceskosten en de nakosten, alle kosten te vermeerderen met wettelijke rente vanaf de datum van het vonnis tot aan de dag der algehele voldoening.'*

3.2.    DME legt aan haar vorderingen primair onder meer ten grondslag dat Fernandes c.s. onrechtmatig handelen jegens haar danwel dat zij profiteren van de door Dmarcian Inc. jegens DME gepleegde wanprestatie en het onrechtmatig handelen van Draegen en Dmarcian Inc. DME betoogt onder meer dat Fernandes c.s. op de hoogte zijn van de afspraken tussen DME en Dmarcian Inc. met betrekking tot het aan DME verleende exclusieve recht om Dmarcian software in Europa, Afrika en Rusland te verkopen en de klanten aldaar te bedienen. Daarnaast zijn zij bekend met de inhoud van het vonnis van de voorzieningenrechter in Rotterdam én van het feit dat Draegen en Dmarcian Inc. de inhoud van dit vonnis negeren. Desondanks blijven zij voor Dmarcian Inc. actief als sales managers in Europa en benaderen zij in die hoedanigheid klanten van DME. Daarmee handelen Fernandes c.s. zelf onrechtmatig dan wel profiteren van het onrechtmatig handelen van Dmarcian Inc., aldus DME. DME stelt zich bovendien op het standpunt dat als Fernandes c.s. voor Dmarcian Inc. werkzaam zijn via hun vennootschap Vision, hen als bestuurders persoonlijk een ernstig verwijt kan worden gemaakt.
Subsidiair verzoekt DME de vorderingen bij wijze van ordemaatregel toe te wijzen, tenminste voor de duur van het door de ondernemingskamer onderzoek en totdat de door de ondernemingskamer aangestelde bestuurder zich een oordeel heeft kunnen vormen over de eigendomssituatie met betrekking tot het auteursrecht op de nieuw ontwikkelde software.

3.3.    Fernandes c.s. voeren verweer.

3.4.    Op de stellingen van partijen wordt hierna, voor zover van belang, nader ingegaan.

**4.    De beoordeling**

4.1.    Fernandes c.s. voeren als prealabel verweer aan dat DME niet in haar vorderingen kan worden ontvangen omdat een rechtsgrond ontbreekt op basis waarvan DME Fernandes c.s. in privé kan aanspreken. Zij betogen dat DME met haar vorderingen jegens hen eraan voorbij gaat dat zij haar werkzaamheden voor Dmarcian Inc. uitvoeren op basis van een 'consulting agreement' die Vision, waarvan Fernandes en Van der Laan indirect bestuurders zijn, met Dmarcian Inc. heeft gesloten. Er is, zo betogen Fernandes c.s., dus geen rechtsverhouding tussen hen in privé en Dmarcian Inc. DME had Vision moeten aanspreken

omdat de gedragingen die volgens DME onrechtmatig zijn, dan wel wanprestatie opleveren,
rechtens handelingen van Vision zijn.

4.2.      De voorzieningenrechter overweegt het volgende.
De door DME tegen Fernandes c.s. ingestelde vorderingen zijn erop gericht een voorlopige
voorziening te verkrijgen. In de stellingen ligt besloten dat zij zich in hun hoedanigheid van
indirect bestuurders van Vision zodanig hebben gedragen, en dat de rechtspersoonlijkheid
van Vision feitelijk zo weinig om het lijf heeft, dat privé aansprakelijkheid voor het
verweten handelen passend en geboden is.
Of DME zich met haar vorderingen terecht tegen Fernandes en Van der Laan heeft gericht
vergt aldus een inhoudelijke beoordeling van de zaak. Die zal hierna volgen.

4.3.      Fernandes c.s. voeren aan dat zij hun activiteiten voor Dmarcian Inc. in februari
2021 zijn aangevangen. Daarmee staan zij volledig buiten het geschil dat DME en Dmarcian
Inc. hebben. Dat zij kennis dragen van de inhoud van de bij verstek gegeven veroordeling
van 1 februari 2021 maakt dat niet anders. Daar komt bij dat tegen dat verstekvonnis
inmiddels verzet is aangetekend zodat de behandeling van dat kort geding is heropend.
Het is, volgens Fernandes c.s., bij die stand van zaken geen gegeven dat Dmarcian Inc.
gehouden is dat vonnis na te komen.
Daarnaast betogen zij dat Dmarcian Inc. de samenwerking met DME bij brief van 22 januari
2021 heeft beëindigd. Dit brengt mee dat er tussen Dmarcian Inc. en DME geen
rechtsverhouding meer bestaat en om die reden Dmarcian Inc. geen wanprestatie jegens
DME kan plegen, laat staan dat Fernandes c.s. daarvan kunnen profiteren.
Ten slotte staat een afweging van de belangen aan toewijzing van de vorderingen in de weg,
zo betogen Fernandes c.s.

