**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:21-cv-00067-MR**

| | |
|---|---|
| **DMARCIAN, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **O R D E R and** |
| ) | **PRELIMINARY INJUNCTION** |
| **DMARCIAN EUROPE BV,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

**THIS MATTER** is before the Court on the Defendant's Motion to

Dismiss [Doc. 22] and the Plaintiff's Motion for Preliminary Injunction.  [Doc.

6].

On March 12, 2021, dmarcian, Inc. ("dmarcian" or the "Plaintiff") filed

this action against dmarcian Europe BV ("dmarcian Europe" or the

"Defendant").  [Doc. 1].  On March 25, 2021, the Plaintiff filed a Motion for

Temporary Restraining Order and Preliminary Injunction.  [Doc. 6].

On March 30, 2021, the Defendant filed an opposition to the Plaintiff's

Motion for Temporary Restraining Order and Preliminary Injunction

challenging the Court's personal jurisdiction over it.  [Doc. 11 at 6].

On March 31, 2021, the Court entered an Order denying the Plaintiff's

Motion for Temporary Restraining Order, holding the Plaintiff's Motion for

Preliminary Injunction in abeyance pending further presentation of evidence and briefing, and directing the parties to appear for a hearing regarding the Plaintiff's Motion for Preliminary Injunction on April 23, 2021. [Doc. 12].

On April 7, 2021, the Plaintiff filed an Amended Complaint asserting claims for (i) breach of written contract, (ii) breach of oral contract, (iii) copyright infringement under 17 U.S.C. § 101 (the "Copyright Act"), (iv) trademark infringement under 15 U.S.C. § 1051 et seq. (the "Lanham Act"); (v) false designations of origin under the Lanham Act; (vi) defamation; (vii) misappropriation of trade secrets under the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. § 66-152 et seq. (the "NCTSPA"); (viii) computer trespass; (ix) tortious interference with contract; (x) tortious interference with prospective economic advantage; (xi) misappropriation of trade secrets under the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836(b), 1839 et seq. (the "DTSA"); (xii) common law trademark infringement; (xiii) unjust enrichment; and (xiv) unfair or deceptive business practices under N.C. Gen. Stat. §75-1.1 et seq. ("Chapter 75"). [Doc. 19].

On April 19, 2021, the Defendant filed a Motion to Dismiss, arguing that the Plaintiff failed to show that the Court has personal jurisdiction over the Defendant and that the Court should dismiss based on the doctrine of *forum non conveniens*. [Doc. 22; Doc. 23].

On the same date, the Defendant filed an opposition to the Plaintiff's Motion for Preliminary Injunction. [Doc. 25; Doc. 26]. On April 21, 2021, the Plaintiff replied to the Defendant's opposition to the Plaintiff's Motion for Preliminary Injunction. [Doc. 29].

On April 23, 2021, the parties appeared for a hearing on the Plaintiff's Motion for Preliminary Injunction. The Court directed the parties to file additional briefing regarding the scope of the preliminary relief. On April 30, 2021, the parties submitted their briefs. [Doc. 32; Doc. 33].

On April 30, 2021, the Plaintiff filed a response to the Defendant's Motion to Dismiss. [Doc. 31]. On May 7, 2021, the Defendant replied. [Doc. 35].

Having been exhaustively briefed, these issues are ripe for disposition.

## I. PERSONAL JURISDICTION

The Defendant moves to dismiss this action for lack of personal jurisdiction. [Doc. 23 at 7-18].

### A. Standard of Review

Under Federal Rule of Civil Procedure 12(b)(2), a defendant must affirmatively raise a personal jurisdiction challenge. The plaintiff, however, bears the burden of demonstrating personal jurisdiction at every stage following such a challenge. Grayson v. Anderson, 816 F.3d 262, 267 (4th

Cir. 2016) (citing <u>Combs v. Bakker</u>, 886 F.2d 673, 676 (4th Cir. 1989)).  "[A]
Rule 12(b)(2) challenge raises an issue for the court to resolve, generally as
a preliminary matter."  <u>Grayson</u>, 816 F.3d at 267 (citation omitted).

When, as here, a district court considers a question of personal
jurisdiction based on the allegations of a complaint, motions papers,
affidavits, and supporting memoranda, the plaintiff has the burden of making
a *prima facie* showing in support of its assertion of jurisdiction.  <u>Universal
Leather, LLC v. Koro AR, S.A.</u>, 773 F.3d 553, 558 (4th Cir. 2014); <u>Grayson</u>,
816 F.3d at 268.  In deciding whether the plaintiff has met this burden, "the
district court must construe all relevant pleading allegations in the light most
favorable to the plaintiff, assume credibility, and draw the most favorable
inferences for the existence of jurisdiction."  <u>Universal Leather</u>, 773 F.3d at
558 (internal quotation marks and citation omitted).  If the existence of
jurisdiction turns on disputed factual questions and a *prima facie* showing of
personal jurisdiction has been made, a district court can proceed as if it has
personal jurisdiction over the matter, although factual determinations to the
contrary may be made at trial.  <u>Public Impact, LLC v. Boston Consulting
Group, Inc.</u>, 117 F.Supp.3d 732, 736 (M.D.N.C. Aug. 3, 2015) (citations
omitted).  "Nevertheless, either at trial or at a pretrial evidentiary hearing, the
plaintiff must eventually prove the existence of personal jurisdiction by a

preponderance of the evidence." Public Impact, LLC v. Boston Consulting Group, Inc., 117 F.Supp.3d 732, 737 (M.D.N.C. Aug. 3, 2015) (citing New Wellington Fin. Corp. v. Flagship Resort Dev. Corp., 416 F.3d 290, 294 n. 5 (4th Cir. 2005)).

**B.    Facts Regarding Personal Jurisdiction**

Viewing the pleadings and affidavits in the light most favorable to the Plaintiff, in accord with Universal Leather, 773 F.3d at 558, the following is a summary of the relevant facts.

The Plaintiff is a Delaware corporation with a principal place of business in Brevard, North Carolina.  [Doc. 19 at ¶ 3].  The Plaintiff provides DMARC email protection products and services, which help protect businesses from phishing attacks.  [Id. at ¶¶ 16-19].  Tim Draegen is the Plaintiff's founder and former CEO, and his wife Shannon Draegen is the Plaintiff's current CEO.  [Id. at ¶ 24].

The Plaintiff claims to own several types of intellectual property protected by United States intellectual property law.  The Plaintiff alleges that Copyright Registration number TX0008941559 protects its products, software, intellectual property, source code, and technology.  [Id. at ¶¶ 41-44].  The Plaintiff also alleges that Trademark Registration No. 5,702,379 protects its trademark, DMARCIAN®.  [Id. at ¶¶ 45-46].  The Plaintiff further

5

alleges that it owns common law trademark rights in the **dmarcian**

stylized mark.  [<u>Id.</u> at ¶ 48].  The Plaintiff further alleges that it owns trade

secrets, including source code; historical customer data; client contacts;

business and market intelligence; and sales leads.  [<u>Id.</u> at ¶ 162].

Around 2013, a Dutch individual named Martijn Groeneweg reached

out to Tim Draegen to discuss the formation of a business relationship

regarding the software, products, and services developed and being

developed by Draegen.  [<u>Id.</u> at ¶¶ 32-33].  Draegen was in North Carolina

when he received the texts and phone calls from Groeneweg regarding the

proposed business arrangement.  [<u>Id.</u> at ¶ 33].

In 2016, Draegen traveled to the Netherlands and negotiated a

licensing agreement between the Plaintiff and the Defendant.  [Doc. 26-9 at

¶¶ 10-11].  While the parties never reduced the agreement to writing, the

Plaintiff alleges that the agreement gave the Defendant a license to use and

sell the Plaintiff's intellectual property to customers in Europe, Africa, and

Russia.  [<u>Id.</u>].  In exchange, the agreement gave Tim Draegen an option to

purchase the majority interest in the Defendant for €1.  [<u>Id.</u> at ¶ 10].

In 2017, Groeneweg restructured the Defendant, a Dutch corporation

he controlled, to promote and sell the Plaintiff's services and products in the

respective markets, and renamed it dmarcian Europe BV.  [Doc. 19 at ¶¶ 4,

33; Doc. 26-1 at ¶ 6]. On July 12, 2018, Tim Draegen exercised his option to purchase the majority interest in the Defendant. [Doc. 26-17 at 4]. At that point, Tim Draegen owned 50.01% of the Defendant. The other 49.99% was then owned by The Digital Xpedition Holding BV ("TDX"), a Dutch corporation controlled by Groeneweg. [Doc. 26-9 at ¶ 10; Doc. 26-12 at 2]. TDX then served as the Defendant's director and managed the Defendant's affairs. [Doc. 26-1 at 7].

Under the terms of the parties' relationship, the Plaintiff fielded all sales leads in North Carolina, routed certain leads coming from the European Union, Russia, and Africa to the Defendant for service, and supported the Defendant's service to those customers by providing operational assistance, technical support, and platform maintenance. [Doc. 26-9 at ¶ 10; Doc. 19 at ¶¶ 7, 11, 33; Doc. 30 at ¶¶ 4, 8, 9]. The Plaintiff continued developing, supplying, and operating the services, products, and technology for each customer from its North Carolina office. [Id.].

The Plaintiff provided the Defendant with access to its computer systems and its proprietary code for continued product and software development efforts by a group of Bulgarian developers working for the Defendant. [Doc. 19 at ¶ 33]. After some time, the Plaintiff agreed to not charge licensing fees to the Defendant in exchange for the Defendant

funding the continued development of the source code. [Id.]. From 2017 to the present, the Defendant has spent at least €1,300,000 writing new code further developing the software. [Doc. 26-9 at ¶ 20]. The Plaintiff's developers have also continued to work on the software code during that same time. [Doc. 35-1 at ¶ 15]. Even when the Defendant's employees were working on the software code, the Plaintiff continued housing and controlling it. [Doc. 30 at ¶¶ 13-16].

Throughout the parties' agreement, the Defendant's European employees participated in several virtual training sessions and multiple meetings with the Plaintiff's representatives in North Carolina. [Doc. 30 at ¶¶ 24-29]. In January 2019, Groeneweg visited the Plaintiff's offices in North Carolina as the Defendant's representative to discuss plans for sales, marketing, deployment, and customer development. [Doc. 19 at ¶ 6; Doc. 30 at ¶ 31; Doc. 30-3].

In December 2019, the Defendant asserted for the first time that it had an ownership interest in the code that had been developed by the Bulgarian developers. [Doc. 19 at ¶ 36]. The Plaintiff disagreed and directed the Defendant to formally assign to the Plaintiff any new code that had been created by the Bulgarian developers. [Id.]. The Defendant, through its manager TDX, refused and asked the Plaintiff to present a buyout offer for

the minority share of the Defendant.  [Id. at ¶¶ 36, 54].  The parties began quarreling over the terms of the licensing agreement and the Plaintiff responded by briefly suspending the Defendant's access to its computer systems.  [Doc. 26-1 at ¶ 18].

In July 2020, Tim Draegen, as majority shareholder in the Defendant, called a shareholders' meeting to resolve the licensing dispute.  [Doc. 19 at ¶ 55; Doc. 26-1 at ¶ 20].  Around that time, the Defendant allegedly arranged for the Bulgarian developers to assign any rights they may have to the newly revamped source code to the Defendant.  [Doc. 19 at ¶ 59].

Before that meeting could take place, TDX (the Defendant's minority shareholder) filed an action on July 28, 2020, with the Enterprise Court of the Appellate Court of Amsterdam in the Netherlands (the "Enterprise Chamber").  [Id. at ¶ 56; Doc. 26-1 at ¶ 2].  The Enterprise Chamber is a Dutch court with jurisdiction to address disputes among owners of Dutch business entities.  [Doc. 19 at ¶ 57].  The Enterprise Chamber "can take far-reaching measures in the context of intramural corporate disputes, including dismissal and appointment of (temporary) directors or supervisory directors, or depriving one or more shareholders of their governance rights connected with their shares."  [Doc. 26-1 at ¶ 21].

