**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**CIVIL CASE NO. 1:21-cv-00067-MR**

| | |
|---|---|
| **DMARCIAN, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )     **O R D E R** |
| | ) |
| **DMARCIAN EUROPE BV,** | ) |
| | ) |
| **Defendant.** | ) |
| _____ | ) |

      **THIS MATTER** is before the Court on the Defendant's Response [Doc.

61] to the Court's Show Cause Order [Doc. 54] as to why the Defendant

should not be held in contempt for violations of the Court's Preliminary

Injunction [Doc. 39].  The Court conducted a hearing on July 28, 2021, on

the return of the Court's Show Cause Order.

## I.    PROCEDURAL BACKGROUND

      On May 26, 2021, the Court entered an Order imposing a Preliminary

Injunction against the Defendant.  [Doc. 39].  The Preliminary Injunction

enjoined the Defendant, its officers, agents, servants, employees, attorneys,

affiliates, and those persons in active concert or participation with it from:

> (1) providing services to any customers located
> outside of Europe, Africa, or Russia, except for the

six customers detailed in the Defendant's Brief on Proposed Voluntary Commitments [Doc. 32 at 4 n.3];

(2) providing access to any of its websites to IP addresses from countries outside of Europe, Africa, or Russia. The Defendant shall inform website visitors from outside of those areas that it does not create new accounts in that region and shall direct those customers to contact dmarcian, Inc. for services through the Plaintiff's website https://dmarcian.com;

(3) making changes to the copyrighted software except as specifically and expressly allowed or directed by this Order;

(4) using the Plaintiff's trademark in any manner unless such use is accompanied by a statement which reads: "This trademark is the trademark of dmarcian, Inc. This website is produced and generated and posted by dmarcian Europe BV, which is a different entity from dmarcian, Inc. This trademark is being used at this location without the permission of dmarcian, Inc. and only pursuant to the terms of a court order allowing its temporary use during litigation between dmarcian, Inc. and dmarcian Europe BV." That statement must be at least the size of the trademark itself, as presented, or 12-point type when displayed on a 24" computer screen, whichever is larger. Such statement must appear immediately adjacent to the location where the trademark appears, and must be shown at each location where the trademark appears, whether that be on the Defendant's website, in printed material, an electronic display, or otherwise;

(5) displaying any website with the "dmarcian" name unless that website includes a statement that "The dmarcian software was originally developed by dmarcian, Inc. This is not the website of dmarcian,

2

Inc.  The website of dmarcian, Inc. can be found at https://dmarcian.com."  That statement must be displayed as a banner at the top of each page of the website on which the dmarcian name appears and must be of a size that is at least 12-point type when displayed on a 24" computer screen, and the reference to the website of the Plaintiff must be a link to that website;

(6)  redirecting, encouraging, or allowing any customer to change its service provider or payment recipient from dmarcian, Inc. to dmarcian Europe, BV; or

(7) making any public statement about dmarcian, Inc. except as expressly allowed or directed herein.

[Doc. 39 at 75-77].

On June 22, 2021, the Plaintiff filed a Motion for Order to Show Cause. [Doc. 43].  The Plaintiff argues that the Defendant is violating the Preliminary Injunction by continuing to use the Plaintiff's trademark without the obligatory disclaimers, continuing to display the "dmarcian" name without the obligatory disclaimers, soliciting customers to change service providers from the Plaintiff to the Defendant, and making public statements about the Plaintiff. [Id. at 1-2].  The Plaintiff seeks sanctions, including reasonable attorney's fees.  [Id. at 3].

On June 28, 2021, the Court entered the present Show Cause Order, directing the Defendant to show cause why the Court should not impose sanctions for failure to comply with the Preliminary Injunction.  [Doc. 54].  On

3

July 6, 2021, the Defendant filed its response to the Court's Order to Show Cause. [Doc. 61]. On July 13, 2021, the Plaintiff replied. [Doc. 66]. Accompanying their filings the parties have presented extensive written testimony and documentary evidence showing the manner in which the Defendant has acted in response to the Preliminary Injunction. The Court conducted a hearing on July 28, 2021, on the return of the Court's Show Cause Order and thereby provided an opportunity for the Defendant to show why it should not be held in civil contempt.

