**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:21-cv-00067-MR**

| | | |
|---|---|---|
| DMARCIAN, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OF** |
| vs. | ) | **DECISION AND ORDER** |
| | ) | |
| DMARC ADVISOR BV, | ) | |
| f/k/a dmarcian Europe BV, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Defendant's "Motion for

Request to the Register of Copyrights Under 17 U.S.C. § 411(b)(2) and 37

C.F.R. § 205.14 and to Stay this Case." [Doc. 140].

**I.    PROCEDURAL HISTORY**

On March 12, 2021, the Plaintiff, dmarcian, Inc. ("dmarcian, Inc." or

"Plaintiff") filed this action against DMARC Advisor BV (then known as

dmarcian Europe BV) ("DMARC Advisor" or "Defendant"). [Doc. 1]. The

Plaintiff filed an Amended Complaint on April 7, 2021, [Doc. 19], and a

Second Amended Complaint on June 22, 2021 [Doc. 51]. The Second

Amended Complaint alleges fifteen causes of action against the Defendant,

including a cause of action for copyright infringement pursuant to 17 U.S.C. § 501. [Doc. 51 at ¶¶ 125-36].

On September 30, 2022, the Defendant filed the present "Motion for Request to the Register of Copyrights Under 17 U.S.C. § 411(b)(2) and 37 C.F.R. § 205.14 and to Stay this Case," alleging inaccuracies in the Plaintiff's application for copyright registration and requesting the review of the Register of Copyrights. [Doc. 140]. On November 4, 2022, the Plaintiff filed a Memorandum in Opposition to the Motion. [Doc. 150]. On November 14, 2022, the Defendant filed a Reply to the Plaintiff's Memorandum in Opposition. [Doc. 153]. Accordingly, this matter has been fully briefed and is ripe for disposition.

## II.    STANDARD OF REVIEW

The Copyright Act provides that an inaccuracy in an application for copyright registration does not void the registration unless:

(A)    the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and

(B)    the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration.

17 U.S.C. § 411(b)(1). The Act further provides that "[i]n any case in which inaccurate information described under paragraph (1) is alleged, the court

shall request the Register of Copyrights to advise the court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration." Id. § 411(b)(2).

While § 411(b)(2) is "rarely invoked," the courts that have addressed the provision are "in agreement that the provision is mandatory in nature, requiring district courts to solicit the advice of the Copyright Office when the statutory conditions are satisfied." Palmer/Kane LLC v. Rosen Book Works LLC, 188 F. Supp. 3d 347, 349 (S.D.N.Y. 2016) (collecting cases).

## III. FACTUAL BACKGROUND[1]

The facts as they relate to allegations of inaccuracies in the Plaintiff's application for copyright registration are as follows. This case arises from a soured business relationship between the Plaintiff and the Defendant. Tim Draegen ("Draegen") is the Plaintiff's founder and former CEO. [Doc. 9: Draegen Decl. at ¶ 1]. Draegen founded dmarcian, Inc. in 2014[2] to commercialize an anti-phishing software, dmarcian, which he developed in 2012. [Id. at ¶¶ 3-4]. In 2013, Martijn Groeneweg ("Groeneweg"), a Dutch

---

[1] The factual recitation provided here is drawn from the declarations that the parties submitted in conjunction with their briefing on this motion as well as from the record as a whole. Where the parties dispute a fact, that dispute is noted.

[2] Draegen's company Eudaemonic Development, LLC, began doing business as dmarcian in 2012; however, Draegen did not incorporate under "dmarcian, Inc." until 2014. [Doc. 9: Draegen Decl. at ¶ 4].

3

businessman, first contacted Draegen expressing an interest in marketing the Plaintiff's product in Europe. [Id. at ¶ 6; Doc. 26-9: Groeneweg Decl. at ¶¶ 2, 9]. While initial discussions between Draegen and Groeneweg did not produce an agreement, they continued to discuss the possibility of working together. [Doc. 26-9: Groeneweg Decl. at ¶ 9; Doc. 9: Draegen Decl. at ¶ 8].

