# JUDGMENT

**Rotterdam District Court**

Commerce and port team

Case number / cause-list number: C/10/632146 / HA ZA 22-67

**Judgment of December 20, 2023**

In the case of the private limited liability company
**DMARC ADVISOR B.V.** (at the time of the summons named DMARCIAN EUROPE B.V.),
based in Dordrecht,
plaintiff,
counsel A.P. Meijboom in Amsterdam,

against

1.      the company under foreign law
**DMARCIAN, INC.,**
based in Brevard, North Carolina, United States,
defendant,
counsel Mr. T.S. Jansen in Amsterdam,
2.      **TIMOTHY GEORGE DRAEGEN,**
residing in Brevard, North Carolina, United States,
defendant,
counsel P.A. Josephus Jitta in Amsterdam.


The parties will hereinafter be referred to as dBV, dInc and Draegen.


## 1.       The further procedure

1.1.      The course of the proceedings appears from:
-    The judgment in the motion proceedings of December 14, 2022, and its underlying documents;
-    dInc's statement of defense dated February 1, 2023 with exhibits 11 through 120;
-    Draegen's statement of defense dated February 1, 2023, with exhibits 1 through 5;
-    dInc's document containing lists of exhibits dated February 8, 2023;
-    the hearing agenda for June 9, 2023;
-    the minutes of the oral hearing of July 5, 2023 and the documents referred to therein;
-    dBV's pleading notes;
-    dInc's pleading notes;
-    the written statement of S. Draegen, read by her during the oral hearing;
-    Draegen's pleading notes;
-    the letters from dBV and dInc dated August 17, 2023 in response to minutes of the oral hearing, which are part of the file.

1.2.      Finally, judgment was rendered.


## 2.       The case in brief

This is a conflict between two companies offering *software as a service* (and the former founder/director of one of those two companies). The two companies have worked together in the past. How the agreement at that time should be viewed is in dispute, as is whether this agreement can be terminated. The parties both wish to continue offering software to customers. The plaintiff, based in the Netherlands, believes that both companies own copyright on (most of) the software and, at its core, seeks a solution whereby both parties can continue to trade the software, possibly with a division of the world into territories. The defendant, based in the US, disagrees. It believes it is the sole right holder of the software, and therefore believes it has the sole right to determine who can offer the service. The dispute has gone very far. The issues are also being litigated in the US. In those proceedings, the American company is the plaintiff, and the Dutch company is the defendant.

### 3. The facts

In the judgment in the motion proceedings of December 14, 2022, some established facts were listed. The court maintains them and supplements this list with facts that have also been established since, so that the following facts are now assumed.

3.1.     dBV was incorporated on March 21, 2013 and was initially called Mailmerk B.V. The Digital Xpedition Holding B.V. ("TDX") was the sole shareholder and director of dBV until July 2018. The shares of TDX are held, through their personal holdings, by Messrs. M. Groeneweg and H.J. Kalkman.

3.2.     dInc was incorporated on September 19, 2014. Draegen is a shareholder of dInc and was initially also a director.

3.3.     dBV and dInc are engaged in providing email address identity protection products and services. Companies using the service thereby prevent identity fraud such as spoofing.

3.4.     dBV and dInc entered into an oral agreement in January 2016 regarding the use and distribution of the dmarcian software ("the software") developed by dInc. Under this agreement, dBV received a license to use the software and was allowed to sell it (i.e., give paying customers access to the SaaS environment) in Europe, Russia and Africa. In exchange for which dInc (and/or Draegen) received, among other things, an option right to a majority stake in dBV.

3.5.     In practice, the software was offered as a SaaS *(Software as a Service)* service that could be accessed through the website under the URL dmarcian.com. dInc and dBV both offered the service through this URL. Potential customers based in Europe, Russia or Africa (based on their IP address) were directed to dBV through this site. dBV then closed the sales transaction and collected the periodic fees. Customers based in other territories were redirected to dInc, or to other dInc affiliates such as Dmarcian Asia Pacific Pty Ltd.

3.6.     In July 2018, Draegen exercised the option right granted to dInc and/or him and obtained 50.01% of the shares in dBV.

3.7.     dBV holds 100% of the shares in dmarcian Bulgaria EOOD (hereinafter dmarcian Bulgaria). As of mid-2018, with the knowledge of dInc, (further) development of the software (also) took place by dBV and dmarcian Bulgaria. dBV kept dInc periodically informed about the progress of dmarcian Bulgaria. dInc was able to follow the progress of dmarcian Bulgaria, as the parties involved communicated with each other about it. From November 2019, only the thus adapted and extended version of the software is available.

3.8.     Groeneweg sent an email, with attachment, to Draegen on December 4, 2019. That email stated, among other things:

*"(...) The document describes the current situation that software owned by dmarcian Europe BV can't be sold by dmarcian, Inc. nor Dmarcian Asia Pacific Pty Ltd to customers as there's no license agreement in place to do so. Before this problem is solved new software including but not limited to DMARC delegation can't go live on other instances than the EU instance. This document describes a detailed solution for the above problem as well. (...) "*

The attachment contains a document that includes the contents of the agreements reached, according to Groeneweg, between dBV and dInc during 2016. The document further states that the issue mentioned in the email can be resolved by dBV providing a perpetual license to dInc in exchange for certain share transfers.

3.9.     Draegen responded to Groeneweg's proposals with emails of December 4 and 6, 2019. In them, he wrote, among other things:

*"(...) I agree we'll need a licensing agreement to be put into place. Without going into details over email, it makes sense to reflect the perpetual and exclusive license that Europe BV has enjoyed. (...) The proposed solution (...) isn't something I can support. (...) "* and *"(...) The initial terms described around January 22, 2016 are either wrong or inaccurate (...) "* and finally that passages in Groeneweg's document *"have raised serious red flags"* as well as *"issues that cannot be ignored".*

3.10.    On December 6, 2019, dInc blocked dBV's access to the shared systems. On that day, Draegen informed all dmarcian employees worldwide of the following during an online all hands meeting:

*"(...) Right now, I wear two hats. The CEO of the US legal entity, and the majority owner of the Dutch BV. With my CEO hat on, I have to protect the assets of the US company, including intellectual property. (...) I have to protect the property of the company, and need to interpret the letter as an attempt to replace existing terms with new ones. We're now in a legal limbo (...) BV employee access has to be suspended and pretty much everything related to resources provided to the BV by the US entity has to be suspended (...) ".*

This "blackout" was lifted after 48 hours.

3.11.    Draegen, by email dated July 3, 2020, requested that a shareholder meeting of dBV be convened, with on the agenda the proposal to remove TDX as director and appoint another company, to be designated by Draegen, as director.

3.12.    dBV's shareholder meeting was scheduled for August 13, 2020. Prior to that, TDX initiated an inquiry proceedings against dBV at the Enterprise Chamber of the Amsterdam Court of Appeal, after which the shareholder meeting was rescheduled. Draegen joined the Enterprise Chamber proceedings as an interested party.

3.13.    The order of the Enterprise Chamber dated September 7, 2020 considered, among other things, the following (the names of the parties have been replaced, for readability, by the designations used in this judgment):

*"(...) 3.4 The Enterprise Chamber considers as follows. The controversy over the intellectual property rights to the software/software applications developed by dBV (and dmarcian Bulgaria) is at the heart of the dispute between the parties. TDX argues that this software/these software applications are separate from the software developed by dInc. such that the intellectual property thereof belongs to dBV. The ability of dInc. to use and sell this software/these software applications should be based on a license to be granted by dBV, according to TDX. On the other hand, Draegen argues that the software developed by dBV (and dmarcian Bulgaria) comprises no more than additional features for improved use of the software originating from dInc. so that the intellectual property thereof also belongs to*

*dInc. The Enterprise Chamber states first of all that only the ordinary civil court has jurisdiction for the legal assessment of that dispute. However, the Enterprise Chamber notes that this dispute is disruptive for dBV's business; developing and selling software is its core business and the cooperation with dInc. is a necessary condition for that. Nevertheless, this cooperation is not sufficiently regulated by the parties, neither in general, nor with regard to the intellectual property rights to developed and to be developed software/software applications and the licenses granted/to be granted in connection therewith, or the scope thereof, in particular. There are no unambiguously recorded agreements about this, with the result that the current discussion about this has put the cooperation at risk, which forms a serious hindrance to the business operations of dBV. In the opinion of the Enterprise Chamber, the existence of the aforementioned situation provides sufficient well-founded reasons to doubt the correct policy and course of affairs of dBV. The Enterprise Chamber will, as requested by both TDX and Draegen, order an investigation into the policy and course of affairs of dBV from January 1, 2016 to August 20, 2020.*

*3.5 In view of dBV's situation, the Enterprise Chamber agrees with the parties that it is necessary, by way of immediate relief, to appoint a third party as director of dBV with a casting vote, with independent authority to represent dBV. This director may count it among his duties to try to obtain clarity as to where the intellectual property in the software/software applications developed by dBV (and dmarcian Bulgaria), or at least to make sufficiently clear agreements with dInc about this and to record them (...)"*

3.14.    By order dated September 10, 2020, the Enterprise Chamber appointed Mr. H.J.M. Harmeling as director of dBV and Y. Borrius as administrator of all shares less one per shareholder.

