**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:21-cv-00067-MR**

| | |
|---|---|
| **DMARCIAN, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **O R D E R** |
| ) | |
| **DMARC ADVISOR BV, f/k/a** ) | |
| **dmarcian Europe BV,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

**THIS MATTER** comes before the Court on the parties' respective

Motions for Summary Judgment [Docs. 294, 297] and the Defendant's

Motion to Exclude Certain Opinions of Plaintiff's Expert John R. Levine [Doc.

298].

## I.    BACKGROUND

On March 12, 2021, the Plaintiff, dmarcian, Inc. ("dmarcian" or "the

Plaintiff") filed this action against DMARC Advisor BV (then known as

dmarcian Europe BV) ("DMARC Advisor" or "the Defendant").  [Doc. 1]. The

Plaintiff filed a Verified Amended Complaint on April 7, 2021 [Doc. 19], and

a Second Amended Complaint on June 22, 2021 [Doc. 51].[1]  The Second

Amended Complaint alleges fifteen causes of action against the Defendant,

including claims for (i) breach of written contract, (ii) breach of oral contract,

(iii) copyright infringement under 17 U.S.C. § 101, et seq. (the "Copyright

Act"), (iv) trademark infringement under 15 U.S.C. § 1051, et seq. (the

"Lanham Act"); (v) false designation of origin under the Lanham Act; (vi)

defamation; (vii) misappropriation of trade secrets under the North Carolina

Trade Secrets Protection Act, N.C. Gen. Stat. § 66-152, et seq. (the

"NCTSPA"); (viii) computer trespass; (ix) tortious interference with contract;

(x) tortious interference with prospective economic advantage; (xi)

misappropriation of trade secrets under the Defend Trade Secrets Act of

2016, 18 U.S.C. §§ 1836(b), 1839, et seq. (the "DTSA"); (xii) common law

trademark infringement; (xiii) unjust enrichment; (xiv) cybersquatting under

the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)(1)(A)

("ACPA"); and (xv) unfair or deceptive business practices under N.C. Gen.

Stat. §75-1.1, et seq. ("Chapter 75").  The Court entered an Order imposing

a Preliminary Injunction against the Defendant on May 26, 2021.  [Doc. 39].

        This matter is now before the Court on the parties' respective motions

for summary judgment.  By way of a separate motion, the Defendant seeks

---

[1] The Second Amended Complaint is not verified.

to exclude certain opinions of the Plaintiff's designated expert, Dr. John Levine. These matters have been fully briefed and are now ripe for disposition.

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not

3

rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment.  Id. at 324.  Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" in the record.  See id.; Fed. R. Civ. P. 56(c)(1)(a).  Namely, the nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  In considering the facts on a motion for summary judgment, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

## III.  FACTUAL BACKGROUND

At the outset, the Court notes that this case has been strenuously and prolifically litigated for more than three years.  The parties have litigated a preliminary injunction, multiple discovery disputes, contempt motions, and a request to the Register of Copyrights.  This litigation involves hotly disputed issues of copyright and trademark infringement and misappropriation of trade secrets, based on events that took place on multiple continents over the course of nearly a decade.  The present action is just one of several court

actions pending between the parties (or related parties), most of which are pending in Europe. The current docket stands at nearly 350 entries, with numerous declarations proffered by counsel and the officers and agents of the parties, along with countless exhibits, including copies of judgments and orders from courts in the Netherlands.

While the parties have submitted hundreds of pages of briefing to date detailing the events underlying this action and their positions on the claims and defenses arising therefrom, this litigation has always been presented in a rather piecemeal fashion. The Court has been presented with motions relating to discrete legal issues, and the parties have presented those facts and legal authorities which they believed were pertinent to such issues.

Now, the parties have advanced to the summary judgment stage. They now have the opportunity to marshal their forecasts of evidence and argue, based on those forecasts, whether there are any disputes of fact that warrant a trial on the remaining issues. In that sense, the evidence relied upon by the parties is critical to the Court's analysis.

In moving for summary judgment, the Defendant presents a statement of facts which, albeit somewhat brief, generally sets out the course of dealings between the parties. [Doc. 295 at 7-11]. The Plaintiff does not offer a separate statement of facts in its brief opposing the Defendant's Motion for

5

Summary Judgment. Rather, in its response brief, the Plaintiff notes that the Court's Order [Doc. 39] granting the preliminary injunction, "reflects numerous factual findings supporting the Plaintiff's claims" and that "other bolstering facts" would be offered throughout the Argument section of its brief. [Doc. 326 at 7].

The Plaintiff's reliance upon any "factual findings" set forth in the Preliminary Injunction Order, however, is entirely improper. First and foremost, the determination of whether to issue a preliminary injunction involves an entirely different standard of review than the one used to review a motion for summary judgment. As such, any "findings" made in the Preliminary Injunction Order have no bearing on the Court's summary judgment analysis. Moreover, anything the Court "found" in entering a preliminary injunction does not constitute a forecast of *evidence*, either supporting or refuting any party's position. The Plaintiff appears to acknowledge as much. [See Doc. 326 at 7 (noting that preliminary injunction order is "not binding")].

As the non-moving party, the Plaintiff has an affirmative duty at this stage in the proceedings to present a forecast of evidence from which the Court can determine whether there is a genuine issue of material fact for trial. The Plaintiff is not entitled to simply rely upon the Court's prior rulings or the

6

Court's presumed familiarity with the facts of this case to meet this burden. Rather, the Plaintiff must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" to support its assertion that genuine disputes of fact exist. Fed. R. Civ. P. 56(c)(1)(A). To the extent that the Plaintiff supports such assertion with citations to the record throughout its Argument, the Court will consider this forecast of evidence.

Viewing the parties' forecasts of evidence in the light most favorable to the Plaintiff, the following is a recitation of the relevant facts relevant to the Defendant's Motion for Summary Judgment.

The Plaintiff is a Delaware corporation with its principal place of business in Brevard, North Carolina. [Doc. 19: Verified Am. Complaint at ¶ 3]. The Plaintiff provides DMARC email protection products and services, which help protect businesses from phishing attacks. [Id. at ¶¶ 16-19]. Tim Draegen is the Plaintiff's founder and former CEO, and his wife Shannon Draegen is the Plaintiff's current CEO. [Id. at ¶ 24].

The Plaintiff owns several types of intellectual property protected by United States intellectual property law. Copyright Registration number

TX0008941559 protects "the dmarcian Code," that is, the source code for dmarcian's software program. [Id. at ¶¶ 41-44]. The Plaintiff registered Trademark Registration No. 5,702,379 to protects its trademark, DMARCIAN®. [Id. at ¶¶ 45-46]. The Plaintiff also claims common law trademark rights in the stylized Mark. [Id. at ¶ 48]. The Plaintiff further claims a number of trade secrets, including source code; historical customer data; client contacts; business and market intelligence; and sales leads. [Id. at ¶ 162].

In February 2012, Timothy Draegen published www.dmarcian.com, a free website that allowed users to convert DMARC reports from one format to another so that users could then implement DMARC as an email security control. [Doc. 289-1: Pltf. 30(b)(6) Dep. at 33, 38]. Draegen first began to keep copies of the code for the website in June 2012. [Id. at 38].

In September 2014, Draegen formed the Plaintiff to commercialize DMARC software. [Id. at 14]. In April 2015, Draegen assigned all of the source code related to the operation of dmarcian.com and related DMARC processing technology to the Plaintiff. [Id. at Ex. 7].

In January 2016, Draegen traveled to the Netherlands to meet with Martijn Groeneweg, a Dutch DMARC entrepreneur. [Id. at 110-11]. At that time, Draegen and Groeneweg reached an agreement between dmarcian

8

and Mailmerk, BV, a Dutch company associated with Groeneweg. [Id. at 115-17]. As part of this January 2016 agreement, the Plaintiff authorized Mailmerk to distribute dmarcian's software in the European Union (EU). [Id. at 112-13, 122-23]. Draegen and Groeneweg agreed to split ownership of Mailmerk, with Draegen having controlling ownership. [Id. at 112-13, 116]. In an email to Draegen dated December 7, 2016, Groeneweg summarized the essential terms of the parties' January 2016 agreement as follows:

1. dmarcian inc. (or you in person or any other entity you want) gets 51% of the shares of Mailmerk BV, so dmarcian inc. has the majority so you are in control of the strategic direction

2. we rename Mailmerk BV (Dutch inc) to dmarcian Europe BV

3. dmarcian Europe BV and dmarcian inc. worked based on the principle of "Drag Along en Tag Along"

4. dmarcian Europe is responsible for all customers located in Russia, EU or Africa

5. dmarcian Europe can sell dmarcian tooling and revenues remain at dmarcian Europe to let the EU organization grow

6. all knowledge build at Mailmerk from 2012 can be used worldwide

Always difficult to write down those things in a clear way. If you have any remarks or something needs to be added to the list, please let me know.

