IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CASE NO.: 1:21-CV-00067

DMARCIAN, INC.,

                Plaintiff,

   v.

DMARC ADVISOR BV,
f/k/a dmarcian Europe BV,

                Defendant.

**PLAINTIFF'S BRIEF IN
OPPOSITION TO DEFENDANT'S
MOTIONS IN LIMINE**

---

NOW COMES the Plaintiff and hereby opposes the Defendant's

Motion in Limine (Doc. 418).

## STANDARD OF ADJUDICATION

District courts are afforded broad discretion in determining the

admissibility of evidence. *See Minter v. Wells Fargo Bank, N.A.*, 762 F.3d

339, 349 (4th Cir 2014) (citation omitted) ("Under Federal Rule of Evidence

403, determining whether the probative value of evidence is substantially

outweighed by the danger of unfair prejudice, misleading the jury, or

confusion of the issues is within the district court's broad discretion."); *Bunn*

*v. Oldendorff Carriers GmbH & Co. KG*, 723 F.3d 454, 468 (4th Cir. 2013)

("[W]e review a trial court's jury instruction for abuse of discretion, keeping in mind that a trial court has broad discretion in framing its instructions to a jury.") (internal quotation marks omitted); *United States v. Benkahla*, 530 F.3d 300, 309 (4th Cir. 2008) ("Judgments of evidentiary relevance and prejudice are fundamentally a matter of trial management" ). Evidence is only unduly prejudicial when it evokes "a genuine risk that the emotions of a jury will be excited to irrational behavior." *United States v. Ham*, 998 F.2d 1247, 1252 (4th Cir.1993).

## I. DBV'S MOTION TO EXCLUDE DAMAGES EVIDENCE SHOULD BE DENIED.

### A. Allegedly Unproduced Evidence

Plaintiff produced a number of charts and provided a narrative explanation of damages during discovery. [1] (*See*, Doc. 289-7, Deposition of S. Draegen, Exh. 12, 13; Plaintiff's Supp. Answer to Int. #10, Doc. 289-8 at Exh. 18; Doc. 289-8, Exh. 19-21. Both during discovery and during the intervening year since discovery closed, Plaintiff provided opposing counsel multiple opportunities to review financial data which supported Plaintiff's damages charts provided during discovery, again on March 28, 2024

---

[1] The Parties were working through a number of discovery disputes and timing of depositions and stipulated to extend fact discovery through December 11, 2023. (Doc. 277).

2

(confirming an earlier phone call with such invitation), and yet again on January 15, 2025. (See **Exh. 1** hereto, Email Chain Offering Inspection under Rule 1006; Plaintiff's Supp. Answer to Int. #10, Doc. 289-8 at Exh. 18). Plaintiff offered to make its accounting system available on a laptop either in Raleigh or Greensboro, and asked Defendant to propose some dates in advance of trial. *Id*. DBV ignored the several invitations to review the underlying voluminous records if they wished to contest the accuracy of Plaintiff's charts and chose not to do so.

Under Rule 1006, the producing party can designate a place and time for opposing counsel to inspect the data which supports that party's summary of evidence. *Branch v. Government Employees Insurance Company*, 286 F.Supp.3d 771, 780 (E.D. VA 2017). As long as the opposing counsel is given the opportunity to cross-examine the summary chart, and the chart otherwise meets the requirements under Rule 1006,[2] the summary chart is admissible. *See United States v. Strissel*, 920 F.2d 1162, 1164 (4th Cir.1990) (per curiam) (rejecting argument that charts were based on inaccurate information and were therefore inadmissible when "the underlying evidence" was "available to the opponent so that a proper cross-examination

---

[2] Defendant does not raise any challenges in its motion to the other requirements of Rule 1006.

3

[could] be had"); *U.S. v. Griffith*, Nos. 98-4062, 98-4063, 98-4404, 1999 WL 381974, at *1 (4th Cir. 1999) ("[I]t is not a prerequisite that the underlying evidence in support of the summaries be admitted into evidence so long as the supporting documents were admissible and available to the defendants to facilitate cross examination."); *U.S. v. Foley*, 598 F.2d 1323, 1338 (4th Cir. 1979) (holding that the district court did not abuse its discretion by admitting the summary of listings by realtors when the documents were **available for inspection** at the Justice Department **before trial**); *U.S. v. Janati*, 374 F.3d 263, 273 (4th Cir. 2004, emphasis added) (finding the purpose of the availability requirement is "to afford a process to test the accuracy of the chart's summarization").

