**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**Case No. 1:21-cv-00067-MR**

| | | |
|---|---|---|
| DMARCIAN, INC., *Plaintiff*, v. DMARC ADVISOR BV, f/k/a dmarcian Europe BV, *Defendant*. | ) | **BRIEF IN SUPPORT OF DEFENDANT'S MOTIONS IN LIMINE** |

## INTRODUCTION

These motions renew and update DMARC Advisor's 2025 motions in limine, ECF Nos. 417–418, which the Court discussed but did not decide in February 2025. ECF No. 452 at 84:6–8. They ask the Court to apply three rules at trial.

First, the jury should hear the commands courts gave these parties, but not this Court's preliminary findings or its contempt rulings. The plainest example is one this Court has already recounted: in August 2020, "both Draegen and TDX asked the Enterprise Court in the Netherlands to order an investigation into DMARC Advisor's policies and course of affairs," and on September 7, 2020, that court ordered the investigation and "appointed an independent director with a decisive vote," H.J.M. Harmeling. ECF No. 216 at 2–3. The jury needs that fact because Mr. Harmeling ran DMARC Advisor through 2021: he is the court-appointed director who refused dmarcian's January 2021 terms, ECF No. 360 at 15, who was in charge when DMARC Advisor did what dmarcian now sues over, and whose testimony both sides have designated, ECF Nos. 502–503. Jurors cannot weigh what he did without knowing that a court, not either shareholder, put him there, at Mr. Draegen's own request. dmarcian itself concedes that "the existence of certain Dutch proceedings" may come in "subject to a proper limiting instruction." ECF No. 410 at 19. The same rule admits what the Rotterdam court and this Court ordered the parties to do.

Second, dmarcian should be held to what it pleaded and disclosed: the trade secrets, domains, and statements its complaint names; its counsel's statement that dmarcian would not "claim infringement for any purely extraterritorial conduct," ECF No. 452 at 114:11–12; and its damages disclosures. Its damages figures rest largely on estimates and missing records, so none should reach the jury.

Third, witnesses may give only the opinions an expert report or Rule 26(a)(2) disclosure contains.

The Court should also try punitive damages separately, so that DMARC Advisor's finances reach the jury only if they become relevant. DMARC Advisor asks that the rulings be definitive. Fed. R. Evid. 103(b).

## ARGUMENT

### I. The jury should learn what courts ordered these parties to do, but not this Court's preliminary findings or whom it held in contempt.

The jury should learn what a court ordered these parties to do, because the parties acted under those commands, but not about this Court's preliminary findings or any contempt ruling, because each is "a prior determination that invades the province of the jury." ECF No. 452 at 124:18–19. This exclusion request does not reach rulings that define what is being tried, such as the dismissal of dmarcian's copyright claim, ECF No. 360 at 57, or other-proceeding materials offered for another purpose, such as a party's own statements, *see* ECF No. 452 at 122:15–18. These motions do not address the Enterprise Chamber's findings or the other Dutch

judgments; their effect is a question for the Court, which DMARC Advisor will address separately.

### A. The story of 2021 cannot be told without the Rotterdam court's order requiring dmarcian to comply with the agreement and restore access.

In January 2021, during a court-ordered investigation that Mr. Draegen himself had requested, dmarcian said it would end its relationship with DMARC Advisor on February 1 unless DMARC Advisor accepted new terms. It cut off DMARC Advisor's access the same day, ten days before its own deadline, ECF No. 26-1 ¶ 30; ECF No. 17-2 at 1, and when DMARC Advisor's court-appointed director refused the terms, Mr. Draegen "terminated all cooperation between the parties." ECF No. 360 at 15.

On February 1, the Rotterdam District Court, in a hearing dmarcian chose not to attend, ordered dmarcian "to comply with the agreement existing between the parties during the investigation ordered by the Enterprise Chamber," barred it from "terminating that agreement during that period," and ordered it to restore DMARC Advisor's access within twenty-four hours of service and keep it restored "until the existing agreement between the parties has been validly terminated." ECF No. 410-2 at 4 (¶¶ 3.2–3.3); ECF No. 216 at 3. It also barred Mr. Draegen from interfering with DMARC Advisor's business, personally or through a company managed by him, explicitly including dmarcian. ECF No. 410-2 at 5 (¶ 3.5). dmarcian knew what

the order required. Its chief executive, Shannon Draegen, told this Court that the order required access "in order to service customers," and that on March 4, 2021, "we terminated [DMARC Advisor's] access to dmarcian's data and systems." ECF No. 15 ¶¶ 5, 10. The Hague Court of Appeal set the order aside in May 2023, ECF No. 216 at 13, and the Supreme Court of the Netherlands set that judgment aside in turn and sent the case to Amsterdam, ECF No. 410-2 at 47. On August 4, 2026, the Amsterdam Court of Appeal upheld the order through September 8, 2021, the day Mr. Draegen's shares in DMARC Advisor were transferred by Mr. Draegen to TDX, without deciding when the distribution agreement itself ended. Ex. 1 (Aug. 4, 2026 judgment, sworn translation), §§ 2(xv)–(xvi), 3.8, 4.