4.4.      Bij de beoordeling van een en ander dient vooropgesteld te worden dat de
Ondernemingskamer bij beschikking van 7 september 2020 heeft vastgesteld dat onderdeel
van de overeenkomst tussen Dmarcian Inc en DME ten minste is dat DME een licentie heeft
voor het gebruik en de verkoop van software afkomstig van Dmarcian Inc en dat zij
verantwoordelijk is voor de verkoop van die software in Europa, Afrika en Rusland.
Inmiddels heeft de voorzieningenrechter in de rechtbank Rotterdam in het verstekvonnis van
1 februari 2021 Dmarcian Inc bij wijze van ordemaatregel veroordeeld die overeenkomst na
te komen. De omstandigheid dat Dmarcian Inc en Draegen daartegen in verzet zijn gekomen
laat onverlet dat zij gehouden zijn het vonnis na te komen. Het vonnis is immers
uitvoerbaar bij voorraad verklaard en het verzet heeft geen schorsende werking.

4.5.      DME heeft onbetwist gesteld dat Dmarcian Inc en Draegen de overeenkomst met
DME niet langer nakomen. In de praktijk brengt dit mee dat de werknemers van DME geen
(volledige) toegang meer hebben tot de klantsystemen en daardoor in sterke mate worden
gehinderd in de wijze waarop zij Europese, Afrikaanse en Russische klanten kunnen
bedienen. Fernandes c.s. hebben ter zitting erkend dat zij Europese klanten bedienen voor
Dmarcian Inc., in die zin dat zij, als klanten bij hen terechtkomen, daarop reageren. Dat
impliceert dat Europese klanten op dit moment dus niet worden doorgeleid naar DME.
Naar het oordeel van de voorzieningenrechter is het voorgaande voldoende grond om aan te
nemen dat Dmarcian Inc en Draegen onrechtmatig jegens DME handelen.
Daarmee is nog niet gezegd dat ook Fernandes c.s. onrechtmatig handelen jegens DME. De
voorzieningenrechter overweegt daaromtrent het volgende.

4.6. De voorzieningenrechter acht aannemelijk dat het handelen van Dmarcian Inc en Draegen is ingegeven door de wens om DME volledig buiten spel te zetten en op die manier het auteursrecht op de nieuwste versie van de Dmarcian software in handen te krijgen. De omstandigheid dat de overeenkomst klaarblijkelijk is opgezegd in reactie op de vaststelling dat de tijdelijk bestuurder van DME de oren niet liet hangen naar de wensen van Draegen c.s en, hoewel opgezegd tegen 1 februari 2021, op 22 januari 2021 onmiddellijk is doorgevoerd door DME van de systemen af te sluiten, is daarvan afdoende illustratie.

4.7. De stellingen van DME komen erop neer Fernandes c.s. met volledige wetenschap van het onrechtmatige van het hiervoor omschreven handelen zich ertoe hebben geleend om daarbij een actieve rol te spelen.
De voorzieningenrechter acht ook dat aannemelijk.
Vast staat dat Fernandes c.s. als opvolgend (indirect) bestuurders in beeld zijn gekomen in het kader van de poging van Draegen als meerderheidsaandeelhouder in DME om TDX als bestuurder van DME aan de kant te schuiven. Deze poging is op niets uitgelopen omdat TDX zich tot de Ondernemingskamer heeft gewend en deze in haar beschikking heeft geoordeeld dat TDX voorlopig als bestuurder van DME kan aanblijven.
Draegen heeft in zijn e-mail aan Harmeling van 3 november 2020 Fernandes c.s. (Vision) opnieuw als vervanger(s) van TDX als bestuurder van DME naar voren geschoven. Hij is vervolgens overgegaan tot opzegging van de overeenkomst nadat hem duidelijk werd dat hij langs minnelijke weg geen bijval kreeg op zijn visie op de rechtsverhouding tussen Dmarcian en DME.
Uit een en ander leidt de voorzieningenrechter af dat Fernandes c.s. via Vision vanaf de zomer van 2020 betrokken zijn bij de plannen van Dmarcian Inc en Draegen om DME buiten spel te zetten. Verder is duidelijk dat Fernandes c.s. vanaf 3 februari 2021 op de hoogte zijn van het verstekvonnis van 1 februari 2021. Zij geven er bovendien blijk van op de hoogte te zijn van de achtergrond van het geschil tussen DME enerzijds en Dmarcian Inc en Draegen anderzijds.