On September 7, 2020, the Enterprise Chamber ordered an investigation into the management and affairs of the Defendant from January 1, 2016, to August 20, 2020.  [Doc. 26-2 at 13-16].  On the same date, the Enterprise Chamber divested Tim Draegen and TDX of all but one of their shares in the Defendant; appointed Yvette Borrius, a Dutch attorney, as a proxy of those interests pending the resolution of the dispute; and appointed Hub Harmeling, a Dutch attorney, as the Defendant's new managing director pending the resolution of the dispute.  [Doc. 19 at ¶ 60; Doc. 26-1 at ¶ 25; Doc. 26-2 at 28; Doc. 26-9 at ¶ 26].[1]

After Harmeling was appointed as the new managing director, the Plaintiff briefly suspended the Defendant's access to its computer systems in September 2020.  [Doc. 26-1 at ¶ 25].[2]  Harmeling and Draegen continued trying to resolve the dispute for several months.  [Id. at ¶ 26].  On or about January 22, 2021, the Plaintiff notified the Defendant that it was "no longer prepared or able to continue providing technology, services, customers, and use of its trademarks to" the Defendant unless the Defendant agreed to pay

---

[1] Tim Draegen is not a party to this action.  Therefore, the Court offers no opinion as to whether Borrius or Harmeling owe any fiduciary obligations to Tim Draegen, the beneficial owner of the majority interest in the Defendant, pursuant to North Carolina or United States law.

[2] Harmeling claims that the Plaintiff never fully restored the Defendant's access.  [Doc. 26-1 at ¶ 25].

80% of its income to the Plaintiff as a licensing fee. [Doc. 19 at ¶ 64; Doc. 35-4 at 5]. The parties were unable to agree on a licensing fee and the Plaintiff terminated the Defendant's intellectual property license and access to the Plaintiff's computer systems on January 22, 2021. [Doc. 19 at ¶ 76; Doc. 26-1 at ¶ 30].[3] The Plaintiff alleges that even though the license was terminated, the Defendant has continued using the Plaintiff's copyrighted software code and trademark to service customers. [Doc. 19 at ¶ 39].

On January 29, 2021, Defendant commenced a new action against the Plaintiff, this one in a Rotterdam Court, seeking an injunction requiring the Plaintiff to restore the Defendant's access to the Plaintiff's intellectual property pending the resolution of the Enterprise Chamber proceeding. [Doc. 19 at ¶ 67; Doc. 26-1 at ¶ 39]. Because the Rotterdam Court held a hearing on February 1, 2021, only two days after the commencement of the action, the Plaintiff was unable to appear and the Rotterdam Court granted the requested injunction *ex parte*. [Id.].[4] The Plaintiff has refused to comply with the injunction and has been fined €500,000 for refusing to fully restore the Defendant's access to its systems. [Doc. 26-5 at ¶ 15].

---

[3] While the Amended Complaint claims that the Plaintiff reduced the Defendant's access so that the Defendant could service only its existing customers, [Doc. 19 at ¶ 70], the Defendant claims that it was unable to service its existing customers after the access was revoked. [Doc. 26-1 at ¶ 32].

[4] The Plaintiff has since moved to set aside the injunction. [Doc. 26-1 at ¶ 41].

Following the injunction, the Plaintiff asserts that the Defendant's conduct worsened. [Doc. 19 at ¶ 77]. The Plaintiff's evidence shows that the Defendant broke completely free from the Plaintiff's platform and operations and terminated the Plaintiff's access to certain customer information. [Id. at ¶¶ 39, 110]. The Plaintiff argues that the Defendant's actions violated the parties' agreement by making it impossible for the Plaintiff to control and manage the relationship between the Defendant and the Defendant's clients. [Doc. 19 at ¶ 86]. In fact, the Defendant has sent messages to customers acknowledging that it has "set up a safe new platform[,]" and that its "[u]ser data . . . cannot be accessed by anyone outside the European territory" and "is securely out of reach of third parties, including dmarcian, Inc." [Doc. 8-13 at 3-4].

The Plaintiff alleges that the Defendant also began a course of conduct to deceive customers into doing business with the Defendant, rather than the Plaintiff. The Defendant allegedly took control of several European websites featuring the Plaintiff's trademark in their domain names. [Doc. 8 at ¶¶ 8-9]. The Defendant's websites allegedly display the Plaintiff's stylized logo, except for a small alteration adding the word "EUROPE" in small letters below the logo. [Id. at ¶ 12]. At various points, the Defendant's websites have allegedly included videos by Tim Draegen, the likenesses of the

Plaintiff's employees,[5] and the identities of the Plaintiff's global customers. [Doc. 19 at ¶¶ 16-19]. While the Defendant's websites are virtually identical to the Plaintiff's websites, they include the Defendant's contact information, rather than the Plaintiff's, to ensure that any visitors will contact the Defendant for services. [Doc. 8 at ¶¶ 13-14; Doc. 19 at ¶ 91].

The Plaintiff claims that the Defendant's confusingly similar websites misdirect the Plaintiff's potential and current customers to the Defendant's platform instead of the Plaintiff's platform and are causing new customers to register with the Defendant, rather than the Plaintiff. [Doc. 8 at ¶¶ 8-12; Doc. 19 at ¶ 71]. Tim Draegen states in his affidavit that although the Defendant claims to service only customers from outside the United States, he visited one of the Defendant's websites from within the United States and was directed to the Defendant's platform when he selected the option for customers in "the Americas." [Doc. 16 at ¶ 7].

The Plaintiff further alleges that the Defendant has been deceiving the Plaintiff's current customers into leaving the Plaintiff's platform and joining the Defendant's platform by redirecting the Plaintiff's customers to infrastructure controlled by the Defendant and making misrepresentations to

---

[5] The Plaintiff concedes that since the filing of this civil action, the Defendant has removed the likenesses of the Plaintiff's employees from its websites. [Doc. 8 at ¶ 18].

customers regarding a potential data breach by the Plaintiff.  [Doc. 19 at ¶¶ 71, 83; Doc. 15 at ¶ 7; Doc. 8-11].[6]  According to the Plaintiff, the Defendant is using this purported data breach to trick the Plaintiff's customers into providing the Defendant with information which the Defendant can use to access the Plaintiff's platform and steal information for its own use on its own platform.  [Doc. 19 at ¶ 84].

The Plaintiff further alleges that the Defendant's website is offering the Plaintiff's copyrighted software and source code for sale to third parties without the Plaintiff's authorization.  [Id. at ¶¶ 71, 90, 96].  The Plaintiff claims that the copyrighted software and source code constitute trade secrets.  [Id. at ¶ 71].

## B.    Analysis of Personal Jurisdiction

For a court to have personal jurisdiction over the person of a defendant, the plaintiff must show that exercising jurisdiction will (1) comply with the forum state's long-arm statute and (2) comport with the due process requirements of the Fourteenth Amendment.  See Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc., 334 F.3d 390, 396 (4th Cir. 2003) (citation omitted).   A court's exercise of jurisdiction over a nonresident

---

[6] The Defendant's messages suggest that the Plaintiff's access to information *about its own customers* constitutes some sort of data breach.  [Doc. 8-13 at 2-4].

defendant comports with due process if the defendant has sufficient "minimum contacts" with the forum, such that to require the defendant to defend its interest in that state "does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (internal quotation marks omitted).

### 1.    Long-Arm Statute

The Defendant claims that the Amended Complaint does not establish the Court's jurisdiction over the Defendant because it fails to cite a particular provision of the North Carolina long-arm statute.  [Doc. 23 at 8-11].  However, "[t]he failure to plead the particulars of jurisdiction is not fatal to the claim so long as the facts alleged permit the inference of jurisdiction under the statute." Williams v. Inst. for Computational Stud. at Colo. State Univ., 85 N.C. App. 421, 428, 355 S.E.2d 177, 182 (1987).

Under § 1-75.4(4)(a), North Carolina courts have jurisdiction over actions "claiming injury to person or property within [North Carolina] arising out of an act or omission outside [North Carolina] by the defendant, provided in addition that at or about the time of the injury . . . activities were carried on within [North Carolina]. . . on behalf of the defendant[.]"  "In cases of trademark infringement, the wrong occurs not only at the place where the infringing label is affixed but also where the confusion occurs." Christian Sci.

Bd. of Directors of First Church of Christ, Scientist v. Robinson, 123 F. Supp. 2d 965, 972 (W.D.N.C. 2000) (citation omitted). Accordingly, foreign infringement on a North Carolina company's trademark can cause a local injury. Regent Lighting Corp. v. Am. Lighting Concept, Inc., 25 F. Supp. 2d 705, 709 (M.D.N.C. 1997). Likewise, a foreigner's use of a North Carolina company's trade secret can constitute a local injury. Fran's Pecans, Inc. v. Greene, 134 N.C. App. 110, 113, 516 S.E.2d 647, 650 (1999) (citing Hankins v. Somers, 39 N.C. App. 617, 621, 251 S.E.2d 640, 643 (1979)). The North Carolina Court of Appeals has concluded that a North Carolina plaintiff's performance of contractual services for a defendant qualifies as activities "carried on within [North Carolina] . . . on behalf of the defendant[.] Inspirational Network, Inc. v. Combs, 131 N.C. App. 231, 237, 506 S.E.2d 754, 759 (1998)

Here, the Defendant's alleged intellectual property infringement and misuse caused injury to the Plaintiff in North Carolina. Regent Lighting, 25 F. Supp. 2d at 709; Fran's Pecans, 134 N.C. App. at 113, 516 S.E.2d at 650 (citing Hankins, 39 N.C. App. at 621, 251 S.E.2d at 643). While the Plaintiff does not provide the specific date that the Defendant began infringing on the Plaintiff's intellectual property from the Netherlands, that infringement clearly started sometime between late 2020 and early 2021. During that time, the

Plaintiff was carrying on activities within North Carolina on behalf of the Defendant by overseeing and revising the Defendant's changes to the copyrighted source code; fielding sales leads in North Carolina and routing certain leads to the Defendant; managing the source code repository for the parties' joint benefit; and providing the Defendant with operational assistance, technical support, platform maintenance, and customer support. [Doc. 26-9 at ¶ 10; Doc. 19 at ¶¶ 7, 11, 33; Doc. 30 at ¶¶ 4, 8-10, 12, 14-15, 21-22].[7] Because the Plaintiff was performing services on behalf of the Defendant within North Carolina at or around the time of the injury, the Court concludes that § 1-75.4(4)(a) provides personal jurisdiction over the Defendant.[8]

Further, under N.C. Gen Stat. § 1-75.4(5)(b), North Carolina courts have jurisdiction over actions arising from "services actually performed for the defendant by the plaintiff within [North Carolina] if such performance within [North Carolina] was authorized or ratified by the defendant[.]" As discussed above, the Plaintiff asserts that it performed services for the

---

[7] Tim Draegen states that the Plaintiff continues to provide the Defendant with the tools to service customers despite the Defendant's ongoing infringement. [Doc. 30 at ¶ 20]. The provision of those services is occurring at the time of the injury to the Plaintiff. N.C. Gen. Stat. § 1-75.4(4)(a).

[8] The Court's conclusion is consistent "with the mandate that the North Carolina long-arm statute receive liberal construction, in favor of finding jurisdiction." Dowless v. Warren-Rupp Houdailles, Inc., 800 F.2d 1305, 1307 n.5 (4th Cir. 1986) (collecting cases).

Defendant under the contract by overseeing the Defendant's changes to its intellectual property; fielding sales leads in North Carolina and routing certain leads to the Defendant; managing the source code repository for the parties' joint benefit; and providing the Defendant with operational assistance, technical support, platform maintenance, and customer support. [Doc. 26-9 at ¶ 10; Doc. 19 at ¶¶ 7, 11, 33; Doc. 30 at ¶¶ 4, 8-10, 12, 14-15, 21-22]. While the Defendant argues that this action does not arise from those services, those services were allegedly performed pursuant to the contract between the parties. Moreover, the Plaintiff's provision of those services provided the Defendant with the opportunity to misappropriate the Plaintiff's trade secrets and infringe on the Plaintiff's intellectual property. Because the evidence before the Court shows that the Defendant accepted those services, the Court concludes that the Plaintiff's provision of services to the Defendant was ratified and authorized and is, therefore, also sufficient to establish personal jurisdiction under N.C. Gen. Stat. §§ 1-75.4(5)(b).

## 2. Minimum Contacts

The sufficiency of a defendant's contacts depends on the circumstances of the case. A court can have personal jurisdiction over a defendant for all claims if the defendant's contacts with the forum state are

continuous and systematic. This is referred to as "general jurisdiction."[9] However, more limited contacts can be sufficient to establish personal jurisdiction over a defendant where those contacts relate to the substance of the particular claim being asserted. ESAB Grp., Inc. v. Centricut, Inc., 126 F.3d 617, 623 (4th Cir. 1997). This is referred to as "specific jurisdiction." See e.g., Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-16 (1984). In determining whether specific jurisdiction exists, the Court considers (1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiff's claims arise out of those activities; and (3) whether the exercise of personal jurisdiction would be constitutionally "reasonable." ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 711-12 (4th Cir. 2002) (quoting Christian Sci. Bd., 259 F.3d at 215).