## II.    STANDARD OF REVIEW

District courts have "inherent power to enforce compliance with their lawful orders through civil contempt." Sullivan v. United States, 384 U.S. 364, 370 (1966). "That power includes the ability to award damages and attorney's fees to an aggrieved party." Rainbow Sch., Inc. v. Rainbow Early Educ. Holding LLC, 887 F.3d 610, 617 (4th Cir. 2018) (citing Hutto v. Finney, 437 U.S. 678, 691 (1978)). To establish civil contempt, there must be clear and convincing evidence of four elements:

> (1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) that the decree was in the movant's "favor"; (3) that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and (4) that the movant suffered harm as a result.

4

United States v. Ali, 874 F.3d 825, 831 (4th Cir. 2017).

## III. FACTUAL BACKGROUND

Upon consideration of the evidence presented by the parties, the Court finds the following facts to be established by clear and convincing evidence:

### A. Defendant's Refusal to Give Injunction to the Dutch Court

1. On January 29, 2021, the Defendant commenced an action against the Plaintiff in a Dutch court. [Doc. 26-1 at ¶ 39].

2. On February 1, 2021, the Dutch court entered an injunction against the Plaintiff without the Plaintiff having filed an appearance. [Id.].

3. On March 12, 2021, the Plaintiff commenced the present action in this Court. [Doc. 1].

4. On March 25, 2021, the Plaintiff filed a motion for a temporary restraining order and preliminary injunctive relief. [Doc. 6].

5. On March 30, 2021, the Defendant filed a memorandum in opposition to the Plaintiff's motion for injunctive relief, arguing in part that an injunction by this Court preventing the Defendant from servicing customers in Europe, Russia, and Africa would "contradict a Dutch court's recent judgment that Plaintiff and its founder must "grant dmarcian Europe access to the (computer) systems necessary to service its customers," [Doc. 11 at 1], and that the Plaintiff was "wrong

5

to ask [this] Court to interfere with [the Dutch] proceedings and decide whether . . . dmarcian Europe can continue to operate its business in" Europe, Russia, and Africa [Id. at 2].

6.    On March 31, 2021, this Court denied the Plaintiff's motion for a temporary restraining order and held the motion for preliminary injunction in abeyance pending further presentation of evidence and briefing by the parties.   A hearing on the motion for preliminary injunction was scheduled for April 23, 2021.  [Doc. 12].

7.    On April 6, 2021, the Plaintiff moved to set aside the injunction entered by the Dutch court.  [Doc. 26-1 at ¶ 41].

8.    On April 19, 2021, the Defendant filed a Motion to Dismiss in this Court for lack of personal jurisdiction and *forum non conveniens.*  [Doc. 22].

9.    At the April 23, 2021 hearing, the Defendant reiterated its argument that the Plaintiff's requested injunctive relief was essentially a request for this Court "to second-guess proceedings that are going forward in the Dutch courts under Dutch law."  [Doc. 34 at 190].  The Defendant further argued that "we're potentially going to end up in a situation where the Dutch court is ordering this plaintiff to do one thing, the U.S. court is ordering the defendant to do something that, you know, is going to be like two trains running together."  [Id. at 191].

10. Both parties were given the opportunity to submit proposals as to how the Court could order the preservation of the status quo without greatly impacting the business of either party.

11. On May 10, 2021, the Dutch court held a hearing on the Plaintiff's attempt to set aside the injunction. [Doc. 57-1 at ¶ 4].

12. The Dutch court advised the parties to expect a written decision on May 31, 2021. [Id. at ¶ 5].

13. Under Dutch law, a "judge shall not take note of submissions after the court determined the decision date without consent of the other party[,]" which means that "the case is closed after the hearing and due process prevents unilateral submissions to the court after that date." [Id. at ¶ 5].

14. On May 26, 2021, this Court entered its Preliminary Injunction in this case, finding personal jurisdiction over the Defendant and enjoining the Defendant from performing certain specified actions. The Preliminary Injunction took into account the filings of the parties regarding proposed ways of preserving the status quo. This Court also undertook to narrowly tailor the Preliminary Injunction to respect the actions and jurisdiction of the Dutch court. [Doc. 39]. In that Order,

7

the Court also denied the Defendant's Motion to Dismiss on the grounds of personal jurisdiction and *forum non conveniens*. [Id.].