In 2016, Draegen traveled to the Netherlands to meet with Groeneweg. [Doc. 9: Draegen Decl. at ¶ 9]. The two reached an agreement, which was not reduced to writing at the time but was later "summarized in the form of a series of emails," that would allow Groeneweg to market the dmarcian software in Europe through a European legal entity. [Id.]. This "legal entity" was Mailmerk BV, an entity that Groeneweg founded in 2013. [Doc. 26-9: Groeneweg Decl. at ¶¶ 2, 9]. This verbal agreement also granted Draegen an option to purchase 50.01% of Mailmerk's shares for one euro. [Doc 26-9: Groeneweg Decl. at ¶ 10]. Mailmerk rebranded as dmarcian Europe BV,[3] and, in 2018, Draegen exercised his option to purchase 50.01% of then-dmarcian Europe BV's shares. [Doc. 9: Draegen Decl. at ¶ 13].

Initially, the Plaintiff and the Defendant worked together as intended and the Defendant marketed the dmarcian software in Europe. [Id. at ¶ 14]. In 2017, a dmarcian, Inc. contractor in Bulgaria suggested hiring Bulgarian

---

[3] dmarcian Europe BV has since rebranded as DMARC Advisor.

developers to "further [the] development of dmarcian's Code." [Id. at ¶ 15].
The Defendant hired the Bulgarian developers through Bulgaria EEOD, a
Bulgarian company owned in its entirety by the Defendant, and the
developers worked to "API-ify"[4] the dmarcian software. [Doc. 26-9:
Groeneweg Decl. at ¶¶ 18-19]. As of 2021, the dmarcian code was
comprised of forty-three components, with seven of those components
written[5] by Bulgarian developers and one component written by Dutch
developers. [Doc. 30: Draegen Decl. at ¶ 18]. Draegen claims that "[t]he eight
components contributed by Bulgarian/Dutch developers are not considered
core functionality of dmarcian's platform." [Id.].

Beginning in 2019, disputes over the ownership of the portions of the
code developed by the Defendant's developers caused the business
relationship between the Plaintiff and the Defendant to deteriorate. [Doc. 1:
Original Complaint at ¶ 36]. On January 22, 2021, the Plaintiff's counsel sent
the Defendant's counsel a letter stating that if the Defendant did not execute

---

[4] API stands for application programing interface. [Doc. 148-3: Levine Expert Rep. at ¶
26]. "API-ification" involves refactoring code into smaller components to improve the
overall code structure. [Id. at ¶¶ 25-26].

[5] Draegen states that these components were "implemented" by the Bulgarian and Dutch
developers; however, in its Memorandum in Opposition to the present motion, the Plaintiff
characterizes the components as being "written" by the Bulgarian and Dutch developers.
[Compare Doc. 30: Draegen Decl. at ¶ 18, with Doc. 150: Memorandum in Opposition at
7].

an attached distribution and settlement agreement that the Plaintiff would terminate the business relationship on February 1, 2021. [Doc. 17-1: January 2021 Letter at 1]. The letter stated that the agreement "changes the scope of the cooperation between the parties considerably" because of the "breach of trust" stemming from the disputes over code ownership. [Id.]. The Defendant did not sign the agreement and sought an injunction in Dutch court to prevent the termination of the business relationship. [Doc. 26-3: February 1, 2021, Rotterdam Judgment at 10].

On February 18, 2021, the Plaintiff filed an application for a copyright registration for the "dmarcian Source Code" with the United States Copyright Office. [Doc. 148-1: Copyright Registration Docs. at 64]. The Plaintiff submitted twenty pages of code, stated that the work for which it sought copyright was completed in 2012 and first published on February 9, 2012, that the nation of first publication was the United States, and that the work's author was Eudaemonic Development, LLC. [Id. at 3, 64]. The Copyright Office approved the application and issued the Certificate of Registration on March 9, 2021. [Id. at 64]. The registration number for this registration was TX 8-941-559. [Id.] On August 19, 2022, the Plaintiff submitted a supplemental registration application to correct the author of the work from

6

Eudaemonic Development to Tim Draegen. [Id. at 70-71]. In the supplemental application, the Plaintiff stated:

> The author on the original registration was inadvertently and incorrectly listed as Eudaemonic LLC. The correct author is and should have been listed as Timothy G. Draegen and the work was not a work for hire. Tim Draegen was the owner of Eudaemonic but he personally authored and owned the work independent of Eudaemonic and maintained personal and sole ownership of the work until he transferred ownership to dmarcian Inc. by written agreement in 2015.