3.15.    On September 14, 2020, dInc again blocked dBV's access to its systems. After several days, access to the most essential systems was restored.

3.16.    By letter dated January 22, 2021, dInc informed dBV that it wished to terminate its cooperation with dBV as of February 1, 2021, and that it would no longer provide dBV with access to its systems as of that date, unless dBV assigns its copyright in the new software to dInc, in exchange for a license under which dBV, as licensee, will be required to cede 80% of its revenue from the sale of the dmarcian software to dInc.

3.17.    On January 22, 2021, dInc again blocked dBV's access to its systems. dBV no longer has (direct) access to the data of the vast majority of its customers.

3.18.    A few minutes after the letter referred to in 3.16 was sent, Draegen, by letter to dBV sent by email, invoked Article 4 of the exit agreement entered into by Draegen and TDX in 2018 on the occasion of Draegen's acquisition of the controlling interest in dBV. Under this provision, each shareholder has the right to terminate the cooperation between the shareholders by making an offer for the shares of the other shareholder. If the other shareholder does not accept that offer, that other shareholder has the obligation to buy out the first shareholder. Draegen made its offer to TDX under the resolutive condition that dBV would agree to dInc's demands contained in the letter dated January 22, 2021, mentioned above.

3.19.    dBV served dInc and Draegen with a summons on January 29, 2021, to appear before the preliminary relief judge of this court on February 1, 2021. The case was heard on that day, after which a default judgment was rendered the same day. In that judgment, dInc was ordered, as a preliminary measure, to comply with the agreement existing between the parties during the investigation ordered by the Enterprise Chamber and was prohibited from terminating the agreement during that period. dInc was further ordered to lift the blockade of (the employees of) dBV to the SaaS platform. Draegen was ordered to refrain from any action that interferes with dBV's business operations, all pending

clarification of the content and scope of the license agreement between dBV and dInc and the
ownership of the IP rights to the software. The default judgment was corrected on February 2, 2021.

3.20.    Draegen signed a statement on February 9, 2021, thereby declaring his retirement as CEO,
President, CFO and Treasurer of dInc.

3.21.    The dBV director Harmeling, who was appointed by the Enterprise Chamber, requested dInc
on several occasions to end the blockade. dInc did not comply with these demands. dBV then placed
the files (including the jointly developed software) needed to continue running its business on a
separate instance.

3.22.    dInc commenced proceedings against dBV in the United States District Court of the Western
District of North Carolina, Asheville Division (hereinafter the District Court) on March 12, 2021.

3.23.    By summons dated April 6, 2021, dInc opposed the above-mentioned default judgment dated
February 1, 2021, of the preliminary relief judge of this court.

3.24.    In the aforementioned opposition proceedings, the preliminary relief judge of this court
rendered judgment on May 31, 2021. In this judgment, the preliminary relief judge, insofar as
relevant, ordered dInc to lift the blockades, on pain of a penalty, upheld the default judgment and
prohibited Draegen from obstructing dBV's actions until the judgment of the Enterprise Chamber.

3.25.    In a dispute between Draegen and TDX and dBV regarding the transfer of the shares, the
preliminary relief judge of this court, in a judgment dated August 3, 2021, provisionally ordered
Draegen to transfer his shares to TDX. Meanwhile, on July 19, 2022, the Court of Appeal of The
Hague rendered judgment on appeal. The Court of Appeal upheld the judgment in preliminary relief
proceedings and for that purpose, insofar as relevant and briefly put, considered that it can be expected
that in proceedings on the merits it will also be ruled that Draegen was obliged to transfer the shares.

3.26.    The investigator appointed by the Enterprise Chamber at Harmeling's request issued a report.
This report, insofar as relevant, reads as follows (for readability, the party names have been changed to
the names as used in this judgment):

*"(...) 7.23. (...) It is undisputed that most of the arrangements between dInc and dBV were not set forth
in a signed agreement. However, it is no longer in dispute between the parties and dInc that on or
about January 22, 2016, Groeneweg and Draegen made oral agreements regarding the cooperation
between dBV and dInc. (...)*
*7.24. It is now established between the parties that, in any event, agreements were made between dInc
and dBV regarding (1) the sale by dBV of the software in Europe, Russia and Africa (...); (2) the
distribution of the income therefrom (...); and (3) Draegen's or dInc's right to a majority share in dBV
(...). Furthermore, agreements were made between dInc and dBV and/or BeLean, Bulgaria,
Measuremail (...) regarding the development of the software (...).*
*7.25. This report also deals with the issues on which the parties have discussed but have not reached
unambiguous agreements. These include the IP rights to the software (...), the obligation to transfer IP
rights (...) and the establishment of a joint venture (...).*

*7.69 No agreement was produced in the investigation under which BeLean, Bulgaria or dBV have
undertaken to assign their IP rights (copyright), if any, to the software to dInc. The correspondence
between dInc and dBV also contains no explicit obligation to transfer copyright to dInc. (...)*

*7.225. It is emphasized that it is ultimately up to the civil courts to decide whether certain software
contributions are copyrighted. Taking all the above facts and circumstances into account, it is
assumed for the time being, for the purposes of this investigation, that the contributions to the
software made by (employees of) dInc, BeLean, Bulgaria and dBV (...) involve a creative performance
eligible for copyright protection. (...)*

_7.256 Moreover, since Draegen has not further substantiated why it follows from this (or from any other part of the emails of December 7 and 8, 2016) that dBV would be required to transfer its IP rights to the software to dInc, the conclusion is that the parties did not agree that dBV was required to transfer its IP rights to dInc.(...)"_

About the December 4, 2019 email mentioned in 3.8 (and its implications), the investigator concludes, among other things:

_"(...) 9.4 Because the parties did not set out their cooperation arrangements and their rights towards each other in an elaborate written agreement, there was a risk that a conflict would arise over the interpretation of the (mostly verbal or tacit) agreements, which actually occurred. Partly in light of this inadequate (written) protection of dBV's rights, in hindsight TDX took a great risk with the proposals made on behalf of dBV (and partly on its own behalf) by letter dated December 3/4, 2019 (...). In particular, this concerns dBV's claim - not previously made in so many words - to the IP rights to 'new software ' and the proposal to (continue to) operate as two separate companies under the same name, which deviated from the pursuit of a joint company ('global company')._
_9.5. Given these facts and circumstances, it is in itself not surprising that the letter of December 3/4, 2019, surprised Draegen/dInc (unpleasantly) and that, as a result, the confidence of dInc in the cooperation with and intentions of dBV was affected (...). The discussion about the IP rights to the software - which until then had not been conducted in so many words was put on edge at once. The actions of dInc in response to and as a result of the letter of December 3/4, 2019 have forced dBV to incur high costs to ensure the continuity of its business and to defend itself against dInc, while those actions have caused serious damage to dBV, which is still ongoing (...). Moreover, the interplay of this letter and dInc's reaction resulted in the continuation of the cooperation being put at risk and it was ultimately terminated de facto._
_9.6. It is emphasized that dInc's response following that letter - including the multiple instances in which dBV was disconnected from the shared systems and actions to take over dBV's customers - appear to the investigator to be disproportionate, in violation of existing practice of cooperation and the agreement between the parties and partly unlawful (...). Also of relevance here is that dBV's claim to certain IP rights to the software in December 2019 was in part legally defensible (...)._
_9.7. These acts of dInc and the resulting costs and damage were thus not or only partially foreseeable when TDX sent the December 3/4, 2019 letter (...)._
_(...)_
_9.9. It is plausible that by requesting an AGM, with as its main agenda item the dismissal of TDX and the appointment of Vision Management Europe B.V. as director, Draegen wanted to achieve that dBV would subsequently transfer its IP rights to the software to dInc for no consideration. That appointment would also clear the way for dBV's customer base to be transferred to dInc, as dInc subsequently partially realized after dBV was disconnected from the joint systems (...)._
_9.10. Since the arguments put forward for the dismissal by Draegen are insufficient, Draegen, by applying for this AGM, apparently intended to serve (exclusively) the interests of dInc. It is likely that the court will find that Draegen thereby acted in conflict with Article 2:8 of the Dutch Civil Code, which provides that (also) those who are involved in a legal entity by virtue of the law and the articles of association (such as shareholders), shall behave towards each other as such in accordance with what is required by the principles of reasonableness and fairness._
_9.11. The three disconnections from the joint systems were part of dInc 's efforts to put pressure on dBV to transfer its IP rights to dInc. In doing so, dInc has also increasingly (knowingly) harmed dBV. (...)_
_9.12. Draegen's actions as CEO of dInc in blocking dBV from the joint systems must also be considered in connection with his position as majority shareholder of dBV. It is questionable whether Draegen in that capacity acted in accordance with the principles of reasonableness and fairness of Article 2:8 of the Dutch Civil Code, since he acted contrary to the corporate interest, consisting of promoting the company's continued success. After all, the blockade threatens the agreed cooperation with dInc, which according to the Enterprise Chamber's decision is a 'necessary condition ' for the continued existence and success of dBV. (...)_

*9.126. (...) Partly in view of the fact that (...) dInc wanted dBV to transfer its IP rights to the software to dInc free of charge, it is plausible that Draegen's primary intention in dismissing TDX and appointing Vision Management Europe B.V. as a director was to serve the interests of dInc. After all, the way was then clear to instruct the director to realize the intended transfer of dBV's IP rights to dInc. With the appointment of Vision Management Europe B.V. as a director, the path would also be clear to transfer dBV's customer base to dInc, as dInc subsequently tried to realize with the closure of the joint systems (...). This would have deprived dBV of the basis for the continuity of the business, which after all consists of the sale of the software and related services. (...)"*