[Doc. 301-2: Groeneweg Dep. Ex. 2] (errors uncorrected). The Plaintiff has not offered any forecast of evidence indicating that Draegen objected to Groeneweg's summary of the parties' oral agreement.

In 2017, Groeneweg restructured Mailmerk, to promote and sell the Plaintiff's services and products in the respective markets, and renamed it dmarcian Europe BV. [Doc. 19: Verified Am. Complaint at ¶¶ 4, 33; Doc. 26-1: Harmeling Decl. at ¶ 6; Doc. 301-1: Groeneweg Dep. at 145]. On July 12, 2018, Tim Draegen exercised his option to purchase the majority interest in dmarcian Europe BV (now known as the Defendant DMARC Advisor). [Doc. 26-17: Groeneweg Decl. Ex. H at 4]. At that point, Tim Draegen owned 50.01% of the Defendant. The other 49.99% was then owned by The Digital Xpedition Holding BV ("TDX"), a Dutch corporation controlled by Groeneweg. [Doc. 26-9: Groeneweg Decl. at ¶ 10; Doc. 26-12: Groeneweg Decl. Ex. C at 2]. TDX then served as the Defendant's director and managed the Defendant's affairs. [Doc. 26-9: Groeneweg Decl. at ¶ 10].

Under the terms of the parties' relationship, the Plaintiff fielded all sales leads in North Carolina, routed certain leads coming from the European Union, Russia, and Africa to the Defendant for service, and supported the Defendant's service to those customers by providing operational assistance, technical support, and platform maintenance. [Doc. 26-9: Groeneweg Decl.

10

at ¶ 10; Doc. 19: Verified Am. Complaint at ¶¶ 11, 33; Doc. 30: Draegen 2nd Supp. Decl. at ¶¶ 4, 8, 9]. The Plaintiff continued developing, supplying, and operating the services, products, and technology for each customer from its North Carolina office. [Doc. 30: Draegen 2nd Supp. Decl. at ¶¶ 4, 8, 9].

The Plaintiff provided the Defendant with access to its computer systems and its proprietary code. In May 2017, the Defendant began contributing changes to the dmarcian software, mostly through Bulgarian developers, whom the Defendant first hired as contractors and later employed through a wholly owned subsidiary.[2] [Doc. 301-1: Groeneweg Dep. at 124]. The parties, however, never executed a formal written agreement governing the ownership of the intellectual property in these software contributions. [Id. at 156, 375-76]. The Plaintiff agreed to not charge licensing fees to the Defendant in exchange for the Defendant funding the continued development of the source code. [Doc. 19: Verified Am. Complaint at ¶ 33]. From 2017 to the present, the Defendant has spent at least €1,300,000 writing new code further developing the software. [Doc. 26-9: Groeneweg Decl. at ¶ 20]. The Plaintiff's developers have also continued to work on the software code during that same time. [See Doc.

---

[2] The copyright in the software developed by these Bulgarian developers were assigned to DMARC Advisor by means of written agreements in January and February 2021. [Doc. 57-1: Meijboom 2nd Decl. at ¶ 22].

35-1: Groeneweg Decl. at ¶ 15]. Even when the Defendant's employees were working on the software code, the Plaintiff continued housing and controlling it. [Doc. 30: Draegen 2nd Supp. Decl. at ¶¶ 13-16].

At the time that the parties entered into their oral agreement in January 2016, the issue of intellectual property ownership was not discussed. As Groeneweg explained in his deposition:

> Q     Okay, and if I understood your earlier testimony, you said that IP [intellectual property] was just not part of the discussion, at all at that time [referring to January 2016]?
>
> A     No, because there was no intention—sorry if I need to search for words. It wasn't the intention at all at that time that we started developing software, so it wasn't an issue, so we didn't make any agreements on that.

[Doc. 301-1: Groeneweg Dep. at 156].

In December 2019, Groeneweg sent Draegen an email asserting a right in the software contributions made by the Defendant and the Bulgarian developers. [Doc. 289-3: T. Draegen Dep. Ex. 39]. The Plaintiff disagreed and directed the Defendant to formally assign to the Plaintiff any new code that had been created by the Bulgarian developers. [Doc. 19: Verified Am. Complaint at ¶ 36]. The Defendant, through Groeneweg, refused and asked the Plaintiff to present a buyout offer for the minority share of the Defendant. [Id. at ¶¶ 36, 54]. The parties began quarreling over the terms of the licensing

12

agreement and the Plaintiff responded by briefly suspending the Defendant's access to its computer systems. [Doc. 26-1: Harmeling Decl. at ¶¶ 18, 19]. Additionally, the Plaintiff migrated the website created by the Defendant and shared and managed between the parties (www.dmarcian.com) from a European host to a host within in the United States. This meant that the Plaintiff began hosting all of the Defendant's systems and therefore had the power to take down the Defendant's business operations completely. [Id. at ¶ 18].

Eventually, the Plaintiff restored the Defendant's access, and the parties met in the Netherlands in January 2020. [Id. at ¶ 19]. At that time, Draegen expressed his view that the cooperation between the Plaintiff and the Defendant had "been based on trust" but that this "trust-based agreement cannot continue." [Doc. 289-1: T. Draegen Dep. at Ex. 23]. Draegen wrote that "real documents" were needed, including a "[l]icensing agreement for IP and to allow [the Plaintiff] and [the Defendant] to openly collaborate." [Id.]. However, no written licensing agreement was executed at that time.

In an email dated July 30, 2020, Draegen expressed concern that the Plaintiff was "running production code" that did not belong to it because "[o]wnership of IP related to software dev[elopment] is attributed to whoever

pays the bill of the software developer." [Doc. 289-4: T. Draegen Dep. at Ex. 45].

As the majority shareholder of the Defendant, Draegen undertook to assign all of the Defendant's intellectual property rights to the Plaintiff for no payment, and he tried to use his majority interest in the Defendant to force that assignment. [Doc. 26-1: Harmeling Decl. at ¶¶ 19, 20]. This attempt led the Defendant's other shareholders to ask a Dutch court to appoint an independent director with a decisive vote for the Defendant. [Id. at ¶ 22]. In September 2020, the Dutch Enterprise Court appointed H.J.M. Harmeling as director of the Defendant. [Doc. 164-2: Enterprise Court Decision at ¶ 1.2].

On September 14, 2020, counsel for the Plaintiff sent a letter to Mr. Harmeling advising that the Defendant was "in breach of the license agreement under which it had the right to operate using our client's brand, technology, business model, and reputation"; that the Plaintiff was suspending its cooperation with the Defendant; and that if the Defendant intended to continue operating using the dmarcian brand, technology, business model, and reputation, the Defendant would need to, inter alia, assign the Plaintiff "[a]ll intellectual property developed by or on behalf of [the Defendant]." [Doc. 285-2: S. Draegen Dep. at Ex. 10]. On the same day, the Plaintiff completely shut out the Defendant from all of the Plaintiff's

14

systems for a second time.  [Doc. 26-1: Harmeling Decl. at ¶ 25].  After a few days, and at Harmeling's insistence, Draegen caused partial access to most essential systems to be restored to the extent that the Defendant was able to conduct some of its business.  [Id.].

Although the parties made efforts to resolve their dispute, on January 22, 2021, the Plaintiff advised that it would terminate its relationship with the Defendant effective February 1, 2021, unless the Defendant agreed to sign a distribution and settlement agreement which, among other things, vested the Plaintiff with sole ownership of all the intellectual property developed by the parties.  [Doc. 17-1: Jansen Decl. at Ex. A].  When Mr. Harmeling refused, the Plaintiff terminated all cooperation between the parties and terminated all of the Defendant's access to the Plaintiff's computer systems. [Id.; Doc. 26-1: Harmeling Decl. at ¶¶ 28, 30].

On January 29, 2021, the Defendant instituted an action in the District Court of Rotterdam in the Netherlands ("the Rotterdam Court").  On February 1, 2021, the Rotterdam Court directed the Plaintiff and Draegen to lift the blockade to the Defendant's access within 24 hours.  [Doc. 26-1: Harmeling Decl. at ¶ 40].