In each of the cases cited by DBV, the party offering the summary never offered to make the underlying documents available. DBV cited the case of *United States v. Modena*, 302 F.3d 626, 633 (6th Cir. 2002), attempting to distinguish between discovery and Rule 1006. (Doc. 418, p. 4). However, in *Modena*, the government had tried in that case to admit a summary over the defendant's objection that it had never been given an opportunity to review the underlying documents. The government asserted that the defendant had never asked to review the records. *Modena*, 302 F.3d at 633. The Court rejected the government's argument because the

4

government had a duty to offer a time and place to review the records, regardless of whether a request had been made. A similar circumstance arose in another case cited by DBV, *Air Safety, Inc. v. Roman Cath. Archbishop of Bos.*, 94 F.3d 1, 8 (1st Cir. 1996), in which the party proffering the summary argued that it would have made the documents available if requested, but they were never requested. There, the court held that this kind of "passive availability" does not meet the proffering party's obligations under Rule 1006. Lastly, DBV relies on *Remy Holdings Int'l, LLC v. Fisher Auto Parts, Inc.*, No. 5:19-CV-00021, 2022 WL 193742, at *8 (W.D. Va. Jan. 21, 2022), *aff'd sub nom. Remy Holdings Int'l, LLC v. Fisher Auto Parts, Inc,* 90 F.4th 217 (4th Cir. 2024), in which the proffering party never made the documents available for examination, whether in discovery or otherwise.

In stark contrast, the Plaintiff here made several offers for a review of the underlying records over the period of more than a year prior to trial, which DBV simply ignored. (**Exh. 1;** Plaintiff's Supp. Answer to Int. #10, Doc. 289-8 at Exh. 18). This case is akin to *Branch*, in which the plaintiff's counsel had several offers to review additional information from the defendant's database which plaintiff refused to take up. The Court found that plaintiff's failure to accept the offer to review the underlying data showed that the plaintiff "has received all the information she needs to review the

5

spreadsheet as a summary. *Branch,* 286 F. Supp. 3d at 780. Having sat on its hands for more than a year of opportunity to review the underlying records, DBV cannot now complain of an inability to prepare cross examination.

### B. Computation of Damages

DBV incorrectly claims that Plaintiff did not meet its initial disclosure requirements in describing its damages. In Plaintiff's August 1, 2022 initial disclosures (Doc. 289-8, pp. 31-33), dmarcian identified: each cause of action and the amount sought for each claim (statutory damages; profits wrongfully earned by DBV including amounts to the extent known at that time; and lost profits (which could not be ascertained at that time in that damages were an "open box" due to ongoing infringement). *Id.* Plaintiff supplemented its damages calculations to provide additional detail and explanation of damages sought for: (a) specified costs to assist DBV to develop business, supported by a summary to further explain those damages; (b) a calculation of DBV's profits based on gross revenues reflected on its financial statements,[3] noting that DBV bears the burden of

---

[3] Given that DBV's entire business is based on use of dmarcian's code, all of its profits are attributable to dmarcian's IP.

showing expenses[4]; (c) specified personnel costs incurred to deal with customer confusion with supporting documentation; (d) specified operational costs for maintaining expired accounts for customers who elected to stay on dmarcian's platform but paid DBV (given that dmarcian could not terminate those customers under this Court's Amended Injunction (Doc. 82); (e) royalty calculations, specifying the source documents and the rationale for the calculation; (f) reputational injury arising both from defamation[5] and from use of dmarcian's marks.[6] (g) and (h) statutory damages for copyright and trademark; (i) attorneys fees and costs; and (j) punitive and treble damages. (Doc. 323-9, Int. Supp. Rsp. #10).