The order is necessary context for four questions the jury will decide.

*Whether and when the agreement ended*. dmarcian's surviving contract claim rests partly on DMARC Advisor's conduct "following the Plaintiff's termination of the agreement." ECF No. 360 at 22. DMARC Advisor's surviving defenses include prior material breach and repudiation. ECF No. 126 at 20; ECF No. 360 at 53–54. The Fourth Circuit recognized that the license "may well have given dBV the right to operate under the 'dmarcian' name within a certain geographic footprint." *dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 144 (4th Cir. 2023). What DMARC Advisor did after February 1 makes sense only alongside an order, entered that day, forbidding the termination dmarcian said had just taken effect. Context of

that kind is "universally offered and admitted as an aid to understanding." Fed. R. Evid. 401 advisory committee's note to 1972 proposed rules. The order is also context for dmarcian's March 4 cutoff, made with the order in hand, which is conduct at issue under those defenses, not an "other" act.

*Authorization.* Nearly every claim turns on whether DMARC Advisor's use was authorized. Trademark infringement requires use "without the consent of the registrant," 15 U.S.C. § 1114(1); the trade-secret and trespass claims require use without consent or authority, ECF No. 360 at 43–44; and DMARC Advisor's authorization defense to every claim survived summary judgment, ECF No. 126 at 19; ECF No. 360 at 55. Whether dmarcian withdrew its consent effective February 1 turns partly on an order, entered that day, to keep the agreement in place.

*Willfulness and good faith.* dmarcian's 2025 proposed verdict sheet asks the jury to find willfulness, malice, and bad faith, ECF No. 448 at 9, 11, 18, and DMARC Advisor's good-faith defense survived, ECF No. 126 at 22; ECF No. 360 at 56. DMARC Advisor's 2021 view of its rights cannot be judged without the order that shaped it.

*Why DMARC Advisor kept operating.* Asked whether DMARC Advisor's claimed right to use the mark "was the continuation of the '16 agreement and the Rotterdam court order," Martijn Groeneweg answered, "That's correct." He went on: "So the 2016 agreement contained the right to use the Dmarcian name," and

"that's why we continued using that name." TDX 30(b)(6) Dep. 305:8–18 (Nov. 14, 2023) (Ex. 2). The order forbade dmarcian to terminate that agreement. Without it, the jury cannot weigh that answer, or his account that DMARC Advisor built its own platform because dmarcian "refused to follow up that order." *Id.* at 304:13–305:6.

The order is not hearsay: its commands assert nothing true or false, and DMARC Advisor offers them for what they required. Fed. R. Evid. 801(c)(2).

The Court said in 2025 that "what the other tribunal did" is not relevant "unless it is binding on this court." ECF No. 452 at 122:20–23. But the February 1 order's commands bound dmarcian when it cut off access, and the jury cannot judge that conduct without them. Rule 403 favors admission: a short neutral statement and a limiting instruction suffice. In any event, dmarcian's own case puts the order in issue. Its defamation claim rests primarily on DMARC Advisor's March 2021 email calling the cutoff a data breach, ECF No. 360 at 40. That email attached the February 1 order, and dmarcian called DMARC Advisor's description of the order false. ECF No. 8 ¶¶ 30–31. dmarcian cannot have the jury judge DMARC Advisor's conduct under an order the jury never sees.

**B. This Court's preliminary-injunction findings and its contempt rulings should not reach the jury.**

This Court's injunction rests on findings that dmarcian was likely to succeed on claims the jury will try, ECF No. 39 at 42–66, and its commands assume them, barring changes to "the trade secret source code," ECF No. 403 at 2. The Fourth

Circuit added its own labels. *E.g.*, ECF No. 476 at 14–15, 19. These judicial findings "would likely be given undue weight by the jury." *Nipper v. Snipes*, 7 F.3d 415, 418 (4th Cir. 1993) (cleaned up). The jury should hear only a neutral statement of what the injunction required.