4.8. Daarnaast is het volgende van belang.
Fernandes is van maart 2018 tot januari 2020 in dienst geweest van DME. In zijn functie aldaar was hij onder meer verantwoordelijk voor het aantrekken van nieuwe klanten voor DME binnen Europa, Afrika en Rusland. Zijn arbeidsovereenkomst bevatte een geheimhoudingsclausule. Vanuit zijn functie bij DME heeft Fernandes kennis van klanten van DME, welke kennis geacht moet worden onder zijn geheimhoudingsplicht te vallen. Gelet op zijn samenwerking met Van der Laan binnen Vision en gelet op het feit dat zij op dit moment samen voor Dmarcian Inc. de Europese klanten bedienen, moet voorshands aannemelijk worden gedacht dat Fernandes die kennis met Van der Laan heeft gedeeld en dat Van der Laan van de herkomst van die kennis wetenschap draagt. Voorts is aannemelijk dat Fernandes en Van der Laan die kennis op dit moment voor hun werkzaamheden gebruiken. De belangrijkste aanwijzing daarvoor is te vinden in de 'all hands meeting' van 1 maart 2021 van Dmarcian Inc. Bij die gelegenheid meldt Fernandes: *'Hi, so we are here for a month now and I'm seeing a lot of old customers of me, because I see a lot of customers that have to be renewed, that kind of things. We just started, I think a week now, selling again and contacted customers because there are troubles with the European ex-partner. It's going well, we see not so many leads as I thought, because normally we got 20 to 26 leads and nowadays it's 11 because I think that 50% of the leads are going to Europe (...)'*
De voorzieningenrechter leidt hieruit af dat Fernandes en Van der Laan sinds korte tijd contact opnemen met hen bekende Europese klanten in verband met het vernieuwen van het

---

contract, alsmede met nieuwe klanten, om deze een contract te verkopen. Ook kan uit dit citaat worden afgeleid dat Fernandes, anders dan hij ter zitting heeft verklaard, actief hem bekende klanten benadert (*'selling again and contacted customers'*).

Dat Fernandes c.s. op deze manier trachten (potentiële) Europese klanten te bedienen komt ook naar voren in een e-mail van 10 maart 2021 van een klant van DME. Deze klant schrijft: *'Later heb ik Ton (vzr: Fernandes) gebeld om een faktuur op te vragen, en toen kwam er naar voren dat hij aangaf dat renewals alleen via de US lopen, en niet meer via de divisie Europa.'*

Daar komt bij dat DME aannemelijk heeft gemaakt dat Fernandes en Van der Laan offertes gebruiken met een uiterlijk dat is ontleend aan de offertes van DME, op zodanige wijze dat bij bestaande DME klanten -zolang zij de details van het uiterlijk van de offerte niet bestuderen- de indruk wordt gewekt dat zij te maken hebben met DME, terwijl zij bij acceptatie van die offerte niet hun contract met DME vernieuwen maar met Dmarcian Inc. contracteren.

Het voorgaande is voldoende om aannemelijk te achten dat Fernandes en Van der Laan zich sedert hun aanstelling door Dmarcian Inc. als sales managers Europe actief inspannen om klanten van DME richting Dmarcian te laten gaan, zich en daarbij bedienen van listige kunstgrepen en een onjuiste voorstelling van zaken.

4.9.     Fernandes en Van der Laan moeten zich in ieder geval sinds de brief van 3 februari 2021 van de advocaat van DME bewust zijn geweest van het feit dat Dmarcian Inc. en Draegen, als meerderheidsaandeelhouder van DME, gehouden waren de status quo hangende het onderzoek van de Ondernemingskamer te respecteren. Dat wil zeggen dat Fernandes c.s. moeten hebben geweten dat Draegen als minderheidsaandeelhouder van DME en meerderheidsaandeelhouder van Dmarcian Inc ervoor diende te zorgen dat de overeenkomst van Dmarcian Inc. met DME werd nagekomen en DME dus haar (potentiële) klanten in Europa kon blijven bedienen. Ook voor hen zal duidelijk moeten zijn geweest dat de niet nakoming van de overeenkomst door Dmarcian Inc.vanaf 22 januari 2021 niet anders kan worden opgevat dan als een door Draegen gestuurde reactie op de beschikking van de Ondernemingskamer. In het midden kan blijven of die beschikking Dmarcian Inc ruimte bood om die overeenkomst te beëindigen. De beëindiging zoals die heeft plaatsgevonden is zozeer ingegeven door Draegens wens om zijn gelijk buiten ordelijk rechtsstatelijke kanalen te halen dat die bij gebrek aan aanwijzingen voor het tegendeel onrechtmatig moet worden geacht. Verder zal niet zonder overleg met de leiding van Dmarcian Inc. voor het gebruik van de hiervoor genoemde offertes zijn gekozen.