The first prong of the specific jurisdiction inquiry is grounded on the premise that "a corporation that enjoys the privilege of conducting business within a state bears the reciprocal obligation of answering to legal proceedings there." Universal Leather, 773 F.3d at 559 (quoting Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co., Ltd., 682 F.3d 292, 301 (4th Cir. 2012)). In determining whether a foreign defendant has

---

[9] The Plaintiff does not contend that the Court has general jurisdiction over the Defendant.

purposefully availed itself of the privilege of conducting business in a forum state, the Court asks whether "the defendant's conduct and connection with the forum [s]tate are such that he should reasonably anticipate being haled into court there." Fed. Ins. Co. v. Lake Shore Inc., 886 F.2d 654, 658 (4th Cir. 1989) (quoting World-Wide Volkswagen v. Woodsen, 444 U.S. 286, 297 (1980)). This analysis is flexible and "depends on a number of factors that courts consider on a case-by-case basis." Universal Leather, 773 F.3d at 560 (citing Tire Eng'g, 682 F.3d at 302). When a business is involved, those factors include:

> (1) whether the defendant maintains offices or agents in the forum state; (2) whether the defendant owns property in the forum state; (3) whether the defendant reached into the forum state to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the forum state; (5) whether the parties contractually agreed that the law of the forum state would govern disputes; (6) whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship; (7) the nature, quality and extent of the parties' communications about the business being transacted; and (8) whether the performance of contractual duties was to occur within the forum.

Id. (quotation marks and citation omitted). Relevant to this analysis are the *quality and nature* of the defendant's connections, not merely the number of contacts between the defendant and the forum state. UMG Recordings, Inc.

v. Kurbanov, 963 F.3d 344, 352 (4th Cir. 2020), cert. denied, 141 S. Ct. 1057, 208 L. Ed. 2d 525 (2021).  Nevertheless, the Fourth Circuit "generally [has] concluded that a foreign defendant has purposefully availed itself of the privilege of conducting business in the forum state when the defendant 'substantially collaborated with a forum resident and that joint enterprise constituted an integral element of the dispute.'" Universal Leather, 773 F.3d at 560 (quoting Tire Eng'g, 682 F.3d at 302).

In evaluating a parties' contacts with a particular forum, the Fourth Circuit has placed "special importance on 'the fact that defendant initiated contact with the plaintiff in the forum state and repeatedly reached into the forum state to transact business during in-person visits there.'" Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd., 911 F.3d 192, 200 (4th Cir. 2018) (quoting Universal Leather, 773 F.3d at 562).  For example, the Fourth Circuit has concluded that personal jurisdiction existed when a defendant's employees made "first contact" with the plaintiff, traveled to the plaintiff's offices in North Carolina on several occasions, and corresponded with the plaintiff's employees in North Carolina on a "weekly" basis over the course of two years.  Universal Leather, 773 F.3d at 562.

Like the defendant in Universal Leather, it is undisputed that the Defendant in this case reached into the forum state to initiate the relationship

that led to the business arrangement between the parties. [Doc. 33 at ¶ 3]. The Defendant argues, without citing any authority, that it never "reached into the forum state to solicit or initiate business" because the Plaintiff had not yet been formed when Groeneweg reached out to Tim Draegen in North Carolina to begin the relationship that led to the joint enterprise between the Plaintiff and the Defendant. [Doc. 23 at 13]. However, Groeneweg's initial reach into North Carolina is significant because it established the connection that ultimately led to the business arrangement between the Plaintiff and the Defendant. Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 775 (1984) (noting that minimum contacts analysis "focuses on 'the relationship among the defendant, the forum, and the litigation'") (quoting Shaffer v. Heitner, 433 U.S. 186, 204 (1977)). Moreover, Tim Draegen, like the Plaintiff, is a North Carolina resident and was in North Carolina when contacted by Groeneweg. [Doc. 19 at ¶ 33]. Accordingly, while the Defendant did not specifically interact with the not-yet-formed Plaintiff corporation, that initial interaction remains significant in the minimum contacts analysis. Walden v. Fiore, 571 U.S. 277, 285 (2014) (explaining that "our 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there."). Because the Defendant reached into North Carolina and initiated a long-term business relationship with a

North Carolina resident, that factor weighs in favor of exercising jurisdiction. Universal Leather, 773 F.3d at 562 (directing courts to examine whether "the defendant reached into the forum state to solicit or initiate business.").

Moreover, like the defendant in Universal Leather, the Defendant's employees visited the forum state and repeatedly communicated with the Plaintiff's employees in the forum state to transact business and further the purpose of the parties' business arrangement. For example, Groeneweg, visited North Carolina for a week in 2019 in his capacity as the Defendant's managing director to discuss plans for sales, marketing, deployment, and customer development. [Doc. 30 at ¶ 31; Doc. 30-3]. The Defendant's employees also regularly attended monthly "all hands" virtual meetings, and weekly "department" virtual meetings, which were all led by the Plaintiff's employees in North Carolina. [Doc. 30 at ¶¶ 24-30]. The numerous substantive interactions between the Defendant and the forum state weigh in favor of exercising jurisdiction here. Universal Leather, 773 F.3d at 562 (explaining that courts analyzing personal jurisdiction should evaluate whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship and the nature, quality, and extent of the parties' communications about the business being transacted).

Notably, the parties' business arrangement did not involve separate entities in concept or execution. Without a formal written contract, the parties collectively shared intellectual property, sales leads, operational assistance, technical help, platform maintenance, and customer support. [Doc. 19 at ¶¶ 7, 11, 33; Doc. 30 at ¶¶ 4, 8, 9]. The evidence before the Court describes what is not so much an arms-length business transaction, but rather a decision to collaborate and work in concert. Thus, for jurisdictional purposes the parties' arrangement should be analyzed as more akin to a joint enterprise. Tire Eng'g, 682 F.3d at 302 (concluding that there was "purposeful availment where a defendant substantially collaborated with a forum resident and that joint enterprise constituted an integral element of the dispute.").

The evidence further shows that the Defendant understood that the parties' long-term business relationship would necessitate continuing and wide-reaching contacts with a corporation with its primary place of business in North Carolina. [Doc. 26-1 at ¶¶ 12, 13, 16, 33 (characterizing the relationship between the parties as a cooperation or a collaboration); Doc. 19 at ¶ 11 (showing the relationship between the parties)]. The Supreme Court has "upheld the assertion of jurisdiction over defendants who have purposefully 'reach[ed] out beyond' their State and into another by, for

example, entering a contractual relationship that 'envisioned continuing and wide-reaching contacts' in the forum State[.]"  Walden, 571 U.S. at 285 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 479–80 (1985)). Accordingly, the characteristics of the parties' business relationship weigh in favor of the exercise of jurisdiction here.  Universal Leather, 773 F.3d at 562 (explaining that the jurisdictional analysis includes whether the defendant deliberately engaged in significant or long-term business activities in the forum state).

Contrary to the Defendant's assertion, [Doc. 23 at 11-12], this is not a situation where the "locus of the parties' interaction was overwhelmingly abroad."  Tire Eng'g, 682 F.3d at 302.  While the Defendant largely performed its obligations under the contract from abroad, the allegations and evidence at this stage demonstrate that the Defendant and its employees entered into a contractual agreement with a corporation in North Carolina; visited North Carolina to participate in training and planning sessions in furtherance of that agreement; engaged in several meetings and other communications with individuals located in North Carolina to accomplish that agreement; and performed under that contract for several years by paying compensation into North Carolina, acting on client referrals directed through North Carolina, and accepting operational assistance, technical help, platform maintenance, and

customer support from North Carolina. [Doc. 19 at ¶¶ 7, 11, 33; Doc. 30 at ¶¶ 4, 8, 9]. This evidence, which is largely undisputed, establishes that the Defendant reached into the forum state to initiate business; made in-person contact in the forum state with residents of the forum state regarding the business relationship; deliberately engaged in long-term business activities in the forum state; engaged in extensive communications about the business being transacted with residents of the forum state; and accepted services rendered from North Carolina. Universal Leather, 773 F.3d at 560; Williamson Produce, Inc. v. Satcher, 122 N.C. App. 589, 594, 471 S.E.2d 96, 99 (1996). While the Defendant may not have owned offices, sold products, or stationed employees in North Carolina, the substantial cooperation between the Plaintiff and the Defendant appears to have resulted in a business collaboration that had significant ties to North Carolina. Universal Leather, 773 F.3d at 560 (citing Tire Eng'g, 682 F.3d at 302). As such, the Defendant "should reasonably anticipate being haled into court" in North Carolina. See World-Wide Volkswagen, 444 U.S. at 297. Accordingly, the first prong of specific jurisdiction is met here. See CFA Inst. v. Inst. of

Chartered Fin. Analysts of India, 551 F.3d 285, 295 (4th Cir. 2009); Universal Leather, 773 F.3d at 560; Tire Eng'g, 682 F.3d at 303.[10]

Once purposeful availment is satisfied, the second prong of the specific jurisdiction analysis looks to whether "the plaintiff's claims arise out of activities directed at the forum state." Tire Eng'g, 682 F.3d at 303. Where the activity in the forum state is the genesis of the dispute, this prong is easily satisfied. Id. (internal quotation marks and citation omitted). Similarly, this prong is satisfied if "substantial correspondence and collaboration between the parties, one of which is based in the forum state, forms an important part of the claim." Id.

Here, the Plaintiff's intellectual property claims arise from the Defendant's North Carolina-related activities, including the Defendant's misuse of trademarks that have developed a reputation within North Carolina and the Defendant's use of intellectual property maintained, controlled, and owned by a corporation with its primary place of business in North Carolina. Doc. 19 at ¶¶ 8-12, 33, 78-96, 112-13]. Moreover, the Plaintiff's tortious interference claims stem from the Defendant's interference with the Plaintiff's

---

[10] The Plaintiff further contends that the Defendant's actions support jurisdiction under Federal Rule of Civil Procedure 4(k)(2). [Doc. 31 at 19-20]. Because the Court concludes that the Plaintiff has sufficient minimum contacts with North Carolina, this issue need not be addressed.

client relationships, which are alleged to be governed pursuant to North Carolina law. [Doc. 30 at ¶¶ 3, 5-7]. Further, the substantial correspondence and collaboration between the parties forms an important part of the Plaintiff's claims. Tire Eng'g, 682 F.3d at 303. Accordingly, the second prong of personal jurisdiction is satisfied.

The final prong of the specific jurisdiction analysis considers "whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002) (quoting Christian Sci. Bd. of Directors of First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 217 (4th Cir. 2001)). This prong "ensures that litigation is not 'so gravely difficult and inconvenient' as to place the defendant at a severe disadvantage in comparison to his opponent." CFA Inst., 551 F.3d at 296 (quoting Nolan, 259 F.3d at 217). "The burden on the defendant, interests of the forum state, and the plaintiff's interest in obtaining relief guide [the Court's] inquiry." Tire Eng'g, 682 F.3d at 303 (citation omitted).

The Defendant is a Dutch private company organized and existing pursuant to the laws of the Netherlands. [Doc. 19 at ¶ 4]. A corporate defendant's domicile abroad, standing alone, does not render domestic exercise of jurisdiction unduly burdensome. Tire Eng'g, 682 F.3d at 303

(citation omitted).   Nevertheless, the Fourth Circuit has recognized that a foreign defendant's "ability to secure counsel in the forum state and its choice to do business with a forum resident – which also made the prospect of litigation in the state foreseeable – counsel[s] that defending the suit would not be particularly burdensome."   Id.   Here, the Defendant has secured capable counsel to represent it in this matter.   Moreover, the Defendant chose to do business with forum residents.   [Doc. 19 at ¶¶ 7, 33].[11] Therefore, it was reasonably foreseeable that the defendant could be subject to suit here.   CFA Inst., 551 F.3d at 296 (explaining that "the inequity of being haled into a foreign forum is mitigated if it was reasonably foreseeable that the defendant could be subject to suit there.") (citation and quotations omitted).   Accordingly, defending this lawsuit in North Carolina should not be particularly burdensome for the Defendant.

Further, North Carolina maintains a "manifest interest" in resolving the grievances of its businesses.   Burger King, 471 U.S. at 478–79 (explaining that a state has a "manifest interest" in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors.).