15. On May 27, 2021, the Plaintiff posted the bond to activate the Preliminary Injunction.

16. On May 28, 2021, the Plaintiff asked the Defendant to provide its consent to the submission of the Preliminary Injunction to the Dutch court. [Doc. 57-1 at ¶ 6].

17. The Defendant refused to consent to provide the Preliminary Injunction to the Dutch court, with the Defendant's Dutch counsel explaining to the Plaintiff's Dutch counsel that the refusal to provide the Preliminary Injunction to the Dutch court was "in accordance with client's instruction." [Doc. 47-1 at 2].

18. Because the Defendant withheld the Preliminary Injunction from the Dutch court, the Dutch court issued a ruling on May 31, 2021 without knowledge of what had occurred between these parties in this action, particularly that this Court had denied the Defendant's Motion to Dismiss and had entered a Preliminary Injunction pertaining to the Defendant's actions. [Doc. 57-1 at ¶ 6].

## B. Defendant's Continued Use of the Plaintiff's Trademark

19. The Court's Preliminary Injunction found that the Plaintiff owned a valid trademark for the word "dmarcian" and that the Plaintiff had demonstrated a likelihood of confusion stemming from the Defendant's use of that trademark. [Doc. 39 at 50].

20. The Preliminary Injunction explained that customers were being confused by the overlapping services of the Plaintiff and the Defendant and that "[s]uch confusion is unsurprising given that the *Defendant is using the Plaintiff's mark as its domain name*[,]" among other actions. [Id. at 51 (citing Doc. 19 at ¶ 138; Doc. 8-1; Doc. 8-2; Doc. 8-3; Doc. 8-4; Doc. 8-6; Doc. 8-7)].

21. The Preliminary Injunction prohibited the Defendant from "using the Plaintiff's ["dmarcian"] trademark in any manner unless such use is accompanied" by a disclaimer regarding the ownership of the trademark. [Doc. 39 at 76].

22. Despite the Preliminary Injunction, the Defendant continued to redirect traffic to its website from domain names featuring the Plaintiff's "dmarcian" trademark, including dmarcian.eu, dmarcian.nl, dmarcian.co.uk, dmarcian.be, dmarcian.es, dmarcian.fr, dmarcian.at,

dmarcian.frl, dmarcian.io, dmarcian.jp, and dmarcian.hk. [Doc. 46 at 2-4].

23. The Defendant did not post the required disclaimer on any of its websites that received internet traffic from those domain names. In fact, the Defendant undertook no action whatsoever to attempt to comply with this Court's Preliminary Injunction as it pertains to the use of the domain names that contain the Plaintiff's trademark.

24. The Plaintiff sent the Defendant multiple letters complaining about the continued use of the "dmarcian" domain names to redirect visitors to the Defendant's websites without the display of the required disclaimers. [Doc. 48-1 at 1; Doc. 48-2 at 1; Doc. 48-4 at 2].

25. Despite the Plaintiff's objections, the Defendant refused to stop using the "dmarcian" domain names to redirect visitors to its website or post the disclaimers. [Doc. 48-3 at 1; Doc. 48-5 at 2].

26. After the Court held a hearing on the Show Cause Order on July 28, 2021, the Defendant filed a declaration stating that on August 5, 2021 it voluntarily discontinued redirecting internet traffic to its website from the "dmarcian" domain names, including: "dmarcian.co.uk, dmarcian.nl, dmarcian.fr, dmarcian.es, dmarcian.eu and dmarcian-

europe.com . . . and all other domain names under its control that use the word "dmarcian."  [Doc. 78 at ¶ 5].

## IV.  DISCUSSION

### A.  Defendant's Refusal to Give Injunction to the Dutch Court

The Show Cause Order directed the Defendant to explain its decision to withhold the Preliminary Injunction from the Dutch court.  [Doc. 54].

The Defendant provides several explanations for the refusal to provide the Preliminary Injunction to the Dutch court.  First, the Defendant argues that "under Dutch procedural law the adversarial part of the proceedings had already been closed for 3 weeks[.]"  [Doc. 57-1 at ¶ 6].  While that is an undisputed statement of fact and law, it does not explain why the Defendant withheld the Preliminary Injunction from the Dutch court.