[Id. at 71]. The registration number for this updated registration was TX 9-164-197. [Doc. 142-5: Updated Registration Certificate].

The twenty pages of code submitted to the Copyright Office consisted of 734 lines written in HTML. [Doc. 141: Ninth Groeneweg Decl. at ¶ 6]. Those 734 lines were excerpted from a larger file that was first created on November 21, 2017, and revised thereafter. [Id. at ¶ 7]. However, the 734 lines that were excerpted only existed in two versions of the file: the December 14, 2020, version and the January 11, 2021, version. [Id.]. It was the standard practice of the Plaintiff and the Defendant in 2020 and 2021 to first publish updated code on servers located in Europe. [Id. at ¶ 11].

The code was stored in a version-control system that kept a log of changes. [Id. at ¶ 5]. The version-control system shows that between the file's creation in 2017 and January 11, 2021, nine different developers had

7

contributed to the file. [Id. at ¶ 16]. Of these nine developers, four were employees of the Plaintiff, four were Bulgaria EEOD employees, and one was the Defendant's chief technology officer. [Id.]. The version-control system shows that between November 21, 2017, and January 11, 2021, 2,458 lines of code were added to the file and 2,231 were deleted. [Id. at ¶ 18]. Of the lines added, 19.5% (673 lines) were added by Bulgaria EEOD employees or the DMARC Advisor officer. [Id.]. Of the lines deleted, 18.1% (403 lines) were deleted by the Bulgaria EEOD employees or the DMARC Advisor officer. [Id.]. The version-control system does not show any contributions to the file from Tim Draegen. [Id. at ¶ 19].

However, the Plaintiff's expert, Dr. John Levine, states that the version-control system's attribution of specific lines to an individual developer overstates the developer's role in substantively contributing to that line of code. [Doc. 148-3: Levine Expert Rep. at ¶¶ 28-33]. According to Dr. Levine, any change to a line—including edits as trivial as adding or removing a character—is recorded by the version-control system as a change to the entire line and changes authorship for the entire line. [Id. at ¶ 28]. In Dr. Levine's view, the nine developers were not writing an entirely new code but were instead making changes to refactor, or API-ify, the original dmarcian code. [Id. at ¶¶ 24-27]. Accordingly, Dr. Levine states, because refactoring

8

requires that developers move lines of code or make other structural changes, the version-control system attributes authorship to developers who were only reformatting existing code. [Id. at ¶¶ 24-28]. Dr. Levine examined the dmarcian code before and after it was API-ified and stated that "most of the code is unchanged, or at most reformatted" rather than entirely new code. [Id. at ¶ 33]. In Dr. Levine's view, the 2021 code "cannot function without Dra[e]gen's code" and "Draegen's original code remains a substantial part of the current product." [Id. at ¶ 38]. It is also Dr. Levine's opinion that any characterization the dmarcian code as existing in two discrete "versions"— before and after API-ification, for example—is inaccurate because the code evolved "step by step over the past decade, starting in 2012 and with changes made on a regular basis then, including through refactoring." [Id. at ¶ 39].

The Defendant, however, argues that the improvements since 2012 are so substantial that the 2021 code is functionally a distinct version. [Doc. 153 at 7-9]. According to dmarcian, Inc.'s "Product Changelog," a page of the Plaintiff's website that "highlights feature improvements and advancements since 2012 when dmarcian was founded," numerous "improvements and advancements" were made between 2012 and 2021. Product Changelog, dmarcian, https://dmarcian.com/changelog/ (last visited

9

May 12, 2023). As the Defendant notes, two of these updates note that dmarcian features were "rebuilt using API." Id. The Defendant also points out that, in 2020, two new features were released and states that the new features were "written by the Dutch and Bulgarian developers after March 2020." [Doc. 153 at 8-9 (citing Doc. 93-2: DMARC Advisor Investigation Rep. at ¶ 7.56)]. Therefore, according to the Defendant, the code submitted to the Copyright Office was distinct from the code written in 2012 by Draegen.