3.27.    After the immediate relief was lifted by the end of 2021, the Enterprise Chamber rendered a final decision on November 14, 2022. Therein, based to a great extent on the report referred to under 3.26, as far as currently relevant, it was considered (for readability, the party names have been changed to the names as used in this judgment):

*"(...) 3.7 The investigator has found that Groeneweg and Draegen in their actions did not make a clear distinction between their capacity as (indirect) shareholder and director. (...)*

*4.9  The Enterprise Chamber believes that the course of events at dBV, and in particular Draegen's conduct as evidenced by the investigation report, taken together and in context, constitutes mismanagement in the given circumstances. Draegen's response to the e-mail of December 3/4, 2019, in which Groeneweg had made proposals to reach licensing agreements in preparation for the consultation between dBV and dInc. scheduled for December 12, 2019 (..), was disproportionate, also in light of the cooperation between the parties that had developed over the years. The lack of clarity that had arisen as to who was entitled to the IP rights of the (development of the) software was the fault of both parties. It is established that Draegen himself also had not ensured a proper record of the agreements between dBV and dInc.; neither in his capacity as CEO of dInc. at the start of the company nor in mid-2018, at the time of his joining as a shareholder of dBV. The investigator concluded that the parties did not agree that dBV was required to transfer its IP rights to dInc. (..). Although the determination of who is the rightful owner of the software development is at the discretion of the ordinary civil courts, the investigation report does sufficiently demonstrate that dBV's claim to certain IP rights in the software in December 2019 was at least in part arguable (...).*

*4.10 Instead of entering into a dialogue about TDX's proposals at the already scheduled shareholder meeting on December 12, 2019, Draegen, in response to the e-mail in question, cancelled that appointment (...), immediately sought confrontation and, in doing so, unilaterally took measures that were detrimental to dBV and the company it operated. The investigator notes that in retrospect, it is not always clear whether Draegen acted in his capacity as a director of dInc. or (also) as a shareholder of dBV because Groeneweg and Draegen did not strictly separate their respective roles (...). It can be noted, however, that during the all-hands meeting of December 6, 2019, in which he also participated as a shareholder of dBV, Draegen claimed to both the employees of dInc. and those of dBV, that dBV was trying to appropriate the IP rights to software: after all, as the investigator notes, these were "topics of discussion for the scheduled December 12, 2019 meeting. There was (...) no question of a 'theft,' as Draegen claimed" (...). Draegen also threatened to disconnect dBV (and its employees) from the joint computer systems and then also actually disconnected dBV from those systems essential to the company (...). He did the latter in his capacity as CEO of dInc. Further, Draegen arranged for (a) dInc. to take over the management of the website from an employee of dBV who had built the website in consultation with dInc. (b) the hosting of the website, which was hosted by a Dutch service provider, to be moved to a U.S. service provider, (c) the text "Property of dmarcian, Inc." to be added to all components of the source code of the software, and (d) Jones to be appointed director of software, a position that did not previously exist, with the authority to give instructions to the software developers of dBV and dmarcian Bulgaria (...). With these four acts and with his misrepresentation during the speech to dBV's staff, Draegen wrongfully intervened directly, overruling dBV's management, in dBV's business operations, for the benefit of dInc. and to dBV's*

detriment. Thus, Draegen acted as de facto director of dBV, in breach of Article 2:8 of the Dutch Civil Code with respect to both dBV and co-shareholder TDX.

4.11 On July 3, 2020, following unsuccessful talks about an amicable settlement, Draegen, in his capacity as a shareholder of dBV, requested that a general meeting be convened with the main agenda items being the dismissal of TDX as a director of dBV and the appointment of a party associated with dInc. as a director in the place of TDX. The investigator did not find the arguments Draegen made for this to be valid and found it plausible that Draegen's primary purpose in dismissing TDX and appointing Vision Management as a director of dBV was to serve the interest of dInc. in order to have dBV's IP rights transferred to it easily and for no consideration (...). That argument is persuasive. In addition, a few days later - on July 6, 2020, and thus prior to the general meeting to be held - Draegen informed dBV's staff that TDX would be dismissed as dBV's director and Vision Management would become the new director. With that message to the staff, he again wrongly acted as de facto director of dBV, overruling the official board of directors.

4.12 When exercising his rights, a shareholder may, in principle, take his own interest as a guideline, but the shareholder must behave in accordance with what is required by the principles of reasonableness and fairness (Article 2:8 DCC). What is required by the principles of reasonableness and fairness depends on the circumstances of the case. For example, a majority shareholder may have a duty of care towards a minority shareholder (...). Moreover, a shareholder may not, in principle, disregard the interests of the company when exercising his rights, as follows from Article 2:8 DCC. One of the relevant circumstances here is that Draegen, in addition to being the majority shareholder of dBV, was also the CEO of supplier dInc. The essence of the cooperation between dBV and dInc. was that dBV sold and (further) developed the software, while the parties had gradually discussed that one joint global company would be formed, in which discussions, according to the investigator, it was often unclear in which capacity Draegen and Groeneweg were acting (.). That context partly determines how Draegen had to behave as a shareholder of dBV and entails that he could be expected to exercise due care towards dBV and those involved in its business. The request to convene a general meeting with as its agenda items the dismissal of TDX as director of dBV and the appointment of a party associated with dInc. as director in its place, after the parties had negotiated - unsuccessfully for the time being - about the IP rights, followed by the announcement to dBV's staff - even before the general meeting was held - that TDX would be dismissed, without there being any valid arguments for doing so, with the apparent aim of ensuring that dBV's IP rights would be transferred to dInc. for no consideration, is contrary to the due care to be observed by Draegen as majority shareholder pursuant to Article 2:8 DCC towards dBV and TDX.

4.13 In the same context, Draegen's conduct as a director of dInc. as described in 4.1(ii) - the first shut-off - cannot be separated from his role as a majority shareholder of dBV. Draegen had the power to shut off dBV from the computer systems critical to its operations, and did so using the incorrect argument that dBV was attempting to appropriate rights at the expense of dInc. Draegen, by effectively crippling dBV - the joint company of Draegen and TDX - instead of entering into discussions with TDX at the consultation scheduled for December 12, 2019, has neglected dBV's interests. In view of the background of the cooperation, that action was so unreasonable that he should have refrained from exercising that power - putting the systems on black.

4.14 (...) It is clear that even after the Enterprise Chamber intervened with these actions, which can be qualified as a coup, Draegen unjustifiably - in violation of the duties of care incumbent on him as majority shareholder of dBV pursuant to Article 2:8 DCC - allowed the interests of dInc. to prevail over the interests of dBV and its stakeholders.

(...)

4.21 In view of the above, the Enterprise Chamber is of the opinion that the course of events at dBV with regard to the absence of written records of IP rights, while they demonstrate an incorrect policy, cannot justify the qualification of mismanagement. Rather, the investigation report demonstrates that

*for the parties involved, TDX on the one hand and dInc. and Draegen on the other hand, the outlines of the agreements were clear and that none of them felt the urgency to record these agreements unambiguously. With hindsight, this was certainly an incorrect assessment, but there is no question of acting contrary to elementary principles of good entrepreneurship. This also applies to the e-mail of December 3/4, 2019, where it is particularly important that this e-mail also contained the invitation to enter into consultations and that TDX did not have to foresee Draegen's disproportionate reaction.*

*(...)*

*Conclusion*
*4.24 In conclusion, the investigation report has not shown mismanagement of dBV, as described in sections 4.9 to 4.14. Draegen is responsible for that mismanagement. dBV's request will be granted. (...) "*

3.28.     The judgment in preliminary relief proceedings of May 31, 2021, and the judgment in proceedings to set aside a default judgment rendered thereon were appealed. The court has since reversed that judgment. That judgment of May 23, 2023 means, insofar as currently relevant (whereby the party names have been changed to the names as used in this judgment):

*"(...) 4.1 At oral hearing on appeal held on September 15, 2022, Groeneweg, who is an indirect shareholder in TDX, stated that after the blockade on January 22, 2021, dBV succeeded in setting up its own platform – the instance referred to in section (...) - which, on March 8, 2021 finally went live, that dBV then started migrating its customers to that instance (which cost a lot of money) and that that migration has since been completed, so that dBV no longer needs dInc. On behalf of dBV, Mr Meijboom also stated at the oral hearing that after the blockade, which kept dBV from accessing anything, a lot of energy had been put into setting up its own platform and that, at the same time, a legal process had been started seeking a provisional measure compelling dInc to provide access. In (...), dBV noted that it managed to survive, albeit thanks to its own efforts and great financial sacrifices.*

*4.2 It follows from these statements that dBV does not have a sufficient (urgent) interest at this time in the interim measures requested with its claims A, A1, B and C.*