On February 9, 2021, the Plaintiff learned that the Defendant had cloned the dmarcian website, notified all EU-based customers that there had

been a "personal data breach," and was urging customers to move their data to the Defendant's separate platform. [Doc. 15: S. Draegen Supp. Decl. at ¶¶ 7(a)-(d)].

On February 18, 2021, an attorney from Blank Rome LLP filed a copyright application on behalf of the Plaintiff for "dmarcian Source Code." [Doc. 148-1: Dorey Decl. Ex. 1 at 31]. In support of this application, the Plaintiff submitted twenty pages of code and represented that the work for which it sought copyright was completed in 2012 and first published on February 9, 2012; that the nation of first publication was the United States; and that the work's author was Eudaemonic Development, LLC.[3] [See id. at 31-55; Doc. 206: Order at 6]. The portions of the code that the Plaintiff submitted in support of its application were from the code as it existed in 2021. The 2021 version of the code contains the modifications that were incorporated into the code between 2012 and 2021, including modifications made by the Defendant and its Bulgarian software developers. [See Doc. 206: Order at 20].

Based on the information provided in the application, the Copyright Office had no reason to question the Plaintiff's representations and accepted

_____

[3] Tim Draegen created Eudaemonic Development, LLC in 2010 or 2011 to serve as a vehicle to develop software projects. [Doc. 289-1: T. Draegen Dep. at 16].

them as true and accurate. [Doc. 272-1: Response of Register of Copyrights at 4]. The Copyright Office thus registered the claim on March 9, 2021 and assigned it registration number TX0008941559. [Doc. 148-1: Dorey Decl. Ex. 1 at 26].

Three days later, on March 12, 2021, the Plaintiff filed this lawsuit. [Doc. 1: Complaint]. In its Complaint, the Plaintiff alleged that it had received Copyright Registration number TX0008941559 for the "dmarcian Code," [id. at ¶¶ 43, 44], and it asserted a copyright claim against the Defendant for allegedly "infring[ing] Plaintiff's copyright in the dmarcian Code," [id. at ¶ 127]. The Plaintiff amended its Complaint in April 2021 and again in June 2021, without altering these allegations. [Doc. 19: Amended Complaint; Doc. 51: Second Amended Complaint].

In July 2022, the Defendant served the Plaintiff with a document request seeking the "deposited material" that Plaintiff provided to the Copyright Office and the "written agreement" between the Plaintiff and Eudaemonic Development, LLC. [Doc. 267-2: Defendant's First Set of Requests for Production at 3-4]. In August 2022, the Plaintiff filed "an application for supplementary registration" with the Copyright Office in which it "sought to change the author from Eudaemonic [Development] LLC to Timothy G. Draegen." [Doc. 272-1: Response of Register of Copyrights at

17

4]. Once again, the Copyright Office "had no reason to question Plaintiff's representations and accepted them as true and accurate." [Id. at 4-5]. The Copyright Office registered the supplemental claim on September 1, 2022, effective August 19, 2022, and assigned it registration number TX0009164197. [See id. at 5].

On September 30, 2022, DMARC Advisor filed a motion in this Court "alleging inaccuracies in the Plaintiff's application for copyright registration and requesting the review of the Register of Copyrights." [Doc. 206: Order at 2]. In June 2023, the Court granted that motion in part. Specifically, the Court concluded that DMARC Advisor had "sufficiently alleged inaccuracies regarding year of completion and publication date" and referred the following three questions to the Copyright Office:

> (1) Would the Register of Copyrights have refused Registration Numbers TX0009164197 or TX0008941559 had it known that the deposited code was created in or after 2017?
>
> (2) Would the Register of Copyrights have refused Registration Numbers TX0009164197 or TX0008941559 had it known that the deposited lines of code were the lines in use in 2021, and not an exact copy of the code as it existed in 2012?
>
> (3) Would the Register of Copyrights have refused Registration Numbers TX0009164197 or TX0008941559 had it known that the deposited code was published in or after 2017?

18

[Id. at 26-27].

On October 11, 2023, and while this referral was pending, the Plaintiff filed another supplementary application with the Copyright Office, this time seeking "to remove the date of first publication and the nation of publication information from the Registration." [Doc. 275-1: Addendum to Response of Register of Copyrights at 2]. In the application, the Plaintiff explained:

> The work originally registered under TX0008941559 was inadvertently and incorrectly identified as published in the original submission. The registrant mistakenly construed the 2012 launch of its software-as-a-service platform as publication of the work. In actuality, the work (i.e., the underlying source code) was never published and remains today unpublished within the meaning of the Copyright Act.

[Id.]. The Plaintiff did not disclose that the registration that it sought to supplement was the subject of this litigation. [Id.]. Because the registration specialist who received the application was not aware of this ongoing suit, the specialist had no reason to question the Plaintiff's representations and accepted them as true and accurate. [Id. at 2-3]. Accordingly, the registration specialist issued a supplementary registration to the Plaintiff under TXu002393361, effective October 11, 2023. [Id. at 3].

On October 16, 2023, the Register of Copyrights responded to the three questions this Court had referred. The Register stated that "the Copyright Office would not have registered the Work if it had known that the

19

application provided incorrect dates of first publication and/or completion, or that the deposit included material created or published after the dates provided on the application." [Doc. 272-1 at 1, 15].

On November 27, 2023—after the expert report deadlines had expired and just before the December 1, 2023 fact discovery deadline—the Plaintiff filed yet another supplementary application. This time, the Plaintiff sought to change the year of completion of the code by nine years, from 2012 to 2021. [Doc. 289-3: T. Draegen Dep. Ex. 30].

On February 6, 2024, the Copyright Office advised the Plaintiff that the supplementary claim correcting the copyright's year of completion to 2021 was refused. [Doc. 343-1 at 11]. In so doing, the Copyright Office stated its conclusion that the initial copyright registration "was issued in error because the deposited copy of the work was incomplete." [Id.]. As such, the Copyright Office concluded, dmarcian's copyright registration "is now eligible for cancellation." [Id.].

## IV. DISCUSSION

### A. Defendant's Motion for Summary Judgment

#### 1. Breach of Contract Claims (Counts One and Two)

The Defendant first moves for summary judgment as to the Plaintiff's claim for breach of a written contract (Count One) and its alternative claim of breach of an oral contract (Count Two).

To prevail on a breach of contract claim, whether written or oral, a plaintiff must prove (1) the existence of a valid contract and (2) a breach of the terms of that contract. Wells Fargo Ins. Servs. USA, Inc. v. Link, 372 N.C. 260, 276, 827 S.E.2d 458, 472 (2019). To prove the existence of a valid contract, a plaintiff must show that there was an "offer, acceptance, consideration, and mutuality of assent to terms that are sufficiently definite to enable a court to enforce them." MedShift, LLC v. Charles W. Morgan Pelle, LLC, 584 F.Supp.3d 112, 122 (M.D.N.C. 2022); Society for Hist. Pres. of Twentysixth N.C. Troops, Inc. v. City of Asheville, 282 N.C. App. 700, 707, 872 S.E.2d 134, 140 (2022).

Here, the Plaintiff has failed to present a forecast of evidence that the parties had any written agreement. Accordingly, its claim for breach of a written contract must be dismissed. However, viewing the forecast of evidence in the light most favorable to the Plaintiff, there is sufficient evidence from which a jury could reasonably conclude that, at a minimum, the parties had an oral agreement that: gave Draegen a majority and controlling stake in Mailmerk; renamed Mailmerk as dmarcian Europe BV

(later DMARC Advisor); and effectively gave DMARC Advisor a license to (1) use the Plaintiff's marks, copyright, and trade secrets and (2) access the Plaintiff's databases, support resources, website support, website content, and proprietary information in order to service dmarcian customers located in Russia, EU and Africa. The Plaintiff has presented a sufficient forecast of evidence to support a finding that the Defendant breached the oral licensing agreement by continuing to use the Plaintiff's marks and trade secrets following the Plaintiff's termination of the agreement and by claiming ownership rights in the source code. Accordingly, the Defendant's motion for summary judgment with respect to the Plaintiff's claim for a breach of oral contract is denied.

For all these reasons, the Court will grant the Defendant summary judgment with respect to the Plaintiff's claim for breach of a written contract (Count One), and that claim is dismissed. The Defendant's motion for summary judgment with respect to the Plaintiff's claim for breach of an oral contract (Count Two) is denied.

### 2. Copyright Infringement (Count Three)

The Defendant next moves for summary judgment as to the Plaintiff's copyright claim. Specifically, the Defendant argues that the Plaintiff's copyright registration for the "dmarcian Source Code" is invalid because the

Plaintiff submitted the 2021 version of the code with its application, but claimed that the code was created and published in 2012. [Doc. 295 at 14].