DBV's reliance on *Silicon Knights, Inc. v. Epic Games, Inc.,* No. 5:07-

---

[4] In a trade secrets and trademark case, the claimant need only establish gross revenues, and burden is on infringer to prove deductible expenses. *Uhlig LLC v. Shirley,* No. 6:08-CV-01208-JMC, 2012 WL 2923242, at *13 (D.S.C. July 17, 2012) (addressing damages in trade secrets case); *Vantage, Inc. v. Vantage Travel Serv., Inc.,* No. CA 6:08-2765-HMH, 2010 WL 1427965, at *5 (D.S.C. Apr. 8, 2010) (damages in trademark case).

[5] *Boyce & Isley, PLLC v. Cooper*, 153 N.C. App. 25, 29–30, 568 S.E.2d 893, 898 (2002), *writ denied, review denied, appeal dismissed,* 357 N.C. 163, 580 S.E.2d 361 (2003) (allegation impeaching the plaintiff in his business is libel *per se* so that "malice and damages are deemed presumed by proof of publication, with no further evidence required as to any resulting injury.")

[6]*Vantage,* 2010 WL 1427965, at *5 (Lanham Act plaintiff need not prove damages with "exacting specificity").

7

CV-275-D, 2012 WL 1596722, at *4 (E.D.N.C. May 7, 2012) is misplaced. In *Silicon*, the plaintiff's initial disclosures stated that it sought "several million dollars" and simply submitted business financial reports that did not explain how plaintiff's damages were calculated. 2012 WL 1596722, at *4. The plaintiff's expert report, which otherwise would have been an acceptable supplement, was excluded from evidence on other grounds. *Id*. at *3.

In contrast, DBV questioned Ms. Draegen about these calculations and the supporting documentation at length. (DBV 289-8, pp. 1-27; 57-157). Exclusion of evidence for alleged deficiencies in damages disclosures is an extreme result and the Court should consider other less drastic measures. *See, e.g.*, *Foodbuy, LLC v. Gregory Packaging, Inc.,* 987 F.3d 102, 112–13 (4th Cir. 2021) (upholding district court's denial of motion to exclude damages testimony where damages calculations were disclosed for the first time at trial, having given the defendant a one-week recess for rebuttal witness to prepare testimony).

Even if Defendant challenges the admission of the summary, it goes to weight rather than admissibility. *U.S. v. Lewis*, 13 F. App'x 180, 192 (4th Cir. 2001) (giving jury instruction that it should give the charts' conclusions and summaries by IRS "such weight as you feel like that you are entitled to. If you do not think they are entitled to any weight, you don't have to give them

8

any weight"); *United States v. Keplinger*, 776 F.2d 678, 694–95 (7th Cir. 1985) (finding no abuse of discretion because "[g]enerally, objections that an exhibit may contain inaccuracies, ambiguities, or omissions go to the weight and not the admissibility of the evidence"); *United States v. Smallwood*, 443 F.2d 535, 540 (8th Cir.1971) ("The claimed error in the accuracy of the summaries was fully presented to the jury, and in our view the relatively few inaccuracies went to the weight of the evidence and not its admissibility.")

## II. DBV'S MOTION TO EXCLUDE EVIDENCE REGARDING CLARIZEN SHOULD BE DENIED.

Well after discovery has closed,[7] well after Plaintiff produced additional documents in response to the Court's Order about Clarizen (Doc. 334), and without citing a single supporting case, DBV seeks to prevent Plaintiff from introducing evidence about Clarizen at trial. As the Court may recall, Clarizen is a United States company based in California. (Doc. 360 at 36). Plaintiff has contended from the beginning of this case that Defendant unlawfully caused Clarizen to switch from Plaintiff's platform to DBV's platform. (Doc. 15 at ¶4; Doc. 360 at 36-37). DBV's request for this extraordinary relief should be denied because it is untimely, DBV has failed show prejudice, and because Plaintiff complied with discovery obligations.

---

[7] Fact discovery ended in this case ended in December of 2023. (See Doc. 277, Stipulation to Extend Fact Discovery).