Contempt rulings should stay out too. This Court has held DMARC Advisor in civil contempt three times: the first, over DMARC Advisor's domain names, is vacated, ECF No. 402 at 16–17; the second was purged, *id.* at 5 n.2; and the third stands but is reviewable after final judgment, ECF No. 476 at 27. The Court has set "an awfully high bar" for collateral matters, "including such things as the defendant having been held in contempt," ECF No. 452 at 122:2–4, and told the parties to "stick to asking them about facts rather than determinations," *id.* at 124:21–22.

dmarcian argued in 2025 that the domain-name contempt shows willfulness. ECF No. 430 at 22–24. The jury should learn what the injunction required, and no one disputes that DMARC Advisor knew of it. But any contempt during this lawsuit does not relate back to the claims to show that DMARC Advisor tends to act willfully; that is propensity evidence. Fed. R. Evid. 404(b)(1).

The facts behind the vacated contempt should stay out. This Court vacated that finding because DMARC Advisor's use of foreign "dmarcian" domains "occurred outside of the United States." ECF No. 402 at 16. Use of domains that "were not accessible using IP addresses from the United States," *id.* at 15, is conduct

the Lanham Act does not reach and so is an "other" act under Rule 404(b), not conduct at issue. Four of those domains are among the ten dmarcian pleaded in Count Fourteen, ECF No. 51 ¶ 231. If dmarcian can prove that DMARC Advisor used them in United States commerce, that proof comes in, but the contempt finding and its vacatur should stay out either way.

### C. The jury should hear that both shareholders asked the Dutch court for an investigation and that the court installed Mr. Harmeling as an independent director with a decisive vote.

Mr. Harmeling will testify by designation that both Mr. Draegen and TDX "asked the Enterprise Court to appoint a director, and that was me," Harmeling Exam. Tr. 13 (Apr. 2, 2025) (ECF No. 503-2 at 17), and the jury will ask why he was running DMARC Advisor. The answer is proper background. *See* ECF No. 360 at 55. Both answers are facts this Court has recounted: who asked for the investigation, and who appointed him. ECF No. 216 at 2–3. Mr. Draegen agreed that Mr. Harmeling was "appointed at that request," though his "first request" was to remove TDX. T. Draegen Dep. 55:3–16 (Nov. 28, 2023) (Ex. 3). The requests matter because they were made, not for their truth, and dmarcian concedes that the Dutch proceedings evidence may come in with a limiting instruction. ECF No. 410 at 19.

## II. dmarcian should offer no damages figure at trial, because it never disclosed a computation backed by records it produced.

dmarcian computed its damages in its December 2023 interrogatory answers, Deposition Exhibit 18, and two exhibits to them: a spreadsheet allocating its

operating costs, Deposition Exhibit 19, and a table of employee time, Deposition Exhibit 21. Quinlan Decl. ¶ 2 (Ex. 4); Ex. 5 (Deposition Exhibits 18, 19, and 21). In February 2025, the Court told dmarcian that, "[w]ithout the backup available in court when you try the case, your spreadsheet is useless," ECF No. 452 at 92:23–24, and later said that "if there's a big problem with that, then I'll revisit the motion, but I'll be surprised," *id.* at 101:11–12. Two months later, more than sixteen months after discovery closed, ECF No. 258 at 3; ECF No. 277, dmarcian produced what it calls its backup, which Ann Quinlan, a project manager at DMARC Advisor's counsel, reviewed. Quinlan Decl. ¶¶ 3–4 & Ex. A. What dmarcian produced shows a spreadsheet built on estimated revenue and ordinary overhead, almost no records for 2016, and a 2020 tax return that reports no wages at all. *Id.* ¶ 5 & Ex. B.

A party claiming damages must disclose "a computation of each category of damages claimed" and make available "the documents or other evidentiary material . . . on which each computation is based." Fed. R. Civ. P. 26(a)(1)(A)(iii). The disclosure "must state the types of damages that the party seeks, must contain a specific computation of each category, and must include documents to support the computations." *Intercollegiate Women's Lacrosse Coaches Ass'n v. Corrigan Sports Enters., Inc.*, 698 F. Supp. 3d 814, 818–19 (M.D.N.C. 2023) (quoting *Silicon Knights, Inc. v. Epic Games, Inc.*, No. 5:07-CV-275-D, 2012 WL 1596722, at *1 (E.D.N.C. May 7, 2012)). What was not disclosed may not be used "at a trial, unless

the failure was substantially justified or is harmless," and the burden on both is dmarcian's. Fed. R. Civ. P. 37(c)(1); *Intercollegiate Women's Lacrosse Coaches Ass'n*, 698 F. Supp. 3d at 819. And a summary comes in only if the proponent "make[s] the underlying originals or duplicates available," Fed. R. Evid. 1006(b), so the other side can "test the accuracy of the chart's summarization," *United States v. Janati*, 374 F.3d 263, 273 (4th Cir. 2004). DMARC Advisor also asked for those records, and dmarcian agreed in June 2023 to produce them. ECF No. 226-1 at 17; ECF No. 226-3 at 78. It never fully did. The April 2025 production includes transaction reports for 25 expense accounts, none covering any period before 2017, Quinlan Decl. ¶ 3(c), but no production includes a payroll record for any year, a financial statement beyond three month-end income statements, or anything for 2016 beyond three advertising invoices. *Id.* ¶¶ 3, 5.