4.10.    Fernandes c.s. hebben aangevoerd dat Draegen de aandelen in Dmarcian Inc niet langer houdt en ook geen bestuurder meer is. Gelet op de omstandigheid dat het bestuurderschap nu wordt uitgeoefend door de echtgenote van Draegen acht de voorzieningenrechter dit bij gebreke van toelichting over de wijziging in het aandeelhouderschap onvoldoende om de betrokkenheid van Draegen bij Dmarcian Inc. en daarmee de onrechtmatige beweegredenen achter de pogingen om DME uit te hollen weerlegd te achten.

De voorzieningenrechter ziet in de omstandigheid dat (1) Fernandes en Van der Laan gebruik maken van de advocaat die bij en ook na de beëindiging van de overeenkomst voor de Draegens optrad, (2) beide Draegens ook in februari telkens in de correspondentie worden meegekopiëerd en (3) dat de pleitnota van deze advocaat (m.n. de par. 4.11 – 4.26) zich laat lezen als het betoog van Draegen als even zovele aanwijzingen dat de Draegens

nog steeds gezamenlijk aan het stuur zitten en dat Fernandes en Van der Laan zich daarvan niet alleen bewust zijn maar ook vanuit dat bewustzijn participeren.
De opstelling ter zitting illustreert de intentie om die participatie voort te zetten.

4.11.    De geschetste gang van zaken laat geen andere conclusie toe dan dat Fernandes c.s. voldoende zicht moeten hebben gehad op wat er feitelijk gebeurde: Dmarcian Inc en/of Draegen maken het DME onmogelijk om haar klanten te bedienen, en proberen op die manier DME om zeep te helpen.
Dor in de gegeven omstandigheden hun kennis met betrekking tot de klanten van DME te blijven inzetten en te trachten klanten bij DME weg te halen op de wijze zoals geschetst, wordt jegens DME onrechtmatig gehandeld.

4.12.    Aan de orde is daarmee de vraag of Fernandes c.s. daarvoor ook in privé kunnen worden aangesproken.
Fernandes c.s. voeren aan dat zij hun werkzaamheden voor Dmarcian Inc verrichten op basis van een overeenkomst tussen Dmarcian Inc en hun persoonlijke venootschap Vision, waarvan zij de (indirecte) bestuurders zijn.
Uit vaste jurisprudentie van de Hoge Raad volgt dat indien een vennootschap tekortschiet in de nakoming van een verbintenis of een onrechtmatige daad pleegt, uitgangspunt is dat alleen de vennootschap aansprakelijk is voor daaruit voortvloeiende schade.
Onder bijzondere omstandigheden is evenwel, naast aansprakelijkheid van die vennootschap, ook ruimte voor aansprakelijkheid van een bestuurder van de vennootschap. Voor het aannemen van zodanige aansprakelijkheid is vereist dat die bestuurder ter zake van de benadeling persoonlijk een ernstig verwijt kan worden gemaakt.