---

[11] In fact, Tim Draegen was the Defendant's majority shareholder before the Enterprise Court placed all but one of his shares in the control of a proxy.   [Doc. 19 at ¶ 60; Doc. 26-1 at ¶ 25; Doc. 26-2 at 28].   Because the Defendant's majority shareholder was a North Carolina resident for a substantial period (and he apparently continues to own a beneficial majority interest), the Defendant could have reasonably foreseen that it may be haled into court in North Carolina.

That is particularly so in this case, where North Carolina law governs or informs many of the Plaintiff's claims.  [Doc. 19 at ¶¶ 114-124, 158-199, 211-205].

Finally, the Plaintiff has a substantial interest in protecting its trademark and business interests "after having 'carved out a market niche by cultivating' [its] distinctive mark and products."  Tire Eng'g, 682 F.3d at 303 (quoting Nolan, 259 F.3d at 297). Because foreign courts cannot apply United States trademark law, the Plaintiff's interest in obtaining relief in this forum is particularly high.  See Calzaturificio Rangoni S.p.A. v. U.S. Shoe Corp., 868 F. Supp. 1414, 1418 (S.D.N.Y. 1994).  Accordingly, the third prong of the test for specific personal jurisdiction is met.

After considering the relevant factors, the Court concludes that the exercise of personal jurisdiction over the Defendant comports with constitutional due process.  Tire Eng'g, 682 F.3d at 301.

## II.    *FORUM NON CONVENIENS*

The Defendant also moves to dismiss this action based on the doctrine of *forum non conveniens*, arguing that this dispute is more properly litigated in the Netherlands.  [Doc. 23 at 18-25].

"The *forum non conveniens* doctrine is a common law doctrine now largely limited in federal court to cases where the alternative forum for

litigating the dispute is outside of the United States." <u>Compania Naviera</u> <u>Joanna SA v. Koninklijke Boskalis Westminster NV</u>, 569 F.3d 189, 200 (4th Cir. 2009) (citing <u>Sinochem International Co. v. Malaysia International</u> <u>Shipping Corp.</u>, 549 U.S. 422, 435-36 (2007)). "Under the doctrine, a court may dismiss an action in favor of an alternative forum when 'the chosen forum would establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience, or when the chosen forum [is] inappropriate because of considerations affecting the court's own administration and legal problems.'" <u>Id.</u> (quoting <u>American Dredging Co. v.</u> <u>Miller</u>, 510 U.S. 443, 447 (1994)).[12]

A remedy pursuant to *forum non conveniens* may be available when an alternative forum is "(1) available; (2) adequate; and (3) more convenient in light of the public and private interests involved." <u>Jiali Tang v. Synutra Int'l,</u> <u>Inc.</u>, 656 F.3d 242, 248 (4th Cir. 2011) (citing <u>Piper Aircraft Co. v. Reyno</u>, 454 U.S. 235, 241 (1981)). The application of *forum non conveniens* is appropriate when the court can make a finding "that, when weighed against plaintiff's choice of forum, the relevant public and private interests strongly

---

[12] The concept of *forum non conveniens* is largely embodied in 28 U.S.C. § 1404(a), and pertains to the <u>transfer</u> of an action to a more convenient forum. Here, the Defendant seeks the most draconian of remedies under *forum non conveniens*, that of <u>dismissal</u> of the action, notwithstanding the presence of subject matter and personal jurisdiction here. The more drastic the remedy sought, the greater the burden is to show the appropriateness of the remedy.

favor a specific, adequate, and available alternative forum." <u>Tang v. Synutra Int'l, Inc.</u>, 656 F.3d 242, 246 (4th Cir. 2011) (quoting <u>Kontoulas v. A.H. Robins Co.</u>, 745 F.2d 312 (4th Cir. 1984)) (internal quotation marks omitted). "The moving party bears the burden of showing that an adequate alternative forum exists." <u>Jiali Tang</u>, 656 F.3d at 248 (citing <u>Galustian v. Peter</u>, 591 F.3d 724, 731 (4th Cir. 2010); <u>Fid. Bank PLC v. N. Fox Shipping N.V.</u>, 242 F. App'x. 84, 90 (4th Cir. 2007) (unpublished)).

With regard to the availability and adequacy of the Dutch courts as an alternative forum, the Supreme Court has held that an alternative forum ordinarily exists when the defendant is amenable to service of process in the foreign forum. <u>Piper Aircraft</u>, 454 U.S. at 254 n. 22. An alternate forum can be considered unavailable, however, if that forum fails to provide a cause of action for a plaintiff's alleged injury or fails to offer a satisfactory remedy for a plaintiff's injury. <u>See</u> <u>Galustian v. Peter</u>, 591 F.3d 724, 731 (4th Cir. 2010). Likewise, a forum will be considered adequate only when "the parties will not be deprived of all remedies or treated unfairly, even though they may not enjoy all the same benefits as they might receive in an American court." <u>Id.</u> (quoting <u>Fidelity Bank PLC v. N. Fox Shipping N.V.</u>, 242 F. App'x. 84, 90 (4th Cir. 2007)).

The central problem with the Defendant's argument is that foreign courts have no jurisdiction to adjudicate trademark claims arising under United States law. <u>Vanity Fair Mills, Inc. v. T. Eaton Co.</u>, 234 F.2d 633, 644 (2d. Cir. 1956) (explaining that when trademark rights "within the United States are being litigated in an American court, the decisions of foreign courts concerning the respective trademark rights of the parties are irrelevant and inadmissible."); <u>see also</u> <u>Halo Creative & Design Ltd. v. Comptoir Des Indes Inc.</u>, 816 F.3d 1366, 1373 (Fed. Cir. 2016) (collecting cases).[13] Because the Dutch courts cannot adjudicate the Plaintiff's trademark infringement claims, the Plaintiff would be left with no meaningful remedy on those claims, even if found to have been wronged. <u>Piper Aircraft</u>, 454 U.S. at 254-55 (noting that an alternative forum was inadequate when the plaintiffs would "be deprived of any remedy . . . ."). Accordingly, the Court concludes that Defendant has failed to carry its burden to demonstrate that the Dutch courts are an adequate alternative forum. <u>Galustian</u>, 591 F.3d at 732 (denying a motion to dismiss for *forum non conveniens* where an affidavit

---

[13] While the Defendant has submitted a declaration from its Dutch attorney, Alfred Meijboom, attesting that the Dutch courts provide an adequate forum because they can address all the Plaintiff's claims, [Doc. 26-5], that conclusory statement fails to address the jurisprudence of the United States courts that the Dutch courts have no jurisdiction to address the Plaintiff's trademark infringement claim. Nor does it explain any alternative means by which the Plaintiff can resolve that claim in the Dutch courts.

submitted by the moving party failed to demonstrate the availability of a particular cause of action, or a remedy for that cause of action, in the foreign court).[14]

Even if the Defendant had established that the Dutch courts were an available and adequate forum, the private and public interests to be weighed in considering a *forum non conveniens* motion also weigh against the Defendant. When considering such motion, the public interest factors include: "[1] the administrative difficulties flowing from court congestion; [2] the local interest in having localized controversies decided at home; [3] the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; [4] the avoidance of unnecessary problems in conflict of laws or in application of foreign law; and [5] the unfairness of burdening citizens in an unrelated forum with jury duty." Piper Aircraft, 454 U.S. at 241, n. 6. The private interest factors include: "(1) the relative ease of access to sources of proof; (2) availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; (3) possibility of view of premises, if view would be

---

[14] While the Defendant highlights that it is amenable to service in the Netherlands and that American courts have previously found Dutch courts to be an adequate forum, [Doc. 23 at 19], the Dutch courts have abstained from addressing the Plaintiff's intellectual property claims that are asserted in this action. [Doc. 10-1 at ¶ 3.4; Doc. 8-14 at ¶¶ 2.12; 3.5]. Accordingly, even if the Dutch courts provided remedies for the Plaintiff's intellectual property claims, it is not clear that those remedies would be available to the Plaintiff.

appropriate to the action; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive." American Dredging, 510 U.S. at 448 (quoting Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947)).

The Court's analysis begins with the plaintiff's choice of forum, which "ordinarily deserves substantial deference." Piper Aircraft Co. v. Reyno, 454 U.S. at 242 (1981).  The plaintiff's "choice of forum is entitled to even greater deference when the plaintiff chooses [its] 'home forum.'" DiFederico v. Marriott Int'l, Inc., 714 F.3d 796, 803 (4th Cir. 2013) (quoting Piper Aircraft, 454 U.S. at 255–56).  "When the alternative forum under consideration is foreign, 'home forum' refers to any federal district in the United States." Id. (citing Adelson v. Hananel, 510 F.3d 43, 53 (1st Cir. 2007)).  A plaintiff's choice of its home forum "is presumptively convenient, and should be overridden only when the defendant 'establish[es] such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiff's convenience, which may be shown to be slight or nonexistent.'" Id. (quoting Koster v. (American) Lumbermens Mut. Cas. Co., 330 U.S. 518, 524 (1947)). Because the Plaintiff has brought this lawsuit in its home forum, the Plaintiff's choice of this forum is entitled to significant deference.  Id.

The Defendant argues, however, that the deference typically afforded to a plaintiff's choice of its home forum should not apply to the circumstances

present in this case, where "an American corporation doing extensive foreign business brings an action for injury occurring in a foreign country." [Doc. 23 at 19 (quoting DTEX, LLC, v. BBVA Bancomer, S.A., 508 F.3d 785, 795 (5th Cir. 2007))]. However, DTEX and the other cases cited by the Defendant are inapposite. In the present case, the intellectual property rights of the Plaintiff are rights under United States law and the harm alleged to flow from the Defendant infringement is harm being suffered in this district. The cases on which the Defendant relies pertain to losses being suffered in other countries. The Defendant cites no authority whatsoever for applying this proposition to the facts at issue in this case. Accordingly, the Court concludes that the Defendant must overcome a substantial burden to outweigh the deference owed to the Plaintiff's choice of this forum. Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255 (1981) (explaining that "strong presumption in favor of the plaintiff's choice of forum" can "be overcome only when the private and public interest factors clearly point towards trial in the alternative forum.").

Turning to the remaining private and public interests, the ongoing Dutch proceedings do not strongly impact the *forum non conveniens* analysis because "the mere presence of parallel litigation bears only marginally on the touchstone of the *forum non conveniens* analysis; namely, convenience."

SAS Inst., Inc. v. World Programming Ltd., 468 F. App'x 264, 266 (4th Cir. 2012) (citing Adelson v. Hananel, 510 F.3d 43, 54 (1st Cir. 2007); Guidi v. Inter–Cont'l Hotels Corp., 224 F.3d 142, 148 (2d Cir. 2000)). While a trial in this forum may present difficulties with access to the Defendant's witnesses and evidence, which are largely in Europe, a trial in the Dutch courts would present similar issues for the Plaintiff's witnesses and evidence, which are largely in the United States. Moreover, the Defendant has not shown that any witness is actually unwilling to testify or will be unavailable if the proceedings take place in this forum. DiFederico, 714 F.3d at 806 (explaining that the availability of compulsory process for witnesses "should be given little weight in the overall balancing scheme when the defendant has not shown that any witness is actually unwilling to testify."). There is also the issue of language. The Defendant has shown by its filings in this Court that its principals and witnesses are conversant in English, the language to be employed in this forum. On the other hand, the proceedings in the Netherlands presumably would be conducted in Dutch. There is nothing before the Court to show that the Plaintiff's principals and witnesses have any knowledge of the Dutch language. As such, conducting this litigation in English will be much more convenient for the parties. Further, neither party claims that a trial will require the ability to view premises in the

United States or the Netherlands. Accordingly, this forum is comparably more convenient than the Dutch courts.

In addition, this forum is appropriate for determining the claims at issue in the Plaintiff's lawsuit, many of which are governed by North Carolina law. [Doc. 19 at ¶¶ 114-124, 158-199, 211-205]. Notably, none of the Plaintiff's claims are governed by Dutch or other foreign law. [Id.].[15] Moreover, while "[j]ury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation[,]" American Dredging, 510 U.S. at 447-48 (quoting Gulf Oil, 330 U.S. at 508), a North Carolina jury will have an interest in resolving this dispute because the harms being felt by the Plaintiff are being felt within the forum and the Plaintiff has its primary place of business in this forum. DiFederico, 714 F.3d at 808 (denying a motion to dismiss for *forum non conveniens* in part because a Maryland jury had "a strong interest in deciding this case.").[16] Unlike the Dutch proceedings,

---

[15] The Defendant argues that the law applicable to it "is Dutch, not U.S., law." [Doc. 23 at 24]. When United States trademarks and copyrights are at issue, however, United States law can apply even when the infringement occurred outside of the United States. See Herrmann Int'l, Inc. v. Herrmann Int'l Eur., No. 1:17-cv-00073-MR, 2021 WL 861712, at *8-*13 (W.D.N.C. Mar. 8, 2021) (Reidinger, C.J.). Moreover, the Plaintiff has submitted an affidavit stating that United States law governs this dispute as the location of the licensor under Article 4 of Regulation (EC) No 593/2008 of the European Parliament and of the Council on the law applicable to contractual obligations. [Doc. 17 at ¶ 21]. The Defendant has submitted no contrary authority.