Second, the Defendant states that it refused to provide the Preliminary Injunction to the Dutch court because the Defendant did not believe that the Preliminary Injunction would have changed the Dutch court's findings, altered the Dutch court's determination that it had jurisdiction, or persuade the Dutch court to reopen the case and schedule a new hearing.  [Id.].  The Defendant's unilateral determination that the Preliminary Injunction would not alter the Dutch court's analysis bears little weight.  At the very least, the Defendant's refusal to provide the Preliminary Injunction to the Dutch court

11

increased the possibility that this Court and the Dutch court would issue inconsistent or conflicting judgments. Hypocritically, the Defendant has repeatedly raised concerns about the possibility of conflicting judgments in this Court in its briefs on the Plaintiff's motions for injunctive relief, its own motion to dismiss, and its own motion to stay the injunction pending appeal. [Doc. 11 at 12; Doc. 32 at 1; Doc. 60 at 14].

Third, the Defendant states that it considered the provision of the Preliminary Injunction to be "undesirable, potentially inequitable and contrary to due process in view of the fact that the U.S. Order exists of 78 pages with considerations and findings that require further consultation of the parties to secure due process[.]" [Doc. 57-1 at ¶ 6]. The Defendant does not explain why the length of a judicial order makes its provision to the Dutch court "inequitable" or "contrary to due process." To the contrary, by withholding a relevant judicial order from the Dutch court, the Defendant thwarted due process, undermined cooperation between the two courts, and generally acted in an inequitable manner.

Fourth, the Defendant states that it withheld the Preliminary Injunction from the Dutch court because the Plaintiff "waited until Friday May 28, 2021 with its request for consent, knowing that the decision from the Court of Rotterdam would be delivered the next working day and was probably

already drafted[.]"  [Id.].  This argument is meritless.  The Court entered its injunction on May 26 at 3:59 p.m.  [Doc. 39].  The Plaintiff posted the bond activating the injunction at 4:24 p.m. the next day (9:24 p.m. in the Netherlands).  [Doc. 66 at 15].  The Plaintiff acted reasonably by asking the Defendant for consent to submit the Preliminary Injunction to the Dutch court the next day.

Finally, the Defendant states that if "the Rotterdam Court would have reopened the case and scheduled a new hearing upon submission of the U.S. Order, this would have resulted in a further substantial delay which [the Defendant would have] found unacceptable" because the Plaintiff had previously refused to comply with the Dutch court's order, was attempting to put the Defendant out of business, and had ignored the Defendant's previous requests to communicate about problems between the parties.  [Id.].  By acknowledging the possibility that the Dutch court may have reopened the case and scheduled a new hearing upon learning of the Preliminary Injunction, the Defendant undercuts its other explanations for refusing to provide the Preliminary Injunction to the Dutch court.  Moreover, the Plaintiff's actions, wrongful or not, are not a basis for withholding a clearly relevant order from the Dutch court.  Most importantly, the Defendant manifests its contempt for this Court and for its order by unilaterally choosing

not to abide by it because the Defendant found such compliance to be "unacceptable" to it. How or why the Defendant or its counsel believed that compliance with this Court's injunction was purely in its own discretion is not explained.

In sum, the Defendant was aware that the Preliminary Injunction was designed to preserve the status quo by placing very limited and reasonable restrictions on the Defendant while the Dutch court conducted its investigation. The Defendant's decision to withhold the Preliminary Injunction from the Dutch court violated a significant purpose of that order and directly contradicted the Defendant's prior positions in this Court by creating a risk of conflicting judgments between this Court and the Dutch court. The Defendant's disingenuous conduct reflects poorly on its credibility, which is relevant as to whether the Defendant attempted to comply with the Preliminary Injunction in good faith.

## B. Defendant's Continued Use of the Plaintiff's Trademark

The Plaintiff argues that the Defendant has continued infringing on its trademark by redirecting website traffic for various "dmarcian" domain names to the Defendant's website without posting the relevant disclaimers that are required by the Preliminary Injunction. [Doc. 49 at 6-9].