## IV. DISCUSSION

The Defendant argues that its allegations of inaccuracies in the Plaintiff's application for copyright registration trigger § 411(b)(2)'s mandatory referral provision and, therefore, the Court must refer questions about the alleged inaccuracies to the Register of Copyrights. [Doc. 143 at 3]. The Defendant argues that the Court should refer the following questions to the Copyright Office:

> Would the Register of Copyrights have refused Registration Numbers TX0009164197 or TX0008941559 had it known that:
>
> (1) Nine authors – none of whom was Eudaemonic Development, LLC or Timothy G. Draegen – wrote the HTML file from which the deposited code was excerpted, and at least five of those authors never purported to transfer intellectual property rights to dmarcian, Inc.;

(2) The deposited code was written on or after November 21, 2017; and

(3) The deposited code was first published on or after December 14, 2020, outside the United States.

[Id. at 24].

While courts agree that § 411(b)(2)'s referral provision is mandatory, and at least one circuit court has held that invalidation of a copyright registration without § 411(b)(2) referral was reversible error, see DeliverMed Holdings, LLC v. Schaltenbrand, 734 F.3d 616, 624 (7th Cir. 2013), courts differ on the burden a movant must meet to trigger mandatory referral. HealtheState, LLC v. United States, 160 Fed. Cl. 91, 95 (Fed. Cl. 2022).

While the Fourth Circuit has not addressed the issue, the two circuit courts that have considered when a movant has made a showing sufficient to trigger § 411(b)(2) have held that, despite the statutory language specifying that a mere "allegation" is sufficient to trigger solicitation of the opinion of the Register, a movant must "demonstrate that the inaccurate information was knowingly provided." Id. The Seventh Circuit cautioned that § 411(b)(2) had the potential to be used as a "delay tactic" and, therefore, noted that "courts can demand that the party seeking invalidation first establish that the other preconditions to invalidity are satisfied before obtaining the Register's advice on materiality." DeliverMed Holdings, LLC,

11

734 F.3d at 625. The Seventh Circuit also stated that such an approach "has the benefit of an endorsement from the Register," quoting a response from the Register of Copyrights to a § 411(b)(2) request in another case that read "before asking the register whether she would have refused to register a copyright . . . a court should feel free to determine whether there is in fact a misstatement of fact." Id. (alteration in original) (quoting Response of the Register of Copyrights to Request Pursuant to 17 U.S.C. § 411(b)(2) at 12, Olem Shoe Corp. v. Wash. Shoe Co., No. 09-cv-23494, 2010 WL 3505100 (S.D. Fla. Sept. 3, 2010)). The Fifth Circuit adopted the Seventh Circuit's view in Energy Intelligence Group, Inc. v. Kayne Anderson Capital Advisors, L.P., holding that "§ 411(b) does not require immediate referral to the Copyright Office to determine the materiality of alleged inaccuracies." Energy Intelligence Grp., Inc., 948 F.3d 261, 277-78 (5th Cir. 2020).

However, as the Court of Federal Claims recently observed, the heightened burden employed by the Seventh and Fifth Circuits "ignores the statutory language." HealtheState, LLC, 160 Fed. Cl. at 95. The statute unambiguously states that courts "*shall*" request the Register's opinion "in *any case* in which inaccurate information . . . is *alleged.*" 17 U.S.C. § 411(b)(2) (emphasis added). "Where, as here, the words of the statute are unambiguous, the 'judicial inquiry is complete.'" Desert Palace, Inc. v. Costa,

539 U.S. 90, 98 (2003) (quoting Conn. Nat'l Bank v. Germain, 503 U.S. 249, 254 (1992)). The Court agrees with the Court of Federal Claims that the plain and unambiguous language of the statute should control.

Moreover, the Supreme Court's recent opinion in Unicolors, Inc. makes clear that inaccuracies in applications for copyright registrations only render the registrations invalid if the applicant had "actual knowledge" that his application contained a mistake of fact or law. Unicolors, Inc. v. H&M Hennes & Mauritz, L.P., 142 S. Ct. 941, 947. Accordingly, requiring a movant to prove that an applicant had knowledge of inaccuracies in his copyright application would require a determination of scienter, a "fact intensive determination, often appropriately decided by a jury." Tecnoglass, LLC v. RC Home Showcase, Inc., No. 16-24328-Civ-Scola, 2018 WL 11353287, at *4 (S.D. Fla. Sept. 18, 2018) (rejecting the argument that a movant must prove scienter before § 411(b)(2)'s mandatory referral to the Register was triggered). Therefore, applying the Seventh and Fifth Circuits' heightened standard would require a factual determination that is improper at this stage of the proceedings.