*4.3 In view of claim E, the Court of Appeal rules as follows on the situation at the time of the judgment in proceedings to set aside a default judgment. By the date of that judgment (May 31, 2021), dBV's own platform had been completed for quite some time and the migration of customers had been underway for almost three months. The legal process had further been initiated as an "extra". Under these circumstances, in the opinion of the Court of Appeal - with hindsight - it cannot be said that at the time of the judgment in proceedings to set aside a default judgment, the immediate relief taken therein, by granting claims A, B and C, were still necessary; after all, by the date of that judgment, dBV had already been able to remedy the adverse consequences of the blockade to a large extent by itself, so that even then there was no longer a sufficiently urgent interest in those claims. Whether the costs of these measures taken by dBV to prevent the damage can be recovered from dInc (Article 6:96(2a) DCC) is, for that matter, a question that can, if necessary, be addressed in proceedings on the merits about the legality or otherwise of the blockade. It follows from the foregoing that the preliminary relief judge should not have allowed claims A, B and C as awarded in the default judgment to stand (with respect to claim B: partially) in their judgment in the proceedings to set aside a default judgment. Thus, based on the default judgment, no penalties were forfeited. For this reason alone, claim E fails.*

*4.4. (...) the shares were transferred by Draegen to TDX on September 8, 2021. (...)*

*4.5 (...) dBV* [has] *not explained that the price paid by TDX to Draegen for the transfer back of the shares in dBV (€ 446,134.72) included the value of the redemption of a perpetual license of the dInc software. Contrary to what dBV appears to believe (...), the fact that this transfer back price, through the operation of Article 4 EA, is based on the price that then-majority shareholder Draegen had previously offered for the minority package (49.99%) of TDX cannot be interpreted as including a consideration for the redemption of the license rights. It must therefore be seriously considered that the said redemption value was not factored into the transfer back price. And if this is not the case, the balance in the agreement - which is a long-term contract - has been fundamentally disturbed since the transfer back and it is (therefore) subject to serious doubt whether in proceedings on the merits it will (or can) be ruled that dInc is still obliged to fulfill its obligations under that agreement. In the opinion of the court of appeal, at this state of affairs there is a place for measures of order to that effect. (...)*

*(...)*

*4.7 In summary, dBV's claims are not allowable at this time and were not allowable at the time of the judgment in proceedings to set aside a default judgment. (...)"*

3.29.    dBV appealed this judgment to the Supreme Court.

3.30.    An order dated June 27, 2023 from the US Judge (Chief United States District Judge) to the District Court, with sworn translation submitted on July 3, 2023, includes, *inter alia*:

*"(...) under U.S. law, a civil action is commenced with the filing of a complaint. Fed. R. Civ. P. 3. There is no separation of the preliminary proceedings and the proceedings on the merits. The complaint sets forth a statement of the claims upon which the plaintiff seeks relief on the merits. Fed. R. Civ. P. B(a)(2). When a civil action is filed, a plaintiff may seek preliminary relief as part of that action. In order to receive preliminary or interim relief under U.S. law, the party seeking relief must demonstrate a likelihood of prevailing on the merits. A preliminary relief hearing can even be consolidated with a trial on the merits. See Fed. R. Civ. P.65(a)(2).*
*Thus, regardless of whether preliminary injunctive relief is sought, what matters for the purpose of determining under U.S. law whether an action on the merits was first to be filed is the filing of the complaint. The complaint sets forth the claims upon which the Court may issue a final judgment, and therefore it is the filing of the complaint that commences the proceedings on the merits in a U.S. action. (...)*
*(2)  The proceedings on the merits in the U.S. case began with the filing of the Complaint on March 12, 2021, and DMARC Advisor's representations to the contrary to the Rotterdam Court are entirely untrue;*
*(3)  The U.S. case filed on March 12, 2021 presented claims which put copyright ownership and the terms of the parties' contracts squarely at issue. As such, there appears to be some overlap of issues between the U.S. case and that pending before the Rotterdam Court. DMARC Advisor's representation to the Rotterdam Court that the U.S. case pleads only violations of U.S. copyright and trademark law, and not any infringing actions outside the U.S., is entirely untrue; and*
*(4)  The Preliminary Injunction issued by the U.S. Court did not limit application of the Copyright Act to only acts of infringement within the United States and gave extraterritorial application to reach acts of DMARC Advisor in Europe and elsewhere, and DMARC Advisor's representations to the contrary to the Rotterdam Court are entirely untrue. (...) "*

3.31.    In the U.S. proceedings, a timetable has now been established in which mediation should have taken place by October 2023, through the filing of a specific motion, and the commencement of oral argument in the main case *(trial)* is scheduled from March 11, 2024. Furthermore, dBV is required in those proceedings to bring the source code and related documents of the software it currently uses into the proceedings as part of discovery.

## 4.        The further assessment

4.1.        The court previously assumed jurisdiction over the claim. In a judgment dated December 14, 2022, the court also ruled on Draegen's and dInc's *lis pendens* appeal, which must be assessed with respect to each of them under the provisions of Article 12 Dutch Code of Civil Procedure. In this regard, it considered:

*"(...) 5.35 At issue then is whether the U.S. proceedings on which dInc bases its lis pendens appeal were brought earlier than the present case. Is that not the case, then Article 12 Dutch Code of Civil Procedure lacks application and dInc's lis pendens appeal fails for that reason alone.*

*5.36  Since the day of summons in the present case is October 11, 2021, this case is pending pursuant to Article 125(1) Dutch Code of Civil Procedure as of that day.*

*5.37  At the oral hearing on September 14, 2022, dBV explained quite concretely and further substantiated with documents that in the U.S. proceedings that dInc bases its* lis pendens *appeal on, to date, only decisions of a provisional nature (injunctive relief) have been rendered and that the court in those proceedings did not commence the proceedings on the merits until May 22, 2022. dInc has left this explanation of dBV unchallenged and the court assumes that the decisions rendered before May 22, 2022 should be considered injunctive relief under applicable procedural law. (...)*

*Now that it is clear that these proceedings were brought earlier than May 22, 2022, the lis pendens appeal fails. (...)"*

Meanwhile, there is an Order of the District Court, quoted in part at section 3.30, which shows, in summary, that under the procedural law of the United States, the proceedings on the merits there were pending on March 12, 2021, and that under that procedural law, it is possible to file on that occasion, within the then already pending proceedings on the merits, certain claims for injunctive relief *(motion for summary injunction)*.

4.2.        dInc therefore asks the court to reverse its decision not to stay the case, due to *lis pendens*. dBV opposes.

4.3.        The court does not reverse its decision where Draegen is concerned. Indeed, the circumstance that Draegen is not a party to the proceedings in the U.S. is an independent ground for finding Article 12 Dutch Code of Civil Procedure inapplicable.

4.4.        The court does reverse its decision where the case against dInc is concerned. To this end, the following reasons are relevant. On the basis of the District Court's communications, it must be taken as established that, contrary to the court's earlier assumption, the proceedings there commenced earlier than these proceedings. This is explained as follows. It comes down to whether on March 12, 2021 there was, as the District Court previously assumed, the initiation of proceedings for interim relief which, by their nature, cannot lead to a decision that can acquire *res judicata* effect and is then enforceable in the Netherlands, or rather the initiation of proceedings that can lead to such a decision. From the District Court's explanation, it must be concluded that this introductory motion may lead to decisions that are not provisional in nature in a judgment on the merits, which can obtain *res judicata* effect. Although there is no enforcement treaty between the U.S. and the Netherlands, it must be assumed that a judgment to be rendered by the District Court will presumably meet the criteria set forth in the Gazprombank judgment of the Dutch Supreme Court (Surpr. Crt. September 26, 2014, ECLI:NL:HR:2014:2838). After all, it involves an independent regular judge who considers himself competent on plausible grounds, where both parties are heard and where, for that matter, there are sufficient guarantees for due process. That means that a judgment to be rendered by that court, as it now appears, will most likely qualify for a quasi-exequatur in the Netherlands, i.e. a judgment based on Article 431(2) Dutch Code of Civil Procedure. This is confirmed by the Supreme Court judgment

of September 29, 2023, published after the hearing under ECLI:NL:HR:2023:1266. (The court notes that the extensive attention paid to this point at the hearing, where the Advocate-General's conclusion was already available, made it unnecessary to give the parties a separate opportunity to comment on that judgment).

4.5.      In the U.S. proceedings, as to the substantive issues in dispute regarding the IP rights to the software, the same issues are at issue as in these proceedings; the positions there are more or less the mirror image of the positions here. The fact that more is claimed in these proceedings does not alter this. Thus, in this case, if both proceedings are continued, the situation threatens to arise that, on the crucial points of the ownership of the IP rights and the originality of the source code, there are two court judgments enforceable in the Netherlands that may be (in whole or in part) incompatible with each other. This is the situation that Article 12 Dutch Code of Civil Procedure aims to prevent.

4.6.      In addition, these proceedings are not ready for final judgment against dInc. Further investigation is needed for that. Investigations are now underway in the US. The investigation of the source code, which is planned there at relatively short notice and may even have already been carried out in the meantime, is in any event useful and possibly even necessary for the present proceedings as well. dBV has no legally respectable interest in dInc (and itself) having to incur double costs to have this investigation carried out both in the United States and in the Netherlands, with or without the help of experts. Finally, if the schedule referred to in 3.31 is followed, it will probably be possible to render judgment in the proceedings in the U.S. by the end of 2024. That is, taking into account the further procedural steps to be expected in these proceedings, probably earlier than final judgment can be rendered in this case.