The Plaintiff contends that there is nothing inaccurate about its deposit copy, as it "intended to register the 2021 code and deposited the 2021 code…." [Doc. 326 at 13]. To the extent that there were any other inaccuracies in its original copyright application, the Plaintiff argues that such inaccuracies do not invalidate its registration pursuant to the Copyright Act's safe harbor provision.

The Copyright Act provides that "no civil action for infringement of the copyright in any United States work shall be instituted until . . . registration of the copyright claim has been in accordance with this title." 17 U.S.C. § 411(a). A valid registration is "a prerequisite for bring a 'civil action for infringement' of the copyrighted work." Unicolors, Inc. v. H&M Hennes & Mauritz, L.P., 595 U.S. 178, 181 (2022) (citation and internal quotation marks omitted).

To obtain a copyright registration, the author of a work submits a copy of the work and an application to the Register of Copyrights. See 17 U.S.C. §§ 408, 409. The application provides both factual and legal information about the work. Id. § 409. If the Register determines that the work is copyrightable and meets the necessary statutory requirements, a certificate

23

of registration will issue.  Id. § 410(a).  The information on the registration certificate reflects the information provided by the copyright holder on the application.  Id.

In the event that it is determined that inaccurate information was provided in the copyright application, the Copyright Act's safe harbor provision provides that a copyright registration is nevertheless valid "unless (A) the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and (B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration."  Id. § 411(b)(1).  This safe harbor provision "does not distinguish between a mistake of law and a mistake of fact.  Lack of knowledge of either fact or law can excuse an inaccuracy in a copyright registration."  Unicolors, 595 U.S. at 182.

Here, the Plaintiff concedes that its original copyright application contained a number of inaccuracies, including inaccurate information regarding the year of completion, the date of first publication, and the author of the claimed work.  The Plaintiff points out that it filed supplemental applications addressing the date of publication and the author of the claimed work, and that the Copyright Office issued supplemental registrations

thereon.[4]  As for the inaccurate year of completion, the original application claimed that the Source Code was completed in 2012, despite the fact that the Plaintiff intended to register the 2021 version of the Source Code.  To explain this error, the Plaintiff contends that it "had confusion of what date of 'completion' meant in filling out the application."  [Doc. 326 at 13].

The Plaintiff's claimed "confusion" about the legal requirements for filing the copyright application—without more—is merely conclusory and is not sufficient to create an issue of fact for trial.  See Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996) (holding that conclusory or self-serving statements without objective corroboration may be properly disregarded at summary judgment); HEALTHeSTATE, LLC v. United States, 168 Fed. Cl. 624, 651 (2023) (finding applicant's assertion that "he did the best he could" and that he did what he thought the Copyright Office was asking of him was insufficient to create an issue for trial).

To support its claim of confusion, the Plaintiff cites the deposition testimony of Tim Draegen, who provided the factual information to counsel to be incorporated into the original application.  [See Doc. 244: 9th Decl. of

---

[4] The Defendant argues that these supplemental registrations are not valid because they were filed after the institution of this action.  The Court need not address this argument, however, because the Court concludes, for the reasons stated *infra,* that the inaccurate year of completion—which has not been amended by a supplemental registration— renders the copyright invalid.

T. Draegen at ¶ 2]. Mr. Draegen acknowledged in his deposition that changes had been made to the source code in 2021, and that it is his "understanding now" that the year of completion should have been listed as 2021. [Doc. 323-5: T. Draegen Dep. at 282-83] Mr. Draegen testified that including 2012 as the year of completion in the original application was "[his] mistake," [id. at 311], and that he is "not an expert" on matters of law [id. at 282].

While Mr. Draegen claims that he was unaware of what was legally required in claiming the year of completion, this denial alone does not resolve the issue. See HEALTHeSTATE, 168 Fed. Cl. at 651. The Court "need not automatically accept a copyright holder's claim that it was unaware of the relevant legal requirements of copyright law." Unicolors, 595 U.S. at 187. As the Unicolors Court explained, a court may find that an applicant had knowledge, or at least willful blindness, of a legal inaccuracy in a copyright application based on the circumstantial evidence presented, including "the significance of the legal error, the complexity of the relevant rule, the applicant's experience with copyright law, and other such matters . . . ." Id. at 187-88 (internal citation omitted). Thus, the issue before the Court is whether the Plaintiff has presented a forecast of evidence consisting of sufficient circumstantial evidence to buttress the Plaintiff's self-serving

conclusory statement such that a reasonable jury could find that the Plaintiff actually made a mistake of law regarding the "date of completion."

The undisputed evidence presented in this case is that the Plaintiff knew that the code had been modified—on a number of occasions—between 2012 and 2021. In fact, the Defendant alone had made at least €1.3 million worth of modifications in that time period. The Plaintiff had even agreed to allow the improvements to the code to stand for license royalties from the Defendant. Nevertheless, the Plaintiff—through its counsel—submitted a copyright application claiming that the 2021 source code that was deposited in support of the application was "completed" in 2012. The error committed in claiming 2012 as the year of completion on the application was significant. "The information *provided in the application* defines the claim that is being registered, rather than the information provided in the deposit copy(ies) or elsewhere in the registration materials." U.S. Copyright Office, Compendium of U.S. Copyright Practices, § 618.1 (3d ed. 2021) (emphasis added).[5] Because the terms of the *application* itself defines the registered claim, and not the deposit copy, the inclusion of 2012 as the year

---

[5] The Compendium is the administrative manual of the Register of Copyrights and "provides instruction to agency staff regarding their statutory duties and provides expert guidance to copyright applicants, practitioners, scholars, the courts, and members of the general public regarding institutional practices and related principles of law." Id. at 1.

of completion in the application meant that the Plaintiff registered a copyright based upon source code "completed in" 2012, not 2021. The inclusion of this date, therefore, completely changes the nature of the Plaintiff's claimed copyright.

The Court next considers the applicant's experience with copyrights. While the Plaintiff relies upon Mr. Draegen's lack of familiarity of the legal requirements of copyright registration, it must be noted that Mr. Draegen was not the applicant: the Plaintiff was. Further, and most significantly, at all times relevant to this action, the Plaintiff was represented by competent legal counsel, Blank Rome LLP. Attorneys from Blank Rome prepared and submitted the original application, as well as the supplements that followed. [See Doc. 148-1: Dorey Decl. Ex. 1]. Blank Rome is an international law firm with "a long and successful history of working on copyright cases" and "the ability to navigate complex and notoriously difficult areas of copyright law." https://www.blankrome.com/services/intellectual-property-litigation/copyright-litigation (last accessed Apr. 26, 2024).

Moreover, the relevant rules regarding the "year of completion" are not complex. See HEALTHeSTATE, 168 Fed. Cl. at 652 ("interpreting the plain language of the guidance on the [Copyright Office's] website . . . requires no legal training"). In fact, a brief internet search quickly reveals a link to a

Copyright Office website entitled "Standard Application Help: Publication/Completion," which clearly defines "Year of Completion" at the very top of the webpage as follows:

> Year of Completion (Year of Creation)
>
> Provide the year in which the creation of this work was completed, **If there are multiple versions of this work, provide the year of completion for the particular version being submitted for registration. The year of completion should not refer to earlier or later versions of this work.**

https://www.copyright.gov/eco/help-publication.html (last accessed Apr. 26, 2024) (emphasis added). In addition, the Compendium provides the following guidance regarding "year of completion":

**611        Year of Completion / Year in Which Creation of This Work Was Completed**

> To register a work of authorship with the U.S. Copyright Office, the applicant must identify the year that the work was created. 17 U.S.C. § 409(7). A work is considered created when it is fixed in a copy or phonorecord for the first time. If the work was prepared over a period of time, the portion or portions of the work that existed in a fixed form on a particular date constitute the work that has been created as of that date. 17 U.S.C. § 101 (definition of "created")….

**611.1        Completing the Application: Year of Completion / Year in Which Creation of this Work Was Completed**

> When completing an online application, the applicant should identify the year that the work was completed on the Publication/Completion screen in the field marked Year of

29

Completion (Year of Creation). The year of completion must be provided in four numeric digits.

When completing a paper application, the applicant should identify the year that the author completed the work on space 3(a) under the heading Year in Which Creation of This Work was Completed. The specific month and day that the author completed the work need not be provided.