9

In support of its motion, DBV cites Rule 37 of the Federal Rules of Civil Procedure and contends that evidence about Clarizen should be excluded for "spoliation and failure to disclose." (Doc. 418 at 8). DBV's motion is untimely. Spoliation motions are to be filed "as soon as reasonably possible after discovery of the facts that underlie the motion." *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 598 (D. Md. 2009). Other than mentioning purported spoliation in a short footnote in its summary judgment brief which fell well short of its burden to justify spoliation sanctions by clear and convincing evidence, Defendant has not taken any action seeking redress for alleged spoliation. (Doc. 295, p. 11, n. 1; *see also* Doc. 326, Plaintiff's Brief in Opp., pp. 10-11, n. 2)

The *Goodman* court explained why timeliness is important in the context of spoliation motions:

> This is because resolution of spoliation motions are fact intensive, requiring the court to assess when the duty to preserve commenced, whether the party accused of spoliation properly complied with its preservation duty, the degree of culpability involved, the relevance of the lost evidence to the case, and the concomitant prejudice to the party that was deprived of access to the evidence because it was not preserved.

*Id.* at 508. In *Goodman*, the court denied the movant's spoliation motion, noting that the motion was filed more than five months after discovery was closed, more than two months after dispositive motions were briefed, and the

movant "offered no satisfactory explanation why he could not have filed his Motion much earlier, which is particularly egregious given the fact that he clearly was aware of the grounds for his Motion months before he filed it." *Id.* at 509.

On February 7, 2024, this Court entered an order requiring Plaintiff to "produce any documents responsive to the Defendant's Request for Production No. 92 [related to Clarizen] which remain in the Plaintiff's possession or control and have yet to be produced." (Doc. 334 at 12). In compliance with that Order, on February 20, 2024, Plaintiff provided a supplemental production of documents related to Clarizen. DBV filed no further motions concerning alleged spoliation. DBV offers no explanation for why it has waited nearly an entire year before bringing this issue before the Court if it believed Plaintiff's supplemental production was deficient.

The concerns the *Goodman* court observed of untimely spoliation motions are present here. On the eve of trial where this Court has been presented with a host of other issues to resolve, DBV's motion as to Clarizen presents an additional set of issues: whether Plaintiff failed to preserve evidence when it engaged in the routine deletion of a departing employee, Ed Caroll's, mailbox well before this case began; whether Mr. Caroll's emails

are relevant; and, whether DBV is prejudiced in its ability to defend against the allegations regarding Clarizen.

Plaintiff respectfully submits that the Court need not spend time resolving these factual disputes given DBV's untimeliness in bringing this issue before the Court when it has offered no explanation for why it could not have filed this motion nearly a year ago.

Nonetheless, Plaintiff disputes DBV's arguments that Plaintiff has engaged in spoliation or intentional deletion or that DBV has suffered any prejudice as required by Rule 37(e)(1) of the Federal Rules of Civil Procedure. Routinely deleting a departing employee's email well before 2021 (and well before anyone could determine that Clarizen communications would be relevant) does not constitute spoliation. (Doc. 323-6, S. Draegen Dep. Tr. 118:24–125:08). The only specific document that DBV identifies as allegedly being spoliated was one email in a chain of emails that Defendant otherwise had in its possession but which dmarcian was not able to locate and produce.[8] (Doc. 418 at 9, referencing Doc. 285-2 at 9). To support its contention that "Caroll was directly involved with Clarizen," DBV cites to an

_____

[8] In contrast, DBV did nothing to preserve or produce *any* of Hub Harmeling's emails from his account that was used to conduct business for DBV, an issue which Plaintiff raised in December of 2024 in its motion to compel. (Doc. 281, pp. 7, 18–19).

email thread that shows Dan Levinson, rather than Ed Carroll, providing details about Clarizen. (Doc. 418 at 8, citing Doc. 285-2 at Exhibit 8). DBV then contends that Plaintiff failed to produce documents relevant to Clarizen, citing that same email thread. (Doc. 418 at 9, citing Doc. 285-2 at 9). Perhaps understandably given the overwhelming breadth and scope of discovery in this matter, and the large number of documents produced by both sides, DBV has appeared to overlook Plaintiff's production of the key portions of that email thread (DMBVEmails_00225836 and DMBVEmails _00225837) and production of other documents from Mr. Levinson concerning Clarizen (*see, e.g.*, DM_12230 and DM_12326).