### A. The "indirect share" claim rests on estimated, mixed-currency revenue and, for 2016 and 2020, largely on costs no produced record supports.

dmarcian's largest claim, [redacted], is a share of what dmarcian spent to run itself from 2016 through 2021, allocated by "[redacted]" Dep. Ex. 19, at 1–2 (ECF No. 289-8 at 51–52).

For 2020, the spreadsheet's figure for DMARC Advisor's revenue is [redacted]. Dep. Ex. 19, at 2. For 2021, it is "[redacted]

[redacted],” *id.*: [redacted]. For 2017 through 2019, the spreadsheet [redacted], and Ms. Draegen did not know whether it did. Dep. Ex. 18, at 9; Dep. Ex. 19, at 1; S. Draegen Dep. 202:18–20, 203:13–16 (Dec. 8, 2023) (ECF No. 289-8 at 10).

The expense side does not comply with the rules either. Wages, benefits, and payroll taxes are [redacted] of the [redacted] base, [redacted], Dep. Ex. 19, at 1, and dmarcian produced no payroll register or other record of wages paid for any year. Its tax returns and month-end statements report payroll totals for 2017 through 2019 and 2021, *see* Quinlan Decl. ¶ 3(a)–(b), but nothing supports 2016 or 2020. *Id.* ¶ 5(b)–(c), (e). For 2016 there are no books at all, though that year's base includes a single, undescribed "Other Expense" of [redacted], [redacted] of that year's total. Dep. Ex. 19, at 1; Quinlan Decl. ¶ 5(c). For 2020, wages, benefits, and payroll taxes are [redacted] of the [redacted] expense base, Dep. Ex. 19, at 1; no produced record supports them; and the only 2020 return dmarcian produced, a California Form 100, reports no receipts and no wages. Quinlan Decl. ¶ 5(b), (e) & Ex. B, at 18. That year's share alone is [redacted]. Dep. Ex. 19, at 1. Rule 26(a)(1)(A)(iii) required the documents "on which each computation is based," and Rule 1006 the originals; for these lines there are none.

### B. The personnel-time figure is Ms. Draegen's estimate, not a summary of any record, and Rule 701 does not allow it.

dmarcian's second-largest figure, [redacted], for staff time spent on customer confusion, multiplies, for six departments, a percentage of time, a "[redacted] a headcount, and three years. Dep. Ex. 18, at 8 (ECF No. 289-8 at 44); Dep. Ex. 21 (ECF No. 289-8 at 157). Ms. Draegen did not "put literal values" for salaries, using for sales "a fairly low estimate of the average annual salary," and she counted her own time to "research, collect evidence, communicate with counsel, appear in court." S. Draegen Dep. 213:1–5, 218:16–21 (ECF No. 289-8 at 13–14). At the table's own salaries and headcounts, the people it counts would cost [redacted] a year, more than the [redacted] in 2021 wages dmarcian lists, which Ms. Draegen agreed include them. Dep. Ex. 19, at 1 (ECF No. 289-8 at 51); S. Draegen Dep. 211:9–16 (ECF No. 289-8 at 12). dmarcian has produced no time sheet, time log, or other record of that time. Quinlan Decl. ¶ 5(d). Lay opinion must be "rationally based on the witness's perception," Fed. R. Evid. 701(a), and no one perceives what share of six departments' hours went to customer confusion.

### C. No surviving claim lets dmarcian recover its own costs, a royalty it already took in kind, or statutory damages the statutes do not provide.