4.13.    De vraag is dus of het verwijt dat aan Fernandes c.s. gemaakt kan worden, voldoende ernstig is voor het aannemen van persoonlijke aansprakelijkheid.
Bij de beantwoording daarvan komt in de eerste plaats betekenis toe aan het verwijt zelf. Daarover kan niet licht worden gedacht. Het gezamenlijk bewust en opzettelijk plegen en continueren van inspanningen die erop gericht zijn de ultimate beneficial owner van een opdrachtgever behulpzaam te zijn bij het uithollen van de onderneming van een aan hem gelieerde vennootschap, terwijl er rechterlijke uitspraken liggen waaruit volgt dat deze zich daarvan heeft te onthouden, daarbij gebruik makend van de kennis die één van de twee als voormalig medewerker van de gelieerde vennootschap heeft opgedaan, is medewerking aan een ernstige vorm van onrechtmatige concurrentie.
De ernst daarvan wordt vergroot indien dat handelen wordt verricht achter een vennootschappelijke sluier waarvan - bij gebrek aan aanwijzingen voor het tegendeel - het primaire doel in relatie tot dit handelen vooralsnog geacht moet worden te zijn: het voorkomen dat de handelende personen effectief aanspeekbaar zijn voor de schadelijke gevolgen daarvan.
De voorzieningenrechter kent verder gewicht toe aan de omstandigheid dat de zelfstandige identiteit van Vision in relatie tot de aan Fernandes c.s. verweten gedragingen volslagen onduidelijk is gebleven. De overeenkomst op basis waarvan de werkzaamheden worden verricht is niet in het geding gebracht. Ook zijn geen feiten gesteld waaruit kan volgen dat Vision activiteiten ontplooit die los staan van de uitvoering van de overeenkomst met Dmarcian. Wat zijn de verdere ondernemingsactiviteiten? Hebben ze een kantoor? Is er een historie? Is er personeel in dienst? Uit niets blijkt dat er binnen Vision nog anderen werkzaam zijn dan Fernandes en Van der Laan.

Daar komt bij dat Fernandes en Van der Laan als natuurlijke personen en met vermelding van naam en telefoonnummer en foto, op de website van Dmarcian Inc. worden vermeld zonder dat er ook maar iets over Vision wordt vermeld. Ook in de contacten met klanten presenteren Fernandes en Van der Laan zich als natuurlijke personen die werkzaam zijn voor Dmarcian Inc.

Onder deze omstandigheden acht de voorzieningenrechter het aan Fernandes c.s. verweten handelen voldoende voor het oordeel dat ook hen persoonlijk een persoonlijk ernstig verwijt kan worden gemaakt.

4.14.    Fernandes c.s. voeren aan dat een afweging van de wederzijdse belangen maakt dat de vorderingen van DME niet kunnen worden toegewezen. Fernandes c.s. stellen dat zij afhankelijk zijn van de opdracht van Dmarcian om in hun inkomsten te voorzien. Als DME wil vechten voor haar rechtspositie jegens Dmarcian Inc. en meent dat Fernandes c.s. daaraan in de weg staan moet zij dat gevecht tegen de juiste wederpartij en in de juiste arena voeren, niet voor de Nederlandse voorzieningenrechter, tegen Fernandes en Van der Laan.

4.15.    De voorzieningenrechter volgt Fernandes c.s. hierin niet. Het handelen van Dmarcian Inc. en Draegen brengt mee dat de onderneming van DME feitelijk is lam gelegd. DME kan door de weigering van Dmarcian Inc. om haar toegang tot de Dmarcian systemen te geven, haar klanten niet meer bedienen terwijl zij lijdzaam moet toezien hoe deze klanten door Dmarcian Inc worden ingelijfd. Dit terwijl er een vonnis ligt tegen Dmarcian Inc. en Draegen om in ieder geval voorlopig de overeenkomst te respecteren. Door de tijdelijke bestuurder van DME is toegelicht dat het handelen van Dmarcian Inc. en Draegen de situatie precair maakt. Fernandes en Van der Laan kiezen er blijkens hun opstelling ter zitting voor om in het volle bewustzijn van de onrechtmatigheid van het handelen van hun opdrachtgever(s) hun betrokkenheid daarbij te continueren. Zij zullen de consequenties van die keuze dan ook moeten aanvaarden.

4.16.    Omdat tegen de verschillende onderdelen van de vorderingen zoals deze door DME zijn ingesteld geen zelfstandige verweren zijn gevoerd, zullen deze worden toegewezen op na te vermelden wijze.

4.17.    Omdat wordt aangenomen dat de opstelling van Fernandes c.s. wordt gestuurd en gestimuleerd door Dmarcian gaat de voorzieningenrechter aan het protest tegen de hoogte van de gevorderde dwangsommen in zoverre voorbij dat deze op aanzienlijke hoogte zullen worden gehouden. Wel zullen ze aan een maximum worden gebonden.

4.18.    Fernandes c.s. zullen als de in het ongelijk gestelde partij in de proceskosten worden veroordeeld. De kosten aan de zijde van DME worden begroot op:
- betekening oproeping   €        87,61
- griffierecht                         667,00
- salaris advocaat                 1.016,00
Totaal                        €      1.770,61

**5.     De beslissing**

is opgenomen in het kop-staart vonnis van 23 april 2021.

Deze aanvulling is gewezen door mr. A.H. Schotman en afgegeven op 7 mei 2021







VOOR GROSSE AFGEGEVEN
de griffier