[16] There is nothing before the Court to indicate that this matter would be tried before a jury in the Dutch courts.

where the Plaintiff has a pending objection to the exercise of jurisdiction, [Doc. 19 at ¶¶ 61-69; Doc. 20-1], this Court has now resolved that it has jurisdiction to hear this matter.  In addition, this Court is far more familiar with applying United States intellectual property law than the Dutch courts.  As such, there is no question about the Court's willingness or competence to handle the intellectual property claims arising under United States law, which will prevent the parties from having to assert those claims in a different venue.  Accordingly, the Court's adjudication of this dispute may prevent further court congestion, administrative difficulties, and unnecessary problems in conflicts of law or application of foreign law.

In short, the Court concludes that the Defendant has failed to overcome its heavy burden to show that this forum is so inconvenient as to outweigh the Plaintiff's choice of its home forum.  Accordingly, even if the Dutch courts presented an adequate alternative forum for adjudicating the Plaintiff's claims, the public and private interests weigh against granting the Defendant any remedy under *forum non conveniens*. Therefore, the Defendant's Motion to Dismiss for *forum non conveniens* will be denied.

## III.   PRELIMINARY INJUNCTION

Having determined that this Court can properly exercise personal jurisdiction over the Defendant and that this is an appropriate forum for the

adjudication of the Plaintiff's claims, the Court turns next to the Plaintiff's Motion for Preliminary Injunction.  Because the relief requested by the Plaintiff would be interim remedies for the intellectual property and tortious interference claims, the Court will solely address the Plaintiff's Motion for Preliminary Injunction with respect to those claims.  McNeil-PPC, Inc. v. Granutec, Inc., 919 F. Supp. 198, 201 (E.D.N.C. 1995); Nabisco Brands, Inc. v. Conusa Corp., 722 F. Supp. 1287, 1292 n.4 (M.D.N.C. 1989).

A plaintiff seeking a preliminary injunction must demonstrate that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm absent injunctive relief, (3) the balance of equities tips in its favor, and (4) the injunction would be in the public interest.  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  In addition, under the "mandatory and unambiguous" language of Rule 65(c), the "district court must fix a bond whenever it grants a preliminary injunction or restraining order." Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 421 (4th Cir. 1999).

"A preliminary injunction is an extraordinary remedy never awarded as of right."  Id. at 24.  Thus, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 542 (1987).  Ultimately, a plaintiff's entitlement to preliminary

injunctive relief is a matter of discretion with the Court.  See Metropolitan Reg'l Info. Sys., Inc. v. American Home Realty Network, Inc., 722 F.3d 591, 595 (4th Cir. 2013).

The primary function of a preliminary injunction is to maintain or restore the status quo.  See Di Biase v. SPX Corp., 872 F.3d 224, 231 (4th Cir. 2017); see Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 422 (4th Cir. 1999) (explaining that "a preliminary injunction preserves the status quo pending a final trial on the merits[.]").  Accordingly, any preliminary injunction must "be tailored to restrain no more than what is reasonably required to accomplish its ends." Consolidation Coal Co. v. Disabled Miners of S. W. Va., 442 F.2d 1261, 1267 (4th Cir. 1971).

"When considering a motion for preliminary injunction, a district court may assess the relative strength and persuasiveness of the evidence presented by the parties, and is not required to resolve factual disputes in favor of the non-moving party."  Queen Virgin Remy, Co. v. Thomason, No. 1:15-CV-1638-SCJ, 2015 WL 11422300, at *2 (N.D. Ga. June 10, 2015), modified, No. 1:15-CV-1638-SCJ, 2015 WL 11455760 (N.D. Ga. Oct. 21, 2015) (citing Imaging Business Machines, LLC. v. BancTec, Inc., 459 F.3d 1186, 1192 (11th Cir. 2006)).  If the evidence is contested, however, the court "'must assess the facts, draw whatever reasonable inferences it might favor,

and decide the likely ramifications.'" Weaver v. Henderson, 984 F.2d 11, 14 (1st Cir. 1993) (quoting Independent Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co., 864 F.2d 927, 929 (1st Cir. 1988)).

At the preliminary injunction stage, allegations set forth in a verified complaint are treated the same as affidavits. IDS Life Ins. Co. v. SunAmerica Life Ins. Co., 136 F.3d 537, 542 (7th Cir. 1998) (noting that "[v]erified complaints[ are] the equivalent of affidavits"); Synthes USA, LLC v. Davis, No. 4:17-CV-02879-RBH, 2017 WL 5972705, at *1 (D.S.C. Dec. 1, 2017) (explaining that "a verified complaint is wholly sufficient for purposes of ruling on a preliminary injunction motion.") (citation omitted).[17]

## A.    Likelihood of Success on the Merits

### 1.    Laches

As a threshold matter, the Defendant argues that all interim relief should be denied because the Plaintiff's claims are barred by the doctrine of laches.   [Doc. 27 at 25].   Before addressing the merits of the Plaintiff's underlying claims, the Court will address the Defendant's assertion of laches.

---

[17] "In fact, the Fourth Circuit has indicated a complaint—verified or not—must be considered."  Synthes USA, 2017 WL 5972705, at *1 (citing G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd., 822 F.3d 709, 725–26 (4th Cir. 2016), vacated and remanded on other grounds, 137 S. Ct. 1239 (2017).

Laches is an "equitable doctrine" that can bar a request for relief. Perry v. Judd, 471 F. App'x 219, 222 (4th Cir. 2012). Laches requires a defendant to prove two elements: "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." Costello v. United States, 365 U.S. 265, 282 (1961). "The first element of laches, lack of diligence, is satisfied where a plaintiff has unreasonably delayed in pursuing his claim." E.E.O.C. v. Navy Fed. Credit Union, 424 F.3d 397, 409 (4th Cir. 2005) (citing White v. Daniel, 909 F.2d 99, 102 (4th Cir. 1990)). "When a party acts within the applicable statute of limitations, laches will not apply absent exceptional circumstances." Carolina First Bank v. Stambaugh, No. 1:10-cv-00174, 2011 WL 6217409, at *4 (W.D.N.C. Dec. 14, 2011) (Reidinger, J.) (citing Phipps v. Robinson, 858 F.2d 965, 972 (4th Cir. 1988)). Moreover, laches will not penalize a plaintiff for attempting to resolve a dispute within a reasonable time before racing to the courthouse. Mogavero v. McLucas, 543 F.2d 1081, 1083 (4th Cir. 1976) ("In the interest of encouraging disputants to settle claims prior to the institution of litigation, we conclude that such a period should not be counted for purposes of laches.").

The Plaintiff filed this action well within the statute of limitations for its claims. N.C. Gen. Stat. 1–52(1) (three-year statute of limitations for breach

of contract claims under North Carolina law); 17 U.S.C. § 507(b) (three-year statute of limitations for copyright infringement claims under the Copyright Act); Lyons P'ship, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 796 (4th Cir. 2001) (four-year statute of limitations for trademark infringement claims under the Lanham Act); 18 U.S.C. § 1836(d) (three-year statute of limitations for claims for misappropriation of trade secrets under the DTSA); N.C. Gen. Stat. § 66–157 (three-year statute of limitations for claims for misappropriation of trade secrets under the NCTSPA); N.C. Gen. Stat. § 1-52(5) (three-year statute of limitations for claims for tortious interference under North Carolina law). Accordingly, laches does not apply unless the Defendant can show the existence of exceptional circumstances. Carolina First Bank, 2011 WL 6217409, at *4 (citing Phipps, 858 F.2d at 972). The Defendant has failed to demonstrate any exceptional circumstances in this case.

Moreover, although the Defendant's breach of contract allegedly occurred in December 2019, the Plaintiff claims that the Defendant escalated its wrongful conduct in early 2021. [Doc. 19 at ¶ 77]. The Plaintiff promptly initiated this action after becoming aware of the Defendant's worsening conduct, which forms the basis for many of the Plaintiff's claims, including the ones for tortious interference, trademark infringement, misappropriation

of trade secrets, computer trespass, and defamation.  By filing this action within a few months of its claims ripening, the Plaintiff showed diligence, not a lack thereof.

While the Defendant claims that the Plaintiff showed a lack of diligence on its breach of contract claim by waiting to initiate this action until nearly fifteen months after the Defendant allegedly breached the contract in December 2019, [Doc. 25 at 29], the Plaintiff alleges that it "attempted to discuss and resolve the Defendant's breaches during the fall of 2020." [Doc. 19 at ¶ 62].  Beyond negotiating with the Defendant, the Plaintiff has also been diligently pursuing its rights and attempting to protect itself in other ways.  For instance, the Plaintiff sent the Defendant a cease-and-desist letter on February 16, 2021.  [Id. at ¶ 94].  The Plaintiff also filed a complaint in accordance with the Uniform Domain Name Dispute Resolution Policy ("UDRP") on February 25, 2021.  [Id. at ¶ 98].  The Plaintiff did not demonstrate a lack of diligence by attempting to negotiate and resolve this dispute for several months after learning about the alleged breach of contract.  Mogavero, 543 F.2d at 1083.

For these reasons, the Court concludes that the Plaintiff acted with diligence when pursuing its claims.  Accordingly, the Court concludes that the equitable doctrine of laches is inapplicable to this case.

## 2.    Copyright Claims

The Plaintiff's third cause of action is for violations of the Copyright Act. [Doc. 19 at ¶¶ 125-36].

Copyright infringement occurs when a person "violates any of the exclusive rights of the copyright owner." 17 U.S.C. § 501(a). "Therefore, the two elements of an infringement claim are (1) ownership of a valid copyright and (2) encroachment upon one of the exclusive rights afforded by the copyright." Elektra Ent. Grp., Inc. v. Doe, No. 5:08-cv-1159-FL, 2008 WL 5111886, at *2 (E.D.N.C. Dec. 4, 2008) (citing Avtec Systems, Inc. v. Peiffer, 21 F.3d 568, 571 (4th Cir. 1994)). "A certificate of registration issued by the Copyright Office is '*prima facie* evidence of the validity of the copyright and of the facts stated in the certificate,' such as ownership." Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc., 618 F.3d 417, 428 (4th Cir. 2010), as amended (Aug. 24, 2010) (citing 17 U.S.C. § 410(c)). An individual's reproduction of a copyrighted work encroaches on that copyright because "the Copyright Act grants the copyright holder 'exclusive' rights to use and to authorize the use of his work in five qualified ways, including reproduction of the copyrighted work in copies[.]" Sony Corp. v. Universal City Studios, Inc., 464 U.S. 417, 432–33 (1984).

The Amended Complaint asserts that the Plaintiff has copyrighted its products, software, intellectual property, source code, and technology with the United States Copyright Office and that its registration has been accepted and confirmed by the Copyright Office as bearing Registration number TX0008941559. [Doc. 19 at ¶ 40-44]. Accordingly, the Plaintiff has demonstrated that it owns a valid copyright. Universal Furniture, 618 F.3d at 428 (citing 17 U.S.C. § 410(c)).

The Amended Complaint further asserts that the Defendant has used, copied, sold, and distributed the Plaintiff's copyrighted information. [Doc. 19 at ¶ 127]. Accordingly, the Plaintiff has established that the Defendant is encroaching on the rights afforded by the copyright.

The Defendant argues that the Plaintiff's copyright infringement claim fails because the Copyright Act can only be applied to its extraterritorial conduct if the "predicate-act doctrine" applies. [Doc. 25 at 17]. Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co., 682 F.3d 292, 306 (4th Cir. 2012) (citing Update Art, Inc. v. Modiin Publ'g, Ltd., 843 F.2d 67, 73 (2d Cir. 1988)). To invoke the predicate-act doctrine, "a plaintiff is required to show a domestic violation of the Copyright Act and damages flowing from foreign exploitation of that infringing act." Id. at 308. Courts are split on "whether all parts of the infringing act must take place in the United States,

or if it is sufficient that some part of the infringing acts take place in the United States." Shropshire v. Canning, 809 F. Supp. 2d 1139, 1145 (N.D. Cal. 2011) (collecting cases).