14

Although the Defendant admits that it was continuing to redirect traffic to its website from a variety of "dmarcian" domain names, the Defendant argues that employing the Plaintiff's trademark to redirect visitors to its websites did not violate the Preliminary Injunction and cannot support a contempt finding because "there is no specific command about domain names in the Preliminary Injunction." [Doc. 61 at 16]. This argument is meritless. The Preliminary Injunction specifically forbade the Defendant from "using the Plaintiff's trademark *in any manner*" unless accompanied by the relevant disclaimer. [Doc. 39 at 76 (emphasis added)]. As such, the Preliminary Injunction made clear that the Defendant could not use the Plaintiff's trademark without the relevant disclaimers (whether in a domain name or otherwise).[1] At a minimum, the Defendant had constructive knowledge that continuing to use the "dmarcian" domain names would violate the Preliminary Injunction, as directing internet traffic to the Defendant's business by using domain names consisting of the Plaintiff's

---

[1] The Court offered both parties the opportunity to submit proposed restraints that would preserve the status quo and protect the parties' business interests during the proceedings in this Court and the Dutch courts. [Doc. 34 at 203-205]. While the Defendant submitted proposed restraints, [Doc. 32], it did not propose a rebranding such as what it has undertaken. After the Court entered its Preliminary Injunction, however, the Defendant opted to rebrand rather than comply with the scheme contemplated in the parties' filings and the Preliminary Injunction. If there was any confusion associated with the mandate in the Preliminary Injunction, it resulted from the Defendant's choice to follow a course of action that was not contemplated by its proposed restraints or the Preliminary Injunction.

trademark is among the purest modern forms of trading on the Plaintiff's name.

The Defendant further argues that its use of the domain names did not create a likelihood of confusion because the domain names merely redirected visitors to the Defendant's rebranded websites, which "feature the DMARC Advisor name and logo" and "do not mention" the Plaintiff or "dmarcian." [Doc. 61 at 14-15]. However, the Plaintiff has demonstrated that consumers are actually being confused by the overlapping services being offered by the Plaintiff and the Defendant. As the Preliminary Injunction explained, "[s]uch confusion is unsurprising given that the *Defendant is using the Plaintiff's mark as its domain name*[.]." [Doc. 39 at 51 (emphasis added) (citing Doc. 19 at ¶ 138; Doc. 8-1; Doc. 8-2; Doc. 8-3; Doc. 8-4; Doc. 8-6; Doc. 8-7)]. It is unclear why the Defendant now argues that "there is no likelihood of confusion" stemming from its continued use of the domain names when the Preliminary Injunction explicitly stated that the use of the domain names was causing consumer confusion. [Doc. 61 at 14]. This argument is meritless.

The Defendant further argues that the use of a domain name cannot constitute trademark infringement under the Fourth Circuit's decision in <u>Lamparello v. Falwell</u>, 420 F.3d 309 (4th Cir. 2005). [Doc. 61 at 14]. In

Lamparello, Jerry Falwell's claimed that his "Falwell" trademarks were being infringed by a parody website located at www.Fallwell.com.  420 F.3d 309, 310 (4th Cir. 2005).  Falwell argued that the mere similarity between the two domain names was sufficient to establish trademark infringement under the "initial interest confusion theory," which bars "a competitor from luring potential customers away from a producer by initially passing off its goods as those of the producer's, even if confusion as to the source of the goods is dispelled by the time any sales are consummated."  Id. at 316.  The Fourth Circuit rejected that argument, explaining that the relevant inquiry was "whether the use in its entirety creates a likelihood of confusion" when viewed "in the context in which it is seen by the ordinary consumer."  Id.[2]  The Fourth Circuit explained that the similarities between the domain names did not establish a likelihood of confusion because the parody site did not offer similar goods or services as Falwell's website; the parody site featured a prominent disclaimer explaining that it was not affiliated with Jerry Falwell and provided a hyperlink to Falwell's website; the parody site looked different from Falwell's website; visitors to the parody website "quickly realized that Reverend Falwell was not the source of the content therein[;]" and the parody

---

[2] The Defendant's discussion of the "initial interest confusion theory" is inapposite.  The preliminary injunction did not rely on the "initial interest confusion theory" as a basis for finding a likelihood of success on the Plaintiff's trademark infringement claim.

website was not attempting to profit from the business interests that were protected by the trademarks.  Id. at 315-17.  Accordingly, the Fourth Circuit concluded that the parody site did not infringe on Falwell's trademarks because there was no likelihood of consumer confusion.  Id.