For all of these reasons, the Court concludes that § 411(b)(2) requires that the Court seek the Register's opinion based on an allegation of inaccuracy and does not require a movant at this stage to prove that the

information was inaccurate and that the applicant knew of the inaccuracy at the time of application. However, "[e]ven courts that hew closely to the plain language interpretation of § 411(b)(2) review the movant's request to determine whether it has provided *some basis* for its allegation and presented a proper question for referral to the Register." HealtheState, LLC, 160 Fed. Cl. at 95-96 (emphasis added). Accordingly, the Court will address each of the Defendant's proposed questions to determine whether the Defendant has provided "some basis" that the underlying information was inaccurate and that the Plaintiff knew of the inaccuracy when it included the information in its copyright application. The Court will also evaluate whether each question is proper for referral.

## A. Alleged Inaccuracy Regarding Authorship

The Defendant alleges that the Plaintiff knowingly made an inaccurate representation of a material fact to the Copyright Office when it listed Tim Draegen[6] as the author of the code for which it sought copyright registration. [Id. at 19].

---

[6] The Defendant also argues that it was inaccurate to list Eudaemonic Development as the work's author, but the Plaintiff concedes that representation was inaccurate. [Doc. 150 at 4]. As the Plaintiff subsequently submitted a supplemental application naming Draegen as the work's author, the Court will not further consider whether Eudaemonic Development authored the work.

"The Copyright Act of 1976 provides that copyright ownership 'vests initially in the author or authors of the work.'" Cmty. for Creative Non-Violence v. Reid, 590 U.S. 730, 737 (1989) (quoting 17 U.S.C. § 201(a)). "As a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." Id. The Plaintiff argues that Draegen was the party who translated the idea for the dmarcian source code into a fixed, copyrightable work in 2012, making him the author of the work within the meaning of the Copyright Act. [Doc. 150 at 14]. The Defendant does not seem to dispute that Draegen was the author of the code as it existed in 2012. Rather, it argues that Draegen was not the author of the 2021[7] code that was submitted to the Copyright Office as part of the Plaintiff's application for copyright registration. [Doc. 143 at 14-15].

Ultimately, the proper inquiry here is whether the Defendant has presented "some basis" for its allegation that a party or parties other than Draegen are the proper authors of the HTML submitted to the Copyright

---

[7] Although the Defendant noted that the code submitted to the Copyright Office could have come from a file as it existed in 2020 or 2021, the Plaintiff stated in its briefing that it submitted code that was in use in 2021. [Doc. 150 at 1]. By referring to the "2012 code" and the "2021 code," the Court takes no position as to whether it is possible to identify two distinct "versions" of the dmarcian code; rather, the Court uses the terms to differentiate between the lines of HTML actually submitted to the Register of Copyrights in 2021 and the lines of code that constituted the dmarcian source code in 2012.

Office. And because a party is only an author within the meaning of the Copyright Act if he translates an idea into a fixed expression eligible for copyright protection, the inquiry here turns on whether any party other than Draegen contributed any copyrightable element to the 2021 code. Cf. U.S. Copyright Office, Compendium of U.S. Copyright Practices § 613.3 (3d ed. 2021) ("When completing an application, the applicant should only provide the name(s) of the author(s) who created the copyrightable material that the applicant intends to register. . . . [T]here is no need to provide the name of any person(s) who created material that is *de minimis* or uncopyrightable.").

A work is eligible for copyright protection if it is "original to the author." Feist Pubs., Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345 (1991). Original "means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." Id. Presumably, the Defendant takes the position that the nine contributors to the HTML file are coauthors of the code the Plaintiff submitted to the Copyright Office. However, the Defendant fails to identify what each of these nine purported authors contributed to the 2021 code or explain with any specificity why their contributions qualify for copyright protection. In its reply, the Defendant states that "Alert Central and Account Progress Report are new features written by the Dutch and

16

Bulgarian developers after March 2020" and cites the Plaintiff's statement that eight of the forty-three components of the 2021 code were created by the Dutch or Bulgarian developers. [Doc. 153 at 4; 8-9]. However, the Defendant does not argue that any of these components or features would qualify for copyright protection such that the developers who worked on the features should have been listed as coauthors on the Plaintiff's application for copyright registration.