4.7.      In view of this, the proceedings between dBV and dInc will be stayed until judgment is rendered in the United States. Thereafter, the parties may, with insertion of that judgment, continue the proceedings here if they, or at least one of them, deems it advisable.

The claim against Draegen

4.8.      dBV accuses Draegen of tort committed by him personally. In particular, it relies on the three established blockades and the report of the Enterprise Chamber investigator, whose conclusions were largely followed by the Enterprise Chamber in its decision. The Enterprise Chamber ruled that Draegen impermissibly allowed the interests of dInc to take precedence over the interests of dBV, which Draegen, in his capacity as a shareholder, had just as much to look after.

4.9.      Draegen argues that the findings and conclusions of an Enterprise Chamber investigative report such as the present one, which was prepared for a different purpose and in a different context, should not simply be considered by the civil court as established facts. Draegen further argues that based on the largely established facts between the parties, it is clear that Draegen acted in his capacity as a director of dInc and to protect dInc's interests as he saw them, and that he was free to do so. If those blockades were unlawful, it is dInc that acted unlawfully; after all, as a legal entity, it can only act through natural persons, its director in the first place. dBV has not made sufficient allegations to support the conclusion that there is external director liability of Draegen in person, according to Draegen.

4.10.      The court ruled as follows. Based on the facts, it is clear that the blockades were unlawful against dBV. After all, these blockades meant that dBV could no longer perform its work and lost contact with its clients - temporarily. As far as the first blockade is concerned, this sudden blockade was in breach of the then-existing agreement between dBV and dInc, and it was clear to dInc that it would cause damage to dBV, and that it intended such damage. TDX's letter of December 4, 2019, was no justification for this. Although that letter made it clear that TDX was claiming (IP) rights that, according to dInc, did not exist (or, if they did exist, belonged to dInc), the blockade as a response was disproportionate, as evidenced and explained in detail in the investigation report (see section 3.26).

Contrary to Draegen's opinion, that report has normal evidential value in these proceedings; although the investigator was appointed by the Enterprise Chamber to investigate mismanagement (and not in the context of a possible unlawful act), that does not affect the observations and findings that the investigator has made, during his investigation in which he had access to a great deal of material. His legal assessments are irrelevant here; what matters are the facts. Given the facts enumerated in the report, the blockade was also disproportionate and therefore unlawful in the court's opinion.

4.11.    Indeed, at the time of the first blockade, there was no concrete reason to believe that TDX was going to enforce the IP rights that dBV considered its (indirect) property or otherwise take action against other dmarcian entities. The December 4, 2019 letter as such also did not deprive dInc of any rights, so that the situation described by Draegen as "theft" (at least: appropriation of IP rights), was not at issue. That letter exposed an important difference of opinion regarding IP rights, but the parties could have consulted on that at the time. That consultation could have taken place, for example, at the already scheduled shareholders' meeting. There were no irreversible actions by dBV or TDX that required an immediate drastic response by dInc, nor were they announced.
The second and third blockades were also unlawful; they amounted to an abuse of the actual power that Draegen then possessed, as a director of dInc. Those blockades were exclusively intended to safeguard dInc's interests. Draegen does not contradict the latter; he merely believes that he was "forced" to do so by the situation, and that he was also entitled to do so in his capacity as dInc director.

4.12.    Since this involved acts by Draegen in his capacity as a director of dInc, the starting point is that only the company, dInc, is liable for the resulting damage. Under special circumstances, in addition to liability of that company, there is also room for liability of a director of the company. In order to accept such liability, however, it is required that that director, given all the circumstances, can be personally blamed. (ECLI:NL:HR:2006:AZ0758, NJ 2006/659 (*Collector of Taxes/Roelofsen*), later confirmed several times).
dBV's contentions must be understood to mean that Draegen acted unlawfully towards it, since, as its shareholder (pursuant to Article 2:8 of the Dutch Civil Code), it was obliged, vis-à-vis  dBV, to respect dBV's interests and, in any case, not to damage them. By making use of his powers as director of dInc, he did damage those interests. On that basis, it seeks under le a declaratory judgment and under 4 an order for Draegen to pay damages, to be further assessed by the Court.

4.13.    The court finds that this position of Draegen as a shareholder must be taken into account in the consideration referred to under 4.12. The threshold for directors' liability is therefore met. It has neither been argued nor shown that Draegen promoted his personal interests or interests other than those of dInc, or that he profited from this in private, as Draegen rightly argues. That, however, does not exculpate him. After all, the serious personal reproach lies in not taking into account the interests of dBV, of which he was a shareholder, but letting - exclusively - the interests of dInc prevail and in that context deliberately causing damage to dBV. That is unlawful under Dutch law, which Draegen must comply with as a shareholder in a Dutch company. Even if, in due course, it should turn out that dInc is right with respect to the dispute regarding the IP rights, those blockades, which caused dBV damage, were disproportionate and therefore unlawful, on the grounds mentioned above.

4.14.    This means that claims le and 4 against Draegen are allowable. In order to avoid procedural complications and because it cannot be ruled out that the decision on the IP rights may be relevant to the damages, the court will not issue a partial judgment now, but will stay the case.

<u>In the case against both defendants</u>

4.15.    Any further decision is stayed.


**5.    The decision**

The court

in the case against Draegen

5.1.    defers any further decision.

in the case against dInc

5.2.    refers the case to the postponed cases calendar pending decisions in the U.S. proceedings;

5.3.    defers any further decision.

This judgment has been rendered by P.F.G.T. Hofmeijer-Rutten, W.J.M. Diekman and D.E. Stols, in the presence of the Registrar, and publicly pronounced on December 20, 2023.

106/2502/3605/1977

(Signatures)


True photocopy supplied to
A.P. Meijboom  counsel
Court clerk,
M. Ates

I, Roy Theodorus Cornelis Mühren, sworn translator for the Dutch and English languages, listed in the Register of Sworn Translators and Interpreters (Wbtv) under number 40029, do solemnly and sincerely declare that the attached text is a true and faithful translation made by me of the Dutch document hereunto annexed, submitted to me for translation. In testimony whereof I have hereunto set my hand, this 5th day of January two thousand and twenty-four.



 **vonnis**

**RECHTBANK ROTTERDAM**

Team handel en haven

zaaknummer / rolnummer: C/10/632146 / HA ZA 22-67

**Vonnis van 20 december 2023**

in de zaak van

de besloten vennootschap met beperkte aansprakelijkheid
**DMARC ADVISOR B.V.** (ten tijde van de dagvaarding genaamd DMARCIAN EUROPE
B.V.),
gevestigd te Dordrecht,
eiseres,
advocaat mr. A.P. Meijboom te Amsterdam,

tegen

1.    de vennootschap naar buitenlands recht
**DMARCIAN, INC.**,
gevestigd te Brevard, North Carolina, Verenigde Staten,
gedaagde,
advocaat mr. T.S. Jansen te Amsterdam,
2.    **TIMOTHY GEORGE DRAEGEN**,
wonende te Brevard, North Carolina, Verenigde Staten,
gedaagde,
advocaat mr. P.A. Josephus Jitta te Amsterdam.

Partijen zullen hierna dBV, dInc en Draegen genoemd worden.

**1.    De verdere procedure**

1.1.    Het verloop van de procedure blijkt uit:
-    het incidentele vonnis van 14 december 2022 en de daaraan ten grondslag liggende
     stukken;
-    de conclusie van antwoord van dInc van 1 februari 2023 met producties 11 tot en met
     120;
-    de conclusie van antwoord van Draegen van 1 februari 2023 met producties 1 tot en met
     5;
-    de akte overlegging productie overzichten van dInc van 8 februari 2023;
-    de zittingsagenda van 9 juni 2023;
-    het proces-verbaal van mondelinge behandeling van 5 juli 2023 en de daarin genoemde
     stukken;
-    de pleitaantekeningen van dBV;
-    de pleitaantekeningen van dInc;

daarvoor ontving dInc (en/of Draegen) onder meer een optierecht op een meerderheidsbelang in dBV.

3.5.     In de praktijk werd de software aangeboden als een SaaS (*Software as a Service*) dienst die toegankelijk was via de website onder de URL dmarcian.com. dInc en dBV boden beide de dienst aan via deze URL. Potentiële klanten die (op basis van hun IP-adres) gevestigd waren in Europa, Rusland of Afrika werden via deze site doorgeleid naar dBV. dBV sloot vervolgens de verkooptransactie af en incasseerde de periodieke vergoedingen. Klanten gevestigd in andere territoria werden doorgeleid naar dInc, of naar andere aan dInc gelieerde partijen zoals Dmarcian Asia Pacific Pty Ltd.

3.6.     In juli 2018 heeft Draegen het aan dInc en/of hem toegekende optierecht uitgeoefend en 50,01% van de aandelen in dBV verkregen.

3.7.     dBV houdt 100% van de aandelen in dmarcian Bulgaria EOOD (hierna: dmarcian Bulgaria). Vanaf medio 2018 vond met medeweten van dInc (verdere) ontwikkeling van de software (ook) plaats door dBV en dmarcian Bulgaria. dBV hield dInc periodiek op de hoogte van de vorderingen van dmarcian Bulgaria. dInc kon de vorderingen van dmarcian Bulgaria volgen, aangezien de betrokken partijen daarover onderling communiceerden. Vanaf november 2019 is alleen nog de aldus aangepaste en uitgebreide versie van de software te verkrijgen.