### 611.1(A)  Year of Completion for an Unpublished Work Created Over a Period of Time

If the work is unpublished and if the author created the work over an extended period of time, the applicant should provide the year of completion for the most recent iteration of the work. If the applicant provides a year of completion for each iteration of the work (e.g., a cover letter explaining that the author completed the first draft in 2006, the second draft in 2007, and the final draft in 2008), the registration specialist will replace that information with the year of completion for the most recent iteration, and will add an annotation to the registration record specifying the source of that information, such as: "Regarding year of completion: Corrected by Copyright Office from cover letter."

### 611.1(B)  Year of Completion for Multiple Versions of the Same Work

If the author created multiple versions of the same work, each version is considered a separate work. 17 U.S.C. § 101 (definition of "created"). As a general rule, the applicant must submit a separate application and filing fee for each of those versions. See 17 U.S.C. §§ 408(a), 409. In preparing each application, the applicant should provide the year of completion for the specific version that is being registered.

Compendium at §§ 611-611.1(B). Specifically with respect to computer programs, the Compendium provides as follows:

30

**721.9(D)   Year of Completion**

The applicant should identify the year that the author completed the specific version of the program that the applicant intends to register. **As a general rule, the applicant should provide a year of completion only for the specific version of the program that will be submitted for registration.** The applicant should not provide a year of completion for the first version of the program or any other version of the program that is not included in the application.

For the purpose of copyright registration, each version of a computer program is considered a separate work. Each version of a program is considered complete when that version has been fixed in a tangible medium of expression for the first time. When a program is prepared over a period of time, the portion that has been fixed at any particular time constitutes the version that has been completed as of that date. <u>See</u> 17 U.S.C. § 101 (definition of "created"); <u>see also</u> 37 C.F.R. § 202.3(c)(4) (explaining that the year of completion means "the latest year in which the creation of any copyrightable element was completed").

<u>Id.</u> at § 721.9(D) (emphasis added). Thus, the Compendium plainly instructs applicants who are seeking to register source code to provide a year of completion *only for the specific version of the code submitted for registration*.

Viewing this circumstantial evidence as a whole, and viewing such evidence in the light most favorable to the Plaintiff as the non-moving party, the Court concludes that the Plaintiff has failed to present a forecast of evidence from which a reasonable jury could find in the Plaintiff's favor on the issue of knowledge. Given the significance of the legal error, the clarity

31

of the requirements regarding providing the year of completion, and the legal representation that the Plaintiff had throughout the registration process, the Court finds that the Plaintiff has failed to present a forecast of evidence from which a reasonable jury could find that the Plaintiff did not know that the year of completion provided on the copyright application (and repeated on two of the subsequent supplemental applications) was legally inaccurate. Accordingly, Court concludes as a matter of law that the first prong of the safe harbor provision set forth in § 411(b) is satisfied.

The second prong of the safe harbor provision requires a determination of whether the inaccurate statement in the application would have caused the Register, had it known of the inaccuracy, to refuse registration. The Court requested advice from the Register of Copyrights pursuant to § 411(b)(2). In its Response, the Register stated that the Copyright Office "would not have registered the Work if it had been aware that (1) the Work's first publication date and/or completion date were incorrect and/or (2) the deposit material consisted of a copy of code created after 2012, and not the code as it existed on the date claimed in the application." [Doc. 272-1: Register Resp. at 15]. Therefore, the Court concludes that the inclusion of the inaccurate year of completion would have caused the Register to refuse registration.

In sum, there are no genuine issues of material fact as to the question of copyright registration. Based on the forecasts of evidence presented by the parties, the Court concludes as a matter of law that the Plaintiff's copyright registration is invalid because the Plaintiff submitted an application that claimed an inaccurate year of completion for the claimed source code; that the Plaintiff did so with knowledge of, or at least willful blindness to, the inaccuracy; and that the Register would have refused registration had it known of the inaccuracy. Accordingly, the Defendant's motion for summary judgment is granted with respect to the Plaintiff's claim for copyright infringement.

### 3. Trademark Infringement (Counts Four, Five, and Twelve)

The Plaintiff asserts three separate trademark infringement claims. In Count Four, the Plaintiff asserts that the Defendant infringed the dmarcian Mark in interstate and international commerce in violation of the Lanham Act, 15 U.S.C. § 1114, by using the Mark in its name, as well as continued use of the Mark in several domain names, including dmarcian.eu, dmarcian.co.uk, and finance.dmarcian.eu. [Doc. 51: Second Am. Complaint at ¶¶ 137-48]. In Count Five, the Plaintiff asserts a claim for false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a). [Id. at ¶¶ 149-57]. In Count Twelve, the Plaintiff asserts a claim of common law infringement under North

Carolina law. [Id. at ¶¶ 211-15]. The Defendant moves for summary judgment as to all of these claims, arguing that the Plaintiff cannot show any domestic infringing use of its trademarks. [Doc. 295 at 20-22].

### a. Lanham Act Claims (Counts Four and Five)

In granting the Plaintiff a preliminary injunction in 2021, the Court concluded that the Plaintiff had demonstrated that the Defendant's trademark infringement was "damaging the Plaintiff's reputation and confusing consumers in the United States" and that the Plaintiff had "demonstrated a likelihood of success on a claim that the Defendant's actions have had and are having a significant effect on United States commerce." [Doc. 39: Prelim Inj. Order at 53-54].

In 2023, the United States Supreme Court decided the foreign reach of the Lanham Act in Abitron Austria GmbH v. Hetronic International, Inc., 600 U.S. 412 (2023). In that case, a U.S. company (Hetronic) sued its foreign distributors (collectively referred to as Abitron) for trademark infringement. Id. at 415. Abitron argued that Hetronic sought an impermissible extraterritorial application of the Lanham Act. Id. at 416.

The Supreme Court first noted that there is a "presumption against application to conduct in the territory of another sovereign." Id. at 417 (citation and internal quotation marks omitted). Applying this presumption

against extraterritoriality requires a two-step analysis. First, the Court must determine whether Congress intended for the statute to apply to foreign conduct. Id. at 417-18. If the statute is not extraterritorial, the Court then turns to the second step, which requires identifying the "focus of [the] statute" and determining "whether the *conduct relevant to that focus* occurred in United States territory." Id. at 418 (emphasis in original). As the Supreme Court explained:

> Step two is designed to apply the presumption against extraterritoriality to claims that involve both domestic and foreign activity, separating the activity that matters from the activity that does not. After all, we have long recognized that the presumption would be meaningless if any domestic conduct could defeat it. Thus, if the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application of the statute, even if other conduct occurred abroad. And if the relevant conduct occurred in another country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U. S. territory.

Id. at 419 (internal citations and quotation marks omitted).

Applying this framework to the Lanham Act, the Court readily concluded that Sections 1114 and 1125(a)(1) of the Lanham Act are not extraterritorial in scope. Id. at 419-20. The Court therefore moved to the second part of the inquiry, i.e., determining the focus of the Lanham Act and determining whether the conduct relevant to that focus occurred in the United

35

States. Id. On this point, Abitron argued that § 1114(1)(a) and § 1125(a)(1) both "focus on preventing infringing use of trademarks," while Hetronic argued that these provisions focus "both on protecting the goodwill of mark owners and on preventing consumer confusion." Id. at 421. The Court found that both parties missed the "critical point" by centering their arguments on the "focus of the relevant provisions without regard to the conduct relevant to that focus." Id. (citation and internal quotation marks omitted). Rather, the Court found that "[t]he ultimate question regarding permissible domestic application turns on the location of the *conduct* relevant to the focus," which in the case of trademark infringement, "is infringing use in commerce, as the [Lanham] Act defines it." Id. at 422 (emphasis added). Accordingly, the Court concluded that § 114(1)(a) and § 1125(a)(1) "extend only to claims where the claimed infringing use in commerce is domestic." Id. at 415.

Applying Abitron here, the Court concludes that the Plaintiff has presented a forecast of evidence from which a reasonable jury could conclude that at least some of the Defendant's "infringing use in commerce" occurred within the United States. For example, the Defendant's website included an option for customers "in the Americas," including specifically the United States. [Doc. 16: T. Draegen Supp. Decl. at ¶ 7]. Further, Clarizen, a United States company based in San Mateo, California, changed its RUA

from the dmarcian-eu.com (which had been redirected to the Plaintiff's U.S. platform) to the Defendant's platform "dmarcadvisor.com" on March 17, 2021. [Doc. 15: S. Draegen Supp. Decl. at ¶ 4]. Additionally, several other U.S. companies—including Megacool.co based in San Francisco, California; NVIDIA based in Santa Clara, California; and TechData.com based in Clearwater, Florida—utilize the EU platform and therefore were likely exposed to the Defendant's communications (including the data breach notification) through that platform. [Doc. 30: T. Draegen 2nd Supp. Decl. at ¶ 32; Doc. 323-6: S. Draegen Dep. at 88]. Because there are genuine disputes of fact as to whether the Defendant's infringing use in commerce occurred within the United States, the Court will deny summary judgment as to the Plaintiff's Lanham Act claims (Counts Four and Five).