Plaintiff understands that DBV would like Plaintiff to not introduce evidence about Clarizen at trial. After all, in March 2021, DBV sent Clarizen a password reset for its new platform and told Clarizen to "migrate all your domains from dmarcian.com to dmarcadvisor.com." (DBV_005286). But DBV has failed to meet its high burden to justify spoilation sanctions. *Blue Sky Travel & Tours, LLC v. Al Tayyar*, 606 F. App'x 689, 698 (4th Cir. 2015); *see also Steves & Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96, 104–05 (E.D. Va. 2018) (nothing that courts in the Fourth Circuit generally apply clear and convincing standard). Moreover, DBV's motion is untimely, and it has

failed to articulate any manner of prejudice. Therefore, DBV's motion to exclude evidence about Clarizen should be denied.

## III. DBV'S MOTION TO EXCLUDE EXPERT TESTIMONY SHOULD BE DENIED.

### A. The opinions of Dr. Levine and Mr. Gray related to both the copyright and trade secrets claims.

DBV does not identify any particular portion of either the Levine Report or the Gray Report that should be excluded. Rather, DBV broadly and incorrectly contends that the reports of Dr. Levine and Mr. Gray only related to the copyright claims. (Doc. 418, pp. 10-11). To the contrary, their opinions also support the trade secrets claims.

Dr. Levine's opinion relates to the following subjects:

*(a)* *Refactoring and Reliance on Original Programming*. The Python code developed by Tim Draegen was "refactored" beginning in 2017 with the help of Dutch and Bulgarian developers. Dr. Levine's opinions described and explained the refactoring process, why that process would not create new proprietary information (as asserted by DBV), that the code DBV produced is the same code that dmarcian provided to reflect what was in use at the end of the parties' contract of cooperation, and that the so-called "legacy" code remains a part of the Python code used throughout the parties'

14

contract of cooperation such that there is really not a "Version 1" and "Version 2." (Doc. 289-5, Exh. 11, 10/31/22 Levine Report, ¶¶22-41; Doc. 289-5, Exh. 18, 08/08/23 Levine Report, ¶¶26-28, 32-44, 50-52). These opinions were not restricted to supporting copyright protection versus trade secret protection, but rather focus on whether Tim Draegen's code continues to be the underlying support for the program used throughout the parties' contract of cooperation.

(b) *Commentary on what DBV provided for inspection.* Dr. Levine commented on some of the roadblocks that DBV inserted into the process through the manner in which it produced its code for inspection. (Doc. 289-5, Exh. 18, 08/08/23 Levine Report, ¶¶45-49). These facts are not specific to the copyright claim.

(c) *Differences between the February 2012 and June 2012 code.* DBV had attacked the copyright registration on the grounds that the original copyright date was February 2012 but the earliest available code was from June 2012. (Doc. 295 at 18). Dr. Levine offered opinions about the February 2012 code and the June 2012 code which DBV filed in connection with its *Daubert* motion. (Doc. 289-5, Exh. 18, 08/08/23 Levine Report, ¶¶23, 29, 53-55). This may be

15

moot for the purposes of determining copyright validity, but his observations during that time period should be admissible as background information on the development of the Python code which is generally relevant to the question of trade secrets.

The word "copyright" is only mentioned twice in Dr. Levine's second report in relation to describing the question at issue of the February 2012 vs June 2012 code, and not at all in his first report. The thrust of Dr. Levine's report is to make clear that DBV did not, as it claimed, develop a new program or substantively, materially, or with originality produced components to which it can make a common law claim of intellectual property protection, particularly under the circumstances of their work in this case, where Plaintiff controlled throughout the process ALL gatekeeping, caretaking and custodial aspects, including the sole authority to determine what, if anything from Defendant would be incorporated into the code, and even then, Plainitff had to rewrite Defendant's sloppy and otherwise ineffective code on most occasions. This fundamental assertion is plainly relevant to trade secrets. There is no basis to exclude his opinions.

Mr. Gray's opinion relates to the program which DBV began developing in a programming language called "C#"[9] after the parties' dispute arose

---

[9] Verbally, this would be described as "C-Sharp".

concerning the Python program which was jointly used by the parties during their cooperation. (Doc. 418-1). Mr. Gray's opinion primarily discusses the lack of a "clean room" development process to protect against use of information from the Python program in the development of the C# program, discussing that personnel who worked on the Python program were also used in the development of the C# program and why that mattered. *Id.* He also discussed some of the structural similarities between the C# program and the Python program which are suggestive of copying. *Id.* at ¶¶68-82. Whether the Python code is protected by copyright or trade secret protection or both, the question Mr. Gray is addressing is whether the C# code was developed in a way that relied on dmarcian's proprietary information.