Even with records, dmarcian's overhead would not measure any loss DMARC Advisor caused. The DTSA allows "damages for actual loss caused by the misappropriation," 18 U.S.C. § 1836(b)(3)(B)(i)(I); a Lanham Act plaintiff must

prove "a causal link between those damages and the Lanham Act violation," *Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279, 286 (4th Cir. 2003); and North Carolina trade-secret damages must be "proximately caused" by the misappropriation, *Med. Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 661 (2009). Ms. Draegen, who verified the figures, could not say what they rest on. Deanna McKay built the spreadsheet, and Ms. Draegen "cannot speak to her logic." S. Draegen Dep. 191:4–6, 220:10–15 (ECF No. 289-8 at 7, 14). Asked which numbers add up to the largest figure, she "cannot point you to all of the cells of that number." *Id.* at 193:19–194:1 (ECF No. 289-8 at 8). She also said that dmarcian "cannot pinpoint one area of damages to one single line item." *Id*. at 254:24–255:7 (ECF No. 289-8 at 23). Ms. Draegen's theory is that "every activity that Dmarcian created and acted upon was a benefit to dBV," *id.* at 192:8–10 (ECF No. 289-8 at 7), so she claims all of dmarcian's advertising, including [redacted] spent in 2023, *id.* at 205:8–206:6 (ECF No. 289-8 at 11), and its charitable donations, "a decision to build our brand," *id.* at 209:21–25 (ECF No. 289-8 at 12). She claimed a [redacted] "Cash Withdrawal" she could not explain "right here and right now." *Id.* at 225:11–24 (ECF No. 289-8 at 16). dmarcian would have paid such costs anyway, and much of the spending came years before the December 2019 contract breach it alleges. ECF No. 51 ¶ 122.

dmarcian calls its 2021 share, [redacted], the cost of customers it had "to provide free services to in order to uphold our end of that amended injunction," S.

Draegen Dep. 257:22–25 (ECF No. 289-8 at 24), yet Ms. Draegen also called it "the indirect operational costs of the entire business," *id.* at 258:10–12 (ECF No. 289-8 at 24). Those costs, she said, "cannot be divided any further"; the share was "the most logical number that we could provide." *Id.* at 259:17–20 (ECF No. 289-8 at 24). The [redacted] in "direct costs specifically incurred for the particular benefit of Defendant from 2016 to 2020," Dep. Ex. 18, at 7, is nearly all dmarcian's own travel while the parties worked together. Dep. Ex. 19, at 1, 16, 18 (ECF No. 289-8 at 51, 66, 68). And the [redacted] for consultants hired in 2021 "to replace the services being provided by Defendant" was the cost of dmarcian's own European business. Dep. Ex. 18, at 8. Those consultants were "Ton and Ben," *id.*, whom a Dutch court barred on April 23, 2021, from representing dmarcian in Europe, Africa, and Russia while the Enterprise Chamber's director remained in office, ECF No. 410-3 at 2; ECF No. 93-2 at 29 (¶ 7.87), yet the ledger behind the [redacted] shows the payments continuing every month through December 21, 2021. Dep. Ex. 19, at 13 (ECF No. 289-8 at 63). These figures are irrelevant and unfairly prejudicial. Fed. R. Evid. 401–403.

For the years the parties worked together, dmarcian's claimed royalty fails on its admission that it "[redacted]," on the understanding that

the code would serve both parties. Dep. Ex. 18, at 9; *see* ECF No. 149 ¶ 12. A fee already paid in kind is not a loss.

The statutory figures fail too. The "$[redacted]" in copyright damages is for a claim the Court dismissed with prejudice. Dep. Ex. 18, at 11; ECF No. 360 at 57. The "$[redacted]" exists only "[i]n a case involving the use of a counterfeit mark," 15 U.S.C. § 1117(c). The term excludes marks used by one "authorized to use the mark," 15 U.S.C. § 1116(d)(1)(B), and even a former licensee's continued use "is not the use of a counterfeit mark," *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1192 (6th Cir. 1997).

### D. dmarcian never tied DMARC Advisor's revenue to any wrong or computed its reputational harm, and it disclosed no damages on four claims.

dmarcian seeks "[redacted]" since 2021. Dep. Ex. 18, at 7. Its 2022 initial disclosures tabulated DMARC Advisor's reported revenue, expenses, and net profit for 2020 through 2022. Dep. Ex. 17, at 6 (ECF No. 289-8 at 33). Its December 2023 answers instead claim gross revenue, asserting that "[redacted]" from dmarcian's property. Dep. Ex. 18, at 7. Neither measures what any alleged wrong earned. The trade-secret statutes reach "unjust enrichment caused by the misappropriation," 18 U.S.C. § 1836(b)(3)(B)(i)(II), and Lanham Act profits run only to "sales of articles bearing the infringing mark," *see Mishawaka Rubber & Woolen Mfg. Co. v. S.S.*

*Kresge Co.*, 316 U.S. 203, 206 (1942) (1905 Act), in U.S. commerce, *see Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 415 (2023). Section 1117(a) makes "defendant's sales" dmarcian's burden, and dmarcian has identified no sale in U.S. commerce and tied no revenue to a trade secret.

dmarcian's "[redacted]" also has no number; its losses "[redacted]." Dep. Ex. 18, at 10–11. None has been calculated.