The Plaintiff's Amended Complaint asserts that the Defendant is using, copying, selling, and distributing the Plaintiff's copyrighted products, software, intellectual property, source code, and technology. [Doc. 19 at ¶ 26].[18] The Plaintiff has also presented evidence to show that the Defendant is using the Plaintiff's copyrighted information to service customers in the United States from the Defendant's offices abroad, specifically a California company named Clarizen. [Doc. 15 at ¶ 4; Doc. 15-2]. The Plaintiff presents further evidence to show that the Defendant is servicing American customers who merely have offices and operations in Europe and elsewhere. [Doc. 8 at ¶ 5]. That evidence shows that the Plaintiff is likely to ultimately prove that the Defendant's actions are causing companies within the United States to use the Plaintiff's copyrighted information without authorization. Accordingly, the Court concludes that the Plaintiff has demonstrated a likelihood of

_____

[18] While the Defendant's prior use of the Plaintiff's intellectual property may have been lawful pursuant to the licensing agreement between the parties, the Plaintiff claims that the Defendant's recent use of its intellectual property has exceeded any scope of that license. Tattoo Art Inc. v. TAT Int'l LLC, 498 F. App'x 341, 346 (4th Cir. 2012) (explaining that "'[a] licensee infringes the owner's copyright if its use exceeds the scope of its license.'") (quoting ITOFCA, Inc. v. MegaTrans Logistics, Inc., 322 F.3d 928, 940 (7th Cir. 2003)).

success on its argument that the Defendant's actions have led to copyright infringement within the United States. Because the Defendant's foreign exploitation of that infringement within the United States has allegedly caused the Plaintiff damages, the Court concludes at this time that the predicate-act doctrine authorizes the application of the Copyright Act to the Defendant's conduct.[19]

### 3. Trademark Claims

The Plaintiff in its fourth and fifth causes of action asserts violations of the Lanham Act, including trademark infringement and false designation of origin. [Doc. 19 ¶¶ 137-57]. The Plaintiff in its twelfth cause of action asserts common-law trademark infringement. [Id. at ¶¶ 211-215].

To prevail on a trademark infringement claim under the Lanham Act, the Plaintiff must show that it has a valid mark and that the similarity of the defendant's mark to the plaintiff's mark creates a "likelihood of confusion" in the marketplace. See Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 124 (4th Cir. 1990). "[A] certificate of registration of a mark serves as *prima facie* evidence that the registrant owns the registered mark, has properly registered it under the Lanham Act, and is entitled to its exclusive use in

---

[19] Although the Court concludes that the Plaintiff has shown a likelihood of success on its claim under the Copyright Act at this stage, it remains to be seen whether the Plaintiff will ultimately prove that a predicate-act occurred within the United States.

commerce." Brittingham v. Jenkins, 914 F.2d 447, 452 (4th Cir. 1990). The Fourth Circuit has enunciated at least nine factors that are relevant to the likelihood of confusion, including:

> (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public.

George & Co., LLC v. Imagination Entm't Ltd., 575 F.3d 383, 393 (4th Cir. 2009).

The Plaintiff asserts that it has a valid trademark and provides its registration from the U.S. Patent and Trademark Office. [Doc. 19 at ¶¶ 45-49; Doc. 19-1 at 1]. Accordingly, the Court concludes that the Plaintiff has a valid trademark.

The Court further concludes that the Plaintiff demonstrates a likelihood of confusion. The Plaintiff asserts that its mark has "become distinctive and famous as the indication of origin of [its] services" and that its mark "is instantly recognizable and has undoubtedly acquired valuable goodwill." [Doc. 19 at ¶ 49]. While the Defendant argues that the Plaintiff's Amended Complaint only claims that the use of the Plaintiff's trademark "is likely to

cause confusion or mistake among consumers, customers, and their employees as to the origin, sponsorship or approval of Defendant's goods or services," [Doc. 25 at 19 (citing Doc. 19 at ¶ 141)], the Plaintiff has submitted several exhibits showing consumers that have contacted the parties or posted on the internet after becoming confused about the relationship between the Plaintiff and the Defendant.  [Doc. 8 at ¶ 24; Doc. 8-11 at 1-10; Doc. 8-12; Doc. 15-5 at 1-2].  Beyond a mere likelihood of confusion, those exhibits demonstrate actual confusion.  Such confusion is unsurprising given that the Defendant is using the Plaintiff's mark as its domain name; hosting a website that is virtually identical to the Plaintiff's website; and operating a business that provides essentially the same services as the Plaintiff.  [Doc. 19 at ¶ 138; Doc. 8-1; Doc. 8-2; Doc. 8-3; Doc. 8-4; Doc. 8-6; Doc. 8-7]. Based on the evidence submitted by the Plaintiff, the Court concludes that the Plaintiff has demonstrated a likelihood of success of ultimately proving that the Defendant's use of the mark has caused consumer confusion.

The Lanham Act, however, only regulates "commerce which may lawfully be regulated by Congress." <u>Steele v. Bulova Watch Co.</u>, 344 U.S. 280, 286 (1952). Accordingly, the Court can only enjoin the Defendant's conduct after considering whether: (1) the defendant's conduct had a significant effect on United States commerce; (2) the defendant is a citizen

of the United States; and (3) the issuance of an injunction would interfere with trademark rights under the relevant foreign law. Id. at 283-86. Generally, "the absence of two of the three Bulova factors in this case is fatal to an argument that the conduct is governed by the Lanham Act." Totalplan Corp. of Am. v. Colborne, 14 F.3d 824, 831 (2d Cir. 1994).

The first factor considers whether the Defendant's conduct had a significant effect on United States commerce. Nintendo of Am., Inc., v. Aeropower Co., Ltd., 34 F.3d 246, 250–51 (4th Cir. 1994). While the operation of a passive website generally is insufficient to show a significant effect on United States commerce, the Defendant is operating a platform using the Plaintiff's mark that provides an option for customers in "the Americas" and the Plaintiff has apparently enticed at least one United States company to change platforms from the Plaintiff's to the Defendant's. [Doc. 15 at ¶ 4; Doc. 30 at ¶ 32; Doc. 16 at ¶ 7]. While the Defendant argues that the Plaintiff has provided no allegations or evidence to show consumer confusion in the United States, [Doc. 25 at 19], the Plaintiff asserts and provides evidence that the Defendant's use of a "confusingly similar" mark has caused actual confusion and has led to reputational, relationship and economic injury to the Plaintiff's business in the United States. [Doc. 8 at ¶ 24; Doc. 8-11 at 1-10; Doc. 8-12; Doc. 15-5 at 1-2]. Notably, one of the

internet posts about the dispute states that the resulting confusion "has completely eroded any faith we have in dmarcian (US and EU). We'll be moving to a new provider." [Doc. 8-11 at 3]. That negative post, along with many others, is readily accessible to U.S. consumers on the internet, as are the Defendant's various websites containing the confusingly similar marks and domain names. Bulova, 344 U.S. at 286 (explaining that the application of the Lanham Act was appropriate where a defendant's "operations and their effects were not confined within the territorial limits of a foreign nation."). Further, the Defendant has affirmatively caused at least some confusion among U.S. consumers by sending a message regarding a data breach to every customer of the Plaintiff and the Defendant, including those located within the United States. [Doc. 8 at ¶ 27]. It is likely that at least some of the consumers in the United States would be confused upon learning about a purported data breach from an apparently separate entity that is using the Plaintiff's mark. Such confusion leads to "the archetypal injury contemplated by the Act" by harming a plaintiff's "trade reputation in United States markets." Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co., 682 F.3d 292, 310 (4th Cir. 2012) (citing Aeropower, 34 F.3d at 250). Because the evidence at this stage demonstrates that the Defendant's trademark infringement is damaging the Plaintiff's reputation and confusing

consumers in the United States, [Doc. 43 at ¶¶ 30, 34-36], the Court concludes that the Plaintiff has demonstrated a likelihood of success on a claim that the Defendant's actions have had and are having a significant effect on United States commerce. Sterling Drug, Inc. v. Bayer AG, 14 F.3d 733, 746, 747 (2d Cir. 1994).

The second factor examines the citizenship of the Defendant. Bulova, 344 U.S. at 285-86. Where the alleged infringing foreign acts involve a foreign citizen, "courts have been reluctant to extend the reach of the Lanham Act." Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd., 955 F.Supp. 220, 226–27 (S.D.N.Y. 1997). Defendant is a Dutch corporation [Doc. 19 at ¶ 4], and thus this factor counsels somewhat against extending the Lanham Act to the Defendant's conduct. Aerogroup, 955 F. Supp. at 226–27. Nevertheless, foreign citizenship alone is not sufficient to defeat extraterritorial application of the Lanham Act. Totalplan, 14 F.3d at 831. The weight of this factor is variable because the "application of United States law to United States nationals abroad ordinarily raises considerably less serious questions of international comity than does the application of United States law to foreign nationals abroad." E.E.O.C. v. Arabian Am. Oil Co., 499 U.S. 244, 274 (1991) (Marshall, J., dissenting). That is particularly true in a case such as this one where the foreign corporate Defendant has a majority

American shareholder, and thus is not the ordinary case of a foreign-owned, foreign-operated, foreign-located defendant. Though this factor may weigh against the extension of the Lanham Act to the Defendant's activities, such weight is rather light.

The third factor considers whether the application of the Lanham Act would interfere with trademark rights under the relevant foreign law. <u>Bulova</u>, 344 U.S. at 283-86. Courts have concluded that the Lanham Act "should not be given an extraterritorial application against foreign citizens acting under presumably valid trade-marks in a foreign country." <u>See</u> <u>Vanity Fair Mills, Inc. v. T. Eaton Co.</u>, 234 F.2d 633, 643 (2d Cir. 1956). Here, the Defendant does not claim that it has any valid trademarks in foreign countries. While the Plaintiff has some foreign trademarks, [Doc. 15-1], those foreign trademarks are not at issue in this case. Although there are unresolved proceedings in the Dutch courts, [Doc. 10-1 at ¶ 3.4; Doc. 8-14 at ¶¶ 2.12, 3.5], the Dutch courts have expressly declined to resolve the intellectual property disputes presented in this case and have no authority to adjudicate trademark claims arising under United States law. <u>Vanity Fair</u>, 234 F.2d at 644 (explaining that when trademark rights "within the United States are being litigated in an American court, the decisions of foreign courts concerning the respective trademark rights of the parties are irrelevant and

inadmissible."); see also Halo Creative & Design Ltd. v. Comptoir Des Indes Inc., 816 F.3d 1366, 1373 (Fed. Cir. 2016) (collecting cases).  Because the Dutch proceedings cannot adjudicate the Plaintiff's trademark claims, the application of the Lanham Act to the Defendant is not "fraught with possibilities of discord and conflict with the authorities of another country." Vanity Fair Mills, 234 F.2d at 647.

On balance, the Court concludes that the Lanham Act can be applied extraterritorially on the facts presented in this case.  While the Defendant is a foreign citizen, the Defendant's actions have had a significant effect on United States commerce and there are no foreign trademarks at issue here. Because the Plaintiff has demonstrated that it owns a valid trademark and a likelihood of success of ultimately proving that the Defendant's actions are causing consumer confusion, the Court concludes that the Plaintiff has shown a likelihood of success on the merits of its claims under the Lanham Act.

Having concluded that the Plaintiff has shown a likelihood of success on the merits of its trademark infringement claim under the Lanham Act, the Court need not address the Plaintiff's claims for false designation of origin or common-law trademark infringement under the Lanham Act at this time. McNeil-PPC, Inc. v. Granutec, Inc., 919 F. Supp. 198, 201 (E.D.N.C. 1995);

Nabisco Brands, Inc. v. Conusa Corp., 722 F. Supp. 1287, 1292 n.4 (M.D.N.C. 1989).

### 4. Trade Secrets Claims

The Plaintiff in its seventh and eleventh causes of action asserts claims for misappropriation of trade secrets under the NCTSPA and the DTSA, respectively. [Doc. 19 at ¶¶ 161-71; 200-10].

To establish a misappropriation claim under the DTSA, the plaintiff must show "(1) that he holds a trade secret, (2) that the trade secret was misappropriated, and (3) that the trade secret implicates interstate or foreign commerce." Hunter Structural, P.A. v. Arp Eng'g, Inc., No. 3:17-cv-00086, 2018 WL 662367, at *5 (W.D.N.C. Feb. 1, 2018) (Mullen, J.) (citing 18 U.S.C. § 1836(b)(1)).