Unlike Lamparello, there was a serious risk of consumer confusion stemming from the Defendant's continued use of the "dmarcian" domain names because the Plaintiff and the Defendant offer essentially identical services; the Defendant has refused to post a disclaimer on its websites; visitors have been confused about the similarities between the Plaintiff and the Defendant's branding; and the Defendant's site attempts to profit from the business interests that are protected by the Plaintiff's trademarks.  While the Defendant argues that this case is like Lamparello because the parties' websites look different after the Defendant rebranded and changed the logo and color scheme of its websites, the parties' websites still look substantially similar and have the same layout, the same features in the same places, the same functionality, and virtually identical text.  Under such circumstances, the unauthorized use of a company's trademark to redirect visitors to a different website constitutes trademark infringement.  See People for Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 365 (4th Cir. 2001); Herrmann Int'l, Inc. v. Herrmann Int'l Eur., No. 1:17-CV-00073-MR, 2021 WL

18

861712, at *10 (W.D.N.C. Mar. 8, 2021) (Reidinger, C.J.); <u>Buzz Off Insect Shield, LLC v. S.C. Johnson & Son, Inc.</u>, No. 1:05-CV-363, 2009 WL 10712996, at *2 (M.D.N.C. July 30, 2009).[3] After all, any consumer who seeks the Plaintiff's services by accessing a domain name with the Plaintiff's trademarked name in it, and there finds a business providing that precise service, the different name displayed by the Defendant would most likely lead the consumer to conclude that the *Plaintiff* has rebranded.

The Defendant further argues its continued use of the "dmarcian" domain names did not violate the Preliminary Injunction because it would have been impossible to place the disclaimer adjacent to a domain name, as required by the injunction. [Doc. 61 at 16]. The Defendant also argues that the disclaimer's reference to "this trademark" no longer made sense after the Defendant rebranded to DMARC Advisor and started displaying its DMARC Advisor trademark on its website. [Doc. 61 at 16]. The Defendant's argument that it cannot place a disclaimer immediately adjacent to a domain name is disingenuously technical. Even though the Defendant could not place the disclaimer *in* the address bar of an internet browser, the Defendant

---

[3] Even if the parties' websites had appeared materially different following the rebrand, the touchstone for the likelihood of confusion inquiry is the "content of the website" rather than its appearance. <u>Lamparello</u>, 420 F.3d at 315-17. Because the parties' websites offer essentially the same content, the Defendant's use of the Plaintiff's trademark is likely to cause consumer confusion, particularly because the Defendant and the Plaintiff are competitors who offer identical services.

19

made no good faith attempt to comply with the Preliminary Injunction, for instance by posting a slightly modified version of the required disclaimer as the landing page of its websites that received traffic from the "dmarcian" domain names.  The consumer could then choose to search out the Plaintiff's site or proceed to the Defendant's.  The Defendant also could have made a good faith attempt to comply with the Preliminary Injunction by moving the Court to clarify or amend the disclaimer language after it rebranded.  Notably, the Defendant filed a motion to amend or clarify the Preliminary Injunction but made no argument asserting any confusion or issues with the disclaimer language.  Instead, the Defendant unilaterally chose to ignore the disclaimer requirement.  That falls far short of making a good faith attempt to comply with the Preliminary Injunction.  It was, in fact, no attempted compliance at all.

In sum, the Preliminary Injunction gave the Defendant actual and constructive knowledge that using the Plaintiff's trademark as a domain name to redirect visitors to its website constituted trademark infringement. The Defendant received multiple notices of those violations and therefore had constructive knowledge that its continued use of the Plaintiff's trademark in domain names violated the Preliminary Injunction.  Rainbow Sch., Inc. v. Rainbow Early Educ. Holding LLC, 887 F.3d 610, 618-19 (4th Cir. 2018).