The Plaintiff, on the other hand, argues that *only* Draegen has contributed anything copyrightable to the 2021 code. The Defendant does not meaningfully dispute the assertion that Draegen's code is integral to the 2021 code, stating only that:

> For his part, [the Plaintiff's] putative expert repeatedly declares that "Draegen's original code" – an undefined term that presumably refers to code Draegen wrote in the distant past without ever seeking registration – is a "part" of the overall work that [the Plaintiff] registered. Even if that were true, it does not justify [the Plaintiff's] registration. [The Plaintiff] did not tell the Copyright Office that Draegen wrote a "part" of the registered work; it told that Copyright Office that he "personally authored" the work.

[Doc. 153 at 5 (citations omitted)]. However, by failing to allege the copyrightability of the other "parts" of the code, the Defendant fails to show that the Plaintiff's application was inaccurate. While it may be true that only

17

"part" of what the Plaintiff submitted was authored by Draegen, that does not preclude that the other "parts" of the submitted code were not eligible for copyright protection. And the fact that Draegen did not personally contribute to the HTML file does not preclude him from being the sole author of the *copyrightable content* of the file. The Defendant has failed to provide any basis to conclude that the nine developers who worked on the file contributed anything copyrightable. Accordingly, the Court will not refer a question to the Copyright Office regarding an alleged inaccurate representation that Draegen authored the work.

## B. Alleged Inaccuracy Regarding Year of Completion

The Defendant also alleges that the Plaintiff knowingly made an inaccurate representation of material fact when it stated that 2012 was the year of completion of the work it submitted to the Copyright Office. [Doc. 143 at 21]. The Plaintiff stated that the "year of completion" was 2012 but does not dispute that the code it submitted was the code as it existed in 2021. [Doc. 150 at 18].

"To register a work of authorship with the U.S. Copyright Office, the applicant must identify the year that the work was created. A work is considered created when it is fixed in a copy or phonorecord for the first time. If the work was prepared over a period of time, the portion or portions of the

18

work that existed in a fixed form on a particular date constitute the work that has been created as of that date." U.S. Copyright Office, Compendium (Third) of Copyright § 611 (internal citations omitted) (first citing 17 U.S.C. § 409(7); and then citing 17 U.S.C. § 101).

The Plaintiff argues that 2012 was the last year that anything copyrightable was created[8]; therefore, 2012 was the correct the year of completion. [Doc. 150 at 18]. In other words, the Plaintiff argues that the only copyrightable portion of what was submitted to the copyright office was fixed in 2012. The Defendant, on the other hand, argues that the code submitted to the Copyright Office depicted the code as it existed in 2021, not as it existed in 2012, and that the 2021 code was "a materially different work than the 2012 version." [Doc. 143 at 11-12].

The Defendant seems to make two distinct allegations of inaccuracies here: first, it takes issue with the assertion that 2012 was the last time any copyrightable work was created; and second, it asserts that, regardless of

---

[8] Confusingly, the Plaintiff cites 37 C.F.R. § 202.3 to support its position regarding the definition of "year of completion." [Doc. 150 at 18]. However, the relevant portion of that section states: "In the case of applications for registration made under paragraphs (b)(4) through (5) of this section or under § 202.4, the 'year of creation,' 'year of completion,' or 'year in which creation of this work was completed' means the latest year in which the creation of any copyrightable element was completed." 37 C.F.R. § 202.3(c)(4). However, paragraphs (b)(4) through (5) of § 202.3 and § 202.4 relate to copyright registration of group works. The Plaintiff does not allege that it registered a group work, so it is unclear why it cites this definition.

19

when the last copyrightable work was created, what the Plaintiff submitted was not the work as it existed in 2012.

To rebut the Defendant's first allegation—that 2012 was not the last date anything copyrightable was created—the Plaintiff makes a similar argument as its argument regarding authorship. The Plaintiff emphasizes its expert's conclusion that Draegen's code was integral to the code the Plaintiff submitted and therefore constituted the only copyrightable portion of that code. Confusingly, however, the Plaintiff's expert seemed to be comparing a version of the code as it existed in 2017 to the 2021 code. [Doc. 148-3: Levine Rep. at ¶ 29]. It is unclear whether Dr. Levine reviewed the code as it existed in 2012, and it is unclear if any record of the code as it existed in 2012 even exists. And, as, the Defendant points out, "[e]ven if [the Plaintiff] were right that nothing written after May 2017 is eligible for copyright protection, that would still mean that it misrepresented the creation and publication date by over five years." Accordingly, the Court concludes that the Defendant has provided "some basis" for its allegation that 2012 was not the date of creation.