3.8.     Groeneweg heeft op 4 december 2019 een e-mail, met bijlage, gestuurd aan Draegen. In die e-mail staat onder meer:

*"(...) The document describes the current situation that software owned by dmarcian Europe BV can't be sold by dmarcian, Inc. nor Dmarcian Asia Pacific Pty Ltd to customers as there's no license agreement in place to do so. Before this problem is solved new software including but not limited to DMARC delegation can't go live on other instances than the EU instance. This document describes a detailed solution for the above problem as well. (...)"*

De bijlage bevat een document dat de inhoud van de, volgens Groeneweg, in de loop van 2016 tussen dBV en dInc gemaakte afspraken bevat. In het document staat verder dat het in de e-mail genoemde probleem kan worden opgelost door het verstrekken van een eeuwigdurende licentie door dBV aan dInc in ruil voor bepaalde aandelenoverdrachten.

3.9.     Draegen heeft met e-mails van 4 en 6 december 2019 op de voorstellen van Groeneweg gereageerd. Hij schrijft daarin onder meer:

*"(...) I agree we'll need a licensing agreement to be put into place. Without going into details over email, it makes sense to reflect the perpetual and exclusive license that Europe BV has enjoyed. (...) The proposed solution (...) isn't something I can support. (...)"* en *"(...) The initial terms described around 22 January 2016 are either wrong or inaccurate (...)"* en ten slotte dat passages in het document van Groeneweg *"have raised serious red flags"* alsmede *"issues that cannot be ignored"*.

3.10.     Op 6 december 2019 heeft dInc de toegang van dBV tot de gemeenschappelijke systemen geblokkeerd. Op die dag heeft Draegen tijdens een online *all hands meeting* aan alle dmarcian-werknemers wereldwijd medegedeeld:

_eigendom op de door dBV (en dmarcian Burgaria) ontwikkelde software(applicaties) berust, althans_
_daarover met dInc voldoende duidelijke afspraken te maken en deze vast te leggen. (...)"_

3.14.    Bij beschikking van 10 september 2020 heeft de Ondernemingskamer mr. H.J.M.
Harmeling aangewezen als bestuurder van dBV en mr. Y. Borrius als beheerder van alle
aandelen minus één per aandeelhouder.

3.15.    Op 14 september 2020 heeft dInc de toegang van dBV tot haar systemen opnieuw
geblokkeerd. Na enkele dagen is de toegang tot de meest essentiële systemen hersteld.

3.16.    Bij brief van 22 januari 2021 heeft dInc aan dBV bericht dat zij de samenwerking
met dBV per 1 februari 2021 wenst te beëindigen en dat zij dBV vanaf die datum geen
toegang meer verschaft tot haar systemen, tenzij dBV haar auteursrecht op de nieuwe
software aan dInc overdraagt, in ruil voor een licentie waarbij dBV als licentienemer 80%
van haar inkomsten uit de verkoop van de dmarcian-software aan dInc zal moeten afstaan.

3.17.    Op 22 januari 2021 heeft dInc de toegang van dBV tot haar systemen opnieuw
geblokkeerd. dBV heeft geen (directe) toegang meer tot de gegevens van het overgrote deel
van haar klanten.

3.18.    Enkele minuten na verzending van de in 3.16 bedoelde brief heeft Draegen bij, per
e-mail verzonden, brief aan dBV een beroep gedaan op artikel 4 van de door Draegen en
TDX in 2018 ter gelegenheid van de verwerving door Draegen van het meerderheidsbelang
in dBV gesloten _exit agreement_. Op grond van deze bepaling heeft iedere aandeelhouder het
recht om de samenwerking tussen de aandeelhouders te beëindigen door een bod uit te
brengen op de aandelen van de andere aandeelhouder. Indien de andere aandeelhouder dat
bod niet accepteert, heeft die andere aandeelhouder de verplichting om de eerste
aandeelhouder uit te kopen. Draegen heeft zijn aanbod aan TDX gedaan onder de
ontbindende voorwaarde dat dBV akkoord zou gaan met de eisen van dInc opgenomen in de
hierboven genoemde brief van 22 januari 2021.

3.19.    dBV heeft dInc en Draegen op 29 januari 2021 gedagvaard om op 1 februari 2021
te verschijnen voor de voorzieningenrechter van deze rechtbank. Op die dag is de zaak
behandeld, waarna dezelfde dag een verstekvonnis is gewezen. In dat vonnis is, bij
wijze van ordemaatregel, geboden om gedurende het door de Ondernemingskamer gelaste
onderzoek de tussen partijen bestaande overeenkomst na te komen en is het haar verboden
de overeenkomst gedurende die periode op te zeggen. dInc is voorts geboden om de
blokkade van (de medewerkers van) dBV tot het SaaS-platform op te heffen. Draegen is
veroordeeld zich te onthouden van iedere handeling die de bedrijfsvoering van dBV
belemmert, een en ander in afwachting van duidelijkheid over de inhoud en reikwijdte van
de licentieovereenkomst tussen dBV en dInc en de eigendom van de IE-rechten op de
software. Het verstekvonnis is op 2 februari 2021 verbeterd.

3.20.    Draegen heeft op 9 februari 2021 een verklaring ondertekend waarin hij verklaart
(daarmee) terug te treden als CEO, President, CFO en Treasurer van dInc.

3.21.    De door de OK aangewezen dBV-bestuurder Harmeling heeft dInc meermaals
verzocht een einde te maken aan de blokkade. Aan deze sommaties heeft dInc niet voldaan.

Case 1:21-cv-00067-MR   Document 294-1   Filed 01/10/24   Page 18 of 24

*en dBV (...) een creatieve prestatie behelzen die voor auteursrechtelijke bescherming in aanmerking komt. (...)*

*7.256 Nu Draegen overigens niet nader heeft onderbouwd waarom hieruit (of uit enig ander onderdeel van de e-mails van 7 en 8 december 2016) volgt dat dBV verplicht zou zijn haar IE rechten op de software over te dragen aan dInc, is de conclusie dat partijen niet hebben afgesproken dat dBV haar IE rechten diende over te dragen aan dInc. (...)"*

Over de in 3.8 genoemde e-mail van 4 december 2019 (en de gevolgen daarvan) concludeert de onderzoeker onder meer:

*"(...) 9.4 Omdat partijen hun samenwerkingsafspraken en de rechten over en weer niet hebben vastgelegd in een uitgewerkte schriftelijke overeenkomst bestond het risico dat een conflict zou ontstaan over de uitleg van de (veelal mondeling of stilzwijgend gemaakte) afspraken, hetgeen zich daadwerkelijk heeft voorgedaan. Mede in het licht van deze gebrekkige (schriftelijke) bescherming van de rechten van dBV heeft TDX achterafgezien een groot risico genomen met de namens dBV (en deels namens zichzelf) bij brief van 3/4 december 2019 gedane voorstellen (...). Het gaat dan met name om de – niet eerder met zoveel woorden gemaakte – aanspraak van dBV op de IE rechten op 'new software' en het voorstel verder te (blijven) gaan als twee afzonderlijke ondernemingen onder dezelfde naam, wat afweek van het streven naar een gezamenlijke onderneming ('global company').*
*9.5. Gezien deze feiten en omstandigheden is het op zich niet verwonderlijk dat de brief van 3/4 december 2019 Draegen/dInc (onaangenaam) verraste en dat daardoor het vertrouwen van dInc in de samenwerking met en de intenties van dBV is aangetast (...). De discussie over de IE rechten op de software – die tot dan toe niet met zoveel woorden was gevoerd werd in één keer op scherp gezet. De handelingen van dInc in reactie op en naar aanleiding van de brief van 3/4 december 2019 hebben dBV gedwongen hoge kosten te maken om de continuïteit van haar onderneming te waarborgen en zich tegen dInc te verweren, terwijl die handelingen ernstige schade hebben toegebracht aan dBV, die nog steeds voortduurt (...). Bovendien heeft het samenspel van deze brief en de reactie van dInc er toe geleid dat de voortzetting van de samenwerking op het spel is komen te staan en deze uiteindelijk de facto is beëindigd.*
*9.6. Daarbij wordt nadrukkelijk aangetekend dat de reactie van dInc na die brief – waaronder het meermalen afsluiten van dBV van de gezamenlijke systemen en acties om de klanten van dBV over te nemen – de onderzoeker disproportioneel voorkomen, in strijd met de bestaande samenwerkingspraktijk en de overeenkomst tussen partijen en deels onrechtmatig (...). Daarbij is ook van belang dat de aanspraak van dBV op bepaalde IE rechten op de software in december 2019 in juridisch opzicht voor een deel verdedigbaar was (...).*
*9.7. Deze handelingen van dInc en de daaruit voortvloeiende kosten en schade waren daarmee niet of maar ten dele voorzienbaar toen TDX de brief van 3/4 december 2019 verzond (...).*
*(...)*
*9.9. Het is aannemelijk dat Draegen met het aanvragen van een AVA, met als belangrijkste agendapunt het ontslag van TDX en de benoeming van Vision Management Europe B.V. tot bestuurder, wilde bereiken dat dBV vervolgens haar IE rechten op de software om niet aan dInc zou overdragen. Met die benoeming zou ook de weg vrij zijn om het klantenbestand van dBV over te hevelen naar dInc, zoals dInc naderhand na de afsluiting van dBV van de gezamenlijke systemen gedeeltelijk heeft gerealiseerd (...).*
*9.10. Nu de voor het ontslag door Draegen aangevoerde argumenten ontoereikend zijn, heeft Draegen met het aanvragen van deze AVA kennelijk beoogd (uitsluitend) het belang van dInc te dienen. Aannemelijk is dat geoordeeld wordt dat Draegen hiermee in strijd heeft gehandeld met art. 2:8 BW, inhoudende dat (ook) degenen die krachtens de wet en de statuten bij een rechtspersoon zijn betrokken (zoals aandeelhouders), zich als zodanig jegens elkander gedragen naar hetgeen door redelijkheid en billijkheid wordt gevorderd.*