### b. Common Law Infringement (Count Twelve)

The test for common law trademark infringement in North Carolina is "essentially the same" as that under the Lanham Act. Georgia Pac. Consumer Prods., LP v. Von Drehle Corp., 618 F.3d 441, 449 (4th Cir. 2010). "[A] complainant must demonstrate that it has a valid, protectible trademark and that the defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers." Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc., 43 F.3d 922, 930 (4th Cir. 1995). Because

37

dmarcian's common law trademark infringement claim essentially rises and falls with its Lanham Act claims, the Defendant's motion for summary judgment is denied with respect to the Plaintiff's common law claim for trademark infringement.[6]

### 4. Defamation (Count Six)

The Defendant moves for summary judgment with respect to the Plaintiff's claim for defamation.

In order to recover for defamation under North Carolina law, a plaintiff must demonstrate "that the defendant caused injury to the plaintiff by making false, defamatory statements of or concerning the plaintiff, which were published to a third person." Boyce & Isley, PLLC v. Cooper, 153 N.C. App. 25, 29, 568 S.E.2d 893, 897 (2002).

As a preliminary matter, the Defendant argues that the Plaintiff cannot maintain a defamation claim under North Carolina law because the Plaintiff has failed to present any forecast of evidence that any allegedly false statement was "published or republished in North Carolina." [Doc. 295 at 23].

---

[6] The Defendant argues that the Plaintiff's common law trademark claim must be dismissed because the Plaintiff has not presented any forecast of evidence that the Defendant used the Plaintiff's trademark anywhere in North Carolina. [Doc. 295 at 22]. The Defendant, however, cites no authority for the proposition that a North Carolina trademark holder cannot assert a common law infringement claim without proof of actual infringement within the state.

Because this is a supplemental state law claim, the Court applies the choice of law principles of North Carolina. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941). For tort claims, such as defamation, North Carolina applies the lex loci delicti rule "i.e., where the injury occurred." Terry v. Swift Transportation, No. 1:16CV256, 2017 WL 1013074, at *7 (M.D.N.C. Mar. 14, 2017), report and recommendation adopted, No. 1:16CV256, 2017 WL 2881141 (M.D.N.C. July 6, 2017). For a defamation claim, "the place of the harm has traditionally been considered to be the place where the defamatory statement was published, i.e., seen or heard by non-parties." Wells v. Liddy, 186 F.3d 505, 521–22 (4th Cir. 1999); see also Restatement (First) of Conflict of Laws § 377 n.5 (1934) ("Where harm is done to the reputation of a person, the place of wrong is where the defamatory statement is communicated."). North Carolina courts have not yet addressed the application of the lex loci delicti rule in the context of a defamatory statement made in a multistate internet communication. Federal district courts within the State, however, have predicted that, in such a case, the North Carolina Supreme Court would apply the law of the state where the plaintiff suffered its injury, i.e., its reputational and financial harm. See, e.g., Wiener v. AXA Equitable Life Ins. Co., No. 3:18-cv-00106-RJC-DSC, 2021 WL 665112, at *4 (W.D.N.C. Feb. 19, 2021) (Conrad, J.), reversed on

39

other grounds by 58 F.4th 774 (4th Cir. 2023); Castro v. Goggins, No. 1:16CV10, 2016 WL 7217282 at *3 (M.D.N.C. Dec. 12, 2016), report and recommendation adopted sub nom. Castro v. Coggins, 2017 WL 5749731 (M.D.N.C. Jan. 10, 2017); Nobles v. Boyd, No. 7:14-CV-214-FL, 2015 WL 2165962 at *5 (E.D.N.C. May 8, 2015); Ascend Health Corp. v. Wells, No. 4:12-CV-00083-BR, 2013 WL 1010589, at *2 (E.D.N.C. Mar. 14, 2013). Here, any reputational and financial injury that the Plaintiff suffered as a result of the Defendant's statements regarding a data breach occurred in North Carolina, as this is the state where the Plaintiff has its principal place of business. Accordingly, the Defendant's contention that North Carolina law cannot support the Plaintiff's defamation claim is without merit.

Next, the Defendant contends that the Plaintiff has failed to present a forecast of evidence that any defamatory statements were made. Here, the primary basis for the Plaintiff's defamation claim is that the Defendant advised customers that the Plaintiff's actions in disconnecting the Defendant from all of its systems that the Plaintiff had technical and operational access to qualified as a data breach. [Doc. 8-13: S. Draegen Decl. Ex. G-1]. The Plaintiff also claims that it was defamed by the Defendant (1) using the Plaintiff's marks and the likenesses and information of the Plaintiff's employees on the Defendant's website to falsely represent that the Plaintiff's

employees and executives continue to be involved in the Defendant's business and to falsely suggest that the customers were continuing to do business with the Plaintiff; (2) falsely representing to customers that more than 50% of the source code was developed by the Defendant and the Bulgarian developers ; and (3) falsely representing to such customers that the source code belongs to the Defendant rather than the Plaintiff. [Doc. 51: Second Am. Complaint at ¶ 159]. Viewing the forecast of evidence in the light most favorable to the Plaintiff, the Court finds that the Plaintiff has presented a forecast of evidence sufficient for a reasonable jury to conclude that the Defendant's statements were defamatory. Accordingly, the Defendant's motion for summary judgment with respect to the Plaintiff's defamation claim is denied.

The Defendant asserts the defense of qualified privilege with respect to its statements regarding the alleged data breach, arguing that it had a legal duty to notify its customers and the Dutch Data Protection Authority of the Plaintiff's actions. [Doc. 295 at 22-23]. "Qualified privilege is a defense for a defamatory publication[.]" Clark v. Brown, 99 N.C. App. 255, 262, 393 S.E.2d 134, 138 (1990).

> A qualified privilege exists when a communication is made: (1) on subject matter (a) in which the declarant has an interest, or (b) in reference to which the declarant has a right or duty, (2) to a person having

a corresponding interest, right, or duty, (3) on a privileged occasion, and (4) in a manner and under circumstances fairly warranted by the occasion and duty, right, or interest.

Phillips v. Winston-Salem/Forsyth Cnty. Bd. of Educ., 117 N.C. App. 274, 278, 450 S.E.2d 753, 756 (1994). Again, viewing the forecast of evidence in the light most favorable to the Plaintiff, the Court finds that there are numerous questions of fact as to whether the Defendant's communications were "in a manner and under circumstances fairly warranted by the occasion and duty, right, or interest." Id. Accordingly, the Defendant's motion for summary judgment based upon the application of qualified privilege is also denied.

### 5. Misappropriation of Trade Secrets (Counts Seven and Eleven)

The federal Defend Trade Secrets Act (DTSA) authorizes suits by owners of trade secrets that have been misappropriated. 18 U.S.C. § 1836. North Carolina law also prohibits the misappropriation of trade secrets. N.C. Gen. Stat. §§ 66-152—66-162. A trade secret consists of:

business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:

a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent

42

development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Id. § 66-152(3).

"Under both North Carolina law and the DTSA, information must be subject to reasonable efforts to maintain its secrecy to be considered a trade secret, and misappropriation occurs only where that information is acquired or used without either express or implied consent." Sysco Mach. Corp. v. DCS USA Corp., No. 5:23-CV-134-BO-RJ, 2023 WL 7752051, at *3 (E.D.N.C. Nov. 15, 2023). Moreover, "trade secret protection is eviscerated when otherwise protected information is disclosed to others who have no obligation to protect its confidentiality." MicroStrategy Servs. Corp. v. OpenRisk, LLC, No. 1:14CV1244 JCC/IDD, 2015 WL 1221263, at *7 (E.D. Va. Mar. 17, 2015), on reconsideration, No. 1:14CV1244 JCC/IDD, 2015 WL 2126924 (E.D. Va. May 6, 2015).