Just as Dr. Levine's report was not specific to copyright versus other intellectual property rights, Mr. Gray's report is likewise not limited to copyright issues. He mentions the word "copyright" only three times, twice as an example of a need for clean room development (a concern which would equally apply to other IP rights) and once to note the presence of copyright protection statements in the dmarcian files which he felt would

have highlighted to the developers of the C# code the need for a clean room environment.  (Doc. 418-1, Gray Report,  ¶¶44, 78, 81).[10]

## B.    Tim Draegen can offer testimony as a lay witness.

Again, as with Plaintiff's experts, DBV broadly objects to unspecified testimony that it contends Mr. or Mrs. Draegen should be excluded.  The motion in limine should be denied on those grounds alone.

> "A motion in limine is designed to prevent the interjection of specific evidence that is irrelevant, inadmissible, or prejudicial…. Moreover, a motion in limine seeking to prohibit generic, unspecified "prejudicial" testimony would not have been useful. In order to rule on the admissibility of a question and response, the presiding judge would have to hear them as they arose in the context of the case.

*Hemetek v. United States*, No. 3:08-CR-00198, 2012 WL 3870620, at \*9 (S.D.W. Va. Apr. 25, 2012), *report and recommendation adopted*, No. CIV.A. 3:11-0579, 2012 WL 3870605 (S.D.W. Va. Sept. 6, 2012), *aff'd*, 527 F. App'x 261 (4th Cir. 2013); *see also, Short v. Anangel Spirit Compania Naviera, S.A.,* No. CIV.A. 01-1400, 2002 WL 31740707, at \*1 (E.D. La. Dec. 4, 2002) (denying motion in limine seeking to limit testimony by vessel pilots to conditions they observed firsthand and seeking to exclude expert testimony

---

[10] It is worth noting that Mr. Gray's expert deposition was scheduled, but DBV chose not to proceed with it, and the failure to do so affects any arguments DBV could seek to make regarding preclusion.

18

about causation, as there was no specific destination of testimony that defendants deemed objectionable).

The cases cited by DBV do not lend support to its position to exclude unspecified testimony from Mr. (or Mrs.) Draegen. (Doc. 418, p. 11). In *United States v. Ganier*, 468 F.3d 920, 924 (6th Cir. 2006), the defendant sought to exclude testimony by a Special Agent of the IRS who used forensic software to determine what searches were run on some computers at issue. After noting that "computer-related testimony is a relatively new question" (in 2006), the court concluded that a written summary the Special Agent's agents testimony should have been disclosed under Rule 16 of the Federal Rules of Criminal Procedure, but there was no bad faith conduct so the Court declined to suppress the evidence. *Id.* at 927. Similarly, the unpublished opinion in *United States v. Yu,* 411 F. App'x 559, 566 (4th Cir. 2010) dealt with undisclosed expert testimony by a forensic computer examiner in a criminal case regarding the process used to extract data and what it showed. These cases are not remotely similar in nature to the instant case. DBV appears to offer them to try and establish that any testimony about computers and software must be reflected in an expert report, and that is simply not the law.

19

To the contrary, the Draegens can offer testimony as a lay witness and present evidence that is rationally based on their perception. Such testimony often arises and is admissible in the context of an inventor (such as Mr. Draegen) testifying concerning inventions without an expert report, often arising in patent cases for example. *See, e.g.*, *Static Control Components, Inc. v. Future Graphics, LLC,* No. 1:08CV109, 2010 WL 11541810, at *1 (M.D.N.C. Nov. 19, 2010) (denying motion to exclude testimony of inventor in patent case on the grounds he was not disclosed as a retained expert, as no disclosure was required because he was not a retained expert and instead just needed to be disclosed in initial disclosures). Both Mr. and Mrs. Draegen were properly and timely identified as witnesses in initial disclosures and discovery. (Doc. 289-8, p. 28).