The Court left the sufficiency of dmarcian's damages evidence for "a motion in limine or at trial." ECF No. 360 at 52. dmarcian's initial disclosures named no damages for computer trespass (Count Eight), common-law infringement (Count Twelve), or unfair and deceptive practices (Count Fifteen), and for cybersquatting (Count Fourteen) sought only "the forfeiture, cancellation, or transfer to Plaintiff, of Defendant's domain name." Dep. Ex. 17, at 4–5 (ECF No. 289-8 at 31–32). Its December 2023 answers tie none of their ten categories to those claims or to any other; the nearest, [redacted]" names no claim and computes nothing. Dep. Ex. 18, at 6–12. dmarcian should present no damages on them, including statutory damages of up to "$100,000 per domain name." 15 U.S.C. § 1117(d).

### E. The remedy is exclusion now, not a hearing at trial that would give dmarcian a third chance to supply what it withheld.

Rule 37(c)(1) “generally requires exclusion of evidence that a party seeks to offer but has failed to disclose.” *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003). dmarcian has had two chances. The first was discovery, where its December 2023 answers said the source documents “can be produced to the extent required per F.R.E. 1006.” Dep. Ex. 18, at 7. Its later offers of a supervised look at its “live system” on a laptop, ECF No. 430-1 at 1–2, offered access to a database, not the documents “on which each computation is based,” and dmarcian itself later chose production. The second chance followed the Court’s 2025 warning. dmarcian chose what to produce, writing that its backup “satisfies our obligations both under the law as respects admissibility of evidence supporting our damages claims and under FRE 1006.” Quinlan Decl. ¶ 4 & Ex. A. It is held to that choice. Its own Expensify exports link to receipts stored at expensify.com that it never produced. *Id.* ¶ 5(f) & Ex. C. dmarcian may say that DMARC Advisor could then have deposed a records custodian, but an opponent’s “ability to depose witnesses” does not satisfy Rule 26(a)(1)(A)(iii), and the burden stays with the party that failed to disclose. *Silicon Knights*, 2012 WL 1596722, at *5–6. A foundation hearing at trial, which dmarcian may request, would be its third chance and would force DMARC Advisor “to react to [the evidence] for the first time when a witness utters it on the witness stand.” *Intercollegiate Women’s Lacrosse Coaches Ass’n*,

698 F. Supp. 3d at 819. And the Court's question, whether dmarcian could show that "line 1 is supported by Bates numbers 1061 to 1082," ECF No. 452 at 92:11–12, now has its answer: for the payroll lines that are more than 70 percent of the base, there is no underlying record for any year, only totals on returns and month-end statements for four of six years; for 2016 there is nothing at all; and the revenue inputs were estimates. Quinlan Decl. ¶¶ 3, 5 & Ex. B.

As in *Silicon Knights*, dmarcian should be permitted to offer evidence that it was harmed but should "not be allowed to provide a computation of damages." 2012 WL 1596722, at *9. dmarcian should state no amount of damages through any witness, exhibit, or argument, including in opening, and should not offer Deposition Exhibits 19 and 21 or any summary drawn from them. At a minimum, each figure addressed in Parts II.A through II.D should be excluded on its own ground. Fees, costs, and any enhancement are for the Court after trial.

## III. dmarcian should be held to the claims it pleaded and to the conduct its counsel said it would rely on.

Parties "cannot amend their complaints through briefing or oral advocacy." *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013). Nor should dmarcian be allowed to do so through its jury instructions, verdict sheet, or testimony. Its 2025 proposed verdict sheet and instructions, ECF Nos. 448–449, show what it intends to argue. These motions in

limine seek no judgment on any claim; they ask only that the issues tried track the pleadings and the discovery record.

### A. The trade-secret claims should be limited to the six categories dmarcian pleaded, and dmarcian should identify the code it claims before openings.

The operative complaint pleads six categories of alleged trade secrets. ECF No. 51 ¶ 162. dmarcian's 2025 proposed verdict sheet adds "business development plans and intelligence" and expands the code to "related tools, documentation and configuration information." ECF No. 448 at 3–4; ECF No. 449-3 at 1. Its interrogatory answer puts the "specifics" in the complaint, then claims "all business records, business information, and business systems necessary to implement the dmarcian business." ECF No. 317-7 at 2. A definition under which "nearly [the plaintiff's] entire business is a trade secret" identifies nothing, *Sysco Mach. Corp. v. DCS USA Corp.*, 143 F.4th 222, 229 (4th Cir. 2025), so only the six pleaded categories should go forward.

dmarcian also claims "all of the Code" except third-party and public-domain material, Pl.'s Suppl. Resp. to Interrog. No. 11, at 2 (Aug. 17, 2023) (Ex. 6). It must describe its secrets "in sufficient detail to establish each element," *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 661 (4th Cir. 1993), and should name its claimed files before openings.