The DTSA defines a trade secret as

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and

> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3).  The Amended Complaint describes the Plaintiff's trade secrets as its source code; customer database; account registrations; business and market intelligence stemming from the account registrations; application database; and sales lead information.  [Doc. 19 at ¶ 162].  The Amended Complaint asserts that the Plaintiff has undertaken "reasonable measures to protect" that information from disclosure, including taking security measures; conducting yearly penetration tests; restricting access to the source code; adopting terms of service and privacy policies; and requiring its employees to sign confidentiality agreements, nondisclosure agreements, and appropriate use policies.  [Id. at ¶ 202].  The Amended Complaint further asserts that such information derives independent economic value as a result of not being generally known.  [Id. at ¶ 201].  Based on those verified allegations, which are not disputed by the Defendant, the Court concludes that the Plaintiff has shown a likelihood of success of proving that such information constitutes trade secrets under the DTSA.

The DTSA protects against the "misappropriation" of a trade secret, 18 U.S.C. § 1836(b), which is roughly defined as the unauthorized acquisition, disclosure, or use of a trade secret. Id. at § 1839(5). Although the Plaintiff admits that the Defendant was previously authorized to use the Plaintiff's trade secrets in certain contexts, the Amended Complaint asserts that the Defendant acquired the trade secrets under circumstances giving rise to a duty to maintain their secrecy or limit their use to purposes for the parties' joint benefit. [Doc. 19 at ¶ 203]. The Amended Complaint further asserts that the Defendant has misappropriated the Plaintiff's trade secrets by disclosing and using those trade secrets beyond the scope of the parties' agreement. [Id. at ¶ 203-04]. The Defendant does not dispute that it has used the Plaintiff's trade secrets without authorization, only that it has never done so in the United States. [Doc. 25 at 20-21]. Accordingly, the Court concludes that the Plaintiff has shown a likelihood of success of proving that the Defendant misappropriated its trade secrets.

The DTSA requires that the trade secrets have been used in interstate or foreign commerce. Hunter Structural, 2018 WL 662367, at *5 (citing 18 U.S.C. § 1836(b)(1)). The Amended Complaint asserts that the Defendant has used the Plaintiff's trade secrets in interstate and foreign commerce. [Doc. 19 at ¶ 205]. The Defendant does not dispute that it has used the trade

secrets in foreign commerce. [Doc. 25 at 20-21]. Accordingly, the Court concludes that the Plaintiff has shown a likelihood of success of proving that the Defendant used the trade secrets in interstate or foreign commerce.

The thrust of the Defendant's argument is that an extraterritorial claim cannot be brought under the DTSA unless "an act in furtherance of the offense was committed in the United States." [Id. at 20 (citing Herrmann Int'l, Inc. v. Herrmann Int'l Eur., No. 1:17-cv-00073-MR, 2021 WL 861712, at *16 (W.D.N.C. Mar. 8, 2021) (Reidinger, C.J.)]. While the DTSA defines an "offense" as the improper acquisition, unauthorized disclosure, or unauthorized use of a trade secret, 18 U.S.C. § 1836(b); § 1839(5), "[t]he statute does not define what constitutes 'an act in furtherance of the offense.'" Luminati Networks Ltd. v. BIScience Inc., No. 2:18-cv-00483-JRG, 2019 WL 2084426, at *9 (E.D. Tex. May 13, 2019) (citing 18 U.S.C. § 1837(2)).

Courts interpreting the DTSA have established a relatively low bar for acts that are considered "in furtherance of the offense." For instance, the Southern District of New York has concluded that such acts were committed when the defendant's officer met with the plaintiff's CEO in the United States; the parties negotiated a contract in the United States that led to the authorization for the disclosure of the trade secrets; and one of the

defendant's officers had a contract that took place partly in the United States. Medcenter Holdings Inc. v. WebMD Health Corp., No. 1:20-cv-00053 (ALC), 2021 WL 1178129, at *6 (S.D.N.Y. Mar. 29, 2021).  Likewise, the Central District of California has concluded that a defendant attending meetings in the United States to develop and manufacture products containing misappropriated trade secrets committed an act in furtherance of a misappropriation.    MACOM Tech. Sols. Inc. v. Litrinium, Inc., No. SACV19220JVSJDEX, 2019 WL 4282906, at *5 (C.D. Cal. June 3, 2019). On the other hand, the Middle District of Florida has found that a defendant's attendance at a trade show in the United States did not constitute an act in furtherance of a misappropriation because there was no connection between the "attendance at the trade show [and] the alleged misappropriation of the plaintiffs' trade secrets."  ProV Int'l Inc. v. Lucca, No. 8:19-cv-978-T-23AAS, 2019 WL 5578880, at *3 (M.D. Fla. Oct. 29, 2019).   Those cases demonstrate that courts place less import on the scope of the actions committed within the United States than the tie between those actions and the misappropriation.

The Plaintiff asserts that the Defendant committed two acts in furtherance of the misappropriation within the United States: "(a) accessing Plaintiff's data located in the United States; and (b) marketing the Trade

Secrets to customers in the United States through its website instructing US customers or prospective customers to register with Defendant's separate platform." [Doc. 19 at ¶ 206]. Although initially justified by the parties' cooperation, the Defendant's access to the Plaintiff's data stored on servers within the United States created the opportunity for the Defendant to acquire the Plaintiff's trade secrets. [Id. at ¶¶ 166-69]. The Plaintiff has presented evidence to show that the Defendant is using the Plaintiff's trade secrets to conduct business with customers in the United States, including a California company named Clarizen. [Doc. 15 at ¶¶ 3-4; Doc. 15-2]. Indeed, Tim Draegen claims that when he visited one of the Defendant's websites from his location in the United States, he was directed to the Defendant's platform when he selected the option for customers in "the Americas." [Doc. 16 at ¶ 7]. The Plaintiff's evidence suggests that the Defendant's foreign actions have led to the unauthorized use or disclosure of the Plaintiff's trade secrets within the United States. Because the Defendant originally gained access to the Plaintiff trade secrets within the United States, and the evidence suggests that the Defendant's actions have led to the use or disclosure of the Plaintiff's trade secrets within the United States, the Court concludes that the DTSA can be applied to the Defendant's conduct. See vPersonalize Inc. v. Magnetize Consultants Ltd., 437 F. Supp. 3d 860, 879 (W.D. Wash. 2020)

(explaining that "[i]nsulating a foreign defendant for the sole reason that a transaction occurred over the internet, rather than in a brick and mortar location, is untenable in the context of modern commerce.").

### 5. Tortious Interference Claims

The Plaintiff's ninth and tenth causes of action are for tortious interference with contract and tortious interference with prospective economic advantage, respectively. [Doc. 19 at ¶¶ 177-99].

Under North Carolina law, to state a claim for tortious interference with contract a plaintiff must allege: (1) the existence of a valid contract between the plaintiff and a third person; (2) the defendant knew of this contract; (3) the defendant intentionally induced the third person not to perform the contract; (4) the defendant's acts were committed without justification; and (5) the plaintiff suffered actual damage. Barker v. Kimberly-Clark Corp., 136 N.C. App. 455, 462, 524 S.E.2d 821, 826 (2000). Whether a defendant's interference with a contract is justified depends on the surrounding circumstances; the defendant's motive or conduct; the interests sought to be advanced; the social interest in protecting the freedom of defendant's action; and plaintiff's contractual interests. Embree Const. Grp., Inc. v. Rafcor, Inc., 330 N.C. 487, 498, 411 S.E.2d 916, 924 (1992).

The Amended Complaint asserts that the Plaintiff has valid contracts with every one of its customers, including those serviced by the Defendant. [Doc. 19 at ¶¶ 31, 178, 181]. The Amended Complaint further asserts that the Defendant knew of the Plaintiff's contracts with those customers and has intentionally induced those customers to switch platforms from the Plaintiff's platform to the Defendant's platform. [Id. at ¶¶ 179-81]. Indeed, the Plaintiff asserts and provides evidence that the Defendant has falsely communicated information to the Plaintiff's customers to solicit business and damage the Plaintiff's reputation. [Doc. 19 at ¶¶ 70-71, 88, 158-59; Doc. 8 at ¶ 26-28]. The Plaintiff has provided evidence that at least one of the Plaintiff's U.S. customers has switched to the Defendant's platform, suggesting that the Defendant's efforts have been successful. [Doc. 15 at ¶¶ 3-4; Doc. 15-2].[20] The Amended Complaint further asserts that the Defendant's actions were committed without justification and have resulted in actual damage to the Plaintiff. [Doc. 19 at ¶¶ 182-83]. Based on the evidence submitted by the Plaintiff and the Plaintiff's verified Amended Complaint, the Court concludes

---

[20] While the Defendant argues that the U.S. customer simply "chose to create an account on the European platform[,]" [Doc. 35-1 at ¶ 4], the evidence strongly suggests that the customer changed its provider in response to the Defendant's inducement. Moreover, although the Defendant highlights that the U.S. customer's IT department is based in Israel, [Doc. 35 at 7 n.5, that distinction does not change the assertion that the Defendant is allegedly interfering with a North Carolina corporation's contract with a California company.

that the Plaintiff has established a likelihood of success on the merits on its claim for tortious interference with contract against the Defendant.

Because the Plaintiff has established a likelihood of success on the merits on its claim for tortious interference with contract, the Plaintiff can show a likelihood of success on the merits on its claim for tortious interference with prospective economic advantage by demonstrating the existence of "a contract that would have been entered into but for the defendant's conduct." Movement Mortg., LLC v. McDonald, No. 3:17-cv-00716-RJC-DSC, 2018 WL 6733953, at *5 (W.D.N.C. Nov. 6, 2018), report and recommendation adopted, No. 3:17-cv-00716-RJC-DSC, 2019 WL 452773 (W.D.N.C. Feb. 5, 2019) (citing Beck v. City of Durham, 154 N.C. App. 221, 231, 573 S.E.2d 183, 191 (2002)).

Here, the Amended Complaint asserts that customers who register for a trial on the Plaintiff's website are usually offered the opportunity to enter a contract with Plaintiff at the trial's conclusion. [Doc. 19 at ¶¶ 11, 178, 187]. The Amended Complaint further asserts that under normal circumstances, approximately 800 customers register for trials with the Plaintiff each month and that under normal circumstances approximately 40% of those trials lead to paying customers for the Plaintiff. [Id. at ¶ 189]. The Amended Complaint also asserts that after the Defendant obtained the information about the

Plaintiff's sales leads, the Defendant deceived those prospective customers to use its website instead of the Plaintiff's website by making false statements and utilizing a website that is misleadingly similar to the Plaintiff's. [Id. at ¶¶ 192-93]. Based on that evidence, the Court concludes that the Plaintiff has established a likelihood of success on the merits on its claim for tortious interference with prospective economic advantage.

Because the Court has concluded that the Plaintiff has shown a likelihood of success on the merits on its claims for copyright infringement under the Copyright Act, trademark infringement under the Lanham Act, misappropriation of trade secrets under the DTSA, and tortious interference with contract and prospective economic advantage, it need not consider the Plaintiff's other claims to accord the full interim relief requested by the Plaintiff's Motion for Preliminary Injunction. McNeil-PPC, Inc. v. Granutec, Inc., 919 F. Supp. 198, 201 (E.D.N.C. 1995); Nabisco Brands, Inc. v. Conusa Corp., 722 F. Supp. 1287, 1292 n.4 (M.D.N.C. 1989). The Court makes no conclusions regarding the Plaintiff's likelihood of success on the merits of those claims.

## B. Irreparable Harm

The Supreme Court's "frequently reiterated standard requires [a plaintiff] seeking preliminary relief to demonstrate that irreparable injury is

likely in the absence of an injunction." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008) (internal emphasis omitted). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of an injunction are not enough." Roe v. Dep't of Def., 947 F.3d 207, 228 (4th Cir. 2020) (quoting Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017)) (internal quotation marks and alteration omitted). "The possibility of permanent loss of customers to a competitor or the loss of goodwill may give rise to irreparable harm." Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc., 700 F. App'x 251, 263 (4th Cir. 2017) (quoting Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 552 (4th Cir. 1994)), abrogated on other grounds by Winter, 555 U.S. at 22). Moreover, irreparable harm regularly flows from copyright infringement, trademark infringement, and misappropriation of trade secrets. See Christopher Phelps & Assocs., LLC v. Galloway, 492 F.3d 532, 544 (4th Cir. 2007) (finding that irreparable injury often flows from copyright infringement); Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc., 43 F.3d 922, 938-39 (4th Cir. 1995) (recognizing that irreparable injury regularly flows from trademark infringement); Outdoor Lighting Perspectives Franchising, Inc. v. Home Amenities, Inc., 2012 WL

137808, at *2-*3 (W.D.N.C. Jan 18, 2012) (explaining that irreparable harm normally flows from misappropriation of trade secrets).