Even though the nature of the infringement makes it difficult to ascertain the exact harm to the Plaintiff because it is impossible to know how many potential customers were redirected to the Defendant's website after entering the Plaintiff's trademark into a search engine or an address bar, the Defendant's continued use of the Plaintiff's trademark presumptively causes harm. Rainbow Sch., Inc. v. Rainbow Early Educ. Holding LLC, No. 5:14-CV-482-BO, 2016 WL 7243538, at *3 (E.D.N.C. Dec. 14, 2016), aff'd, 887 F.3d 610 (4th Cir. 2018) (citing Rebel Debutante LLC v. Forsythe Cosmetic Grp., Ltd., 799 F. Supp. 2d 558, 580 (M.D.N.C. 2011)). Moreover, the Defendant's continued use of the Plaintiff's trademark enabled the Defendant to collect consumer information and customer relationships that may otherwise have been obtained by the Plaintiff from users seeking its services by visiting websites under its trademark. [Doc. 45-2]. Further, as demonstrated by the exhibits submitted throughout this matter, the Defendant's continued use of the Plaintiff's trademark has caused consumer confusion. [Doc. 19 at ¶ 138; Doc. 8-1; Doc. 8-2; Doc. 8-3; Doc. 8-4; Doc. 8-6; Doc. 8-7); see also Doc. 44 at ¶¶ 1-13; Doc. 64 at ¶¶ 2, 6-9]. That is sufficient to establish harm to the Plaintiff.

For these reasons, the Court concludes that there is clear and convincing evidence that the Preliminary Injunction was a valid decree of

which the Defendant had actual knowledge; that the Preliminary Injunction was in the Plaintiff's favor; that the Defendant had at least constructive knowledge that its continued use of the "dmarcian" domain names violated the Preliminary Injunction; and that the Plaintiff suffered harm as a result. Accordingly, the Court concludes that the elements of civil contempt are established here. United States v. Ali, 874 F.3d 825, 831 (4th Cir. 2017).[4]

## C.    Defendant's Continued Display of the Plaintiff's Trademark

The Plaintiff also moves for civil contempt on the grounds that the Defendant violated the Preliminary Injunction by continuing to display the Plaintiff's trademark in various places. [Doc. 49 at 9-10]. The Defendant states that it has removed every reference that has been located. [Doc. 57-18 at ¶ 51]. The documentary evidence presented to the Court shows that the Defendant had made significant effort to remove the Plaintiff's "dmarcian" name from its internet presence. Even though the Defendant may not have been successful in removing every single reference to the Plaintiff's

---

[4] Because the Plaintiff sought civil contempt against the Defendant, rather than its agents, the Court does not address the actions of Alfred Meijboom or Hubert J. Harmeling, who appear to be responsible for the Defendant's violation of the Preliminary Injunction. Wilson v. United States, 221 U.S. 361, 376 (1911) (explaining that "[a] command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs[,]" and that "[i]f they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt.").

trademark, the Plaintiff has not shown by clear and convincing evidence what amounts to a purposeful or contemptuous violation of the Preliminary Injunction in this regard.

### D.   Defendant's Continued Solicitation of Customers

The Plaintiff also moves for civil contempt on the grounds that the Defendant violated the Preliminary Injunction by continuing to solicit the Plaintiff's customers to change service providers to the Defendant.  [Doc. 49 at 10-13].   The Preliminary Injunction prohibited the Defendant from "redirecting, encouraging, or allowing any customer to change its service provider or payment recipient from [the Plaintiff] to [the Defendant]."  [Doc. 39 at 77].  That language attempted to preserve the status quo between the parties by preventing the Defendant from tortiously interfering with the Plaintiff's customers.  The parties, however, have struggled to apply this wording of the Preliminary Injunction and have been unable to clearly ascertain which customers are serviced by each.  In light of this ambiguity of application, and the Defendant's belief that it was merely servicing its own customers, the Court finds that it has not been shown by clear and convincing evidence that the Defendant had actual or constructive

23

knowledge that its continued solicitation of certain customers violated the Preliminary Injunction.[5]

### E. Sanctions

Having concluded that the Defendant's actions constituted civil contempt, the Court turns next to sanctions. The Court has the inherent power to coerce compliance with its orders, and it may exercise that authority by ordering a defendant to be incarcerated or to pay a fine, or both, until he purges himself of his contempt. Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 828 (1994). This Court has broad discretion to craft civil contempt remedies. In re Gen. Motors Corp., 61 F.3d 256, 259 (4th Cir. 1995). Any remedy, however, "must be remedial and compensatory and, unlike criminal contempt, nonpunitive." Id.