Moreover, the Defendant correctly asserts that the Plaintiff improperly deposited 2021 code rather than a copy of the code as it existed in 2012, its purported year of creation. An application for copyright registration must

include a copy or copies of the work. 17 U.S.C. § 408(b). While the Fourth Circuit has not further defined what constitutes a "copy" for copyright registration purposes, the Ninth Circuit requires that work submitted must be a "bona fide cop[y] of the original work," not a "reconstruction." Kodadek v. MTV Networks, Inc., 152 F.3d 1209, 1211 (9th Cir. 1998); see also Torres-Negron v. J & N Recs., LLC, 405 F.3d 151, 157 (1st Cir. 2007) (adopting the Ninth Circuit's definition of a copy within the meaning of the Copyright Act); Geoscan, Inc. of Tex. V. Geotrace Techs., Inc., 226 F.3d 387, 393 (5th Cir. 2000) (same); Coles v. Wonder, 283 F.3d 798, 801-02 (6th Cir. 2002) (same); Nova Design Build, Inc. v. Grace Hotels, LLC, 652 F.3d 814, 817 (7th Cir. 2011) (same).

In Tavory v. NTP, Inc., 495 F. Supp. 2d 531 (E.D. Va. 2007), a district court in this Circuit applied the Kodadek standard to conclude that an applicant seeking copyright registration for an electronic mail system source code had failed to deposit a bona fide copy with the Copyright Office. Tavory, 495 F. Supp. 2d at 535. The plaintiff in Tavory sought registration for source code from 1990, but "no original copies of the source code dating from 1990 remain[ed]." Id. at 536. Therefore, the plaintiff "produce[d] his deposit copy only by referring to modified versions of the code and redacting those modifications to the best of his recollection in order to create an 'original.'"

Id. The court in that case concluded that this reconstruction was insufficient to comply with the Copyright Act's registration requirements.

Here, the Plaintiff did not even attempt to produce a bona fide copy of the 2012 source code but instead simply deposited the code as it existed in 2021. Thus, it did even less to attempt to comply with the Copyright Act's deposit requirements than the Tavory plaintiff. Accordingly, the Court concludes that the Defendant has shown some basis supporting its allegation that the Plaintiff's deposited code was not a proper copy of the source material as it existed in the year of completion listed on the application.

The Court also concludes that the Defendant has provided some basis to show that the Plaintiff knew 2012 was not the date of creation and that it knew the code it deposited as part of its application did not represent the dmarcian source code as it existed in 2012. As previously discussed, the Plaintiff's own expert referred to "Draegen's code" as it existed prior to refactoring starting in 2017. And there is no dispute that the Plaintiff knew the code it deposited was the code in use in 2021, not the code as it existed in 2012. Accordingly, the Court concludes referral to the Register is required because the Defendant has sufficiently alleged that the Plaintiff knowingly submitted an inaccurate application.

22

The Defendant asks that the Court submit the following question related to its alleged inaccuracy regarding year of completion: "Would the Register of Copyrights have refused Registration Numbers TX0009164197 or TX0008941559 had it known that . . . the deposited code was written on or after November 21, 2017." [Doc. 143 at 24]. The Court notes that the November 21, 2017, date is the day the HTML file was created; however, the Plaintiff's expert (and the Defendant itself, in its reply) refers to code from *May* 2017. Because the application asks for "year of completion" the Court will remove reference to a specific date from the question. The Court will also replace the word "written" with "created," as the year of creation is what is at issue here, and refer the following question to the Register of Copyright:

> Would the Register of Copyrights have refused Registration Numbers TX0009164197 or TX0008941559 had it known that the deposited code was created in or after 2017?

The Court also notes that while the Defendant does not specifically request referral of a question related to whether it was proper to deposit a copy of the code as it existed in 2021, it has alleged that depositing that code violates the requirement that an applicant deposit a copy of the work at creation. Accordingly, the Court will also refer the following question to the Register:

> Would the Register of Copyrights have refused Registration Numbers TX0009164197 or TX0008941559 had it known that the deposited lines

23

of code were the lines in use in 2021, and not an exact copy of the code as it existed in 2012?