*stelt vast dat achteraf bezien niet steeds duidelijk is of Draegen heeft gehandeld in zijn hoedanigheid van bestuurder van dInc of (ook) als aandeelhouder van dBV omdat Groeneweg en Draegen geen strenge scheiding tussen hun respectievelijke rollen hebben aangebracht (...). Wel kan worden vastgesteld dat Draegen tijdens de all hands meeting van 6 december 2019, waaraan hij ook deelnam als aandeelhouder van dBV, tegenover zowel de werknemers van dInc als die van dBV heeft beweerd dat dBV zich de IE-rechten op software probeerde toe te eigenen: het ging immers, zoals de onderzoeker vaststelt, om "gespreksonderwerpen voor de geplande bespreking van 12 december 2019. Van een 'diefstal', zoals Draegen stelde, was (...) geen sprake" (...). Draegen heeft daarbij gedreigd met afsluiting van dBV (en haar werknemers) van de gezamenlijke computersystemen en dBV vervolgens ook daadwerkelijk afgesloten van die voor de onderneming essentiële systemen (...). Dat laatste deed hij in zijn hoedanigheid van CEO van dInc. Verder heeft Draegen ervoor gezorgd dat (a) dInc het beheer van de website overnam van een werknemer van dBV die de website in overleg met dInc had gebouwd, (b) de hosting van de website, die was ondergebracht bij een Nederlandse serviceprovider, werd verplaatst naar een Amerikaanse serviceprovider, (c) aan alle onderdelen van de broncode van de software de tekst "Property of dmarcian, Inc." werd toegevoegd en (d) Jones werd benoemd tot director of software, een positie die daarvoor niet bestond, met de bevoegdheid instructies te geven aan de software ontwikkelaars van dBV en dmarcian Bulgaria (...). Met deze vier handelingen en met zijn onjuiste voorstelling van zaken tijdens de toespraak voor het personeel van dBV heeft Draegen ten onrechte rechtstreeks, met terzijdestelling van het bestuur van dBV, ingegrepen in de bedrijfsvoering van dBV, ten behoeve van dInc en ten nadele van dBV. Zodoende heeft Draegen gehandeld als feitelijk bestuurder van dBV, en wel in strijd met artikel 2:8 BW ten opzichte van zowel dBV als medeaandeelhouder TDX.*

*4.11 Op 3 juli 2020, na een mislukt overleg over een minnelijke regeling, heeft Draegen in zijn hoedanigheid als aandeelhouder van dBV verzocht een algemene vergadering uit te roepen met als belangrijkste agendapunten het ontslag van TDX als bestuurder van dBV en de benoeming van een aan dInc gelieerde partij tot bestuurder in plaats van TDX. De onderzoeker heeft de argumenten die Draegen daarvoor heeft aangedragen niet steekhoudend genoemd en het aannemelijk geacht dat Draegen met het ontslag van TDX en de benoeming van Vision Management tot bestuurder van dBV primair beoogde het belang van dInc te dienen om zodoende de IE-rechten van dBV eenvoudig en om niet aan haar te kunnen laten overdragen (...). Dat betoog overtuigt. Daar komt bij dat Draegen enkele dagen daarna – op 6 juli 2020, en dus voorafgaand aan de te houden algemene vergadering – aan het personeel van dBV heeft meegedeeld dat TDX als bestuurder van dBV wordt ontslagen en Vision Management de nieuwe bestuurder wordt. Met die boodschap aan het personeel is hij opnieuw ten onrechte opgetreden als feitelijk bestuurder van dBV, met terzijdestelling van het statutaire bestuur.*

*4.12 Een aandeelhouder mag bij de uitoefening van zijn rechten in beginsel zijn eigen belang tot richtsnoer nemen, waarbij de aandeelhouder zich wel moet gedragen naar hetgeen door de redelijkheid en billijkheid wordt gevergd (artikel 2:8 BW). Wat de redelijkheid en billijkheid vergen, hangt af van de omstandigheden van het geval. Zo kan op een meerderheidsaandeelhouder een zorgvuldigheidsverplichting jegens een minderheidsaandeelhouder rusten (...). Bovendien mag een aandeelhouder bij de uitoefening van zijn rechten het belang van de vennootschap in beginsel niet veronachtzamen, zo volgt uit artikel 2:8 BW. Een van de hier relevante omstandigheden is dat Draegen naast meerderheidsaandeelhouder van dBV ook CEO was van leverancier dInc. De kern van de samenwerking tussen dBV en dInc was dat dBV de software verkocht en (verder) ontwikkelde, terwijl partijen gaandeweg hadden besproken te komen tot één gezamenlijke global company, waarbij het volgens de onderzoeker vaak onduidelijk was in welke hoedanigheid Draegen en Groeneweg handelden (...). Die context bepaalt mede hoe Draegen zich als aandeelhouder van dBV had te gedragen en brengt mee dat van hem de nodige zorgvuldigheid jegens dBV en degenen die bij haar onderneming zijn betrokken mocht worden verwacht. Het verzoek om een algemene vergadering te beleggen met als agendapunten het ontslag van TDX als bestuurder van dBV en de benoeming van een aan dInc gelieerde partij tot bestuurder in haar plaats, nadat partijen – voorlopig nog vergeefs –*

*dInc nu niet meer nodig heeft. Namens dBV is door mr Meijboom op die mondelinge behandeling
verder verklaard dat na de blokkade, die ervoor zorgde dat dBV nergens meer bij kon, veel energie is
gestoken in het opzetten van dat eigen platform en dat tegelijkertijd een juridisch traject is ingegaan
om met een ordemaatregel dInc te verplichten om toegang te verlenen. In (...) heeft dBV opgemerkt
dat zij het hoofd boven water heeft weten te houden, zij het dankzij haar eigen inspanningen en grote
financiële offers.*

*4.2 Uit deze verklaringen volgt dat dBV op dit moment geen voldoende (spoedeisend) belang heeft bij
de met haar vorderingen A, A1, B en C gevraagde voorlopige maatregelen.*

*4.3 Met het oog op vordering E oordeelt het hof als volgt over de situatie ten tijde van het
verzetvonnis. Op de datum van dat vonnis (31 mei 2021) was het eigen platform van dBV al geruime
tijd voltooid en was de migratie van klanten al bijna drie maanden gaande. Het juridische traject was
hiernaast als 'extraatje' ingezet. Onder deze omstandigheden kan naar het oordeel van het hof –
achteraf gezien – niet worden gezegd dat ten tijde van het verzetvonnis de daarin, door toewijzing
van de vorderingen A, B en C getroffen ordemaatregelen nog waren geboden; dBV had op de datum
van dat vonnis de nadelige gevolgen van de blokkade immers al voor een groot deel zelf weten op te
heffen, waardoor er ook toen al geen voldoende spoedeisend belang meer bij die vorderingen
bestond. Of de kosten van deze door dBV getroffen maatregelen ter voorkoming van de schade op
dInc kunnen worden verhaald (artikel 6:96 lid 2a BW) is overigens een kwestie die zo nodig aan de
orde kan komen in een bodemprocedure over de al dan niet rechtmatigheid van de blokkade. Uit het
voorgaande volgt dat de voorzieningenrechter de in het verstekvonnis toegewezen vorderingen A, B
en C in het verzetvonnis niet (wat vordering B betreft: deels) in stand had mogen laten. Op basis van
het verstekvonnis zijn dus geen dwangsommen verbeurd. Reeds hierop loopt vordering E stuk.*

*4.4. (...) zijn de aandelen door Draegen aan TDX geleverd op 8 september 2021. (...)*

*4.5 (...) dBV [heeft] niet toegelicht dat in de door TDX aan Draegen betaalde prijs voor
teruglevering van de aandelen in dBV (€ 446.134,72), de waarde van de afkoop van een
eeuwigdurende licentie van de dInc -software was verdisconteerd. Anders dan dBV lijkt te menen
(...), kan uit het feit dat deze teruglevering, door de werking van artikel 4 EA, is gebaseerd op de
prijs die toen nog meerderheidsaandeelhouder Draegen eerder had geboden op het
minderheidspakket (49,99%) van TDX niet worden afgeleid dat daarin een tegenprestatie voor de
afkoop van de licentierechten is begrepen. Er moet dus ernstig rekening mee worden gehouden dat de
genoemde afkoopwaarde niet in de terugleverprijs was verdisconteerd. En wanneer dit niet het geval
is, dan is het evenwicht in de overeenkomst – die een langlopende duurovereenkomst is – sinds die
teruglevering fundamenteel verstoord en is (dus) aan serieuze twijfel onderhevig of in een
bodemprocedure wel zal (kunnen) worden geoordeeld dat dInc nog gehouden is om haar
verplichtingen uit die overeenkomst na te komen. Voor daartoe strekkende ordemaatregelen is bij
deze stand van zaken naar het oordeel van het hof een plaats. (...)
(...)*