Here, the Plaintiff has presented a forecast of evidence that it had an agreement with the Defendant that its trade secrets would only be used in the context of the parties' cooperation. To that end, the Plaintiff used "industry standard methods to control data in terms of [d]marcian maintaining account provisioning and access" so that, as far as Mr. Draegen knew, "no

43

one outside of the cooperation had access to [d]marcian's IP or trade secrets." [Doc. 323-5: T. Draegen Dep. at 299-300]. Additionally, the Defendant expressly assured the Plaintiff that the Defendant had "employee contracts in place to protect [the Defendant] and to protect [d]marcian's assets." [Id. at 297]. Thus, while the parties never executed written confidentiality agreements addressing the use of the Plaintiff's intellectual property rights by the Defendant or any of the software developers that it employed, the Plaintiff has presented a forecast of evidence that it took at least some measures to protect its trade secrets that were reasonable under the circumstances. Accordingly, the Defendant's motion for summary judgment with respect to the Plaintiff's trade secret claims is denied.

### 6. Computer Trespass (Count Eight)

The Defendant next moves for summary judgment with respect to the Plaintiff's computer trespass claim, arguing that the Plaintiff has failed to present a forecast of evidence that it was injured by someone accessing its computer or computer network without authority. [Doc. 295 at 24-25].

North Carolina law prohibits a person from using "a computer or computer network without authority and with the intent to . . . [m]ake or cause to be made an unauthorized copy" of information residing there. N.C. Gen. Stat. § 14-458(a). The Plaintiff asserts a claim under § 1-539.2A, which

44

authorizes a private right of action for a person whose property or person is injured by reason of a violation of G.S. 14-458." Id. § 1-539.2A(a).

In support of this claim, the Plaintiff presents the following forecast of evidence. On January 22, 2021, the Plaintiff notified the Defendant that the Plaintiff was terminating cooperation. [Doc. 19: Verified First Am. Complaint at ¶ 64]. Simultaneously, Tim Draegen sent notice to TDX and the Defendant that he was terminating cooperation under the TDX shareholder agreement. [Doc. 301-1: Def. 30(b)(6) Dep. at 314-17; Doc. 301-3: Dep. Ex. 27]. The Defendant had lost access to the version-controlled source code a month before and was uncertain that the developers had all the code on their laptops needed to run a platform. [Doc. 323-3: TDX 30(b)(6) Dep. at 409-10]. On January 28, 2021, at the Defendant's instruction, one of the Bulgarian developers accessed and downloaded the Plaintiff's Core Repository in South Carolina so that the Defendant would have the source code necessary to operate on its own. [Doc. 244: T. Draegen 9th Decl. at ¶ 6; Doc. 244-1: T. Draegen 9th Decl. Ex. 1; Doc. 323-1: Def. 30(b)(6) Dep. at 280-82; Doc. 57-12: Harmeling 2nd Decl. Ex. A]. The Core Repository houses the code for the "vast majority" of the program's functionality. [Doc. 317-2: Pltf. 30(b)(6) Dep. at 141-42]. The Defendant also accessed customer data on the Plaintiff's system without authorization to identify new users after license

45

termination by exploiting a bug in the Plaintiff's system. [Doc. 289-3: T. Draegen Dep. at 85-91]. Viewing this forecast of evidence in the light most favorable to the Plaintiff, the Court concludes that there are genuine issues of fact as to whether the Defendant committed a computer trespass in violation of North Carolina law. The Defendant's motion for summary judgment with respect to the Plaintiff's computer trespass claim is denied.

### 7.    Tortious Interference Claims (Counts Nine and Ten)

The Plaintiff asserts a tortious interference with contract claim in Count Nine of the Second Amended Complaint, and a tortious interference with prospective economic advantage claim in Count Ten. [Doc. 51 at ¶¶ 177-99]. The Defendant moves for summary judgment with respect to both claims, arguing that the Plaintiff has failed to forecast evidence of any contract that the Defendant induced a third party not to perform or any contract that a third party would have entered into with the Plaintiff but for the Defendant's interference. [Doc. 295 at 25-26].

To prevail on a claim for tortious interference with contract, a plaintiff must show:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract;

(4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC, 368 N.C. 693, 700, 784 S.E.2d 457, 462 (2016) (citation omitted).   The tort of tortious interference with prospective economic advantage "arises when a party interferes with a business relationship by maliciously inducing a person not to enter into a contract with a third person, which he would have entered into but for the interference, if damage proximately ensues, when this interference is done not in the legitimate exercise of the interfering person's rights." Id. at 701, 784 S.E.2d at 463 (citation and internal quotation marks omitted).

Here, the Plaintiff has presented a forecast of evidence that the Defendant induced the Plaintiff's customers to switch from the Plaintiff's platform to the Defendant's platform, "thereby effectively terminating [the Plaintiff's] services to such customers."   [Doc. 19: Verified First Am. Complaint at ¶ 180]. As a result of being induced to switch platforms, the customers were not able to perform the Plaintiff's Terms of Service (TOS), thereby interfering with contracts governed by North Carolina law.  [Doc. 289-7: S. Draegen Dep. at 136 (discussing Mathworks) and at 138 (noting loss of 15,000 European customers); Doc. 37-5, dmarcian TOS].  The Plaintiff has produced a list of customers whom the Defendant induced to switch

47

platforms and who are utilizing the Plaintiff's platform and services but are paying the Defendant. [Doc. 323-9: Plf. Supp. Rsp. to Int. #8; Doc. 289-8, pp. 81-156, Exh. B to Plf. Supp. Int.].

As for the Plaintiff's claim for tortious interference with prospective economic advantage, the Plaintiff has presented a forecast of evidence [see Doc. 19: Verified First Am. Complaint at ¶¶ 192-93] from which a jury could reasonably conclude that the Defendant's "'misleadingly similar' websites had siphoned off would-be customers from [the Plaintiff]." dmarcian, Inc. v. dmarcian Europe BV, 60 F.4th 119, 142 (4th Cir. 2023) (quoting dmarcian, Inc. v. dmarcian Europe BV, No. 1:21-cv-00067-MR, 2021 2144915, at *24 (W.D.N.C. May 26, 2021)).

For all these reasons, the Defendant's motion for summary judgment with respect to the Plaintiff's claims for tortious interference with contract and tortious interference with prospective economic advantage as set forth in Counts Nine and Ten is denied.

### 8. Unjust Enrichment (Count Thirteen)

In Count Thirteen of the Second Amended Complaint, the Plaintiff asserts, in the alternative to its breach of contract claims, a claim for unjust enrichment. [Doc. 51 at ¶¶ 216-22].

The Defendant contends that the Plaintiff cannot pursue a claim for unjust enrichment because the parties' oral agreement governs the claims and relationships between the parties. [Doc. 295 at 26-27].

The Defendant is correct that "a claim for unjust enrichment cannot stand where an express contract exists covering the same subject." Am. Circuits, Inc. v. Bayatronics, LLC, No. 22 CVS 2915, 2023 WL 8597896, at *14 (N.C. Super. Dec. 8, 2023). However, a plaintiff alleging a breach of contract may plead a claim of unjust enrichment in the alternative. Jessey Sports, LLC v. Intercollegiate Men's Lacrosse Coaches Ass'n, Inc., 289 N.C. App. 166, 172, 888 S.E.2d 677, 682 (2023).

Here, the Defendant denies the existence of a contract between the parties. To the extent that any such contract existed, the Defendant disputes the Plaintiff's characterization of the terms of that contract. Given these genuine disputes of fact and the uncertain status of the parties' alleged oral agreement, it would be premature to dismiss the Plaintiff's claim for unjust enrichment at this time. See Davis v. Davis Funeral Serv., Inc., No. 22 CVS 583, 2023 WL 7029602, at *3 ¶ 15 (N.C. Super. Oct. 25, 2023). Accordingly, the Defendant's motion for summary judgment with respect to the Plaintiff's unjust enrichment claim is denied.

### 9. Cybersquatting (Count Fourteen)

In Count Fourteen of the Second Amended Complaint, the Plaintiff asserts a cybersquatting claim under the ACPA. [Doc. 51: Second Am. Complaint at ¶¶ 223-44]. To establish an ACPA violation, the Plaintiff must prove that: (1) DMARC Advisor had a bad faith intent to profit from using the infringing domain names[7] and (2) these infringing domain names are "identical or confusingly similar to, or dilutive of, the Plaintiff's distinctive and famous" Mark. People for Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 367 (4th Cir. 2023).

In moving for summary judgment, the Defendant argues that the Plaintiff cannot show any customer confusion because the Defendant did not use any of the allegedly infringing domains within the United States. [Doc. 295 at 28]. However, the Plaintiff has presented a forecast of evidence from which a reasonable jury could conclude that there was actual customer confusion between the Plaintiff's U.S. website and the allegedly infringing domains used by the Defendant. [See, e.g., Doc. 8: S. Draegen Decl. at ¶¶ 6-24]. The Defendant's argument on this point is without merit.