Inventors can provide testimony such as describing the design and mechanics of his contributions and what he invented, research that he has personal knowledge about, or the nature of the system that was invented. *CertusView Techs., LLC v. S&N Locating Servs., LLC*, No. 2:13CV346, 2016 WL 6915303, at *1 (E.D. Va. Mar. 7, 2016) (collecting cases); *see also*, *Tax-Right, LLC v. SICPA Prod. Sec., LLC*, No. 3:12CV657, 2013 WL 3791487, at *2 (E.D. Va. July 18, 2013) (inventor may provide background information, including explanation of the problems that existed at the time the invention

was made and the inventor's solution to these problems). Mr. Draegen, as the inventor of DMARC technology, can speak to these issues, and no report from him as a retained expert was required.

There is no basis to exclude unspecified testimony from Mr. Draegen concerning the computer code at issue, or indeed any other unspecified testimony from either Mr. or Mrs. Draegen.

## IV. DBV'S MOTION TO EXCLUDE EVIDENCE REGARDING DBV'S CIVIL CONTEMPT SHOULD BE DENIED.

DBV moves to exclude any civil contempt ruling by this Court entered against it. (Doc. 418, pp. 11-12). DBV has been held in contempt three times by this Court: once for continuing to use the dmarcian trade-marked domain names after being enjoined from use of those marks absent an accompanying disclosure; once for failing to provide financial information as ordered by the Court; and once for failing to fully comply with this Court's order to cure misrepresentations to the Dutch Court. (Docs 80, 125, 401). Absent Defendant opening the door (e.g. through admission of evidence relating to the Dutch proceedings[11] by Defendant which may make the third motion for contempt relevant), Plaintiff does not anticipate offering evidence about the second two contempt findings.

---

[11] Plaintiff has moved to exclude evidence relating to the Dutch proceedings. (Doc. 409, 410).

Here, violation of the injunction by continuing to use the trademarked domains is relevant to Plaintiff's claim of willful and malicious infringement and bad faith, and to Defendant's intent and motive. (See Doc. 51, Second Amended Complaint ("SAC"), at ¶¶ 39, 78, 85, 90, 101-106, 138-148, 234-44). Plaintiff expressly alleged that Defendant would continue its infringing use of Plaintiff's trademarks absent an injunction; here, Defendant continued its abuse of Plaintiff's trademarks *even in the face of an injunction.* (Doc. 51, ¶¶147, 155). This evidence is also relevant to disprove at least three of Defendant's affirmative defenses: its 5th Defense that Plaintiff authorized the use of the trademarks; its 13th Defense based on failure to mitigate; its 29th Defense based on acquiescence; its 36th defense based on good faith. (Doc. 126). DBV was plainly on notice of its obligation to cease use of dmarcian's trademarks absent a disclosure, and intentionally and willfully continued that use despite the court order.

Courts have found violation of court orders to admissible to show willful and intentional conduct, and to show that a party acted in contravention of known obligations. *See, e.g., AlphaMed Pharmaceuticals Corp. v. Arriva Pharmaceuticals, Inc.*, No. 03–20078–CIV, 2005 WL 6742954, at *2 (S.D. Fla. Sepp. 1, 2005) (denying plaintiff's motion in limine to exclude evidence of contempt orders issues because it "is relevant to elements of AlphaMed's

prima facie case of misappropriation of trade secrets, i.e., Defendants'
willfulness and intentional conduct in performing the trash pulls at issue in
this case"); *Wiles v. Dep't of Educ.*, No. 04-0442, 2008 WL 4198506, at *1
(D. Haw. Sept.11, 2008) (admitting into evidence contempt order as "relevant
to the central issue in this case: whether Defendant acted with deliberate
indifference," and finding no unfair prejudice, but allowing the defendant to
propose a limiting jury instruction); *Bowers v. City of Philadelphia*, No. 06-
3229, 2008 WL 5234318, at *4-5 (E.D. Pa. Dec. 12, 2008) (denying
defendants' motion in limine to preclude plaintiff from referencing consent
decrees which put defendants on notice of conditions that it failed to remedy,
evidencing "deliberate indifference").