### B. The cybersquatting claim should be limited to the ten domain names the complaint pleads.

Count Fourteen defines "the Infringing Domains" as ten names. ECF No. 51 ¶ 231. dmarcian's 2025 proposed verdict sheet lists twenty-six. ECF No. 448 at 13–14. "[I]ncluding inter alia" does not plead sixteen more.

### C. The defamation claim should be limited to the four statements pleaded, not Mr. Draegen's reputation.

Count Six pleads four statements, ECF No. 51 ¶ 159, and the Court denied summary judgment on those four: the data-breach notice and the three other statements listed in paragraph 159. ECF No. 360 at 40–41. dmarcian means to try more. Its 2025 proposed verdict sheet asks only whether DMARC Advisor made "false statements about the Plaintiff," ECF No. 448 at 19, and it has already put a March 2023 email to a Polish customer before the Court as "false rhetoric," ECF No. 293 ¶¶ 22–25; ECF No. 293-4 at 1–2. The ruling DMARC Advisor seeks is evidentiary: no statement other than the four may be offered or argued as a defamatory publication or as a source of defamation damages, and a later communication admitted on some other claim comes with an instruction that it is not part of Count Six. Fed. R. Evid. 401–403. Whether the verdict sheet should list the four is for the charge conference.

For the same reason, dmarcian should not be permitted to offer evidence that Mr. Draegen's own reputation suffered. Count Six is dmarcian's claim; Mr. Draegen

is not "a party to the litigation," T. Draegen Dep. 321:11–14 (Dec. 5, 2023) (ECF No. 323-5 at 9), and his reputation is not at issue.

### D. No witness or lawyer should call the mark "registered," or invoke a registration presumption, for any period when no registration was in force.

"[W]hatever benefits a federal registration confers are lost when that registration is canceled." *Action Temporary Servs., Inc. v. Labor Force, Inc.*, 870 F.2d 1563, 1566 n.9 (Fed. Cir. 1989) (citing *Anderson, Clayton & Co. v. Krier*, 478 F.2d 1246, 1248 (C.C.P.A. 1973)); *accord Now-Casting Econ., Ltd. v. Econ. Alchemy LLC*, No. 23-947, 2024 WL 2720235, at *2 (2d Cir. May 28, 2024); 5 *Callmann on Unfair Competition, Trademarks and Monopolies* § 26:104 (4th ed., Aug. 2026 update) ("An expired or cancelled registration has no evidentiary weight."). The Court should bar any presumption from the cancelled registration or, at the least, any presumption for the periods when no registration was in force.

### E. dmarcian should be held to its counsel's statement that it will not claim infringement for purely extraterritorial conduct.

dmarcian's counsel said its "intent is not to claim infringement for any purely extraterritorial conduct." ECF No. 452 at 114:10–12. Sections 1114(1)(a) and 1125(a)(1) "extend only to claims where the claimed infringing use in commerce is domestic." *Abitron*, 600 U.S. at 415. dmarcian agreed the jury can be told it "cannot award damages for purely extraterritorial use." ECF No. 430 at 24–25.

### F. The interference claims should be limited to the customers and prospects dmarcian identified by name in discovery.

dmarcian's interrogatory answers identify the customers listed in their Exhibit B, trial customers in Shannon Draegen's declarations, and "any and all Defendant customers and potential customers" who received the data-breach notice. ECF No. 289-8 at 40–41. The last group names no "particular business." *Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 368 N.C. 693, 701 (2016). dmarcian should not be permitted to offer evidence that DMARC Advisor interfered with any customer or prospect it did not name, or seek interference damages for one. See Fed. R. Civ. P. 37(c)(1).

## IV. Witnesses may give the jury only the opinions an expert report or Rule 26(a)(2) disclosure contains.

A retained expert's report must contain "a complete statement of all opinions the witness will express." Fed. R. Civ. P. 26(a)(2)(B)(i). An undisclosed opinion stays out "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). That rule bars any new opinions of dmarcian's experts, Dr. John Levine and Stephen Gray; testimony from anyone on what is a trade secret; and Tim and Shannon Draegen's comparisons of the parties' code.