Here, the Plaintiff states that it has spent more than $1,400,000 building its brand and reputation. [Doc. 8 at ¶ 32]. Because the Plaintiff is in the business of protecting consumer's online security, the Defendant is causing significant harm to the Plaintiff's reputation by using the Plaintiff's intellectual property and making public statements about a purported data breach affecting the Plaintiff's customers. [Doc. 8 at ¶ 25]. The Plaintiff has shown that the Defendant's actions are damaging its reputation and causing customers to terminate their relationship with the Plaintiff. [Doc. 8 at ¶ 24; Doc. 8-11 at 3]. Third-party competitors are using the damage to the Plaintiff's reputation as an opportunity to solicit the Plaintiff's customers, [Doc. 8 at ¶ 28; Doc. 8-12], which makes the damages to the Plaintiff more difficult to quantify. Douglas Dynamics, LLC v. Buyers Prod. Co., 717 F.3d 1336, 1344 (Fed. Cir. 2013) (explaining that "[i]rreparable injury encompasses different types of losses that are often difficult to quantify, including lost sales and erosion in reputation and brand distinction.").

Moreover, the Plaintiff has demonstrated a likelihood of success on the merits on its claims for copyright infringement under the Copyright Act, trademark infringement under the Lanham Act, and misappropriation of trade

secrets under the DTSA.  See <u>Christopher Phelps</u>, 492 F.3d at 544; <u>Lone Star Steakhouse</u>, 43 F.3d at 938-39; <u>Outdoor Lighting Perspectives</u>, 2012 WL 137808, at *2-*3.  The evidence supplied by the Plaintiff shows that irreparable harm will flow from those claims unless a preliminary injunction is entered.  [Doc. 8 at ¶¶ 23-24, 28; Doc. 8-11 at 3; Doc. 8-12].

The irreparable harm to the Plaintiff will only worsen as the Defendant continues using the Plaintiff's intellectual property, drawing visitors to its confusingly similar website, and contacting the Plaintiff's customers.  See <u>Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.</u>, 700 F. App'x 251, 263 (4th Cir. 2017) ("The business's reputation continues to be tarnished as questions about the reliability of its [functions] continue to circulate.").  The Defendant has indicated that it will not stop using the Plaintiff's intellectual property or performing other actions that harm the Plaintiff unless enjoined by the Court.

The harms stemming from the Defendant's continued conduct cannot be fully compensated by monetary damages.  <u>Broad. Music, Inc. v. Prana Hosp., Inc.</u>, 158 F. Supp. 3d 184, 195 (S.D.N.Y. 2016) (citation omitted) (explaining that "[m]onetary damages [are] inadequate where the defendant poses a significant threat of future infringement."); <u>Sony BMG Music Entm't v. Robinson</u>, No. 5:08-cv-00474-BR, 2009 WL 10689624, at *3 (E.D.N.C.

July 6, 2009) (stating that "[t]he remedy available at law for this injury, monetary damages, will only compensate for [d]efendant's one-time infringement . . . and not for inevitable future transfers").[21]

While the Defendant argues that the Plaintiff fails to show an irreparable harm because the Defendant is using the intellectual property only in certain markets outside the United States and has been doing so for years, [Doc. 25 at 23], the Plaintiff has presented evidence to show that the Defendant's use of the Plaintiff's intellectual property has demonstrably changed and is now causing consumer confusion that is impacting the Plaintiff's customer relationships. [Doc. 8 at ¶ 24; Doc. 8-11 at 3]. Moreover, the Plaintiff has presented evidence to show that the Defendant is using the Plaintiff's intellectual property to service a customer that is based in the United States. [Doc. 15 at ¶¶ 3-4; Doc. 15-2]. Those actions go beyond the scope of the parties' initial agreement and highlight the irreparable harm that is facing the Plaintiff from the Defendant's actions.

Because the Defendant's conduct is causing damage to the Plaintiff's reputation, loss of goodwill, and lost sales that may not ultimately be

---

[21] Any damages award would be speculative as to the extent that the Defendant may infringe upon or misappropriate the Plaintiff's intellectual property in the future. Hence, an award of monetary damages would not adequately compensate for such future losses.

quantifiable, the Court concludes that the Plaintiff has demonstrated that it will suffer an irreparable harm in the absence of an injunction.

### C. Balance of Equities

A plaintiff seeking a preliminary injunction must establish that the balance of equities tips in its favor. <u>Winter</u>, 555 U.S. at 20. "[I]n each case the Court 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" <u>Armento v. Asheville Buncombe Cmty. Christian Ministry, Inc.</u>, No. 17-cv-00150- MR-DLH, 2017 WL 3838638 at *1 (W.D.N.C. Sept. 1, 2017) (Reidinger, J.) (quoting <u>Amoco Prod. Co. v. Vill. of Gambell</u>, 480 U.S. 531, 542 (1987)).

Acknowledging the competing interests at stake and the potentially significant harm that an injunction could cause to either party, the Court allowed the parties to offer proposed restraints that will minimize the harms to each side while the contractual dispute is being litigated in the Dutch courts. [Doc. 32; Doc. 33]. The Plaintiff asks the Court to enjoin the Defendant from (1) migrating new customers to its platform; (2) using the Plaintiff's intellectual property or, alternatively, using that intellectual property to secure new customers; (3) disparaging the Plaintiff or claiming an ownership right in the Plaintiff's software; (4) changing any customers from

the Plaintiff's credit card payments to payments to the Defendant through invoice or other payment method; (5) continuing to use a website with a similar appearance and content as the Plaintiff's website; and (6) using the dmarcian domain names or other confusingly similar domain names. [Doc. 33 at 5-6]. While the Defendant continues to object to the Court's exercise of personal jurisdiction, the Defendant voluntarily commits to (1) serve customers only located in Europe, Africa, and Russia; (2) update its websites to reflect a geographic limitation to Europe, Africa, and Russia and remove references to the Plaintiff or its employees; (3) block website access to IP addresses associated with countries outside Europe, Africa, and Russia and direct those visitors to the Plaintiff; (4) use only the stylized "dmarcian" logo; (5) refrain from encouraging customers in Europe, Africa, or Russia who currently pay the Plaintiff to pay the Defendant; (6) refrain from making public statements that would place the Plaintiff in a negative light; and (7) issue a joint statement with the Plaintiff affirming compliance with European data-protection laws, contingent on the Plaintiff restoring the Defendant's access to certain customer information. [Doc. 32 at 3-6].

Considering the particular interests that the Plaintiff seeks to protect during the pendency of this action, as well as the limitations the Defendant concedes it can easily withstand, it is clear that a narrowly tailored

preliminary injunction can be fashioned that can preserve the legal positions of the parties while not causing significant harm to the Plaintiff or the Defendant.  Thus, the Court's injunction will provide a better balance of the interests at stake and the competing harms than the current status quo. Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 422 (4th Cir. 1999) (explaining that a preliminary injunction is typically intended to preserve the status quo).  Accordingly, the Court concludes that the balance of the equities tips in favor of granting this preliminary injunction.

### D.    Public Interest

A plaintiff seeking a preliminary injunction must establish that the granting of an injunction is in the public interest. Winter, 555 U.S. at 20. There is a public interest in limiting customer confusion.   Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc., 43 F.3d 922, 939 (4th Cir. 1995) (holding that an injunction in a trademark infringement case "would serve the public interest by preventing future consumers from being misled"). Moreover, the public has a strong interest in protecting intellectual property rights.   EMI Apr. Music Inc. v. Rodriguez, 691 F. Supp. 2d 632, 635 (M.D.N.C. 2010) (intellectual property); Forestry Sys., Inc. v. Coyner, No. 1:11-cv-00295, 2011 WL 1457707, at *2 (M.D.N.C. Apr. 15, 2011) (trade secrets); PCTV Gold, Inc. v. SpeedNet, LLC., 508 F.3d 1137, 1145 (8th Cir.

2007) (contractual rights). While the Defendant argues that an injunction will harm its customers, [Doc. 25 at 26], the Court's injunction will have only a limited effect on those third-party interests. For instance, it will not prevent them from doing business with the Defendant or using the intellectual property that is at issue here. Cf SAS Inst., Inc. v. World Programming Ltd., 874 F.3d 370, 388 (4th Cir. 2017) (explaining that an injunction was not in the public interest because the defendant's customers "would have to expend significant time and money to replace their existing [software], either now or in the near future.") As such, the Court concludes that the public interest related to the Defendant's customers is minimal. Because the Plaintiff's claims seek to prevent consumer confusion and protect intellectual property rights, the Court concludes that the granting of an injunction is in the public interest.

### E. Security

Federal Rule of Civil Procedure 65(c) provides: "The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). In light of the relatively narrow restraints on the Defendant that are being granted herein, the Court finds that a bond in the amount of $25,000

is sufficient to pay the Defendant's costs and damages in the event the Defendant is found to have been wrongfully restrained. Accordingly, the Plaintiff will be required to post $25,000 as security with the Clerk's Office before this injunction will take effect.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendant's Motion to Dismiss [Doc. 22] is **DENIED IN PART** and **HELD IN ABEYANCE IN PART**. The Plaintiff's Motion for Preliminary Injunction [Doc. 6] is **GRANTED IN PART** as to the Plaintiff's claims for copyright infringement under the Copyright Act; trademark infringement under the Lanham Act; misappropriation of trade secrets under the DTSA; tortious interference with contract; and tortious interference with prospective economic advantage as set forth below, and **DENIED** as to the Plaintiff's other claims.

**IT IS FURTHER ORDERED** that the Defendant, its officers, agents, servants, employees, attorneys, affiliates, and those persons in active concert or participation with the Defendant are **HEREBY ENJOINED** from:

(1) providing services to any customers located outside of Europe, Africa, or Russia, except for the six customers detailed in the Defendant's Brief on Proposed Voluntary Commitments [Doc. 32 at 4 n.3];

(2) providing access to any of its websites to IP addresses from countries outside of Europe, Africa, or Russia. The Defendant shall inform website visitors from outside of those areas that it does not create new accounts in that region and shall direct those customers to contact dmarcian, Inc. for services through the Plaintiff's website https://dmarcian.com;

(3) making changes to the copyrighted software except as specifically and expressly allowed or directed by this Order;

(4) using the Plaintiff's trademark in any manner unless such use is accompanied by a statement which reads: "This trademark is the trademark of dmarcian, Inc. This website is produced and generated and posted by dmarcian Europe BV, which is a different entity from dmarcian, Inc. This trademark is being used at this location without the permission of dmarcian, Inc. and only pursuant to the terms of a court order allowing its temporary use during litigation between dmarcian, Inc. and dmarcian Europe BV." That statement must be at least the size of the trademark itself, as presented, or 12-point type when displayed on a 24" computer screen, whichever is larger. Such statement must appear immediately adjacent to the location where the trademark appears, and must be shown at each location where the

trademark appears, whether that be on the Defendant's website, in printed material, an electronic display, or otherwise;

(5) displaying any website with the "dmarcian" name unless that website includes a statement that "The dmarcian software was originally developed by dmarcian, Inc.  This is not the website of dmarcian, Inc.  The website of dmarcian, Inc. can be found at https://dmarcian.com."  That statement must be displayed as a banner at the top of each page of the website on which the dmarcian name appears and must be of a size that is at least 12-point type when displayed on a 24" computer screen, and the reference to the website of the Plaintiff must be a link to that website;

(6) redirecting, encouraging, or allowing any customer to change its service provider or payment recipient from dmarcian, Inc. to dmarcian Europe, BV;

(7) making any public statement about dmarcian, Inc. except as expressly allowed or directed herein; and

**IT IS FURTHER ORDERED** that the Defendant shall provide to the Court (under seal) copies of all documents sufficient to show all income received by the Defendant and the sources thereof, all expenditures made by the Defendant and the payors thereof, and all net income generated by

the Defendant's business efforts from the date of this Order until the conclusion of this action.

**IT IS FURTHER ORDERED** that the Plaintiff shall post a bond in the amount of $25,000.

**IT IS SO ORDERED.**

Signed: May 26, 2021

Martin Reidinger
Chief United States District Judge