Having reviewed the extensive evidence submitted by the parties throughout this matter, the Court concludes that the imposition of sanctions is necessary to compensate the Plaintiff for the Defendant's failure to comply with the Preliminary Injunction. Based on the volume of business of both Plaintiff and Defendant, and considering what is warranted to encourage

---

[5] Based on the arguments and evidence presented by the parties in this matter, the Court will, contemporaneously herewith, modify the Preliminary Injunction to ensure that it does not prevent the Defendant from servicing customers with whom it has valid contracts while also protecting the Plaintiff from tortious interference with its contractual relations.

24

compliance with the Preliminary Injunction, the Court finds that a sanction in the amount of $5,000.00 per day for the period of violation is adequate. Therefore, the Defendant will be sanctioned $5,000 for each day, starting from May 29, 2021,[6] that the Defendant continued to operate any of the websites featuring "dmarcian" domain names following the entry of the Preliminary Injunction. Such sanctions shall continue to be imposed until the contempt is purged.

The Defendant has already provided some evidence of its attempts to purge its contempt "voluntarily." The parties will be given an additional fourteen (14) days to provide any further evidence of the Defendant's compliance or non-compliance with the Preliminary Injunction, and the Court will enter an order as to when or if the daily sanction ends.

The Court will also award the Plaintiff's reasonable attorneys' fees and costs in litigating this matter. The Plaintiff shall file a brief within fourteen days from the entry of this Order providing a breakdown of the hours incurred in litigating this contempt proceeding and discussing the relevant factors for

---

[6] The Plaintiff posted its bond on Thursday, May 27, 2021, after the close of business in the Netherlands. Thus, the Defendant should have begun complying with the Preliminary Injunction no later than the close of business on May 28, 2021. As such, the imposition of sanctions shall begin on the first full day of the Defendant's non-compliance, May 29, 2021.

determining the reasonableness of a fee request in the Fourth Circuit. <u>See</u> <u>Grissom v. The Mills Corp.</u>, 549 F.3d 313, 321 (4th Cir. 2008).

Finally, it is this Court's intention to try to stay in step with the Dutch court proceedings and to provide proper and appropriate deference so that the Dutch courts can adjudicate what is before them and this Court can address what is properly pending here. To that end, the Court will direct the Defendant to provide a copy of this Order to any and all Dutch courts in any pending proceedings in which the Plaintiff and the Defendant are parties.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendant is hereby held in civil contempt of the Court's Preliminary Injunction. [Doc. 39]. The Defendant shall be pay to the Plaintiff Five Thousand Dollars ($5,000.00) for each day after the entry of the Preliminary Injunction, starting from May 29, 2021, that the Defendant continues to use dmarcian.eu, dmarcian.nl, dmarcian.co.uk, dmarcian.be, dmarcian.es, dmarcian.fr, dmarcian.at, dmarcian.frl, dmarcian.io, dmarcian.jp, dmarcian.hk, or any other website featuring the "dmarcian" domain name. The parties shall provide any further evidence of the Defendant's continued compliance or non-compliance with the Preliminary Injunction within fourteen (14) days of the entry of this Order

**IT IS FURTHER ORDERED** that the Defendant shall pay the Plaintiff's attorneys' fees and costs in litigating this matter. The Plaintiff shall file a brief detailing its reasonable costs, fees, and expenses incurred in this action within fourteen (14) days of the entry of this Order.

**IT IS FURTHER ORDERED** that the Defendant shall provide a copy of this Order to any and all Dutch courts in any proceedings in which the Plaintiff and the Defendant are parties.

The Court will retain jurisdiction over the Show Cause Order to levy fines, order compliance, and otherwise grant further relief as the Court finds appropriate.

**IT IS SO ORDERED**.

Signed: August 11, 2021

Martin Reidinger
Chief United States District Judge