## C.    Alleged Inaccuracy Regarding Country of Publication

The Defendant also alleges that the Plaintiff knowingly made an inaccurate representation of material fact when it represented to the Copyright Office that the work for which it sought copyright registration was first published in the United States on February 9, 2012. [Doc. 143 at 24].

To the extent the Defendant has provided a basis to show that the copyrightable work was not created until at least 2017, it has sufficiently alleged that February 9, 2012, was not the date of publication. Accordingly, the Court will refer the following question to the Register:

> Would the Register of Copyrights have refused Registration Numbers TX0009164197 or TX0008941559 had it known that the deposited code was published in or after 2017?

However, the Defendant provides no details regarding why the United States was not the country of first publication. It attaches an affidavit by Groeneweg stating that, during 2020 and 2021, it was the standard practice of the Plaintiff and the Defendant to first "publish changes" to the code on servers outside of the United States but fails to explain if that practice qualifies as a publication within the meaning of the Copyright Act. It also fails to allege that any of these "changes" are copyrightable. Accordingly, the

Court will not refer a question to the Register relating to the country of publication.

**D.    Request for Stay of Proceedings**

The Defendant also argues that the Court should stay these proceedings while the above questions are referred to the Register. [Doc. 140]. It argues that failing to stay the proceedings will cause the parties to "engage in wasteful discovery and potentially motion practice over whether DMARC Advisor infringed [dmarcian, Inc.'s] supposed rights to code written by DMARC Advisor's own employees and agents between 2017 and 2021." [Doc. 153 at 10].

The copyright claim is but one of fifteen claims asserted in the Second Amended Complaint. Additionally, while referral to the Register is mandatory upon a sufficient allegation of inaccuracies in a copyright registration application, the Register's opinion is not binding and a stay is not mandatory. See Palmer/Kane LLC v. Rosen Book Works LLC, 188 F. Supp. 3d 347, 349 ("Nor does § 411(b)(2) require courts to stay proceedings while a court's request for an advisory opinion is pending."). The Court does not find that a stay is necessary while it awaits an advisory opinion relating to one of fifteen

25

claims at issue in this case.[9] The Court, therefore, declines to enter a stay of the present proceedings.

## V. CONCLUSION

Because the Court concludes that the Defendant has sufficiently alleged inaccuracies regarding year of completion and publication date, the Court will refer certain questions to the Register. However, the Court declines to enter a stay of the proceedings while the Register considers the questions and renders an advisory opinion.

**IT IS, THEREFORE, ORDERED** that the Defendant's Motion for Request to the Register of Copyrights Under 17 U.S.C. § 411(b)(2) and 37 C.F.R. § 205.14 and to Stay this Case [Doc. 140] is **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** to the extent that the following questions are hereby referred to the Copyright Office:

> (1) Would the Register of Copyrights have refused Registration Numbers TX0009164197 or TX0008941559 had it known that the deposited code was created in or after 2017?

> (2) Would the Register of Copyrights have refused Registration Numbers TX0009164197 or

---

[9] Moreover, the Defendant has repeatedly sought to stay these proceedings. As observed by the Seventh Circuit, a request for a referral to the Register has the potential to be used as a "weapon to delay the proceedings in district court." DeliverMed Holdings, LLC, 734 F.3d at 625 (quoting Olem Shoe Corp. v. Wash. Shoe Co., No. 09-cv-23494, 2010 WL 3505100, at *3 n.4 (S.D. Fla. Sept. 3, 2010)). Accordingly, the Court is wary that staying the proceedings in this case would transform the referral of questions to the register into exactly the sort of delay tactic the Seventh Circuit warned against.

TX0008941559 had it known that the deposited lines of code were the lines in use in 2021, and not an exact copy of the code as it existed in 2012?

(3) Would the Register of Copyrights have refused Registration Numbers TX0009164197 or TX0008941559 had it known that the deposited code was published in or after 2017?

The Motion is otherwise **DENIED**.

The Clerk of Court is respectfully directed to provide a copy of this Order to the General Counsel of the Copyright Office via email at 411filings@copyright.gov, in accordance with the procedures set out in 37 C.F.R. § 205.14.

**IT IS SO ORDERED.**

Signed: June 12, 2023

Martin Reidinger
Chief United States District Judge