*4.7 De vorderingen van dBV zijn, resumerend, op dit moment niet toewijsbaar en waren
dat ook niet ten tijde van het verzetvonnis. (...)"*

3.29.    Tegen dit arrest heeft dBV cassatie ingesteld.

3.30.    Een *order* van 27 juni 2023 van de US rechter (Chief United States District Judge)
bij het District Court, met beëdigde vertaling overgelegd op 3 juli 2023 houdt onder meer in:

*niet het geval, dan mist artikel 12 Rv toepassing en faalt het litispendentieberoep van dInc reeds om die reden.*

*5.36 Aangezien in de onderhavige zaak als de dag van dagvaarding 11 oktober 2021 heeft te gelden, is deze zaak op grond van·artikel 125 lid 1 Rv vanaf die dag aanhangig.*

*5.37 Tijdens de mondelinge behandeling van 14 september 2022 is door dBV heel concreet uiteengezet en met stukken nader onderbouwd dat in de Amerikaanse procedure die dInc ten grondslag legt aan haar litispendentieberoep tot op heden uitsluitend beslissingen van voorlopige aard (voorlopige voorzieningen) zijn gegeven en dat de rechter in die procedure pas op 22 mei 2022 een start heeft gemaakt met de bodemzaak. dInc heeft deze uiteenzetting van dBV onbetwist gelaten en de rechtbank gaat ervan uit dat de beslissingen van vóór 22 mei 2022 naar het toepasselijke procesrecht beschouwd moeten worden als voorlopige voorzieningen. (...)*

*Nu duidelijk is dat deze procedure eerder aanhangig is gemaakt dan 22 mei 2022, faalt het litispendentieberoep. (...)"*

Inmiddels is beschikbaar een Order van de District Court, ten dele geciteerd onder rov. 3.30, waaruit, kort samengevat, blijkt dat naar het procesrecht van de Verenigde Staten de bodemprocedure aldaar aanhangig is gemaakt op 12 maart 2021, en dat het naar dat procesrecht mogelijk is om aan bij die gelegenheid, binnen de dan reeds aanhangige bodemprocedure, bepaalde vorderingen strekkende tot een voorlopige maatregel in te dienen (*motion for summary injunction*).

4.2.	dInc verzoekt de rechtbank daarom terug te komen op haar beslissing om de zaak niet, vanwege litispendentie, aan te houden. dBV verzet zich.

4.3.	De rechtbank komt niet terug op haar beslissing waar het Draegen betreft. De omstandigheid dat Draegen geen partij is in de procedure in de VS is immers een zelfstandige grond om artikel 12·Rv niet toepasselijk te achten.

4.4.	De rechtbank komt wel terug op haar beslissing waar het de zaak tegen dInc betreft. Daartoe is het volgende redengevend. Op basis van de mededelingen van de District Court moet als vaststaand worden aangenomen dat, anders dan de rechtbank eerder aannam, de procedure daar eerder is aangevangen dan deze procedure. Dat wordt als volgt toegelicht. Het komt erop aan of op 12 maart 2021 sprake was, zoals de rechtbank eerder aannam, van de inleiding van een procedure die strekt tot voorlopige voorzieningen die uit hun aard niet kunnen leiden tot een beslissing die gezag van gewijsde kan verkrijgen en dan in Nederland executabel is, of juist om de inleiding aan een procedure die wel tot een dergelijke beslissing kan leiden. Uit de uitleg van de District Court moet worden opgemaakt dat op basis van dat inleidende processtuk beslissingen zullen kunnen worden genomen die niet voorlopig van aard zijn in een vonnis ten gronde, dat gezag van gewijsde kan krijgen. Weliswaar bestaat er geen executieverdrag tussen de VS en Nederland, maar aangenomen moet worden dat een door de District Court te wijzen vonnis vermoedelijk aan de criteria uit het Gazprombank-arrest van de Hoge Raad (HR 26 september 2014, ECLI:NL:HR:2014:2838) zal voldoen. Immers, er is sprake van een onafhankelijke overheidsrechter die zich op plausibele gronden bevoegd acht, waar beide partijen gehoord worden en waar overigens voldoende waarborgen voor een behoorlijke rechtspleging gelden. Dat betekent, dat een door die rechter te wijzen vonnis in Nederland naar het zich nu laat aanzien hoogstwaarschijnlijk in

plaats. dBV heeft onvoldoende gesteld om de conclusie te kunnen dragen dat hier sprake is van externe bestuurdersaansprakelijkheid van Draegen in persoon, aldus Draegen.

4.10.     De rechtbank oordeelt als volgt. Op basis van de feiten is duidelijk dat de blokkades onrechtmatig waren jegens dBV. Die blokkades leidden er immers in elk geval toe dat dBV haar werkzaamheden niet meer kon verrichten en het contact met haar klanten – tijdelijk – kwijtraakte. Voor de eerste blokkade geldt dat deze plotselinge blokkade in strijd was met de op dat moment bestaande overeenkomst tussen dBV en dInc, dat het dInc duidelijk was dat deze schade zou toebrengen aan dBV, en dat zij die schade ook beoogde. De brief van TDX van 4 december 2019 was daarvoor geen rechtvaardiging. Hoewel die brief duidelijk maakte dat TDX aanspraak maakte op (IE-)rechten die volgens dInc niet bestonden (of, als die wel bestonden, aan dInc toebehoorden) was de blokkade als reactie disproportioneel, zoals blijkt en uitvoerig is toegelicht in het onderzoeksrapport (zie ro. 3.26). Anders dan Draegen meent komt aan dat rapport in deze procedure vrije bewijskracht toe; de onderzoeker was weliswaar benoemd door de OK om onderzoek te doen naar wanbeleid (en niet in het kader van een eventuele onrechtmatige daad), maar dat doet geen afbreuk aan de waarnemingen en vaststellingen die de onderzoeker heeft gedaan, gedurende zijn onderzoek waarbij hij toegang had tot zeer veel materiaal. Zijn juridische waarderingen doen daarbij niet ter zake; het gaat om de feiten. Gelet op de in het rapport opgesomde feiten, was de blokkade ook naar het oordeel van de rechtbank disproportioneel en daarmee onrechtmatig.

4.11.     Er was, ten tijde van de eerste blokkade, immers geen enkele concrete aanleiding om aan te nemen dat TDX de IE-rechten die dBV als haar (indirect) eigendom beschouwde zou gaan handhaven of anderszins actie zou gaan ondernemen tegen andere dmarcian-entiteiten. De brief van 4 december 2019 als zodanig ontnam dInc ook geen enkel recht, zodat de door Draegen als "diefstal" omschreven situatie (althans: het zich toe-eigenen van IE-rechten), niet aan de orde was. Die brief legde een belangrijk verschil van inzicht omtrent de IE-rechten bloot, maar daarover hadden partijen destijds overleg kunnen voeren. Dat overleg had bijvoorbeeld kunnen plaatsvinden op de al geplande aandeelhoudersvergadering. Niet meer terug te draaien acties van dBV of TDX waarop onmiddellijke een drastische reactie van dInc moest volgen waren er niet, en die waren ook niet aangekondigd.
Ook de tweede en derde blokkade waren onrechtmatig; zij kwamen neer op misbruik van de feitelijke macht waarover Draegen toen, als bestuurder van dInc, beschikte. Die blokkades waren uitsluitend bedoeld om de belangen van dInc veilig te stellen. Dat laatste weerspreekt Draegen ook niet; hij meent slechts dat hij daartoe door de situatie "gedwongen" was, en dat hij daartoe in zijn hoedanigheid van dInc-bestuurder ook gerechtigd was.

4.12.     Nu het ging om handelen van Draegen in zijn hoedanigheid van bestuurder van dInc is uitgangspunt dat alleen de vennootschap, dInc, aansprakelijk is voor de daaruit voortvloeiende schade. Onder bijzondere omstandigheden is, naast aansprakelijkheid van die vennootschap, ook ruimte voor aansprakelijkheid van een bestuurder van de vennootschap. Voor het aannemen van zodanige aansprakelijkheid is echter vereist dat die bestuurder, gegeven alle omstandigheden, persoonlijk een ernstig verwijt kan worden gemaakt. (ECLI:NL:HR:2006:AZ0758, NJ 2006/659 (Ontvanger/Roelofsen), later meermaals bevestigd).
De stellingen van dBV moeten zo worden begrepen dat Draegen onrechtmatig jegens haar heeft gehandeld, nu hij als haar aandeelhouder (ex artikel 2:8 BW) verplicht was, jegens

Dit vonnis is gewezen door mr. P.F.G.T. Hofmeijer-Rutten, mr. W.J.M. Diekman en mr. D.E. Stols, in aanwezigheid van de griffier, en in het openbaar uitgesproken op 20 december 2023.
106/2502/3605/1977

M. Ates

Voor fotocopie conform uitgegeven aan
mr    A.P. Meijboom        advocaat
De Griffier,
M.Ates