---

[7] These domains are identified as dmarcian.app; dmarcian.email; dmarcian-europe.com; dmarcian.nl; dmarcian.co.uk; dmarcian.es; dmarcian.fr, dmarcian.de, dmarcian.it, and dmarcian.ru. [Doc. 51: First Am. Compl. at ¶ 231].

The Defendant further argues that the Plaintiff cannot show bad faith because the allegedly infringing domains include the Defendant's former legal name. [Doc. 295 at 22]. Viewing the evidence in the light most favorable to the Plaintiff, however, the Court concludes that the issue of whether the Defendant had a bad faith intent to profit from use of the dmarcian domain names is question of fact that must be resolved by the jury.

For all of these reasons, the Defendant's motion for summary judgment with respect to the Plaintiff's cybersquatting claim is denied.

### 10. Chapter 75 (Count Fifteen)

For its final claim, the Plaintiff asserts that the Defendant's "conduct as set forth in Counts Four through Thirteen of the Complaint is unfair and deceptive within the meaning of N.C. Gen. Stat. § 75-1.1." [Doc. 51: First Am. Complaint at ¶ 246].

The Defendant first contends that the Plaintiff cannot prevail on a Chapter 75 claim because it cannot show that any of DMARC Advisor's alleged unfair and deceptive conduct actually occurred in North Carolina. [Doc. 295 at 29]. The Fourth Circuit has already rejected this jurisdictional argument in upholding this Court's determination that North Carolina's long-arm statute was satisfied by the fact that the Plaintiff, a North Carolina business, claimed injury from the foreign conduct of the Defendant at a time

when the Plaintiff provided services on behalf of the Defendant. dmarcian, 60 F.4th at 132. Now at the summary judgment stage, the Plaintiff has presented a forecast of evidence sufficient to show that it suffered injurious effects to its business as a result of the Defendant's conduct abroad. The Defendant's argument on this issue is without merit.

The Defendant further argues that summary judgment is warranted on the Plaintiff's Chapter 75 claim for the same reasons the Defendant asserted with respect to Counts Four through Thirteen, supra. For the reasons previously stated, the Court finds that the Plaintiff has submitted a forecast of evidence sufficient for a reasonable jury to conclude that the Defendant engaged in unfair and deceptive trade practices. Accordingly, the Defendant's motion for summary judgment with respect to the Plaintiff's Chapter 75 claim is denied.

### 11. Damages

The Defendant also moves for summary judgment based on the Plaintiff's purported failure to "disclose cognizable evidence of damages." [Doc. 295 at 23-24]. The Court declines to address the sufficiency of the Plaintiff's evidence regarding damages in the context of summary judgment. Such issues are more appropriately addressed in a motion in limine or at trial.

**B. Plaintiff's Motion for Summary Judgment**

The Plaintiff moves for summary judgment with respect to 27 of the 38 defenses asserted in the Defendant's Answer. [Doc. 297]. In reviewing this motion, the Court construes the forecasts of evidence presented by the parties in the light most favorable to the Defendant. Smith v. Collins, 964 F.3d 266, 274 (4th Cir. 2020).

**1. Defenses Related to Copyright Claim**

As an initial matter, the Plaintiff moves for summary judgment with respect to various defenses related to the Plaintiff's copyright claim. As that claim has been dismissed, the Plaintiff's motion for summary judgment is moot with respect to the Defendant's Third Defense (failure to join necessary parties), Eleventh Defense (standing), Twelfth Defense (real party in interest), Eighteenth Defense (lack of signed transfer), and Twenty-Fourth Defense (misuse), as well as the Defendant's Fourteenth Defense (fair use), insofar as such defense relates to the Plaintiff's copyright.

**2. Defenses for Which No Argument is Offered**

Although the Plaintiff moves for summary judgment with respect to the Defendant's Seventeenth Defense (rescission), Nineteenth Defense (estoppel), Twentieth Defense (material breach), and Twenty-First Defense (repudiation), it offers no argument with respect to these defenses.

Accordingly, the Plaintiff's motion for summary judgment with respect to the Defendant's Seventeenth, Nineteenth, Twentieth, and Twenty-First Defenses are denied.

### 3. Thirty-Seventh Defense

As its Thirty-Seventh Defense, the Defendant asserts the defense of duress. [Doc. 126: Answer at 23]. Essentially, the Defendant contends that the Plaintiff's conduct in terminating the Defendant's access to the shared platform and computer systems needed to service its customers forced the Defendant to take immediate action to mitigate the damages, including taking the previously shared software and creating a standalone platform controlled by the Defendant. [Doc. 319 at 28].

"Duress exists where one, by the unlawful act of another, is induced to make a contract or perform or forego some act under circumstances which deprive him of the exercise of free will." Radford v. Keith, 160 N.C. App. 41, 43-44, 584 S.E.2d 815, 817 (2003). A threatened act is unlawful "if made with the corrupt intent to coerce a transaction grossly unfair to the victim and not related to the subject of such proceedings." Link v. Link, 278 N.C. 181, 194, 179 S.E.2d 697, 705 (1971).

Here, the Defendant has failed to produce a forecast of evidence from which a reasonable jury could conclude that the Plaintiff's actions subjected

the Defendant to duress within the meaning of North Carolina law. Accordingly, the Plaintiff's motion for summary judgment is granted with respect to the Thirty-Seventh Defense asserted in the Defendant's Complaint.

### 4. Thirty-Eighth Defense

In its Thirty-Eighth Defense, the Defendant asserts that the Plaintiff's claims are barred in whole or in part because the Defendant "acted under the control of a court-appointed independent director," Hub Harmeling. [Doc. 126: Answer at 23]. The Defendant offers no legal authority to support its contention that the appointment of Mr. Harmeling somehow shields the Defendant from legal liability for its actions. The Plaintiff's motion for summary judgment is granted with respect to this defense.

### 5. Other Defenses

With respect to the other defenses for which the Plaintiff seeks summary judgment, the Court finds that there are numerous issues of fact which preclude a grant of summary judgment in favor of the Plaintiff. Accordingly, the Plaintiff's motion for summary judgment is denied with respect to the Defendant's Ninth Defense (claim preclusion); Tenth Defense (issue preclusion); Fourteenth Defense (fair use of trademark); Fifteenth Defense (authorization of conduct); Sixteenth Defense (ownership of

55

intellectual property); Twenty-Second Defense (laches); Twenty-Third Defense (statute of limitations); Twenty-Sixth Defense (fraudulent inducement); Twenty-Ninth Defense (acquiescence); Thirtieth, Thirty-First, Thirty-Second, Thirty-Third, and Thirty-Fourth Defenses (related to defamation); Thirty-Fifth Defense (statutory immunity under § 1833); and Thirty-Sixth Defense (good faith).

For all of these reasons, the Plaintiff's Motion for Summary Judgment is granted with respect to the Defendant's Thirty-Seventh Defense (duress) and Thirty-Eighth Defense (acting under control of court-appointed independent director). In all other respects, the motion is denied.

## C. Defendant's Motion to Exclude Plaintiff's Expert

The Defendant moves to exclude certain opinions proffered by the Plaintiff's expert, John R. Levine, PhD. [Doc. 298]. All of Dr. Levine's challenged opinions relate to the Plaintiff's copyright claims. Because these claims have been dismissed, the motion to exclude Dr. Levine's opinions has been rendered moot.

## O R D E R

**IT IS, THEREFORE, ORDERED** that:

(1)     The Defendant's Motion for Summary Judgment [Doc. 294] is **GRANTED IN PART and DENIED IN PART** as follows: the Defendant's Motion for Summary Judgment is **GRANTED** with respect to the Plaintiff's claim for breach of written contract (Count One) and the Plaintiff's claim for copyright infringement (Count Three), and these claims are **DISMISSED WITH PREJUDICE**.   In all other respects, the Defendant's Motion for Summary Judgment is **DENIED**.

(2)     The Plaintiff's Motion for Summary Judgment [Doc. 297] is **GRANTED IN PART and DENIED IN PART** as follows: the Plaintiff's Motion for Summary Judgment is **GRANTED** with respect to the Defendant's Thirty-Seventh Defense (duress) and Thirty-Eighth Defense (acting under control of court-appointed independent director).  In all other respects, the motion is **DENIED**.

(3)     The Defendant's Motion to Exclude Certain Opinions of Plaintiff's Expert John R. Levine [Doc. 298] is **DENIED AS MOOT**.

**IT IS SO ORDERED.**

Signed: May 1, 2024

Martin Reidinger
Chief United States District Judge