Plaintiff acknowledges that the Contempt Order was ultimately vacated
due to a change in the law on the grounds that civil contempt sanctions are
invalidated by the Supreme Court's subsequent ruling in *Abitron* that the
Lanham Act does not have extra-territorial application.  (Doc. 402, pp. 15-
16).  However, as this Court also noted, a party must comply with a court
order even if it is ultimately determined to be in error.  *Id.* at 16 (citing *McLean
v. Central States, Southeast and Southwest Areas Pension Fund*, 762 F.2d
1204, 1210 (4th Cir. 1985).  This Court found that DBV continued to use the
dmarcian trademarks after the entry of the injunction and despite repeated

demands by dmarcian to cease doing so because such conduct was in violation of the injunction. (Doc. 80 at p. 10, ¶¶21-25). This Court further found that DBV made "no good faith attempt" to comply with the Preliminary Injunction. (*Id.* at 19–20). This Court further found that the "Preliminary Injunction gave actual and constructive knowledge that using the Plaintiff's trademark as a domain name to redirect visitors to its website constituted trademark infringement." (*Id.* at 20). These findings go directly to the issue of knowledge, intent, motive, maliciousness and bad faith. The fact that *Abitron* subsequently changed the geographical scope of the injunction can be addressed with a limiting instruction. *See, e.g.*, *Johnson*, 974 F.2d at 1413.

Plaintiff urges the Court to deny Defendant's motion in limine to exclude evidence of Defendant's contempt, in particular as to its persistence in abusing Plaintiff's trademarks after entry of the injunction.

## V. DBV'S MOTION TO EXCLUDE EVIDENCE RELATING TO EXTRATERRITORIAL USE OF PLAINTIFF'S TRADEMARKS SHOULD BE DENIED.

As noted in Section IV above, Defendant's continued use of Plaintiff's trademarks after the injunction was entered is relevant to several claims and defenses. The fact that the law changed midway through the case can be addressed in a limiting instruction to make clear that the jury cannot award

damages for purely extraterritorial use of the dmarcian trademarks.  An order broadly excluding the fact of all extraterritorial use of those trademarks will make the admission of evidence unwieldy and artificial, as it is simply a fact of the parties' relationship that the dmarcian name was used abroad in connection with the parties' contract of cooperation and it was the parties' intent that the name be limited to that context.

## CONCLUSION

For the reasons set forth above, Plaintiff urges the Court to deny the Defendant's Motion in Limine.

This the 31st day of January, 2025.

*/s/ Pamela S. Duffy*_____
Pamela S. Duffy, N.C.S.B. No. 18329
pamela.duffy@elliswinters.com
Tyler C. Jameson, N.C.S.B. No. 59348
ty.jameson@elliswinters.com
Ellis & Winters LLP
PO Box 2752
Greensboro, NC 27402
Telephone: (336) 217-4193
*Attorneys for Plaintiff*

OF COUNSEL:
*/s/ David Dorey*_____
David Dorey, DE #5283
Blank Rome, LLP
David.dorey@BlankRome.com
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6418

## AI CERTIFICATION

Undersigned counsel hereby certifies that no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg.

Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 31st day of January, 2025.

*/s/ Pamela S. Duffy*
Pamela S. Duffy, N.C.S.B. No. 18329
pamela.duffy@elliswinters.com
Ellis & Winters LLP
PO Box 2752
Greensboro, NC 27402
Telephone: (336) 217-4193
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served upon counsel for all other parties to this action listed below by efiling a copy of the same utilizing the Western District of North Carolina's efiling system:

Mr. Pressly M. Millen
press.millen@wbd-us.com
Mr. Samuel B. Hartzell
Sam.hartzell@wbd-us.com
Womble Bond Dickinson (US) LLP
P O Box 831
Raleigh, NC 27602
*Attorneys for DMARC ADVISOR BV,*
*f/k/a dmarcian Europe BV*

This the 31st day of January, 2025.

/s/ Pamela S. Duffy
Pamela S. Duffy, N.C.S.B. No. 18329
*pamela.duffy@elliswinters.com*
Ellis & Winters LLP
PO Box 2752
Greensboro, NC 27402
Telephone: (336) 217-4193
*Attorney for Plaintiff*

27