### A. Dr. Levine and Mr. Gray may not give trade-secret or contamination opinions.

No report from either expert identifies a trade secret or applies the statutory definition. *See* Levine Suppl. Decl. ¶ 31 (Jan. 28, 2026) (Ex. 7) (the only use of the

term). After Dr. Levine confirmed his reports held all his trial opinions, Levine Dep. 103:23–104:4 (May 14, 2026) (Ex. 8), dmarcian's counsel read him language tracking the statutory definition, and he agreed the code's design choices fit it. *Id.* at 112:8–18, 116:11–16. He offers no opinion that DMARC Advisor used a dmarcian trade secret in building its newer platform. *Id.* at 84:15–25, 109:9–14. Mr. Gray's report has Mr. Kalkman, a developer for DMARC Advisor, "contaminating the C# developers" who wrote its newer platform. Gray Suppl. Rpt. ¶ 7 (Feb. 3, 2026) (Ex. 9). On redirect that somehow became a rule, resting on Mr. Kalkman's testimony, rather than code analysis: anyone exposed to both systems is "by definition, contaminated." Gray Dep. 30:18–22, 83:19–84:3 (May 20, 2026) (Ex. 10).

Under the factors in *S. States*, 318 F.3d at 596–97, exclusion follows. The opinions came at the end of each deposition, with no report for DMARC Advisor's expert to answer, and without explanation. The ability to cross-examine "is not the ability to cure." *Id.* at 598 (quoting the district court). dmarcian made the strategic choice to disclose no trade-secret opinions in any report, and its own counsel's deposition questions cannot reverse it.

The 2026 supplements do not fill the gap. On May 2, 2025, dmarcian called them "in process," the Court said to treat issues "as though they are arising two or three weeks before trial," and DMARC Advisor objected. ECF No. 490 at 16:5–17, 17:2–5, 23:20–24:3. They came nine months later, and neither identifies a trade

secret, applies the statutory definition, or says that DMARC Advisor used one: Mr. Gray's opinions are that the C# developers "were exposed to and benefited from" dmarcian's code and database design, Gray Suppl. Rpt. ¶¶ 16–17, and Dr. Levine's one use of the term is in defining clean-room design, Levine Suppl. Decl. ¶ 31.

### B. No witness may tell the jury what is or is not a trade secret.

The Court has said as much, barring any "expert who comes up with some opinion that he didn't put in his report" and admitting code evidence "without that expert ever offering an opinion about what is or is not a trade secret." ECF No. 452 at 114:23–25, 115:4–7. Testimony that "draws a legal conclusion by applying law to the facts is generally inadmissible." *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006).

### C. The Draegens may testify to what they saw and did, but not compare the parties' platforms or code.

dmarcian never disclosed either Draegen under Rule 26(a)(2)(A) or (C). The Court allowed a party "a slightly broader interpretation of 701," but not a "boundless" one. ECF No. 452 at 118:2–3, 118:24. A witness describing his own work gives testimony that is "largely fact based." *Id.* at 120:17–121:1. Comparing the parties' platforms or code is different: it requires analyzing code the witness did not write, which is "specialized knowledge." Fed. R. Evid. 701(c). The Fourth Circuit vacated a judgment that admitted such testimony from a witness whose knowledge "derived from his investigation and his analysis of the data he collected."

*Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200, 203–04 (4th Cir. 2000). The Draegens may describe dmarcian's history and services, but not offer expert testimony camouflaged as fact testimony.

### V. The Court should try punitive damages in a second phase and keep DMARC Advisor's finances out of the first.

DMARC Advisor's net worth and ability to pay bear only on the amount of any punitive award. *See* N.C. Gen. Stat. § 1D-35(2)(i). Rule 42(b) governs bifurcation here, and a single trial is the usual course. *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 974–75 (4th Cir. 2020). But *McKiver* also held that the district court "should have bifurcated the trial pursuant to Federal Rule of Civil Procedure 42(b) in order to avoid any undue prejudice associated with" evidence of the defendant's corporate parents' finances. *Id.* at 976. dmarcian's 2025 proposed verdict sheet asks one jury to set punitive damages on three claims against a Dutch company, ECF No. 448 at 10, 12, 21, and net-worth evidence invites verdicts that "express biases against big businesses, particularly those without strong local presences." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003) (quoting *Honda Motor Co. v. Oberg*, 512 U.S. 415, 432 (1994)). Punitive damages, and that evidence, should wait for a second phase; at a minimum, the amount should.

## CONCLUSION

The Court should enter the definitive rulings requested in Parts I through V.

Dated: October 20, 2026

Respectfully submitted,

**WOMBLE BOND DICKINSON (US) LLP**

*<u>/s/ Samuel B. Hartzell</u>*
Ripley Rand, NC State Bar No. 22275
Samuel B. Hartzell, NC State Bar No. 49256
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
919-755-2112
Ripley.Rand@wbd-us.com
Sam.Hartzell@wbd-us.com

*Counsel for Defendant DMARC Advisor BV*